TALIS J. COLBERG
ATTORNEY GENERAL
Brenda B. Page
Assistant Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Phone:  (907) 269-5135
Fax:  (907) 258-4978

Attorney for the State of Alaska, Department
of Transportation and Public Facilities

IN THE DISTRICT COURT FOR THE UNITED STATES
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ELSA BILLINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF TRANSPORTATION AND PUBLIC ) | |
| FACILITIES ) | |
| ) | |
| Defendant. ) | |
| _____ ) | Case No.  3:05-cv-0240 (TMB) |

**MOTION FOR SUMMARY JUDGMENT**

Defendant, State of Alaska, Department of Transportation and Public Facilities ("DOT/PF"), by and through the Office of the Attorney General, submits this motion for summary judgment.

**I.       INTRODUCTION**

This case concerns Ms. Billingham's termination from employment at Airfield Maintenance at Ted Stevens Anchorage International Airport.  Ms. Billingham initially filed an expansive complaint against DOT/PF and numerous individual

defendants in this lawsuit. Because this Court previously dismissed most of her claims, however, Ms. Billingham's only remaining claims are: (1) that her termination from DOT/PF in June 2004 was retaliatory and discriminatory based on her sex and age; and (2) that DOT/PF management retaliated against her after her termination by "blacklisting" her from employment in finding her ineligible for rehire.

Ms. Billingham's claims should be dismissed because:

- Ms. Billingham was not performing according to her employer's legitimate expectations;

- No employees with a discipline and performance history similar to Ms. Billingham's were treated more favorably;

- Ms. Billingham has provided no evidence that her termination was merely a pretext for discrimination or retaliation;

- DOT/PF acted in good faith and in accordance with the terms of the applicable Collective Bargaining Agreement and supplementary Last Chance Agreement in terminating Ms. Billingham's employment;

- Ms. Billingham was ineligible for rehire at DOT/PF because she was terminated for performance problems.

For all of these reasons, the State respectfully requests that the Court grant its motion for summary judgment and dismiss Ms. Billingham's remaining claims.

II.        STATEMENT OF FACTS

A.      **Ms. Billingham Had A History of Performance Problems Before Her Employment At Airfield Maintenance**

When DOT/PF hired Ms. Billingham in 1994, she was 44 years old. (Bill. Dep. at 13, 100-01).[1]  In the thirteen years prior to Ms. Billingham's employment with DOT/PF, she was terminated from at least six positions because of performance problems.  (Bill. Dep. at 26-18, 33-34, 56, 72; Bill. Dep. Exhs. 1-3).  Ms. Billingham specifically recalls that:

- She was terminated for cause from LHD & Associates in 1981 for "borrowing" a pick-up truck and taking a drive around the North Slope without authorization (Bill. Dep. at 71-72);

- She was terminated for safety reasons from Northwestern Construction in 1981 because she "hit something" while driving on the job (Bill. Dep. at 68-70);

- She was discharged from Kiewit in 1983 because she took a position running a loader for which she was not qualified (Bill. Dep. at 67-68);

- She was discharged for performance reasons from a surveying position with Alpha Tech. Incorporated in 1983 because she "had made a mistake with the numbers" (Bill. Dep. at 65-67);

---

[1]      Relevant deposition transcript excerpts and deposition exhibits are attached to this motion as follows: Billingham Deposition ("Bill. Dep.") attached as Exh. A; Ashton Deposition attached as Exh. B; Dougherty Deposition attached as Exh. C; Johnson Deposition attached as Exh. D; Meers Deposition attached as Exh. E; Newbill Deposition attached as Exh. F.

- She was discharged for performance reasons from a driver position with Enserch in 1989, when she continued to drive a truck with a radiator leak (Bill Dep. at 55-56, 62-65);

- She was discharged from a water truck driver position with Eastwind in 1994 when the rear end went out of the truck while she was driving (Bill. Dep. at 39-43).

Ms. Billingham accepts responsibility for some of the terminations, but believes that many were the result of discrimination. (Bill. Dep. at 42-43, 59, 63-72).

In 1994, when Ms. Billingham applied for employment with DOT/PF, she failed to reveal that she had been terminated from previous positions. (Bill. Dep. at 27-28, 30, 39-44; Bill. Dep. Exhs. 1-2). Despite certifying that her application was true and complete, Ms. Billingham admits that she knowingly withheld information from DOT/PF. (Bill. Dep. at 30-31, 44; Bill. Dep. Exh. 2).

### B.    Ms. Billingham Had Repeated Performance And Conduct Problems Throughout Her Employment At Airfield Maintenance

Airfield Maintenance hired Ms. Billingham in May 1994 as a Laborer, Wage Grade 58.[2] (Bill. Dep. at 103; Bill. Dep. Exh. 15). In June 1998, Ms. Billingham

---

[2]    Wage Grade 58 is an entry level position and the lowest paying wage grade for a laborer position. (Mushat Aff. ¶ 4). As the wage and experience level increases in a position classification, the wage grade number decreases. (Mushat Aff. ¶ 4). Therefore, a Wage Grade 57 position, is a higher level position than a Wage Grade 58 position. (Mushat Aff. ¶ 4). Ms. Mushat's Affidavit and accompanying exhibits are attached to this motion as Exh. H.

was promoted to an Equipment Operator Position, Wage Grade 57.  (Bill. Dep. at 101-03,

111-12; Bill. Dep. Exhs. 14, 19).  As a result of a classification study of all Labor, Trade

and Craft positions in the State classified service, Ms. Billingham's position was

reclassified in 1999 to Equipment Operator, Wage Grade 56.  (Bill. Dep. at 118-19; Bill

Dep. Exh. 22; Mushat Aff. ¶ 5).

Airfield Maintenance is in charge of maintenance of runways, taxiways,

roads, lighting, vehicles, equipment, and grounds at the Ted Stevens Anchorage

International Airport.  (Hartman Aff. ¶ 2 ).[3]  It employs a wide variety of employees,

including laborers, electricians, equipment operators, radio technicians, mechanics,

custodians, welders, machinists, and administrative staff, to ensure that the Airport keeps

running smoothly, efficiently, and safely.  (Hartman Aff. ¶ 2).  Because Airfield

Maintenance's responsibilities have a direct impact on the safety of the traveling public,

its employees must understand and accept the necessity of working safely, efficiently,

and under the direction of their supervisors.  (Hartman Aff. ¶ 2).

1.    **Ms. Billingham's Yearly Evaluations Showed Ongoing Performance Problems**

From her hire in mid 1994 to mid 2003, Ms. Billingham received eleven

written yearly evaluations.  (Mushat Aff. ¶ 6; Mushat Aff. Exhs. A-K).  Her evaluation

---

[3]    Mr. Hartman's Affidavit and accompanying exhibits are attached to this motion as Exh. G.

Motion for Summary Judgment                                      Page 5 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

ratings fluctuated—she received overall effectiveness ratings of "mid-acceptable" four times, "low-acceptable" five times, and "unacceptable" two times. (Bill. Dep. at 106-07; Mushat Aff. ¶ 6; Mushat Aff. Exhs. A-K).

Her supervisors indicated that Ms. Billingham's performance was an ongoing problem. Each written evaluation has category subsections of "performance," "work habits," and "interpersonal relationships." (Mushat Aff. ¶ 7). Ms. Billingham's performance was rated as "unacceptable" in seven of the eleven evaluations. (Mushat Aff. ¶ 7; Mushat Aff. Exhs. A-K). Over the nine-year period, four different supervisors evaluated Ms. Billingham and all had similar comments and conclusions regarding Ms. Billingham's performance. (Mushat Aff. ¶ 7; Mushat Aff. Exhs. A-K).

The supervisors consistently found that Ms. Billingham was deficient in her: ability and willingness to follow directions; judgment; safe performance; informing her supervisor of absences, incidents, and accidents; and ability to accomplish job fundamentals without constant, close supervision. (Hartman Aff. ¶ 5; Mushat Aff. ¶ 8; Mushat Aff. Exhs. A-K). Their concerns were reflected in the evaluations, with comments such as the following:

- In 1995-1996, "I find Elsa needs to monitored much more when it comes to doing her job. There seems to be a problem when it comes to understanding at times what she is supposed to do. She has also shown on a couple of occasions not to inform her supervisor when something may have happened or when she felt she

was to [sic] sick to work and needed to go home." (Mushat Aff. Exh. B).

- In 1997-98, "Ms. Billingham's performance during this evaluation period showed a lack of job fundamentals to accomplish some very basic tasks, such as traffic control and sign repairs. Elsa also displayed an unwillingness to abide by some very basic field maintenance Standard Operating Procedures." (Mushat Aff. Exh. D).

- In 1998-99, "Elsa requires explicit instructions and when given them she usually meets the job requirements … [w]hen performing in a higher wage grade Elsa requires constant supervision." (Mushat Aff.                    Exh.                    E).

- In 1999-2000, "Ms. Billingham's performance … has barely met acceptable standards. Elsa requires very explicit instructions before she understands what is expected of her and the instructions must be repeated numerous times … she easily forgets what she was told and causes undue stress on the equipment." (Mushat Aff. Exh.  F).

- In 2000-01, "Ms. Billingham's performance for the past few months has been marked with several instances of failure to follow supervisory instructions … [s]he seems to feel that she knows more than her supervisors know and has a tendency to arguer [sic] with them." (Mushat Aff. Exh. G).

- In 2001-02, "As an employee Ms. Billingham presents some difficult challenges to myself as a foreman. … I took her out for a field check that involved letting her drive and operate the radio. Ms. Billingham made numerous mistakes including telling the Tower she was clear of an active runway, when in fact she was still on it. Her failure to recognize the gravity of the

situation was disturbing to me and her operating ability is far below what she should be doing with her experience." (Mushat Aff. Exh. I).

- In 2002, "Ms. Billingham has several incidents this past year of failure to follow instructions. She received a 30-day suspension within this rated period. Her behavior has not improved. She continues to be argumentative and defiant. Her behavior and lack of operating ability have created several safety incidents." (Mushat Aff. Exh. J).

- In 2002-03, "Supervising Ms. Billingham presents quite a challenge. Elsa seems to lack a basic understanding of her job duties at Field Maintenance … [h]er level of performance cannot be considered acceptable at this time. It is also my expressed opinion that her job performance is actually declining." (Mushat Aff. Exh. K).

Although Ms. Billingham received repeated counseling regarding her performance deficiencies, she did not improve. (Hartman Aff. ¶ 6; Mushat Aff. ¶ 9; Mushat Aff. Exhs. A-K).

### 2. Ms. Billingham's Repeated Performance Problems, Incidents, And Accidents Led To Progressive Discipline

Ms. Billingham also had an extensive history of incidents and accidents— many of which were the result of her failure to follow instructions. (Hartman Aff. ¶ 7). Some of the incidents were documented and some were not. (Ashton Dep. at 69-70; Hartman Aff. ¶ 7). The cumulative nature of the incidents and Ms. Billingham's failure

to correct her conduct led to progressive disciplinary action and contributed to the final decision to terminate her employment. (Hartman Aff. ¶ 7).

For example, early in her employment at DOT/PF, in November 1996, Ms. Billingham received a Letter of Instruction for walking off her shift and going home without notifying her shift supervisor. (Bill. Dep. at 108-09; Bill. Dep. Exh. 17). Similarly, in April 2000, Ms. Billingham received a Letter of Expectation for leaving her duty station early for lunch. (Bill. Dep. at 121-23; Bill. Dep. Exh. 24).

In August 1998, Ms. Billingham shattered the back window of a pick-up truck when throwing a pallet in the truckbed. (Bill. Dep. at 114-16). Her supervisor noted in the accident investigation report that, "I have talked with Elsa and told her not to throw anything into the pickups and to slow things down … Elsa a lot of times won't listen to what you tell her maybe this time she will catch on." (Bill. Dep. at 116; Bill. Dep. Exh. 21).

On July 31, 2000, Ms. Billingham received a three-day suspension for an incident in which she failed to follow her supervisor's directions and caused damage to a passing vehicle. (Bill. Dep. at 127; Bill. Dep. Exh. 26). Ms. Billingham's supervisor had given her explicit instructions to use a push mower to mow a small grass area near the road—instructions that she disregarded. (Hartman Aff. ¶ 8; Bill. Dep. Exh. 26). Instead of using the push mower, Ms. Billingham took a more powerful riding mower, which threw a rock and hit a passing vehicle. (Hartman Aff. ¶ 8). The rock shattered the

vehicle's passenger window, reportedly causing minor injuries to the driver, but fortunately missing a baby in the back seat.  (Hartman Aff. ¶ 8).  Ms. Billingham failed to take responsibility for her actions and did not express remorse for the incident.  (Bill. Dep. 127-134; Bill. Dep. Exh. 26; Hartman Aff. ¶ 8; Mushat Aff. ¶ 9).

Soon after, in August 2000, Ms. Billingham looked through a foreman's personal logbook without his knowledge or permission, tore a page out, ripped it up and threw it away, and then lied about the incident.  (Bill. Dep. at 135-38; Hartman Aff. ¶ 9).  According to Jim Ashton, Business Manager of Public Employees Local 71, Ms. Billingham's union, her conduct in this one incident was grounds for termination and other union members have been terminated for similar offenses.   (Ashton Dep. at 31, 34-35).  Because Ms. Billingham's years of state service and expressions of remorse were considered mitigating factors, she was not terminated but, instead was suspended for five days and scheduled to attend an anger management class.  (Bill. Dep. at 135; Bill. Dep. Exh. 27; Hartman Aff. ¶ 9).  Mr. Ashton testified that that "a five-day suspension was a kind discipline for that offense."  (Ashton Dep. at 35).  Ms. Billingham was warned that any future similar occurrences would result in further disciplinary action up to and including termination.  (Bill. Dep. Exh. 27; Hartman Aff. ¶ 9).

Several months later, in November 2000, Ms. Billingham was involved in another incident in which she refused to follow her supervisor's repeated direct orders not to use a four-wheeler for snow removal on sidewalks near the terminal, which her

Motion for Summary Judgment                                      Page 10 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

supervisor believed created an unsafe condition for the traveling public.  (Bill. Dep. at 139-140; Bill. Dep. Exh. 28; Hartman Aff. ¶ 10).   Ms. Billingham received a third suspension for the incident—this time for ten days.  (Bill. Dep. Exh. 28; Hartman Aff. ¶ 10).  Dan Hartman, Director of Airfield Maintenance, warned her in writing that, should she continue to ignore her supervisor's directives, the State would have no recourse except to consider terminating her employment.  (Bill. Dep. Exh. 28; Hartman Aff. ¶ 10).

These incidents contributed to Ms. Billingham's unacceptable rating in her next evaluation, which her supervisor attempted to review with her on January 23, 2001.  (Bill. Dep. at 141-45; Bill. Dep. Exhs. 29-30; Hartman Aff. ¶ 11).   During the review, Ms. Billingham became angry, called her supervisor a "bastard" and walked out.  (Bill. Dep. at 144-46; Hartman Aff. ¶ 11).   Because Ms. Billingham apologized to her supervisor and was remorseful about the incident, she was not terminated but, instead, was suspended for twelve days.  (Bill Dep. Exh. 30;  Hartman Aff. ¶ 11).

In February 2002, Ms. Billingham got a sand truck stuck on the bike path and did not call her supervisor, as she had been briefed to do on several occasions.  (Bill. Dep. at 151-55; Bill. Dep. Exh. 34).   Management counseled Ms. Billingham regarding her responsibility to inform her supervisor anytime she had an incident or accident and placed a memo for the record in her file.  (Bill. Dep. at 151-55; Bill. Dep. Exh. 34).   Ms. Billingham acknowledges that she understood and was aware of policy requiring her to

call her foreman immediately if she was involved in an incident or accident, however slight.  (Bill. Dep. at 108, 116-17, 153-57).

In July 2002, Ms. Billingham again was disciplined for two incidents in which she failed to follow her supervisor's orders to mow specific areas and water specific flower beds.  (Bill. Dep. at 158-62; Bill. Dep. Exh. 36; Hartman Aff. ¶ 12). Because of her prior disciplinary history for the same type of behavior, DOT/PF suspended Ms. Billingham for thirty days, warned her that any future occurrences of the same nature may be cause for her dismissal, and advised her to take the warning seriously, "as this is the last chance to change your behavior."  (Bill. Dep. Exh. 36; Hartman Aff. ¶ 12).

Soon after, however, Ms. Billingham was given another chance and a "Final Warning & Discipline" on September 26, 2002, when she received a thirty-day suspension for disobeying an explicit directive not to operate or drive the flush truck and for attempting to persuade a co-worker to "change his story" regarding the incident. (Bill. Dep. at 163-66; Bill. Dep. Exh. 37; Hartman Aff. ¶ 13).  Dan Hartman informed Ms. Billingham in writing that another act of insubordination or refusing or failing to obey her supervisors would result in immediate discharge.  (Bill. Dep. Exh. 37; Hartman Aff. ¶ 13).

C.    **The Last Chance Agreement**

On April 16, 2003, Ms. Billingham was involved in another incident in which she left the scene of an accident without informing her supervisor. (Hartman Aff. ¶ 14). Specifically, Ms. Billingham backed a pickup truck into a stop sign and drove away from the accident scene without immediately calling her supervisor, as required. (Bill. Dep. at 173, 178-79; Bill. Dep. Exh. 42; Hartman Aff. ¶ 14). When Ms. Billingham left the accident site, the stop sign was bent at a 45-degree angle, posing a hazard to passing traffic. (Bill. Dep. Exh. 42; Hartman Aff. ¶ 14). This incident—in which Ms. Billingham again refused to follow instructions and policy—combined with her poor work history, disciplinary record, and failure to take responsibility for her actions, was the last straw, leading Mr. Hartman to decide to terminate Ms. Billingham's employment. (Bill. Dep. Exh. 42, Hartman Aff. ¶ 14).

Mr. Hartman consulted with Charlotte Mushat, and Mort Plumb, Airport Director, who both concurred with his decision. (Bill. Dep. Exh. 42; Hartman Aff. ¶ 15; Mushat Aff. ¶ 10). On June 10, 2003, Dan Hartman, Charlotte Mushat, and Corky Caldwell, Deputy Director of the Airport, met with Ms. Billingham and her union representatives, Billy Meers and Jim Ashton, to inform Ms. Billingham of her termination. (Hartman Aff. ¶ 16; Mushat Aff. ¶ 10). At the meeting, Jim Ashton intervened on Ms. Billingham's behalf and convinced management to give Ms. Billingham yet another chance to maintain her employment. (Ashton Dep. at 39-47;

Hartman Aff. ¶ 16).  The union negotiated a Letter of Dispute Resolution with Airfield Maintenance management to allow Ms. Billingham to maintain her employment under agreed-upon terms.  (Ashton Dep. at 42, 47-49;  Ashton Dep. Exh. 6; Hartman Aff. ¶ 16).

A Letter of Dispute Resolution, also referred to as a "Last Chance Agreement," is a settlement of a dispute regarding discipline for a specific employee. (Dougherty Dep. at 9-10; 15-17).  Under a Last Chance Agreement, an employee who otherwise would be terminated has a chance to go back to work subject to specific terms and requirements.  (Ashton Dep. at 9-10; Dougherty Dep. at 15-17).  The Last Chance Agreement is a negotiated supplement to the applicable Collective Bargaining Agreement ("CBA"), and supplants any "just cause" termination requirement in the CBA. (Dougherty Dep. at 15-16).  Instead, an employee working under the terms of a Last Chance Agreement is subject to immediate termination, without challenge, if he or she breaches or violates the requirements of the Agreement.  (Dougherty Dep. at 10, 15-16). Last Chance Agreements are commonly used in labor relations and Local 71 and Airfield Maintenance have used such agreements on numerous occasions.  (Dougherty Dep. at 10-11, 17-18; Ashton Dep. at 49-50; Meers Dep. at 18-20; Johnson Dep. at 15-17;  Hartman Aff. ¶ 24).

In this case, Mr. Hartman agreed not to terminate Ms. Billingham in June 2003, and to allow her to continue her employment at Airfield Maintenance under the

following terms set out in the Agreement:

1)     Ms. Billingham will voluntarily demote to a WG58 Laborer, Sub-journey I effective June 11, 2003.

2)     Ms. Billingham will be placed on a thirty-day (30) suspension commencing Monday, May 12, 2003 and ending June 10, 2003.

3)     During the first year as a WG58, Ms. Billingham will not be upgraded to higher level equipment, nor be entitled to training other than WG58 equipment and safety training.

4)     If Elsa's performance does not reach a mid-acceptable level or higher after one year as a WG 58, she will be dismissed.

5)     This will be Ms. Billingham's last chance to change her behavior. One more act of unacceptable behavior will result in dismissal.

(Ashton Dep. Exh. 6; Hartman Aff. ¶ 17).

Ms. Billingham admits that she understood the terms of the Last Chance Agreement and agreed to work under those terms. (Bill. Dep. at 176, 181, 184-85; Bill. Dep. Exh. 43; Ashton Dep. at 54-58). Jim Ashton, who negotiated the agreement on Ms. Billingham's behalf, was very pleased with the fact that management was willing to give Ms. Billingham another chance. (Ashton Dep. at 48-51). In Mr. Ashton's 17 years of union work experience, Ms. Billingham is the only individual of whom he is aware who has ever been given a chance to continue employment after five suspensions. (Ashton Dep. at 28-30, 41, 47). Mr. Ashton testified that a lot of employers would have

terminated Ms. Billingham "a long time prior to that," and that Airfield Maintenance management "went well above and beyond in trying to work with her."  (Ashton Dep. at 50).  According to Mr. Ashton, there was no evidence that DOT/PF was discriminatory or retaliatory in any way in agreeing to the Last Chance Agreement, but rather, "it was a real show of good faith for them to allow another chance."  (Ashton Dep. at 58).

Billy Meers, also acting as Ms. Billingham's union representative, concurs with Mr. Ashton, testifying that Airfield Maintenance complied with all the terms of the CBA in entering into the Last Chance Agreement and was "giving somebody a chance that probably didn't deserve another chance."  (Meers Dep. at 21-22).  He also found no evidence that management was discriminatory or retaliatory in entering into the agreement.    (Meers Dep. at 21-24).   Both Mr. Ashton and Mr. Meers believed that management had good cause to terminate Ms. Billingham in June 2003, and that the Last Chance Agreement was a resolution that was to her benefit and betterment—giving her another chance at employment.  (Ashton Dep. 47, 55-57; Meers Dep. at 20-26).   At the meeting when Ms. Billingham was offered the Last Chance Agreement, Ms. Billingham indicated to Mr. Ashton and Mr. Meers that she was very thankful and appreciative to be given another opportunity.  (Ashton Dep. at 49, 56-57; Meers Dep. at 16-19, 26).

When Ms. Billingham returned to work, the parties agreed that Airfield Maintenance management would provide regular evaluations to give her feedback regarding whether she was meeting performance expectations and, if necessary, how she

could improve her performance. (Bill. Dep. at 185-86, 188-90; Ashton Dep. at 59-61; Hartman Aff. ¶ 18). According to Mr. Ashton, such periodic evaluations are a "pretty standard operating practice" for employees who have "gotten crossways with the administration" and failed to meet performance expectations. (Ashton Dep. at 60-61).

### D.    Ms. Billingham Failed To Meet The Requirements Of The Last Chance Agreement

When Ms. Billingham returned to work under the terms of the Last Chance Agreement, her problematic conduct continued. (Hartman Aff. ¶ 19). The same issues that had led to previous discipline arose again—failure to follow instructions, failure to use reasonable judgment, failure to follow leave policies, and inefficient use of time. (Hartman Aff. ¶ 19). Ms. Billingham's supervisors met with Ms. Billingham five times between July and November 2003, to give her feedback on her performance progress. (Hartman Aff. ¶ 19). During this period, Ms. Billingham's supervisors rated her performance as low-acceptable and unacceptable in June and July; unacceptable in August; and mid-acceptable in October. (Bill. Dep. at 185-90; Hartman Aff. ¶ 19; Hartman Aff. Exh. A). Areas for improvement included:

- Causing breakage and unneeded wear and tear on equipment;

- Difficulty getting along with co-workers;

- Failure to follow instructions resulting in damage to an irrigation line and initially failing to admit her mistake;

- Failing to accept directions from her supervisor and improperly going up chain of supervision in hope of getting what she wanted;

- Unauthorized use of leave and wasting time.

(Hartman Aff. Exh. A). Several times during the feedback sessions, Ms. Billingham became argumentative and, in November 2003, she told Mr. Hartman that she did not want to get any more feedback and did not want to be informed as to what she needed to improve to meet a "mid acceptable" performance level as required by the Last Chance Agreement. (Bill. Dep. at 190-91; Bill Dep. Exh. 46; Hartman Aff. ¶ 20; Hartman Aff. Exh. A).

Ms. Billingham's supervisors continued to draft progress reports for Ms. Billingham over the next months, even though she refused to discuss them. (Hartman Aff. ¶ 21; Hartman Aff. Exh. B). Ms. Billingham's performance continued much the same—she received one mid-acceptable rating, one low-acceptable rating and three unacceptable ratings between January and June 2004. (Hartman Aff. ¶ 21; Hartman Aff. Exh. B). Ms. Billingham's supervisors continued to note their concerns that Ms. Billingham:

- Resisted learning new methods of accomplishing tasks;

- Refused to accept her supervisor's directions and went to higher supervision in an attempt to get her way;

Motion for Summary Judgment                                           Page 18 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

- Failed to perform complete vehicle inspections and report needed repairs;

- Continually asked to operate pieces of equipment that were not necessary to do the assigned job;

- Failed to complete work assignments;

- Failed to follow directions;

- Started breaks and lunch periods 10-15 minutes early; and

- Created a safety hazard for herself and the traveling public.

(Hartman Aff. Exh. B).  During the period from June 2003 to June 2004, Ms. Billingham received five unacceptable, three low-acceptable, and two mid-acceptable ratings. (Hartman Aff. Exh. B).

Ms. Billingham acknowledges that her performance did not reach a mid-acceptable level or higher, as required under the terms of the Last Chance Agreement. (Bill. Dep. at 197-98).  Ms. Billingham also admits that she violated the terms of the Last Chance Agreement by twice applying for promotions to higher level positions—which she acknowledges was an "in your face" message to management.  (Bill. Dep. at 191-95). Ms. Billingham understood that a violation of the Last Chance Agreement would result in her dismissal.  (Bill. Dep. at 190).

**E.     Ms. Billingham's Dismissal From Employment At Airfield Maintenance**

On June 28, 2004, Ms. Billingham was dismissed from employment at Airfield Maintenance because she did not achieve the standard of performance required under the Last Chance Agreement.  (Hartman Aff. ¶ 22; Hartman Aff. Exh. C). Ms. Billingham did not raise her performance level to mid-acceptable for the year and refused to accept feedback to assist her in reaching that goal.  (Hartman Aff. ¶ 22).    Dan Hartman made the decision to terminate Ms. Billingham's employment and Charlotte Mushat and Mort Plumb concurred.  (Hartman Aff. ¶22; Mushat Aff. ¶ 11).  At the time, Ms. Billingham was 54 years old, Dan Hartman was 59 years old, Charlotte Mushat was 51 years old, and Mort Plumb was 60 years old.  (Hartman Aff. ¶ 22; Mushat Aff. ¶ 11).

**F.     Ms. Billingham Is The Only Female Employee Terminated By Mr. Hartman And He Terminated The Two Male Employees Who Violated Terms of Their Last Chance Agreements**

Dan Hartman has been Manager of Airfield Maintenance since March 2000.  (Hartman Aff. ¶ 1).  Before that, he served as Assistant Manager from April 1999.  (Hartman Aff. ¶ 1).  During Mr. Hartman's tenure as Director of Airfield Maintenance, he has hired every female applicant referred to him by Local 71, in positions ranging from laborer to equipment operator and electrician.  (Hartman Aff. ¶ 23).  Mr. Hartman has hired individuals from all age groups, including an individual who was 69 years old when hired.  (Hartman Aff. ¶ 23).  He has terminated (or allowed to resign in lieu of

termination) between 15-20 employees since March 2000, the youngest aged in his mid-twenties. (Hartman Aff. ¶ 23). Ms. Billingham is the only female employee that he has terminated. (Hartman Aff.   ¶ 23).

Mr. Hartman has agreed to enter into Last Chance Agreements with three employees—Ms. Billingham and two others. (Hartman Aff. ¶ 24). Both of the other employees were male, both violated the terms of the Last Chance Agreements, one was allowed to resign in lieu of termination and the other was terminated. (Hartman Aff. ¶ 24; Hartman Aff. Exh. D).[4]

### G.    Ms. Billingham's Union Representatives Determined That Her Termination Was Based On Reasonable Grounds

Ms. Billingham filed a grievance with Local 71 challenging her termination. (Bill. Dep. at 198). Dale Johnson, a business representative with the union, investigated Ms. Billingham's allegations that her termination was discriminatory and in violation of the collective bargaining agreement. (Bill. Dep. at 198-99; Johnson Dep. at 12-13). Mr. Johnson's conclusion and recommendation to Jim Ashton was that "Dan Hartman went above and beyond the fact of trying to retain Ms. Billingham out at the airport." (Johnson Dep. at 22). As Mr. Johnson explained:

---

[4]     The names of employees have been redacted for confidentiality from the documents attached to Mr. Hartman's Affidavit as Exhibit D and those attached to Ms. Mushat's Affidavit as Exhibit M. Should it become necessary to disclose the names, DOT/PF will file the unredacted documents under seal.

> Dan [Hartman] clearly had nothing to do with discrimination. This was just about following instructions. This is just about him asking Elsa to do what he asked her to do. Go to work, be on time, do what your supervisor and foremans [sic] ask you to do, and then you don't have to come see me.

(Johnson Dep. at 26).

Mr. Johnson also consulted with Kevin Dougherty, Local 71's attorney, and Mr. Ashton regarding Ms. Billingham's allegations. After an investigation and review of Ms. Billingham's case, all three concluded that: (1) Airfield Maintenance had followed the terms of the CBA and Last Chance Agreement in terminating Ms. Billingham's employment; (2) Airfield Maintenance had reasonable grounds for the termination; (3) there was no evidence of disparate treatment of Ms. Billingham; (4) there was no evidence that Ms. Billingham's termination was discriminatory; (4) there was no evidence that Ms. Billingham's termination was retaliatory; and (5) her grievance did not have sufficient merit to proceed to arbitration. (Ashton Dep. at 63-68; Dougherty Dep. at 7-14, 18-25; Dougherty Dep. Exhs. 1-2; Johnson Dep. at 19-34; Johnson Dep. Exhs. 2-4).

Mr. Dougherty sent a letter to Ms. Billingham, on December 6, 2004, explaining the union's decision not to pursue her grievance to arbitration:

> [t]he Union thoroughly reviewed your case file, including interviewing co-workers and superiors. Given the clear findings that the Employer had reasonable grounds to terminate Local 71 properly determined that the grievance lacked sufficient merit to proceed to arbitration.

Motion for Summary Judgment
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

(Bill Dep. at 199-201, Bill. Dep. Exh. 49).

### H.     After Her Termination, Ms. Billingham Was Ineligible For Rehire With DOT/PF

Under the personnel rules governing classified state employment, the Division of Personnel may refuse to consider an applicant for employment if the applicant has been dismissed from public service for misconduct, unsatisfactory performance of duties, or other similar cause.[5] (Newbill Dep. at 20; Mushat Aff. ¶ 12; Mushat Aff. Exh. L).    When a Local 71 member is found to be ineligible for rehire with DOT/PF after termination, Ms. Mushat's practice is to notify Local 71 and request that the individual not be referred to DOT/PF for employment consideration.    (Mushat Aff. 13).

In the year-and-a-half period between May 2003 and January 2005, Ms. Mushat requested that at least three individuals not be referred by Local 71 for positions at DOT/PF.  (Newbill Dep. at 29-23;  Mushat Aff. ¶ 14; Mushat Aff. Exh. M).  One of those requests involved Ms. Billingham, the other two involved male employees who likewise had been terminated based on performance issues.  (Mushat Aff. ¶ 14: Mushat Aff. Exh. M).  In addition, during this period, Mr. Hartman sent a similar written request to Local 71 asking that the union no longer dispatch a terminated male employee for any

---

[5]     The personnel rules have been amended since 2004, but the 2004 and current versions both contain this provision.

future positions at Airfield Maintenance. (Newbill Dep. at 21-22; Newbill Dep. Exh. 5). According to the Local 71 dispatcher who handles referrals, Tracy Newbill, a request not to refer an individual for hire is a fairly common practice after an employee has been terminated for cause and it is well within the employer's right to request that individuals not be referred based on prior work records or, even, how well they get along with other people in a crew. (Newbill Dep. at 7-9, 11-15, 32-33).

In this case, Ms. Billingham was not recommended for rehire with DOT/PF because of her termination for unsatisfactory performance of her duties. (Hartman Aff. ¶ 25; Mushat Aff. ¶ 12). Ms. Mushat inadvertently failed to notify Local 71 immediately of Ms. Billingham's ineligibility for rehire with DOT/PF. (Mushat Aff. ¶ 15). In the meantime, before the notification, Ms. Newbill referred Ms. Billingham to Joe Owens, Project Engineer, for a non-permanent Engineering Technician Wage Grade 59 position at the Airport Project Office in August 2004. (Newbill Dep. at 15-17; Mushat Aff. ¶ 15). Mr. Owens "hired" Ms. Billingham for the position without the required approval of the Division of Personnel. (Newbill Dep. at 18-19; Mushat Aff. ¶ 15). When Ms. Mushat learned of the mistake, she notified Pat Wittrock, the manager responsible for the Airport Project Office, that Ms. Billingham was ineligible for rehire with DOT/PF. (Mushat Aff. ¶ 15). Either Ms. Mushat or Mr. Wittrock then informed Mr. Owens, who immediately notified Ms. Billingham that her services as a non-permanent employee were no longer needed. (Bill. Dep. at 257-260; Bill. Dep. Exh. 59; Newbill Dep. at 16-18; Mushat Aff.

Motion for Summary Judgment                                    Page 24 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

¶ 15; Def. Resp. to Req. for Admiss. Nos. 24-26, 28). Non-permanent employees at DOT/PF are just that—non permanent. (Mushat Aff. ¶ 16). Their employment is dependent on workload needs and they can be terminated at will—just cause is not necessary. (Bill. Dep. at 259; Mushat Aff. ¶ 16).

After notifying Mr. Wittrock of Ms. Billingham's ineligibility for rehire, Ms. Mushat sent a written request to Ms. Newbill at Local 71 that Ms. Billingham not be referred to DOT/PF for employment consideration. (Mushat Aff. 17; Mushat Aff. Exh. N). Ms. Newbill viewed the request as a standard practice in accordance with the CBA and did not see any evidence that the request was discriminatory or retaliatory toward Ms. Billingham. (Newbill Dep. at 32-34). Ms. Mushat's request only applied to referrals to DOT/PF and did not preclude Local 71 from referring Ms. Billingham for positions with other state departments or with non-state employers. (Newbill Dep. at 20-24; Mushat Aff. ¶ 18).

## I.    Ms. Billingham Continued To Have Performance Problems In Her Employment After Her Termination From Airfield Maintenance

In the summer of 2005, Local 71 referred Ms. Billingham to the Municipality of Anchorage, which hired her for a seasonal position driving a water truck. (Bill. Dep. at 81). The Municipality terminated Ms. Billingham from that position early the following season, in May 2006, because of unsatisfactory performance. (Bill. Dep. at 81-82). The conduct resulting in Ms. Billingham's discharge from the Municipality was

reminiscent of her conduct at Airfield Maintenance—she failed to contact her supervisor to report an incident in which she accidentally sprayed debris onto a pickup truck while watering a flower planter, causing damage to the truck.  (Bill. Dep. at 83-85, 95-99; Bill. Dep. at Exh. 12).   After her termination, the Municipality determined that she was not eligible for rehire and requested that Local 71 not refer Ms. Billingham for any positions with the Municipality.  (Newbill Dep. at 25-27).

Ms. Billingham also was terminated from a truck driving position with Brice, Inc. in November 2005.  (Bill. Dep. at 36-38).   Ms. Billingham took an open Teamsters Union call to drive maxi hauls for Brice on the North Slope.  According to Ms. Billingham, she knows how to drive maxi hauls based on "thousands of hours" of experience.  (Bill. Dep. at 34-37).   Brice terminated Ms. Billingham after three and half-hours of employment because, according to Ms. Billingham, she "was backing up crooked, I guess you might say."  (Bill. Dep. at 37).   Brice requested that the Teamsters place Ms. Billingham on the ineligible for rehire list for driving maxi-hauls.  (Bill. Dep. at 36-38, 91).

### J.    Ms. Billingham Has Not Prevailed In Any of Her Many Challenges to Adverse Employment Decisions

Ms. Billingham has filed multiple unsuccessful union grievances, administrative complaints and lawsuits against various employers and unions alleging discrimination and retaliation since at least 1989.   Ms. Billingham filed an EEOC

Motion for Summary Judgment                                                Page 26 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

complaint in 1989 against Enserch, followed by a state court lawsuit, alleging that her termination was discriminatory and retaliatory. (Bill. Dep. at 56-59; Bill. Dep. Exh. 7). The lawsuit was dismissed for lack of prosecution. (Bill. Dep. at 14-15).

Ms. Billingham filed multiple grievances against DOT/PF during her employment. She did not prevail on any of the grievances. (Bill Dep. at 256). Between 2002 and 2004, she filed two complaints of discrimination and retaliation against DOT/PF with the EEOC and the Alaska State Commission for Human Rights ("ASCHR"). (Bill. Dep. at 255-56). The EEOC and ASCHR dismissed all of her complaints.[6] (Bill. Dep. at 256). Ms. Billingham also filed an unsuccessful charge against Local 71 after she received the letter from Mr. Dougherty indicating that the union found reasonable cause for her termination from DOT/PF and would not take her grievance to arbitration. (Bill. Dep. at 200-05, 255; Bill. Dep. Exhs. 50, 58; Dougherty Dep. at 23-25). In addition, Ms. Billingham filed unsuccessful grievances against the Municipality regarding her employment there in 2005-06. (Bill. Dep. at 99-100, 260-61).

Jim Ashton from Local 71 testified that he personally counseled and advised Ms. Billingham as to how to be successful in her job, but "[m]y biggest initial reaction to Elsa is no ownership, ever. It's never her fault. Someone else is always to blame." (Ashton Dep. at 19-22, 25-26)

---

[6]    Ms. Billingham appealed ASCHR's dismissal of the 2002 complaint and the appeal is pending in State superior court.

Motion for Summary Judgment                                    Page 27 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

K.      **This Lawsuit**

Ms. Billingham filed an initial complaint in this case on October 12, 2005, and a "Second Amended Complaint" on February 7, 2006, against DOT/PF and numerous individual defendants, alleging that she was discriminated and retaliated against during and after her employment at DOT/PF.    The State and individual defendants filed a Motion to Dismiss the individual defendants and untimely claims on February 23, 2006.

This Court granted the motion on May 15, 2006, dismissing the individual defendants and the claims that Ms. Billingham brought based on her allegations in the first two complaints that she filed with the EEOC and ASCHR.[7] (Order attached as Exh. L).  As a result, Ms. Billingham's only remaining claims are: (1) that her termination was retaliatory and discriminatory based on age and sex; and (2) her ineligibility for rehire with DOT/PF constituted retaliatory "blacklisting."   Ms. Billingham alleges that her termination and ineligibility for rehire were in violation of Title VII, AS 18.80 and the covenant of good faith and fair dealing.

---

[7]      Ms. Billingham alleged in the first EEOC/ASCHR complaint in 2002 that during her eight years of employment with DOT/PF, she was denied employment opportunities based on her age and sex.  (Attached as Exh. I).  In her second EEOC/ASCHR complaint, filed on January 30, 2004, Ms. Billingham alleged that between January 10, 2003, and January 12, 2004, she was subjected to ongoing discrimination and retaliation for filing the earlier complaint and that the Last Chance Agreement was discriminatory and retaliatory.  (Attached as Exh. J).

## III.          ARGUMENT AND CITATION OF AUTHORITY

The State is entitled to summary judgment on Ms. Billingham's remaining claims.  Summary judgment "*shall* be rendered" when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56(c) (emphasis added).  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

Mere allegations of factual dispute, without more, will not defeat an otherwise proper motion.  *Id.*  The evidence presented in opposition to a motion for summary judgment must be probative and properly supported: "A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of "ersatz evidence.'"  *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870 883 (9th Cir. 1982).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]"  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).  When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the plain language of Rule 56(c) *mandates* entry of summary judgment."  *Celotex,* 477 U.S. at 322, 106 S. Ct. 15 2552 (emphasis added).

### A. Ms. Billingham Has Failed to Establish That Her Termination Was Based On Her Sex

Ms. Billingham's sex discrimination claim fails as a matter of law because she has neither established a *prima facie* case nor shown that the reason for her termination was merely a pretext for discrimination. Ms. Billingham claims that DOT/PF terminated her employment because of her sex in violation of Title VII and the Alaska Human Rights Act. 42. U.S.C. § 2000e-2; AS 18.80.220. In analyzing employment discrimination claims under these statutes, courts apply the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93. S. Ct. 1817 (1973).[8]

In the summary judgment context, Ms. Billingham bears the initial burden to establish a *prima facie* case of discrimination. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (2004). If Ms. Billingham succeeds in establishing a *prima facie* case, the burden shifts to DOT/PF to articulate a legitimate, nondiscriminatory reason for its action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct 1817. Once DOT/PF articulates

---

[8] For discrimination claims under the Alaska Human Rights Act, AS 18.80, Alaska courts look to federal Title VII cases for guidance and have expressly adopted the *McDonnell Douglas* burden-shifting framework. *Miller v. Safeway,* 102 P.3d 282, 290-91 (Alaska 2004); *Haroldsen v. Omni Enters., Inc.,* 901 P.2d 426, 430-31 (Alaska 1995). Although there are some differences in the Alaska Human Rights Act and Title VII, the distinctions are not relevant for Ms. Billingham's claims. All of DOT/PF's arguments related to Ms. Billingham's Title VII sex discrimination and retaliation claims are applicable to Ms. Billingham's claims under the Alaska Human Rights Act and show that summary judgment should be granted.

such a reason, the burden then shifts back to Ms. Billingham to prove that the legitimate

reasons offered by DOT/PF were merely a pretext for discrimination. *Id.* at 804, 93 S.Ct.

1817.

       1.       **Ms. Billingham Cannot Establish A *Prima Facie* Case Of Discrimination**

Ms. Billingham fails to establish a *prima facie* case of sex discrimination

for two reasons—she was not performing according to her employer's legitimate

expectations and she cannot demonstrate that employees similarly situated to her were

treated more favorably. Because Ms. Billingham presents no direct evidence[9] of

discrimination, to establish a *prima facie* case of discrimination she must show that:   (1)

she belongs to a protected class; (2) she was performing according to her employer's

legitimate expectations; (3) she suffered an adverse employment action; and (4) other

employees with qualifications similar to her own were treated more favorably.[10]

*Vasquez,* 349 F.3d at 640 n. 5; *Haroldsen,* 901 P.2d at 430-31.   A plaintiff's "failure to

offer evidence establishing a necessary element of her *prima facie* case will ordinarily be

---

[9]      "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez,* 349 F.3d at 640 (quotation omitted).

[10]    In some decisions, the Court of Appeals for the Ninth Circuit has articulated a slightly different version of the *prima facie* case, requiring the plaintiff to show: (1) that she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Leong v. Potter,* 347 F3d 1117, 1124 (9th Cir. 2003).   Under either version, Ms. Billingham fails to establish a *prima facie* case.

fatal to her claim."  *Grosz v. The Boeing Co.,* 455 F. Supp. 2d 1033, 1040 (C.D. Cal.

2006).

**a.    Ms. Billingham Was Not Performing According To Her Employer's Legitimate Expectations**

Ms. Billingham's claim fails at the outset because she was not performing

according to her employer's legitimate expectations.  To establish a *prima facie* case, a

plaintiff must provide some evidence other than her subjective appraisal of her

performance and qualifications.  *Hedenburg v. Aramark American Food Services, Inc.,*

476 F. Supp. 2d 1199, 1207 (W.D. Wash. 2007)(holding that plaintiff did not establish a

*prima facie* case of discrimination where there was no evidence that plaintiff was

performing to employer's expectations other than plaintiff's own subjective review).

In this case, the record is replete with evidence that Ms. Billingham was not

performing according to DOT/PF's legitimate expectations.  The record shows that the

supervisors and management at Airfield Maintenance—and Ms. Billingham's own union

representatives—did not believe that Ms. Billingham's performance was acceptable.  The

undisputed evidence shows that Ms. Billingham disregarded supervisors' directives,

engaged in insubordinate conduct, was untruthful, had difficulty getting along with male

and female co-workers, used poor judgment, committed safety violations, and refused to

take responsibility for her actions.

Moreover, Ms. Billingham admits that her performance did not meet a "mid-acceptable" level during the last year of her employment. Therefore, she fails to establish a *prima facie* case of discrimination and her sex discrimination claim should be dismissed.

### b.    Ms. Billingham Cannot Show That Employees Similarly Situated Employees To Her Were Treated More Favorably

Ms. Billingham's claim also fails at the *prima facie* stage, because the undisputed evidence shows that employees similarly situated to her were not treated more favorably—they also were discharged. To establish a *prima facie case,* a plaintiff must show that he or she received less favorable treatment than another employee who was similarly situated in *all material respects. Moran v. Selig,* 447 F.3d 748, 755 (9th Cir. 2006). The Court of Appeals for the Ninth Circuit expressly held that, when a plaintiff is subject to the terms of a Last Chance Agreement, the only employees similarly situated in all material respects are those that likewise are subject to the terms of a Last Chance Agreement. *Leong v. Potter,* 347 F.3d 1117, 1124 (9th Cir. 2003).

In the *Leong* case, the plaintiff had a history of reprimands and suspensions for cursing at supervisors, failing to follow directions and other violations of workplace rules. *Id.* at 1121. The plaintiff's union negotiated a Last Chance Agreement, as an alternative to termination, which allowed him to continue working if he followed certain conditions specified in the agreement. *Id.* When the employer received several

complaints from co-workers that the plaintiff had cursed at them and obstructed their work, the plaintiff was terminated. *Id.*

The plaintiff in *Leong* argued that several individuals were similarly situated and treated more favorably because they committed similar violations and were not terminated. *Id.* at 1124. The Court held that the plaintiff's proposed comparators were not similarly situated because, unlike the plaintiff, they were not subject to Last Chance Agreements, noting that:

> Although these employees did commit serious violations, it appears none amassed a record of misconduct comparable to [the plaintiff's]. [The plaintiff's] record of reprimands and suspensions suggests that the [employer] is generous in affording employees 'second chances,' but [the employer] must be permitted to draw the line somewhere. Therefore, the district court did not err in holding that [the plaintiff] failed to establish a prima facie case of discrimination.

*Id.*

As the Court explained, similarly situated employees must have a similar history of performance and disciplinary actions. *See also Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 751-51 (7th Cir. 2006) (holding that a coworker is not similarly situated unless he had similar job performance and a "comparable set of failings"). "When warranted by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders." *Wall v. Nat'l Railroad Passenger Corp.,* 718 F.2d 906, 909 (9th Cir. 1983).

Ms. Billingham was a repeat offender. Although Ms. Billingham argues that other employees had accidents and were not terminated, her accidents were only one factor in her termination. The other performance issues—such as her failure to take direction and follow policies, her insubordinate conduct, her poor judgment, her problems getting along with co-workers, her safety violations—all contributed to her eventual termination. Moreover, in a job where safety is paramount, it is critically important that employees learn from their mistakes. Ms. Billingham did not do so, but continued to engage in the same problematic conduct even after repeated counseling and discipline.

Ms. Billingham's long history of performance problems, misconduct and discipline ultimately led to her being given one final opportunity to continue her employment through a negotiated Last Chance Agreement. As with the plaintiff in *Leong,* when she failed to fulfill the terms of that agreement, she was terminated. The other employees who violated Last Chance Agreements likewise were terminated. Therefore, Ms. Billingham has failed to show that employees similarly situated to her were treated more favorably and cannot establish a *prima facie* case of discrimination.

2. **Ms. Billingham Also Fails To Establish That The Reason For Her Termination Was Merely A Pretext For Discrimination**

Even if Ms. Billingham had established a *prima facie* case, she cannot show that DOT/PF's reason for her termination was a pretext for discrimination. DOT/PF has articulated a legitimate non-discriminatory reason for Ms. Billingham's termination—her

Motion for Summary Judgment                                         Page 35 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

failure to bring her performance level to an acceptable level to meet the requirements of the Last Chance Agreement. Ms. Billingham must show pretext either "directly, by showing that discrimination more likely motivated [DOT/PF], or indirectly, by showing that [DOT/PF's] explanation is unworthy of credence." *Vasquez,* 349 F.3d at 641 (9th Cir. 2000) (citation omitted).

To establish pretext, Ms. Billingham may rely on circumstantial evidence, but the evidence must be "specific and substantial" to create a genuine issue of material fact. *Nilsson v. City of Mesa,* --- F.3d ---, 2007 WL 2669788, at *5 (9th Cir. September 13, 2007). "Mere conclusory allegations of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment." *Lindsey v. Shalmy,* 29 F.3d 1382, 1385 (9th Cir. 1994). "[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact" sufficient to defeat summary judgment. *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 270 (9th Cir. 1996).

Moreover, Ms. Billingham must show that DOT/PF did not believe or was not actually motivated by its own stated reasons for her termination. While Ms. Billingham may try to refute the accuracy of some of the allegations regarding her conduct, it is not important whether the allegations were objectively true, "[r]ather, courts only require that an employer honestly believed its reason for its actions even if its reason is foolish, trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054,

1063 (9th Cir. 2002)(quotations omitted).   Ms. Billingham has produced no evidence showing that the individuals who decided to terminate her employment did not honestly believe that her performance was unacceptable.

Instead, the record evidence shows that a wide variety of individuals believed that Ms. Billingham's performance and conduct were unacceptable. In Ms. Billingham's performance evaluations, numerous different supervisors expressed the same concerns with serious deficiencies in her performance.   In addition, Ms. Billingham's union representatives believed that her performance was unacceptable, that DOT/PF had reasonable cause to terminate her employment, and that Dan Hartman "went above and beyond" in giving Ms. Billingham chances to be successful at her job. (Ashton Dep. at 28).

Ms. Billingham's union representatives also testified that other individuals who engaged in conduct similar to hers were terminated without being given multiple chances to correct performance, as she was.   For example, Mr. Ashton, with 17 years experience at Local 71, believed that Ms. Billingham received preferential treatment at Airfield Maintenance:

> Q:     [MS. PAGE]  So you're saying that you feel that she
>           was actually given preferential treatment?
>
> A:     [MR. ASHTON]  I do, yes.  Yes.

A point in case is when –and you'll probably get to that when—I'm assuming her termination one, when we did the last chance letter of agreement.

That last chance letter of agreement actually came on the heels of five suspensions.  No employee gets five suspensions and stays working.  It just doesn't happen this way.

(Ashton Dep. at 28-29).

The evidence supports Mr. Ashton's contention—showing that DOT/PF gave Ms. Billingham more chances to improve her performance than any other employers for whom she has worked.  Ms. Billingham has been terminated many times from other employment for reasons that are remarkably similar to the reasons for her discipline and termination from DOT/PF.  The other employers terminated Ms. Billingham after only one or two incidents.   In contrast, DOT/PF gave Ms. Billingham multiple "last chances"—but she simply would not or could not change her behavior.

Moreover, although Ms. Billingham attempts to excuse her performance problems by claiming that she was "targeted," she has not shown any evidence of differential treatment based on her sex.  Ms. Billingham worked with numerous other women at Airfield Maintenance—none of whom were terminated.   Notably, Ms. Billingham testified that these women targeted and picked on her, alleging that they treated her badly, she had problems getting along with them, one physically "attacked" her, they spread rumors about her, they "bad-mouthed" her, and they did not want to

work with her.  (Bill. Dep. at 216-21, 224-26, 233).  Such allegations against her female

co-workers undermine her contention that she was targeted because of her sex

      In sum, Ms. Billingham has fallen far short of producing specific and

substantial evidence of pretext and summary judgment is appropriate.

### B.    Any Claims Of Age Discrimination Should Be Dismissed

      Ms. Billingham's Second Amended Complaint does not specifically set out

a claim of age discrimination.  Nonetheless, Ms. Billingham indicated in discovery that

she is alleging that her termination was discriminatory based on her age as well as her

sex.  Ms. Billingham, however, cannot maintain a claim of sex discrimination under

either Title VII or the Alaska Human Rights Act.

### 1.    A Claim Brought Under The Age Discrimination In Employment Act Is Barred By Sovereign Immunity

      Because Title VII does not cover age discrimination, the Age

Discrimination in Employment Act ("ADEA") is the proper federal statute under which

to bring a claim of age discrimination.  42 U.S.C. §2000e(a)(6); 29 U.S.C. §§ 621 *et seq*.

The doctrine of sovereign immunity, however, bars lawsuits brought by an individual in

federal court against the State under the ADEA.  *Kimel v. Florida Bd. of Regents,* 528

U.S. 62, 91, 120 S. Ct. 631 (2000).  Therefore, Ms. Billingham cannot proceed with a

lawsuit against DOT/PF under the ADEA and her claim should be dismissed.

### 2.    Ms. Billingham Has Not Established A Claim Of Age Discrimination

To the extent Ms. Billingham seeks to bring a claim of age discrimination under the Alaska Human Rights Act, AS 18.80.220, her claim fails for the same reasons that her sex discrimination claim fails.  The same analysis applies to both claims—Ms. Billingham must be able to show that she was meeting her employer's legitimate expectations, that similarly situated employees were treated more favorably and that her termination was a pretext for discrimination based on her age.  *Miller,* 102 P.3d at 290-91.  As discussed in the section on sex discrimination, Ms. Billingham has neither established that she was meeting her employer's legitimate expectations nor that similarly situated employees were treated more favorably than she.  Therefore, she has not made a *prima facie* case.

Nor has Ms. Billingham shown that her termination was a pretext for age discrimination.  Ms. Billingham must offer more than her "unsupported assumptions and speculation" to show pretext.  *Mahan v. Arctic Catering, Inc.,* 133 P.3d 655, 661 (Alaska 2006); *see also Grant v. Anchorage Police Dep't,* 20 P.3d 553, 559 (Alaska 2001)(upholding summary judgment in age claim where plaintiff provided no evidence that age was a factor in his termination). In this case, Ms. Billingham has provided no evidence whatsoever that age was a factor in her termination.  In fact, the evidence shows that the decisionmakers were close to Ms. Billingham's age or older.  Ms. Billingham has

failed to meet her burden and her claim of age discrimination under the Alaska Human Rights Act should be dismissed.

### C.     Ms. Billingham's Retaliation Claims Fail As A Matter Of Law

As with Ms. Billingham's discrimination claims, her retaliation claims fail for two reasons—she cannot establish a *prima facie* case and she has failed to show pretext.  To establish a *prima facie* case of retaliation, Ms. Billingham must show that: 1) she engaged in protected activity; 2) she suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision.  *Villiarimo,* 281 F.3d at 1064.  If Ms. Billingham can establish a *prima facie* case, the *McDonnell Douglas* burden-shifting framework applies, and Ms. Billingham must show that the adverse employment decisions were a pretext for unlawful retaliation. *Manatt v. Bank of America,* 339 F.3d 792, 800 (9th Cir. 2003).

In this case, Ms. Billingham brings two claims of retaliation.  She alleges that her termination was retaliatory and that her ineligibility for rehire with DOT/PF was retaliatory "blacklisting."  Both claims should be dismissed.

### 1.     Ms. Billingham has failed to establish a *prima facie* case of retaliatory termination

Ms. Billingham has not provided evidence establishing a causal connection between protected activity and her termination. Ms.  Billingham  contends  that  she engaged in protected activity: (1) when she was interviewed in approximately 1996 in a

confidential discrimination investigation conducted by the Division of Personnel; (2) when she wrote an affidavit for and testified at a former co-worker's ASCHR hearing on July 16, 2003; and (3) when she filed complaints of discrimination against DOT/PF with the EEOC and ASCHR in August 2002 and January 2004. Although it is unclear whether the 1996 and 2003 activities constitute protected activity, there is no dispute that her complaints to the EEOC are protected activity. Therefore, she has met the first prong of a *prima facie* case for retaliation. She also has met the second prong because her termination was an adverse employment action.

Ms. Billingham, however, has not shown a causal link between protected activity and her termination. In fact, the lack of temporal proximity between Ms. Billingham's EEOC complaints and her termination and the documented evidence of her performance problems throughout her employment undercut any finding of causation.

While causation may be inferred by temporal proximity between the protected activity and adverse employment action, "in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (quotations omitted); *see also Manatt*, 339 F.3d at 802 (holding that inference of causation was not possible because nine months lapsed between plaintiff's complaint and alleged adverse decisions).

"As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's

enemy." *Lalvani v. Cook County, Ill.,* 269 F.3d 785, 790 (7th Cir. 2001). Courts have routinely held that a period of four to five months between protected activity and an employee's termination is too long to raise an inference of retaliation. *Filipovic v. K. & R Express Sys. Inc.,* 176 F.3d 390, 398-99 (7th Cir. 1999)(holding that "substantial time lapse" of four months between EEOC complaint and termination was counter-evidence of any causal connection, especially in light of arbitrator's finding of just cause for termination); *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997)(holding that four-month period is too long to support causation finding). Moreover, "[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Kaspar v. Federated Mut. Ins.,* 425 F.3d 496, 504 (8th Cir. 2005); *see also Erenberg v. Methodist Hosp.,* 357 F.3d 787, 793 (8th Cir. 2004)(holding that evidence that plaintiff was disciplined for same performance issues both before and after complaint belie contention of causal connection).

   In this case, Ms. Billingham's performance and conduct problems were documented continually and consistently throughout her years of employment at Airfield Maintenance. When Ms. Billingham filed her first claim of discrimination in 2002, she was far along in progressive discipline, had received several suspensions, and was

warned that she was being given a last chance to change her behavior.[11]  She was not terminated after filing her EEOC complaint, but was given several more "last chances" to continue with her employment.

Even in June 2003, when Ms. Billingham's union representatives believed that DOT/PF had good cause to terminate her employment, Mr. Hartman agreed to allow Ms. Billingham to continue with her employment if she would agree to improve her performance.  Ms. Billingham did not improve her performance but, instead, filed another EEOC complaint in January 2004.  After filing the second complaint, Ms. Billingham continued to have the opportunity to meet the terms of the Last Chance Agreement and raise her performance to an acceptable level for the year.  When the year was over, in July 2004, and she did not fulfill the terms of the Last Chance Agreement, she was terminated.  At that point, almost two years had passed since she filed her first EEOC complaint and more than five months had passed since she filed her second complaint— substantial time lapses that undercut any inference of causation.

Ms. Billingham has failed to show a causal connection between her complaints and her termination.  When Ms. Billingham did not fulfill the terms of the Last Chance Agreement, DOT/PF was "entitled, and perhaps obligated, to follow

---

[11]    Although Ms. Billingham contends that she engaged in protected activity by participating in a confidential investigation in 1996, she has produced no evidence to show that Dan Hartman, or any management at Airfield Maintenance, was aware of her participation in the investigation until after she filed her first EEOC complaint in 2002.

through." *Fuller v. Frank,* 916 F.2d 558, 560 (9th Cir. 1990)(noting that last chance agreement would have become meaningless if plaintiff was allowed another chance after violating the agreement). "[F]iling a complaint does not clothe [a plaintiff] with immunity for past and present inadequacies, [and] unsatisfactory performance." *Shanklin v. Fitzgerald,* 397 F.3d 596, 604 (8th Cir. 2005)(quotation omitted).

Accordingly, Ms. Billingham cannot make a *prima face* case of retaliatory termination and her claim should be dismissed.

### 2. Ms. Billingham Has Failed to Establish a *prima facie* case of retaliation for alleged "blacklisting"

Ms. Billingham also alleges that DOT/PF "blacklisted" her after her termination because DOT/PF determined that she was ineligible for rehire for positions in the Department. As with her termination claim, there simply is no evidence of a causal connection between her complaints to the EEOC and ASCHR and the determination that she was ineligible for rehire. A State employer has the right under the personnel rules to refuse to consider an applicant for employment if the applicant has been dismissed for unsatisfactory performance of duties. 2 AAC 07.112; *See also Smith v. Cont'l Ins. Corp.,* 747 F. Supp. 275, 283 (D.N.J. 1990)(upholding summary judgment for failure to rehire retaliation claim noting that company policy prohibiting rehire of previously discharged employees was eminently reasonable). Ms. Billingham was terminated for

unsatisfactory performance of her duties and she was ineligible for rehire for the same reason.

The evidence shows that it is a common practice for employers to request that Local 71 not refer an individual for hire after an employee has been terminated for cause. Ms. Billingham has not shown that she was treated differently than other employees who likewise were terminated. To the contrary, the evidence shows that Ms. Mushat and Mr. Hartman requested that Local 71 not refer other employees for hire after those employees were terminated for performance problems. Moreover, other employers, including the Municipality, have requested that Local 71 not refer Ms. Billingham for employment because of her performance problems. Such a request is eminently reasonable and legitimate and cannot support a finding of causation.

> ### 3. Ms. Billingham has not shown that the legitimate reasons for her termination and ineligible for rehire status were a pretext for retaliation

Ms. Billingham's retaliation claims also fail because she has not shown pretext. For the same reasons discussed regarding her discrimination claims, she has not shown pretext for retaliation claims. Ms. Billingham has offered no specific evidence to support her claims of retaliation. Her claims rely solely on her speculation and conjecture–which is insufficient to defeat summary judgment. *Villiarimo,* 281 F.3d at 1065, n 10 (holding that plaintiff failed to establish pretext where he argued only that a jury could infer that the real reason for his discharge was his complaint of sexual

Motion for Summary Judgment                                                      Page 46 of 49
*Elsa Billingham v. SOA/DOT&PF*
3:05-cv-0240 (TMB)

harassment, explaining that "at summary judgment, this court need not draw *all* possible inferences in [the plaintiff's] favor, but only all *reasonable* ones"). Accordingly, Ms. Billingham has not met her burden of showing pretext and her claims of retaliation should be dismissed.

### D.    The Evidence Shows That DOT/PF Did Not Breach The Covenant Of Good Faith And Fair Dealing

Ms. Billingham has failed to establish a claim for breach of the covenant of good faith and fair dealing. Under Alaska law, a covenant of good faith and fair dealing is implied into all employment contracts. *Chijide v. Maniilaq Ass'n of Kotzebue,* 972 P.2d 167, 172 (Alaska 1999). The fundamental issue in this cause of action is fairness. The covenant has two elements—a subjective or pretext element and an objective element. The subjective prong focuses on the employer's motive or intent. An employer engages in subjective bad faith if the employer is motivated by the goal of depriving the employee of a benefit under the contract. *Blackburn v. State, Dep't of Transp.,* 103 P.3d 900, 907 (Alaska 2004); *Ramsay v. City of Sand Point,* 936 P.2d 126, 133 (Alaska 1997). The objective test focuses on conduct. It requires an employer to "act in a manner which a reasonable person would regard as fair." *Ramsay,* 936 P.2d at 133 (quoting *Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1224 (Alaska 1992(). An "employer who acts in accordance with the express terms of a contract satisfies the covenant's objective component." *Chijide,* 927 P.2d at 172.

Because the State has produced evidence as to the reasons for Ms. Billingham's dismissal, she must show that these reasons were pretextual or improper. *French v. Jadon, Inc.,* 911 P.2d 20, 23 (Alaska 1996); *Era Aviation, Inc., v. Seekins,* 973 P.2d 1137, 1141 (Alaska 1999) (concluding that termination of employee because of personality conflict was not improper or impermissible). An employee's own speculation, opinion or assumptions about the employer's motivations are insufficient to raise a genuine dispute of fact to defeat summary judgment. *French,* 911 P.2d at 27 and n. 6. If an employer makes a determination, in good faith, that misconduct occurred, there is no breach of the covenant of good faith and fair dealing. *Holland v. Union Oil Co. of Calif., Inc.,* 993 P2d 1026, 1035 (Alaska 2000).

In this case, the State made a good faith determination that misconduct had occurred and that Ms. Billingham's performance and failure to meet the terms of the Last Chance Agreement warranted her termination. Ms. Billingham's own union representatives agreed, testifying that her termination was based on reasonable cause, was done in accordance with the terms of the Last Chance Agreement and CBA, and that they believed that Airfield Maintenance management acted in good faith.

There simply is no evidence to support a claim of breach of the covenant of good faith and fair dealing.

## III.        CONCLUSION

For all of the reasons discussed above, DOT/PF respectfully requests that this Court grant summary judgment in its favor and dismiss Ms. Billingham's complaint in its entirety, with prejudice.

RESPECTFULLY submitted this: <u>5th day of November, 2007</u>.

TALIS J. COLBERG
ATTORNEY GENERAL

By:   /s/  Brenda B. Page

Assistant Attorney General
Attorney General's Office
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5136 (Phone)
(907) 258-4978 (Fax)
LSA_ECF@law.state.ak.us
Alaska Bar No.  0303007

### CERTIFICATE OF SERVICE

This is to certify that on November 1, 2007, a true and correct copy of the Motion for Summary Judgment in this proceeding was served by first class U.S. Mail on the following:

Elsa Billingham
P.O. Box 231625
Anchorage, AK 99523

   /s/   Leticia Alvarez
Leticia Alvarez, Law Office Assistant
Attorney General's Office