Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,                )
                                )
        Plaintiff,              )
                                )
vs.                             )
                                )
STATE OF ALASKA, DEPARTMENT     )
OF TRANSPORTATION AND PUBLIC    )
FACILITIES,                     )
                                )
        Defendant.              )
_____)
Case No. 3:05-cv-0240 (TMB)

COPY

DEPOSITION OF ELSA BILLINGHAM

Pages 1 - 288, inclusive

Tuesday, September 25, 2007, 9:26 a.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

Exh. A
Billingham Deposition

Case 3:05-cv-00240-TMB   Document 87-3   Filed 11/06/2007   Page 2 of 20

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 2

```
 1              A-P-P-E-A-R-A-N-C-E-S

 2   For Defendant:

 3   ATTORNEY GENERAL'S OFFICE
     BY:  Brenda B. Page, Esq.
 4   1031 West 4th Avenue, Suite 200
     Anchorage, Alaska, 99501
 5   907/269-5100

 6

 7   Also Present:

 8   Dan Hartman

 9

10   Reported By:

11   Katherine L. Novak, RPR
     Registered Professional Reporter
12
```

Page 11

1  defendants request all documents that support,
2  refute, or otherwise relate to your claims?
3      A.  Okay.  Repeat the question.
4      Q.  In our written requests, the defendant's
5  written requests for documents, did the defendant
6  request all documents that support, refute, or
7  otherwise relate to your claims?
8      A.  Yes, I believe so.
9      Q.  And you provided me with approximately two
10 boxes of documents in response to defendant's
11 request; is that correct?
12     A.  Yes, I have.
13     Q.  Were those all of the documents that
14 support, refute, or otherwise relate to your
15 claims?
16     A.  No, they are not all of the documents.
17 They are probably the majority of the documents.
18     Q.  Are there documents that are responsive to
19 the defendant's request that you haven't produced to
20 us?
21     A.  Well, I understand you wanted copies of
22 the tape-recordings that I have.  And I was actually
23 going to try to make copies of those for you, and I
24 have not had the time to do it, but I am going to
25 try to get to it.

Page 12

1      Q.  All right.  Well, you'll need to get those
2  to us --
3      A.  Okay.
4      Q.  -- before the end of the discovery period.
5      A.  Right.  Right.  Exactly.
6      Q.  Aside from the tape-recordings, are there
7  any other documents that are responsive to
8  defendant's request that you have not provided to us
9  already?
10     A.  I'm not really sure.
11     Q.  And let me say again --
12     A.  I believe that I have provided you with
13 all of the documents that you have requested.  There
14 may be some things that I have not provided in
15 detail, but if I can -- and I'm not really sure
16 exactly what it is I have not provided, but I will
17 if I can get to it and if I can think of what I need
18 to send it.
19     Q.  Let me just say, you have an obligation
20 under the federal rules to provide all documents
21 responsive to our discovery requests.  And discovery
22 ends next week, so --
23     A.  Exactly.
24     Q.  -- if there's anything that you haven't
25 provided, you need to get them to me as quickly as

Page 13

1  possible.
2      A.  Exactly.
3      Q.  Okay.  Now, aside from the document
4  production request that defendant sent, you also got
5  interrogatory requests from defendants during this
6  litigation; is that right?
7      A.  Exactly.
8      Q.  And did you give an accurate and truthful
9  response to those interrogatories?
10     A.  I believe that I have.
11     Q.  And you signed a verification to that
12 effect; is that right?
13     A.  Yes, I have.
14     Q.  I'm going to start out going into just a
15 little bit of background about you.
16     A.  Okay.
17     Q.  And then I want to go into some questions
18 about some of your employment prior to starting out
19 at airfield maintenance.
20     A.  Okay.
21     Q.  What is your age?
22     A.  57.
23     Q.  What's your actual birth date?
24     A.  11/28/1949.
25     Q.  What's your current address?

Page 14

1      A.  Post Office Box 231625, Anchorage, Alaska,
2  99523.
3      Q.  And what's your residence address right
4  now?
5      A.  8113 East 3rd, Anchorage, Alaska.
6      Q.  How long have you lived there?
7      A.  Since 1999.
8      Q.  Are you married?
9      A.  No, I am not.
10     Q.  Do you have any children?
11     A.  No, I do not.
12     Q.  Have you -- well, you mentioned earlier
13 that you had brought some litigation before.
14     A.  Uh-huh.
15     Q.  And that was a case against Enserch; is
16 that right?
17     A.  That's right.
18     Q.  When was it that you brought that
19 litigation?
20     A.  1989.
21     Q.  And was that an employment related
22 matter?
23     A.  Yes, it was.
24     Q.  What court did you bring that in,
25 Ms. Billingham?

Page 15

1   A.   I believe it was state court.
2   Q.   Here in Alaska?
3   A.   Yes, it was.
4   Q.   And what was the outcome of that case?
5   A.   Actually, it was dropped. I was unable to
6   afford the attorney that I had, and so he basically
7   dropped my case.
8   Q.   And who was that attorney?
9   A.   Hal Gazaway.
10  Q.   And did the court drop it for lack of
11  prosecution?
12  A.   Yes, they did.
13  Q.   Have you ever been involved in any
14  litigation other than that case against Enserch?
15  A.   Well, I own a house in Meadow Lakes that's
16  a rental. And occasionally I've had to evict people
17  from the house, people that are not paying the rent
18  and that are living there and trashing the house and
19  stuff, so I've had to go to court.
20      I think I went to court on maybe one or
21  two occasions, and I don't recall any of the
22  details, basically, but I've had to do -- I think
23  they call them FEDs.
24  Q.   And did you handle those yourself, or did
25  you have an attorney?

Page 16

1   A.   Yes, I did. Well, one of them I handled
2   myself, and then another one I actually had hired an
3   attorney.
4   Q.   Who was that attorney?
5   A.   Greg Youngmun.
6   Q.   Aside from those eviction proceedings and
7   the case against Enserch, is there any litigation
8   you've been involved in as a party?
9   A.   Not that I can think of right now.
10  Q.   Is there any other litigation you've been
11  involved in as a witness?
12  A.   Not that I can recall.
13  Q.   Have you ever been sued yourself?
14  A.   No, I have not.
15  Q.   Have you ever been convicted of a crime?
16  A.   I was convicted of a misdemeanor.
17  Shoplifting.
18  Q.   When was that?
19  A.   That was nineteen -- I believe it was
20  1968.
21  Q.   And what was the outcome of that?
22  A.   I think I had to pay a $50 fine.
23  Q.   Was this in Alaska or somewhere else?
24  A.   Anchorage, Alaska.
25  Q.   Do you have any other arrests besides the

Page 17

1   shoplifting?
2   A.   I was arrested once for a DUI. And I
3   believe it was 1987, but I was not convicted.
4   Q.   Any other arrests?
5   A.   Not that I'm aware of right now.
6   Q.   Did you ever have any issues with the
7   Internal Revenue Service where they were garnishing
8   your paycheck?
9   A.   Yes. As a matter of fact, I owed the IRS
10  some money and I thought I could pay them $50 a
11  month. And so I believe that's what I was doing. I
12  think they were taking money out of my paychecks to
13  pay the IRS. And it was -- I'm not exactly sure how
14  much money they were taking.
15  Q.   What period of time was that?
16  A.   I believe it was when I first started
17  working for the State in 1994, but it may have
18  occurred before that. It may have occurred in
19  1992.
20  Q.   And what was the basis for your owing
21  money to the IRS?
22  A.   I had cashed out a Teamster's retirement
23  policy for $60,000, and then I believe that I owed
24  them -- and I'm not exactly sure what it was,
25  something like $18,000. And I thought I could pay

Page 18

1   them $50 a month, but that didn't work.
2   Q.   They didn't agree?
3   A.   No.
4   Q.   Okay.
5   A.   So anyway, I --
6   Q.   Was there any kind of criminal accusation
7   made against you related to that --
8   A.   No.
9   Q.   -- or was that something --
10  A.   It was just I owed them money, I wasn't
11  paying it in a timely fashion, so that's why I ended
12  up having money taken out of my paychecks.
13  Q.   I want to go through your educational
14  background.
15  A.   Okay.
16  Q.   Did you graduate from high school?
17  A.   Yes, I did.
18  Q.   And when was that?
19  A.   1967.
20  Q.   What was the name of the high school?
21  A.   Actually, it was Billy Mitchell High
22  School. General Billy Mitchell High School,
23  Colorado Springs.
24  Q.   Did you attend college?
25  A.   Yes, I did.

Page 19

1  Q. Where?
2  A. I went one year to the University of New
3  Mexico in Albuquerque, New Mexico. And I went two
4  years to the University of Alaska and College
5  Alaska.
6  Q. When was it that you were at the
7  University of Alaska?
8  A. 1968 through I believe 1970.
9  Q. And did you get a college degree?
10 A. No, I did not.
11 Q. What was your area of study?
12 A. General studies.
13 Q. Any military service?
14 A. No.
15 Q. Other training or licensing that you've
16 had?
17 A. I started out -- I went to school in
18 Anchorage, Alaska, in, I believe it was, nineteen
19 seventy -- I'm trying to think.
20     I joined the Teamsters Union I believe in
21 1975, and I took some training with them. I took a
22 construction surveying class at Anchorage Community
23 College, but it was affiliated with the Teamsters
24 Union.
25 Q. And that was in when, approximately

Page 20

1  1975?
2  A. Approximately 1975, I believe.
3  Q. Okay. And we're talking over each other a
4  little bit.
5  A. Okay. Sorry.
6  Q. So try and be aware of that.
7  A. Sorry.
8  Q. Was that something that you received some
9  sort of a diploma or certificate for?
10 A. I believe I received a certificate.
11 Q. What other kind of licensing have you
12 had?
13 A. Then in nineteen -- I think it was 1979, I
14 took the Teamsters heavy-duty truck driving class.
15 Q. What did that consist of?
16 A. Basically, consists of general practice,
17 driving big trucks around town and learning how to
18 do a pre-trip and learning how to check the oil
19 and --
20 Q. How long of a class was it?
21 A. It was approximately -- I think it was two
22 to three weeks.
23 Q. And did you get some sort of certificate
24 or license?
25 A. Yes. I got a certificate.

Page 21

1  Q. Anything else?
2  A. Then I -- let's see, I'm trying to think.
3  I've taken quite a few other training classes since
4  then through the Teamsters Union. And I don't
5  recall exactly what all I've taken.
6     I took a 40-hour hazardous materials
7  class, and I don't remember when I first took it.
8  I've taken it several times.
9     And I take the eight-hour hazardous
10 materials upgrade every year, because you have to
11 have that in order to keep the certificate current.
12 And my certificate is presently current.
13     I've also taken the MSHA training through
14 the Laborers Union, and I've been taking that -- I
15 just started taking that in the last couple of
16 years.
17 Q. And what is MSHA training?
18 A. Mining Safety and Health Assessment.
19 Q. Anything else?
20 A. I've taken forklift certification
21 training, and I actually took that through the
22 State. And I also attended, in 1990, I think it
23 was, I attended the Operating Engineers upgrade
24 school.
25    I had worked through the Operating

Page 22

1  Engineers for one summer, I think it was. And I
2  believe that was 1990. And then when I got out, I
3  applied to go through their upgrade class, and they
4  said that's okay. So it was approximately two to
5  three weeks of just general practice operating
6  equipment.
7  Q. Anything else?
8  A. Let me think. I have taken first aid
9  classes. I've taken CPR classes off and on since --
10 I'm not sure. I take them every, approximately, two
11 to three years. I took them through the State.
12 I've taken them through the Teamsters Union and
13 through the Laborers Union.
14    I took -- I've taken some more training
15 classes through the Teamsters Union, some upgrades
16 on specific types of trucks, on articulating end
17 dumps. I took that just recently, a couple of years
18 ago. And I've taken -- let's see.
19    I took some training to get a chauffeur's
20 license.
21 Q. When was that?
22 A. I believe that was two years ago or so.
23 So I had to take a class. It's a one-day class, and
24 then you sit down and study.
25 Q. So do you currently have a chauffeur's

### Page 23

1  license?
2  A. Yes, I do.
3  Q. What about a commercial driver's
4  license?
5  A. Yes, I do.
6  Q. When did you get that?
7  A. I'm not sure when I first got it, but I
8  think it was 1992, I think. But I could be wrong on
9  that. I don't remember exactly which year I first
10 got it, but then I had to renew it every five
11 years.
12 Q. And you've kept it up to date?
13 A. Yes, I have.
14 Q. Is there any training, other than, you
15 know, maybe very minor half-day training that you've
16 sort of covered, but any other training that we
17 haven't covered?
18 A. Well, when I worked for the State they
19 gave me training on various types of equipment.
20 They trained me on the curb and gutter broom. They
21 trained me on one of their riding lawn mowers. They
22 trained me on air compressors, generators, water
23 pumps. I'm trying to think. They gave me a lot of
24 the -- I'm trying to think of what it's called.
25 Q. Well, is it fair to say that you were

### Page 24

1  trained on various types of equipment while you were
2  working for the State?
3  A. That's true. That's true.
4  Q. I'm really looking more for more formal
5  training that you may have had, as opposed to
6  on-the-job training.
7     But my understanding of what you're saying
8  is that you did receive on-the-job training from the
9  State; is that correct?
10 A. Yes, I did.
11 Q. Is there any other formal training that
12 you've had that you haven't mentioned here today?
13 A. What exactly do you mean by formal
14 training?
15 Q. Well, I mean, something where you would go
16 and get a certificate or, you know, the kind of
17 things you've already talked about where you went to
18 the --
19 A. Yes, I did. I took -- I took the
20 flaggers -- and now this is just a one-day class
21 also, but I did get a certificate, the flagging,
22 traffic control certificate. And I also took -- I
23 know that there was something else. It just slipped
24 my mind.
25 Q. Well, if it comes to you later --

### Page 25

1  A. Okay.
2  Q. -- you can go ahead.
3  A. Okay.
4  Q. But to the best of your recollection, have
5  we covered the training that you've had through the
6  years?
7  A. Yes.
8  Q. Now, you mentioned that you've been a
9  union member. What unions have you had membership
10 with during your time in Alaska?
11 A. I've been a member of the Teamsters Union.
12 I've been a member of the Public Employees Union
13 Local 71. I'm a member of the Laborers Local 341.
14 And I'm a member of the Operating Engineers 302.
15 Q. Are you currently a member of all of those
16 unions?
17 A. Yes, I am.
18 Q. I want to start talking about your
19 employment history before coming to work for the
20 State here.
21    When was it that you actually started
22 working in Alaska?
23 A. Now, are you referring to just
24 construction, or prior to when I worked
25 construction?

### Page 26

1  Q. Anything.
2  A. I worked at the Arctic Health Research
3  Institute in Fairbanks, Alaska, when I was going to
4  college. And I believe I worked there for one year,
5  but it was only a part-time job.
6  Q. When was that?
7  A. I believe it was -- I want to say 1969.
8  Q. And when was your first construction
9  job?
10 A. My first construction job was 1976.
11 Q. I'm going to hand you a document that
12 we'll have marked as Exhibit 1.
13   (Exhibit 1 marked.)
14 BY MS. PAGE:
15 Q. If you could take a look at that,
16 Ms. Billingham.
17    Do you recognize this document?
18 A. Uh-huh. Yes, I do.
19 Q. What is it?
20 A. It's an old copy of one of my resumes.
21 Q. This doesn't, as far as I can see, have an
22 actual date on it.
23    Do you have a sense as to when this resume
24 would have been a current resume?
25 A. I would say -- I believe when I first

Page 27

1  applied for a job with the State, I believe that
2  this was the resume that I used at that time.
3      Q.  I'm going to hand you another document.
4      A.  Or actually, this may have been prior to
5  that. Because I can see that I put down Clovis High
6  School, Clovis, New Mexico, which is where I went to
7  high school, but I also went to another high school
8  in Colorado Springs, which I did graduate from.
9          So I know that this was not an accurate --
10 I failed to put down the other high school. But I
11 did attend Clovis High School for several years.
12     Q.  Well, I'm going to hand you another
13 document, and I'm going to have this one marked as
14 Exhibit 2.
15         (Exhibit 2 marked.)
16 BY MS. PAGE:
17     Q.  If you would take a look at that, please.
18         Do you recognize this document?
19     A.  No, not really. I know it's my writing.
20     Q.  Is that your signature on the second
21 page?
22     A.  Maybe this was the application that I used
23 when I applied for the State job.
24     Q.  And it says "Application for Employment
25 Labor, Trades and Crafts" at the top, correct?

Page 28

1      A.  Uh-huh.
2      Q.  And is that your signature on the second
3  page?
4      A.  Yes, it is.
5      Q.  And is this your handwriting throughout
6  the document, the handwritten portions?
7      A.  Yes, it is.
8      Q.  And this has a date on it of June 7th,
9  1994; is that right? Next to your date -- I mean,
10 next to your signature on the back page?
11     A.  Yes, it does.
12     Q.  And you said earlier that you thought
13 Exhibit 1 may have been the resume that you would
14 have submitted with your application with the State;
15 is that still your --
16     A.  Yes.
17     Q.  -- assessment?
18     A.  And it was an old resume, it wasn't
19 current.
20     Q.  Now, you said that you have Clovis High
21 School on here. Why did you put Clovis High School
22 on rather than the Colorado Springs High School?
23     A.  I attended Clovis High School from
24 nineteen -- well, I attended junior high school in
25 Clovis, New Mexico. And then I attended high school

Page 29

1  from 1965, I believe, through -- and we moved in the
2  middle of my senior year, which I believe was 1967.
3          So I did attend Clovis High School until
4  1967, and then we moved to Colorado Springs.
5      Q.  So this says you graduated from Clovis
6  High School, though.
7      A.  Right.
8      Q.  Is that not accurate?
9      A.  No, that is not accurate.
10     Q.  Why didn't you put the name of the high
11 school that you had graduated from?
12     A.  I was just trying to keep it simple and
13 short, and since most of my high school transcripts
14 are from Clovis, New Mexico, but I did graduate from
15 General Billy Mitchell High School in Colorado
16 Springs.
17     Q.  Was there any reason why you didn't want
18 an employer to check your transcript from the
19 Colorado Springs High School? I mean, were you
20 trying to --
21     A.  No.
22     Q.  -- hide anything?
23     A.  No.
24     Q.  Okay.
25     A.  I was just trying to keep my resume short

Page 30

1  and --
2      Q.  But is it fair to say it's not accurate
3  that you graduated from Clovis High School?
4      A.  That's true. That's true.
5      Q.  Now, is this list that we have -- we'll
6  look on Exhibit 2, which you said was your
7  application for employment with the State of Alaska
8  in 1994.
9      A.  Uh-huh.
10     Q.  Is this an accurate list of your
11 employment immediately prior to working for the
12 State?
13     A.  I believe so.
14     Q.  And at the bottom of the application
15 there's a certificate of the applicant certifying
16 that this was true and complete and that you hadn't
17 knowingly withheld any information; is that
18 correct?
19     A.  I believe so.
20     Q.  Well, I mean, you can take a look at it.
21 Is that correct?
22     A.  Uh-huh.
23     Q.  And you signed this, correct?
24     A.  Yes, I did.
25     Q.  Let's look at -- let's start at the

Page 31

1  employer at the top here, which would be what you
2  represented in your application to be the employer
3  that would have been the one that was the most
4  current prior to your applying with the State in
5  1994, correct?
6      A.  Uh-huh.
7      Q.  And you have Gray Line of Alaska on here.
8      A.  Uh-huh.
9      Q.  And you said that you were working there
10  from February 1994 to the present, correct?
11     A.  Uh-huh.
12     Q.  Okay. What was your job with Gray Line?
13     A.  I was driving a motorcoach.
14     Q.  Was that a union position?
15     A.  No, it was not. It was nonunion.
16     Q.  Were you allowed to take nonunion
17  positions while you were a union member at that
18  time?
19     A.  Yes.
20     Q.  Was this a full-time position during this
21  period of time?
22     A.  No, it was a part time. It was
23  actually -- it included some -- it was actually not
24  full time at all. It was just training. They were
25  basically training me on buses. And then I worked

Page 32

1  part time, and I don't recall what my schedule was
2  or how many days a week I worked.
3          But then when I worked for the State, I
4  also worked at the same time driving motorcoach on
5  the weekends, because I know I was working one day a
6  week driving motorcoach.
7      Q.  Can you approximate how many actual trips
8  you drove for Gray Line?
9      A.  No, I cannot.
10     Q.  Would it be between 0 and 10, 10 and 20,
11  20 and 30; can you give me some sense?
12     A.  Anywhere up to 20, I'm thinking.
13     Q.  Was it a contract position? How did that
14  work?
15     A.  It's a summertime -- they're seasonal
16  positions. They hire -- they train and hire new
17  drivers. And they train you the way they want you
18  trained. And then you drive -- I was driving from
19  Anchorage to Seward and back. And sometimes they
20  would have me drive from Anchorage to Seward, back
21  to Anchorage, and then back to Seward in one day.
22  It was exhausting.
23     Q.  What was your reason for leaving that
24  position?
25     A.  They basically didn't pay very much. I

Page 33

1  think I was getting like seven dollars an hour, and
2  I was working for the State at the same time, kind
3  of towards the end of the summer. And it was just
4  too exhausting for me to drive for Gray Line and
5  work for the State at the same time.
6      Q.  So you just voluntarily left?
7      A.  Yeah. Yeah. But the season was ending,
8  so I would have been laid off anyway.
9      Q.  Did you have any performance issues with
10  your Gray Line job at all?
11     A.  Not that I'm aware of.
12     Q.  I'm now going to hand you what we'll have
13  marked as Exhibit 3.
14         (Exhibit 3 marked.)
15  BY MS. PAGE:
16     Q.  If you would take a look at that, please.
17         And do you recognize this document?
18     A.  Yes, I do.
19     Q.  What is it?
20     A.  It's a computer printout from the
21  Teamsters Union.
22     Q.  And this is a multi-page document. In the
23  lower right-hand corner, it says EB 0541 and goes
24  through EB 0545.
25     A.  Uh-huh.

Page 34

1      Q.  And then if you'd look, there's a last
2  page that has a number in the corner that just says
3  2019.
4          Is that a different document that we've
5  combined here?
6      A.  Yes, it is. This one is out of the
7  Operators Union.
8      Q.  So this is a dispatch?
9      A.  Yeah. These are two separate documents.
10     Q.  If you'd take a look at this, and let
11  me -- I guess let me ask you.
12         So this first one is your dispatch
13  history.
14     A.  Uh-huh.
15     Q.  From what union, did you say?
16     A.  Teamsters Union.
17     Q.  Teamsters; okay.
18         And how does this work? Every time you
19  would be dispatched for a position, would it show up
20  on this computerized --
21     A.  I believe so.
22     Q.  If you'd go down to the fifth entry on
23  this first page, it says 05-22. It says 14.27,
24  2006.
25         Do you know what -- is that a date?

**Page 35**

1  A.  Okay. I'm not sure which one you're
2  looking at.
3  Q.  The fifth one down.
4  A.  One, two, three, four, five.
5  Q.  Is this a date here?
6  A.  The one that says "Municipality of
7  Anchorage"?
8  Q.  Yeah.
9  A.  Yeah, that's got to be 2006.
10  Q.  So that would be May 22nd?
11  A.  I believe so.
12  Q.  And now, if you -- this says "not hired"
13  on it, correct?
14  A.  Uh-huh.
15  Q.  What does that mean; how does that work?
16  If you're dispatched and then --
17  A.  Well, what it means is that you have to
18  take an application over to the city. And you have
19  to go through an interview process -- or the city
20  does their application process, which means they
21  review your application, and then they certify you.
22  You're either eligible to apply for the job or
23  you're not. At least this is my understanding of
24  what they do. And I applied for the job and I was
25  rejected for the job, although I --

**Page 36**

1  Q.  Why were you rejected; do you know?
2  A.  They don't tell you that.
3  Q.  Okay. And then if you'll go down two
4  more, there's one that says, "2005-11-10-14.33 Brice
5  Incorporated."
6     Do you see that one?
7  A.  Uh-huh.
8  Q.  That says "not eligible for maxi hauls" on
9  it, correct?
10  A.  Exactly.
11  Q.  And then there is -- actually, both with
12  this one and the Municipality job, there's a column
13  on the right that says "rehire" up at the top?
14  A.  Okay. I'm trying to follow you.
15  Q.  Go all the way over to the right.
16  A.  Uh-huh.
17  Q.  Do you see that column that says "rehire"
18  at the top?
19  A.  Yes.
20  Q.  And the Municipality job and this Brice
21  job both have "N's" in them.
22     Do you know what that means?
23  A.  Not really.
24  Q.  Could it stand for not eligible for
25  rehire?

**Page 37**

1  A.  It's possible.
2  Q.  So with this Brice job that's on here, it
3  says "Not eligible for maxi hauls."
4     Do you know what the reason is for that?
5  A.  Well, I took an open call to go to the
6  Slope to drive maxi hauls. And I have thousands of
7  hours on maxi hauls and I know how to drive them.
8  These people had trucks that were 20 years old.
9  Okay? You know, every truck is different.
10     I get up there and -- and besides that,
11  maxi hauls are the most difficult of all
12  tractor-trailers to back up. And since I hadn't
13  driven one in 15 years, I was kind of backing up
14  like this.
15  Q.  Now, the court reporter can't --
16  A.  Oh. I was backing up crooked, I guess you
17  might say. I wasn't backing up straight. So I was
18  fired after three, three-and-a-half hours.
19  Q.  From a Brice job?
20  A.  Yeah, Brice.
21  Q.  And did they then put you on a status
22  where you were not eligible to be rehired for maxi
23  hauls?
24  A.  They told me I was eligible -- I had
25  worked for them before. I was eligible to drive

**Page 38**

1  articulators, but I'm not -- they said I was not
2  eligible to drive maxi hauls. Although I dispute
3  that, because I do have thousands of hours driving
4  maxi hauls and I know how to drive them, but --
5  Q.  But for purposes of the Teamsters
6  dispatch --
7  A.  Right.
8  Q.  -- you're on here as not eligible for maxi
9  hauls?
10  A.  That's what they say, yeah.
11  Q.  And then the position after that says,
12  "Interstate Brands, not hired."
13     What was the situation with that?
14  A.  Well, the situation with that was I had
15  applied for the job and they wanted a
16  tractor-trailer driver in town. I did not feel
17  proficient enough to drive tractor-trailer in town.
18  I can drive tractor-trailers on dirt jobs or out of
19  town, but not in town.
20  Q.  So did you take yourself out of the
21  running?
22  A.  So I took myself out, exactly.
23  Q.  And this was in 2005, correct?
24  A.  Yes.
25  Q.  Let's turn the page and look at the second

### Page 39

1  page, which is marked in the lower right-hand corner
2  with an EB 0542. And there appears to be a gap on
3  here. We have positions going back to 2000, and
4  then there's a gap going down to 1994.
5      So is that during the period of time that
6  you were employed with the State where you didn't
7  take any Teamsters positions?
8      A.  From 2000 to nineteen -- from 1994 to
9  2000 --
10     Q.  Yeah.
11     A.  -- is that what you're saying?
12         I believe so, because that's when I was
13 working for the State.
14     Q.  And there's a position, if you look at the
15 third entry on down there, it says,
16 1994-05-04-23.50, position with Eastwind, correct?
17     A.  Yes.
18     Q.  And if you look at it, it says 1994, May
19 18th, D-I-S-C. Do you know what the "D-I-S-C"
20 stands for?
21     A.  Discharge.
22     Q.  So were you discharged from the position
23 with Eastwind in 1994?
24     A.  Yes, I was.
25     Q.  I'm going to hand you a document that we

### Page 40

1  will have marked as Exhibit 4.
2      (Exhibit 4 marked.)
3  BY MS. PAGE:
4      Q.  If you could take a look at that, please.
5      A.  Uh-huh.
6      Q.  Do you recognize what has been copied in
7  this document?
8      A.  Yes, I do.
9      Q.  This is a three-page document, correct?
10     A.  Yes.
11     Q.  And it has marked EB 0738, EB 0739, and
12 EB 0740, correct?
13     A.  Uh-huh.
14     Q.  Now, when you responded to defendant's
15 discovery requests, you provided us with a series of
16 hard-bound journals; is that right?
17     A.  That's correct.
18     Q.  Okay. Now, are these copies, on these
19 pages that I just provided to you, copies of journal
20 pages from the journals that you provided to us?
21     A.  Yes, they are.
22     Q.  Okay. And we have dates on the top of
23 every page, correct?
24     A.  Uh-huh.
25     Q.  Okay. And to the best as you can tell,

### Page 41

1  are these accurate copies of your journals?
2      A.  Yes, as far as I can tell.
3      Q.  Now, do these pages here, that I've
4  provided to you, record your journal entries at the
5  time that you had the position that we were just
6  talking about --
7      A.  Yes.
8      Q.  -- with Eastwind?
9      A.  Yes, it does.
10     Q.  Can you wait until I finish the question
11 before you answer.
12     A.  Oh. Sorry.
13     Q.  So you were discharged from that position.
14 What was the reason that they gave you for the
15 discharge?
16     A.  I don't recall.
17     Q.  Was it a performance issue?
18     A.  To tell you the truth, I do not recall.
19 It was so long ago, that --
20     Q.  Okay. But this was a job driving a water
21 truck, correct?
22     A.  Yes, it was.
23     Q.  And how many days did you have the job
24 before you were discharged?
25     A.  I'm not sure.

### Page 42

1      Q.  Okay.
2      A.  A couple of days, I think.
3      Q.  And it says on your entry for May 17th,
4  1994, that you "drove until approximately 2:45 and
5  then the rear end went out. Craig said to drive it
6  to the pit stop on asphalt and let the water drain
7  out, which I did. He came up and said I was going
8  the wrong way and to go to the pit. I was fired."
9          Correct?
10     A.  I believe so.
11     Q.  Okay. And is that an accurate assessment
12 as to what happened?
13     A.  I believe so.
14     Q.  Okay. Did you file an EEOC charge related
15 to your discharge with Eastwind?
16     A.  I don't think I did, because I think it
17 was like right after that that I went to work for
18 the State. And I was working for -- I believe I was
19 also still working for Gray Line, and I was too
20 busy. I did not have a chance to do it. I was
21 going to, but I didn't.
22     Q.  And your May 18th journal entry, you
23 indicate in there, "I called EEOC."
24     A.  Uh-huh.
25     Q.  Is that regarding this Eastwind job?

Page 43

1    A.   Yes. Probably.
2    Q.   Okay. But to the best of your
3  recollection, you didn't actually file a charge with
4  them?
5    A.   To the best of my recollection.
6    Q.   And what would your charge have been based
7  on?
8    A.   Well, the truck broke down and I did not
9  cause the truck to break down. It was an old, worn
10 out piece of junk. Everything was wrong with this
11 truck. They could blame me for the rear end going
12 out, but I did not cause the rear end to go out.
13   Q.   So did you believe they were -- the
14 discharge was discriminatory?
15   A.   Exactly.
16   Q.   Based on what?
17   A.   Exactly.
18   Q.   I mean, based on what grounds? Sex?
19 Age?
20   A.   Well, I had only been there for a couple
21 of days. I believe it was sex. And they didn't
22 even give me a chance.
23   Q.   And did you have any evidence to support
24 an allegation?
25   A.   Probably not.

Page 44

1    Q.   So, in your mind, it wasn't your fault, it
2  was -- you were discharged because of sex
3  discrimination?
4    A.   Yes. That's true.
5    Q.   Now, did you include this job on your
6  application for employment with the State of
7  Alaska?
8    A.   No, I did not.
9    Q.   And why not?
10   A.   Well, I did not want them to -- I don't
11 know. It was a short job, it didn't last very long,
12 and so I did not include it.
13   Q.   Did you not want them to know that you had
14 been discharged from it?
15   A.   That's true.
16   Q.   So when you signed this certificate of
17 applicant at the bottom where you said that you had
18 not knowingly withheld any facts or circumstances
19 from your previous employment, in fact that's not
20 true; is that right?
21   A.   That's true.
22   Q.   So you basically did knowingly withhold
23 information on the application?
24   A.   Yes, I did.
25   Q.   The next job that you list on here is M&B

Page 45

1  Contracting.
2    A.   Yes.
3    Q.   And that was a pilot car position --
4    A.   Uh-huh.
5    Q.   -- is that right?
6         And you said the reason for leaving that
7  was an RIF. Is that a reduction in force?
8    A.   Uh-huh.
9    Q.   Okay. Did you have any performance issues
10 with that position?
11   A.   Not that I'm aware of.
12   Q.   And then there's a position on the
13 Teamsters dispatch sheet from 1991. I'm going to go
14 down to the Quality Asphalt Paving. It's one two,
15 three, four, five, six, seven, eight, nine -- nine.
16 The ninth one on the second page.
17   A.   Okay.
18   Q.   It says QAP. Am I correct that that
19 stands for Quality Asphalt Paving?
20   A.   Yes, that's true.
21   Q.   Okay. And that has a date of 1991, it
22 says 06-04-23.49.
23   A.   Uh-huh.
24   Q.   And it appears to indicate you were
25 discharged from that position; is that right?

Page 46

1    A.   That's right. But I had never worked for
2  them, so I don't know how they could discharge me.
3  I mean, they just -- I was not hired by Quality
4  Asphalt. So that is actually a wrong -- that's a
5  misprint, a typo.
6    Q.   Was it some other job that you were hired
7  for?
8    A.   I tested and they failed to hire me.
9    Q.   And it also has an "N" in the rehire
10 column, correct?
11   A.   Uh-huh.
12   Q.   Okay.
13   A.   That's correct.
14   Q.   So you're saying you were not discharged
15 from them; they refused to hire you?
16   A.   That's what I believe occurred.
17   Q.   I want to go back actually on this first
18 page here. Back up a minute.
19        That job you said with the Municipality
20 where they wouldn't hire you.
21   A.   Uh-huh.
22   Q.   We have a date there of May 2006.
23   A.   Uh-huh.
24   Q.   Wait a second. There's also a job on
25 here -- back up a little from the Asphalt Quality

### Page 47

1  Paving. On the second page, the fourth one down.
2  It says 1994-03-10, Municipality of Anchorage.
3      A.  Uh-huh.
4      Q.  A bus driver position.
5      A.  Uh-huh.
6      Q.  What was that position?
7      A.  That was a city bus driver position and
8  they would not hire me. They had a psychological
9  test, and I failed their psychological test.
10     Q.  What kind of psychological test was
11 that?
12     A.  I'm not really sure. It was just kind of
13 a -- in my opinion, it wasn't -- it was kind of a
14 dumb test, but that's just my opinion.
15     Q.  Was it a written test?
16     A.  Yes, it was.
17     Q.  And they told you that you had failed
18 it?
19     A.  Now, I had applied for jobs with them on
20 several occasions. And I'm not sure exactly which
21 times I failed the psychological test.
22     Q.  Okay.
23     A.  But it was a couple of different times.
24 So obviously they did not want to hire me.
25     Q.  So you failed their psychological test

### Page 48

1  more than once?
2      A.  I believe so.
3      Q.  And did they give you a reason why you had
4  failed it?
5      A.  No, they did not.
6      Q.  I'm going to hand you what we'll mark as
7  Exhibit 5.
8      (Exhibit 5 marked.)
9  BY MS. PAGE:
10     Q.  Take a look at that.
11         And again, is this an accurate -- are
12 these accurate copies of pages from your journals
13 that you provided?
14     A.  I believe so.
15     Q.  And this is again three different pages,
16 and they're marked as EB 0694, EB 0709, and EB 0711.
17 And these date from March and April of 1994,
18 correct?
19     A.  Uh-huh.
20     Q.  And if you look at the second page, it
21 says "called city, Neil Koeninger reversed my
22 ineligible for rehire for driving jobs."
23     A.  Uh-huh.
24     Q.  So did you -- before that, had you been
25 ineligible for rehire for driving jobs with the

### Page 49

1  Municipality?
2      A.  I'm not sure.
3      Q.  But it would appear that way from what you
4  said on here?
5      A.  Yeah. Uh-huh.
6      Q.  Okay. And then do you recall why it was
7  that he reversed your ineligibility for rehire?
8      A.  Do I recall what?
9      Q.  Why he would have reversed that?
10     A.  No, I do not.
11     Q.  And do you know why you would have been
12 ineligible for rehire in March 1994?
13     A.  No, I do not.
14     Q.  And then if you look at the April 4th,
15 1994, entry, it says, "I had not passed their
16 psychological test."
17        Is that referring to the Municipality's
18 psychological test?
19     A.  Yes, it is.
20     Q.  And that's what you were talking about
21 earlier?
22     A.  Yes. Yes.
23     Q.  So does this put into context, you know,
24 when it was, at least, at one time you hadn't passed
25 their psychological test?

### Page 50

1      A.  That's correct.
2      Q.  And these are tests specifically for
3  driving school buses or --
4      A.  City buses.
5      Q.  City buses.
6      A.  Uh-huh.
7      Q.  Okay. Now, were you having --
8      A.  And that reminds me. I did take some
9  training for school bus driving also.
10     Q.  Okay. When was that?
11     A.  And I passed -- I believe it was in 2002,
12 approximately. I passed their written test, I
13 passed their driving test. And they do not give a
14 psychological test, but they do do a full background
15 check on everybody. And you're not even allowed to
16 have one DUI.
17     Q.  And did you pass that?
18     A.  I passed it.
19     Q.  Did you ever do any driving?
20     A.  And I actually had a school bus license
21 for one year, I think.
22     Q.  Did you actually --
23     A.  No, I did not.
24     Q.  Let me finish the question.
25     A.  Okay.

### Page 55

1   A.  Uh-huh.
2   Q.  You've got a job on here, Red Samms
3   Construction from 6/91 to 7/91, correct?
4   A.  Uh-huh. Uh-huh.
5   Q.  Why did you leave that position?
6   A.  I was laid off.
7   Q.  And I'm not seeing that in this dispatch
8   sheet. Was that through another union?
9   A.  Yeah. That's through the Operators
10  Union.
11  Q.  Okay. And then you said this Quality
12  Asphalt Paving job that shows up on here is a
13  mistake, as far as you know, correct?
14  A.  I have never worked for Quality Asphalt.
15  I have worked for them on a couple of occasions
16  flagging, but that -- I believe that was -- I had
17  taken a belly dump driving call, and I believe that
18  was the one that I was rejected for.
19  Q.  Now, we'll go back to 1989 on this
20  dispatch sheet, which is fourth from the bottom on
21  the copy I have on EB 0542. And that's a job with
22  Enserch --
23  A.  Uh-huh.
24  Q.  -- correct?
25  A.  Uh-huh.

### Page 56

1   Q.  And it indicates that you were fired from
2   that position?
3   A.  Uh-huh.
4   Q.  Now, is that the position that you filed a
5   lawsuit as a result of your termination?
6   A.  Yes, it is.
7   Q.  Did you include that position on your
8   application for employment with the State of
9   Alaska?
10  A.  No, it is not on the application, but it
11  is on my resume.
12  Q.  And that would be the last position in the
13  resume --
14  A.  Yes.
15  Q.  -- that says Enserch '85 to '89,
16  correct?
17  A.  Yes.
18  Q.  And you didn't give any reason on the
19  resume as to why you left there?
20  A.  No.
21  Q.  Tell me a little bit about the lawsuit --
22  well, actually let me do this. I'm going to hand
23  you what we'll have marked --
24  A.  I think I actually submitted a copy.
25  Q.  I think you did.

### Page 57

1   A.  Oh. Okay.
2   Q.  We'll mark this as Exhibit 7.
3   (Exhibit 7 marked.)
4   BY MS. PAGE:
5   Q.  If you'd take a look at this.
6   Do you recognize these documents?
7   A.  Yes, I do.
8   Q.  And you said you believe you had submitted
9   a copy, what were you referring to?
10  A.  This.
11  Q.  And you've submitted a copy of this with
12  the court, is that what you had meant, or --
13  A.  No, I submitted this with you.
14  Q.  Did you file a copy of this with the court
15  in this litigation with documents that you submitted
16  to the court?
17  A.  I believe so.
18  Q.  And the first page is --
19  A.  Well -- excuse me. Can I backtrack?
20  Q.  Sure.
21  A.  I believe that I submitted a copy of this
22  to the EEOC.
23  Q.  A copy of what to the EEOC?
24  A.  Well, this is an EEOC copy.
25  Q.  And you're referring to the first page of

### Page 58

1   this --
2   A.  Yeah. The first page.
3   Q.  -- which says charge of discrimination.
4   A.  Uh-huh. And the other, and I believe it
5   had to have been filed with the court, the attorney
6   that I had.
7   Q.  I'm talking about the court in this
8   litigation.
9   A.  Okay.
10  Q.  Do you recall that you submitted a
11  whole --
12  A.  Okay.
13  Q.  -- bundle of documents to the court in
14  this litigation?
15  A.  Yes. Yes, I did.
16  Q.  Do you recall if this was among those
17  documents?
18  A.  I don't recall.
19  Q.  Okay.
20  A.  I believe I did, but I'm not positive.
21  Q.  We could look at the court file and
22  ascertain that, correct?
23  A.  Okay.
24  Q.  Is this an accurate copy of the EEOC file
25  that you filed against Enserch?

Page 59

1   A.  Yes, it is.
2   Q.  And is this an accurate copy of an amended
3   complaint that you filed?
4   A.  Yes, it is.
5   Q.  So what was your complaint against Enserch
6   based on? Was it sex discrimination?
7   A.  It was sexual harassment, it was sex
8   discrimination, and it was retaliation and
9   harassment.
10  Q.  And if you will look at the back page of
11  what we've marked here as Exhibit 7.
12      Do you recognize that document?
13  A.  Yes, I do.
14  Q.  And what is it?
15  A.  It's a letter from Sue Wyrick.
16  Q.  Who is Sue Wyrick?
17  A.  She was a coworker on that job.
18  Q.  And do you know where she is now?
19  A.  Yes, I do.
20  Q.  Where is she now?
21  A.  She works for the school district.
22  Q.  Here in Anchorage?
23  A.  Uh-huh.
24  Q.  Is her name still Sue Wyrick?
25  A.  I do not know.

Page 60

1   Q.  Do you know how to get in touch with
2   her?
3   A.  Yes, I do.
4   Q.  Do you have her phone number?
5   A.  No, I do not.
6   Q.  Okay. How would you get in touch with
7   her?
8   A.  Through the Teamsters Union.
9   Q.  Is she still a teamster member?
10  A.  Yes, she is.
11  Q.  What does she do for the school
12  district?
13  A.  She's a truck driver, maintenance
14  worker.
15  Q.  Are you still in contact with her?
16  A.  No, I am not.
17      As a matter of fact, I would like to say
18  one thing. This is not -- some of the other
19  discovery that I have received, there is a more --
20  there's more pages to this letter, one or two more
21  pages. And I want to refute, dispute what she says,
22  because it is a false statement.
23  Q.  Okay. So you're saying that Sue Wyrick,
24  this written statement and any other written
25  statements that she may have submitted -- and is

Page 61

1   this a submission to Enserch, as far as you know, or
2   do you know what that is?
3   A.  Exactly. Right. She wrote it to the
4   union.
5   Q.  How do you know that? When have you seen
6   this document before?
7   A.  I've never seen it before.
8   Q.  Oh, you haven't seen this before?
9   A.  Not prior to this lawsuit. I have never
10  seen this before.
11  Q.  So you saw this when we produced it to
12  you?
13  A.  Yes.
14  Q.  Okay. So you're making assumptions as to
15  what this is, but you didn't have prior knowledge of
16  it?
17  A.  That's correct.
18  Q.  And I guess at the time that this
19  happened, did you know that Sue Wyrick -- well, let
20  me ask you this. Let's back up.
21      If you would read the next to the last
22  sentence of this note that's apparently signed by
23  Sue Wyrick, what does that say?
24  A.  I wouldn't -- I'm not going to read -- I'm
25  not going to read that.

Page 62

1   Q.  Well, it says, "I wouldn't wish losing a
2   job on anybody, but in this case I feel it was
3   justified"; is that correct?
4   A.  That's correct.
5   Q.  And was she talking about you getting
6   discharged from Enserch; do you know?
7   A.  I believe so.
8   Q.  That's what it appears to be, correct?
9   A.  Uh-huh.
10  Q.  Now, Sue Wyrick is a woman; is that
11  right?
12  A.  Yes, she is.
13  Q.  And do you have any idea what her age
14  is?
15  A.  I would believe she would be about my age,
16  but I don't know her exact age.
17  Q.  So is it accurate to say, from looking at
18  this document, that it appears that Sue Wyrick
19  believed that your discharge was justified?
20  A.  I believe so.
21  Q.  Did you know at the time that Sue Wyrick
22  believed that your discharge was justified?
23  A.  Okay. Say that again.
24  Q.  At the time that you were -- let me ask
25  you this. At the time you were discharged, did you

Page 63

1  have any conversations with Sue Wyrick regarding
2  your discharge?
3      A.  No, I did not.  She was a coworker.  She
4  was supposed to have been working.  I was fired for
5  having a radiator leak.  I didn't cause the leak.  I
6  had a mechanic look at the truck.  His name was
7  Carroll Eby.  I had two witnesses, Debbie Larsh and
8  another equipment operator named Dennis.  I called a
9  mechanic.  He looked at the truck and authorized me
10 to drive it, so I drove it.
11     When I got to the top of the mountain, the
12 supervisor came up and said, "You've got a radiator
13 leak, you're fired."
14     Sue Wyrick, to the best of my knowledge,
15 wasn't there.  She's not a mechanic.  She had no
16 knowledge whatsoever what happened with this truck.
17 The truck was old and worn out.
18     Q.  So this sounds similar to what you had
19 said with the previous position we were discussing
20 with Eastwind --
21     A.  Right.
22     Q.  -- where you were let go because of -- and
23 I don't know, is it failure to recognize that there
24 was a problem with the truck?  I mean, is that the
25 reason that you were given?

Page 64

1      A.  On this particular situation, I -- first
2  of all, an oiler starts the truck.  They do the
3  pre-trip.  The drivers don't even do a pre-trip on a
4  construction job.  The oiler had examined the truck.
5  He had started it up.
6      I walked over to the truck.  I noticed
7  water leaking underneath it.  I immediately drove it
8  to the shop.  I drove over to the shop, I called the
9  mechanic, Carroll Eby.  He examined the truck.  He
10 said, "It's okay, it's just water from the box,
11 drive it."  So I drove it.
12     Q.  Was it steaming as you were driving up the
13 hill?
14     A.  As a matter of fact, there was a little
15 bit of steam and I was watching the temperature
16 gauges, and the temperature gauges never went in the
17 red.
18     Q.  So is it your contention that you were
19 terminated because of your sex then?
20     A.  I believe that I was falsely terminated
21 and I was wrongfully terminated, because I had
22 nothing to do with the radiator leak on that
23 truck.
24     Q.  But was it -- in other words, what do you
25 believe the reason was that they terminated you?

Page 65

1      A.  I'm not really sure.
2      Q.  Let's go back to the dispatch history.  If
3  you'll go down to -- we'll look on the third page,
4  which is EB 0543, in the right-hand corner.
5      If you'll go down about two-thirds of the
6  way, there is a 1983 job with Alpha Tech,
7  Incorporated.
8      A.  Uh-huh.
9      Q.  And it says you were discharged from that
10 position --
11     A.  Uh-huh.
12     Q.  -- is that correct?
13     A.  That's correct.
14     Q.  What was the reason you were discharged
15 from that position?
16     A.  It was a surveying position and I had made
17 a mistake with the numbers.
18     Q.  How long did you work there for?
19     A.  Not very long.  I don't remember
20 exactly.
21     Q.  It was basically a performance issue that
22 resulted in your termination; is that right?
23     A.  Yes, it was.
24     Q.  Did you file a lawsuit or a complaint
25 regarding that discharge?

Page 66

1      A.  I'm not sure.
2      Q.  Did you believe that the discharge was
3  discriminatory?
4      A.  Yes, I did.
5      Q.  Based on what?
6      A.  Based on the fact that surveyors make --
7  say the wrong numbers all the time and that's why
8  they check each other.  One person will call out a
9  number, then the second person calls out a number,
10 and they check each other, constantly, because
11 people transpose numbers all the time.
12     Q.  So are you blaming it on somebody else
13 then?
14     A.  No.  I'm not blaming it on somebody else.
15 I'm just saying that I should have been more
16 careful, but surveyors make mistakes in numbers, and
17 that's why they constantly check each other's work
18 and they check themselves.
19     Q.  Isn't it very important for surveyors to
20 get the numbers right --
21     A.  Exactly.
22     Q.  -- isn't that what their job is?
23     A.  Exactly.
24     Q.  So if you got the numbers wrong,
25 presumably there would be justification for

### Page 67

1  terminating you, correct?
2     A.  Well, there should have been someone else
3  checking my numbers.
4     Q.  So it's not your fault that you got the
5  numbers wrong, it should have been someone else
6  checking your numbers?
7     A.  Well, surveyors check each other all the
8  time.
9     Q.  So are you saying this was discriminatory
10 based on your sex?
11    A.  Yes, I do.
12    Q.  Just because there was nobody else
13 checking your numbers?
14    A.  It should have been caught. The mistake
15 should have been caught.
16    Q.  Let's go on to the position under that,
17 which is a Kiewit position.
18    A.  Uh-huh.
19    Q.  And again, this is 1983-08-09-23. And
20 again, that one indicates that you were discharged.
21 And both of these positions with Alpha Tech and
22 Kiewit have an "N" in the rehire column, correct?
23    A.  Uh-huh. Uh-huh.
24    Q.  What was the Kiewit position and why were
25 you discharged from that one?

### Page 68

1     A.  I was not qualified to run a loader. I
2  took a loader, 966 forklift operating position, and
3  I was not qualified for the job.
4     Q.  Did you go on the position you were
5  dispatched out and started working?
6     A.  Yes. I was going to operate the loader,
7  and hopefully they would teach me how to do it. But
8  they didn't, so they sent me back.
9     Q.  So they fired you?
10    A.  Yes, they did.
11    Q.  Okay. Are you contending that was
12 discriminatory?
13    A.  No. I was not qualified for the job.
14    Q.  Then we have a Northwestern Construction
15 job on the next page, EB 0544. Oh, a little more
16 than halfway down. It's a 1981-07-31. And I keep
17 seeing 23.49 on these. That must be a dispatch
18 number for you or something, is it? Because it's
19 the same on all of these.
20    A.  I really don't know. They change --
21    Q.  Okay. So we have to find that out from
22 the union.
23    A.  They change their computer system all the
24 time.
25    Q.  Okay. Do you see that Northwestern

### Page 69

1  Construction?
2     A.  Yes, I do.
3     Q.  And that says safety. Is that a discharge
4  for safety reasons?
5     A.  Yes, I was discharged.
6     Q.  And what was that job?
7     A.  Construction.
8     Q.  Was it driving?
9     A.  Yes, it was.
10    Q.  And why were you discharged from that
11 position?
12    A.  I believe that I hit something.
13    Q.  How long did you work for them?
14    A.  Let's see. It should be on here.
15    Q.  Well, it says 1981-07-31, if that would be
16 your hire date, then we have 1981-08-22 safety.
17 Would that be the discharge date?
18    A.  It must be.
19    Q.  Okay. But we could determine that by
20 talking to the people from the union, correct?
21    A.  Uh-huh.
22    Q.  Okay.
23    A.  Well, maybe not, because the people from
24 the union are new people that weren't here --
25 weren't around when this occurred.

### Page 70

1     Q.  But presumably they'd know how to read the
2  computer printout?
3     A.  Oh. Presumably.
4     Q.  So you were terminated from that job
5  because you hit something --
6     A.  Uh-huh.
7     Q.  -- for safety reasons.
8        Do you contend that that was
9  discriminatory?
10    A.  No. I hit something and I contend that it
11 was my fault and I admit that I did it, so...
12    Q.  Okay. Then let's go down another three
13 to -- there's a 1981-06-22 position with Aleutian
14 Constructors.
15    A.  Uh-huh.
16    Q.  And that says refused. Do you recall why
17 you were refused for employment? And it has an end
18 dump as the classification.
19    A.  Now, where was this at? Aleutian
20 Constructors; okay.
21    Q.  Page EB 0544.
22    A.  Actually, I refused to take the
23 position.
24    Q.  Ah. Okay.
25    A.  And I'm not sure why, but it was a short

### Page 71

1  job. And it was out on the Aleutian Islands, so I
2  changed my mind and decided not to go on that one.
3      Q.  Remote?
4      A.  Uh-huh. Really remote.
5      Q.  Let's go down two more. 1981, LHD &
6  Associates. And that indicates you were terminated
7  for cause as well, correct?
8      A.  Okay. Now, where was this one again?
9      Q.  This is on page EB 0544.
10     A.  Uh-huh.
11     Q.  About two-thirds of the way down.
12 1981-01-26.
13     A.  Uh-huh.
14     Q.  LHD & Associates.
15     A.  Uh-huh.
16     Q.  Do you recall that position?
17     A.  Yes, I do.
18     Q.  And why were you terminated from that
19 position?
20     A.  I had borrowed a pickup and took a drive
21 around the North Slope and got busted for taking the
22 pickup.
23     Q.  And what was that position?
24     A.  I believe it was a rear chain man.
25     Q.  So do you contest that that discharge was

### Page 72

1  discriminatory?
2      A.  No, I was -- I took the pickup without
3  authorization and they have security checkpoints on
4  the North Slope, so... But it was common practice.
5  A lot of people did it and they still do it, but...
6      Q.  But you got caught?
7      A.  I got caught.
8      Q.  Okay. So in going over this list from the
9  Teamsters Union, it looks to me like before you came
10 to work for the State you were terminated or let go
11 from, I don't know, approximately ten positions --
12     A.  Uh-huh.
13     Q.  -- because of performance problems. Is
14 that correct?
15     A.  Uh-huh.
16         COURT REPORTER: Can I have you answer
17 verbally?
18         THE WITNESS: Yes. Sorry.
19 BY MS. PAGE:
20     Q.  Now, how long did you work for the State
21 of Alaska at airfield maintenance?
22     A.  Approximately ten years.
23     Q.  Is that the longest employment by far that
24 you've ever had?
25     A.  Yes, it is. But it's -- maintenance is a

### Page 73

1  more permanent position. Construction --
2  construction jobs are temporary positions. They
3  don't last very long.
4      Q.  What's the -- aside from your State of
5  Alaska job, what's the longest time period that
6  you've held one particular position?
7      A.  That was the longest.
8      Q.  I know. Aside from that job.
9      A.  Well, I believe that I worked for Enserch
10 for approximately four summers in construction.
11     Q.  And that's a position you were terminated
12 from and then you --
13     A.  Yes.
14     Q.  -- brought litigation against them?
15     A.  Yes.
16     Q.  And again, I need you to wait until I
17 finish the question before you answer.
18     A.  Sorry.
19     Q.  I want to talk about your employment after
20 you left the State.
21     A.  Okay.
22     Q.  And then we'll get to the State of Alaska
23 employment.
24     A.  Okay.
25     Q.  What was the first position that you had

### Page 74

1  after you left -- after you left the State; do you
2  recall?
3      A.  I believe that that was the one where I
4  took the job with Brice up on the Slope. And it
5  only lasted actually three-and-a-half hours, but I
6  think that was the first one I had.
7      Q.  Okay. What about Khotal, is that how you
8  pronounce it?
9      A.  Khotal.
10     Q.  Khotal.
11     A.  Right.
12     Q.  Did you work for them?
13     A.  Yes, I did.
14     Q.  Did you have some problems with them
15 refusing to hire you for a period of time?
16     A.  Well, I was working in snow removal and I
17 was on call. And it was a temporary on-call
18 position.
19     Q.  When -- first of all, let's go back.
20 When were you discharged from your
21 employment with airfield maintenance?
22     A.  June 2004.
23     Q.  I'm going to hand you what we'll mark as
24 Exhibit 8. Take a look at that.
25     (Exhibit 8 marked.)

### Page 79

1  BY MS. PAGE:
2    Q.  And your oath that you took at the
3  beginning is still --
4    A.  Yes.
5    Q.  You just interrupted again. -- is still
6  in effect. Okay?
7    A.  Okay.
8    Q.  I wanted to actually go back to something
9  we talked about before, where it looked like you had
10 been dispatched on a position during your employment
11 with the State.
12       How did that work; if you were employed
13 with the State, were you able to be dispatched on
14 other positions? On the weekend? What were you
15 doing?
16   A.  Excuse me, I don't mean to interrupt, but
17 I want to backtrack and I want to go back to this
18 training.
19   Q.  Can you answer my question first, and then
20 we can go to that.
21   A.  Oh, okay. Okay. Say the question
22 again.
23   Q.  Your dispatch sheet indicated that during
24 your employment, during the time you were employed
25 with the State, you also were dispatched on some

### Page 80

1  teamster positions. I think we have 2002, 2003,
2  2002, 2000.
3       How was it that you were dispatched a
4  teamster position when you were working full time
5  for the State?
6    A.  I was attempting to find other employment
7  so I could leave the State.
8    Q.  So I'm not sure I understand that. We've
9  got a Matanuska Maid job in 2000, Interstate Brands
10 in 2002. Did you actually work for these
11 employers?
12   A.  No, I did not. I did not. I applied for
13 the positions and I was either rejected for the
14 position or I decided not to take the position.
15   Q.  And that includes J&J/BMAR, what is
16 that?
17   A.  Okay. I --
18   Q.  That's the first page, in 2002. Bottom of
19 the first page.
20   A.  Okay. Yes. I was -- I applied for that
21 position and I was rejected for the position.
22   Q.  What is J&J/BMAR?
23   A.  I believe that it was a groundskeeping
24 position out on Elmendorf Air Force Base. I might
25 be mistaken, but I believe that's what it was.

### Page 81

1    Q.  And then there is a Kiewit job in 2002?
2    A.  Right.
3    Q.  Municipality of Anchorage job -- I mean,
4  Kiewit is 2003, Municipality 2003.
5    A.  Right. I was at --
6    Q.  Anchorage School District, 2003. So these
7  are all positions, you're saying, that you applied
8  for during your employment at the State and you were
9  not hired for; is that correct?
10   A.  That's correct.
11   Q.  Okay.
12   A.  That's correct.
13   Q.  Now, in the summer of 2005, were you hired
14 by the Municipality of Anchorage?
15   A.  Yes, I was.
16   Q.  What was that job?
17   A.  Water truck driving.
18   Q.  Was that a seasonal position?
19   A.  Yes, it was.
20   Q.  Did you have performance -- any
21 performance problems with that position?
22   A.  I did ultimately.
23   Q.  What do you mean by that?
24   A.  I drove one summer, and then the following
25 summer I went back and I was involved in an

### Page 82

1  accident. I inadvertently sprayed water into a
2  flower planter. I was adjusting my water sprayer.
3  These are -- this is a 3,000-gallon water truck and
4  they're used for firefighting.
5       This truck was really, really old. Very,
6  very old, and had a very powerful sprayer. They
7  call it a cannon. It's mounted on the front of the
8  truck.
9       I sprayed water into a -- I was adjusting
10 the water sprayer and it blew water into a flower
11 planter, which blew dirt onto a pickup. And I was
12 discharged from my job because of it.
13   Q.  And that was in 2006?
14   A.  Yes, it was.
15   Q.  Okay. Let's go back to 2004 -- oh,
16 actually, you had said you wanted to say something
17 about something previously.
18   A.  Well, on the training that I had on the
19 articulator, back on this one.
20   Q.  And what are you referring to?
21   A.  April 20th, 2005.
22   Q.  Okay.
23   A.  I was in training. I had operated
24 articulators before. But they had made me take a
25 load and I wasn't ready to take a load up a steep

Page 83

1  hill, really steep hill. Volvos, the levers are --
2  it's a Swedish-made truck, and they're just the
3  opposite from American-made trucks. So I had taken
4  it out of four-wheel drive; I thought it was engaged
5  in four-wheel drive.
6        After the fact they tell me, oh, it's a
7  Volvo, everything's reversed, as far as the levers
8  go. And that's why I was put in an unsafe situation
9  that I did not feel comfortable with.
10       Q.  And you said in your writing there in your
11  journal that you "freaked out when you got into some
12  difficulties." Is that accurate?
13       A.  Well, when you're at the top of a really
14  steep hill -- and these are -- these trucks are
15  unsafe to begin with, because they're top heavy.
16       Q.  I'm just asking you if that's accurate,
17  that you freaked out?
18       A.  Yes, it is.
19       Q.  Okay. So now, back to your Municipality
20  position in the summer of 2005, during that summer,
21  did you have some performance issues?
22       A.  I was in training. They were training me
23  to operate these trucks. A couple of their trucks
24  were so old that they should have been taken off the
25  streets, but --

Page 84

1        Q.  Is that a yes, you had some performance
2  issues?
3        A.  I don't believe that I did.
4        Q.  Did the Municipality --
5        A.  I may have had some problems adjusting the
6  sprayers on the trucks, because they were old and
7  rusted.
8        Q.  Did the Municipality believe that you had
9  any performance problems in 2005?
10       A.  I'm not sure.
11       Q.  Okay. Did you ever get a performance
12  evaluation for 2005?
13       A.  Yes, I did, but it was from a different
14  job. It was actually a job that I had worked on in
15  the winter.
16       Q.  So when did you work in the winter for the
17  Municipality?
18       A.  Okay. I worked a summer position as a
19  water truck driver, and then I worked in the winter
20  as a parks and rec -- parks and rec caretaker.
21       Q.  And that was in 2005 as well?
22       A.  Yes, it was.
23       Q.  Was that a position doing hot mopping?
24       A.  Yes, it was.
25       Q.  And did you have performance issues in

Page 85

1  that position?
2        A.  I don't believe that I did. I did break
3  several of their hot mops. And the reason that
4  happened -- that occurred was because they used
5  recycled materials, recycled pipe, and it was
6  rusted. And then the hot mops would freeze to the
7  ground and I'd try to pull them up and they'd break.
8  So I broke about -- oh, several of them. But I
9  would rebuild them. They trained me to re-make the
10  hot mops.
11       Q.  Did your supervisors believe you had some
12  performance problems with that fall of --
13  fall-winter, I guess it is, 2005 position?
14       A.  He never said a word to me. You would
15  have to talk to him.
16       Q.  Who was your supervisor?
17       A.  Ray -- Ray Roberts.
18       Q.  Did he ever do a performance evaluation
19  for that 2005 parks position?
20       A.  He did a performance evaluation, but I had
21  never seen it.
22       Q.  And was it a good performance
23  evaluation?
24       A.  No, it was not.
25       Q.  Let's go back to the summer of 2005

Page 86

1  position. And I want to make sure I've got this
2  right.
3        So that was with the Municipality, but it
4  wasn't with parks and recreation?
5        A.  No, it was not. I worked two different
6  jobs. I worked summertime driving a water truck,
7  and then in the wintertime I drove -- I worked as a
8  parks caretaker.
9        Q.  So who was your actual employer when you
10  were driving a water truck?
11       A.  His name was Jim, and I can't think of
12  his -- Chesbro.
13       Q.  And that was just a general Municipality
14  position? I mean, what was the actual entity at the
15  Municipality that was employing you?
16       A.  Parks and rec.
17       Q.  So it was parks and rec --
18       A.  Parks and rec.
19       Q.  -- too, but it was a different position at
20  parks and rec?
21       A.  Exactly. Exactly.
22       Q.  Okay. I'm going to hand you what we will
23  have marked as Exhibit 10.
24       A.  Okay.
25       Q.  Take a look at that, please.

**Page 91**

1   Q.  So then after you had this position with
2   the Municipality in the summer of 2005, is when you
3   went to work for Brice in November of 2005,
4   correct?
5   A.  Uh-huh.
6   Q.  And that's the position that you were
7   terminated after about three hours?
8   A.  Uh-huh.
9   Q.  And the reason for that was you didn't
10  know how to properly operate the equipment; is that
11  right?
12  A.  No, that's not right.
13  Q.  What was the reason for your
14  termination?
15  A.  I knew how to operate the equipment, but I
16  wasn't backing up straight enough. And the reason
17  being is because a 50-ton maxi haul is extremely
18  difficult to back up. They're the most difficult of
19  all tractor-trailers. And I have thousands of hours
20  operating maxi hauls, but I hadn't driven one in 15
21  years.
22  Q.  So in the estimation of Brice, were you
23  sent back because they felt you weren't qualified to
24  operate the maxi haul?
25  A.  I believe so.

**Page 92**

1   Q.  So then you said you went to work for the
2   Municipality at the end of 2005. And that was the
3   hot mopping job, correct?
4   A.  Right. Exactly.
5   Q.  I'm going to hand you what we'll mark as
6   Exhibit 11.
7   (Exhibit 11 marked.)
8   BY MS. PAGE:
9   Q.  Take a look at that. Are you familiar
10  with this document?
11  A.  Yes, I am.
12  Q.  What is this one?
13  A.  This is allegedly an evaluation from the
14  city.
15  Q.  And is this the one that we were referring
16  to before where you said you did not get a good
17  performance evaluation?
18  A.  Yes. Exactly.
19      I had never seen this document until after
20  I was terminated from the city.
21  Q.  Okay.
22  A.  I did not sign it --
23  Q.  Is that why --
24  A.  I did not sign it. It had never been
25  discussed with me. I had no knowledge of this at

**Page 93**

1   all.
2   Q.  But when you say allegedly a performance
3   evaluation from the city, I mean, it is -- it is --
4   does say "Municipality of Anchorage" and has the
5   date of the appraisal period on the top, correct?
6   A.  Yes.
7   Q.  So you're just saying you had never seen
8   it until you were terminated?
9   A.  Uh-huh. That's correct.
10  Q.  And is that the reason you're saying it's
11  allegedly a performance evaluation?
12  A.  Well, do you have the rebuttal that I
13  wrote to it?
14  Q.  I do, but I don't have it with me.
15  A.  Because the city had given me a safety
16  award. And I gave you a copy of it. I was given a
17  safety award by the city, by their safety officer.
18  And, to the best of my knowledge, the only thing I
19  ever did that was unsafe, and that wasn't unsafe,
20  their hot mops broke, but that had nothing to do
21  with me. They were using recycled materials, rusted
22  pipe that did not work properly.
23  Q.  Do you know who filled out this
24  performance evaluation?
25  A.  No, I do not.

**Page 94**

1   Q.  But it indicates that your performance was
2   unsatisfactory in almost every area, correct?
3   A.  Well, I'm thinking that my supervisor did
4   not fill this out. I'm thinking that the people in
5   the office filled this out.
6   Q.  But you don't know who filled it out,
7   correct?
8   A.  Well, does it have a signature on it?
9   Q.  I'm just asking if you knew who filled it
10  out.
11  A.  No, I do not.
12  Q.  Okay. But it does indicate that your
13  performance was substandard and --
14  A.  Okay. I'm not going to acknowledge
15  something that doesn't even have a signature on
16  it.
17  Q.  That's fine. All I'm saying is that this
18  does indicate that your performance was substandard
19  in almost every category, correct?
20  A.  This might be a false document, for all I
21  know.
22  Q.  Have you seen this document before?
23  A.  Yes, I have.
24  Q.  Where did you see it before?
25  A.  I went to the office down at the city and