Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 95

1 they gave it to me.
2    Q.   So you got this document from the
3 Municipality?
4    A.   Uh-huh.  Uh-huh.
5    Q.   What do you mean, it could be a false
6 document, for all you know?
7    A.   Maybe one of the secretaries in the office
8 filled it out.
9    Q.   So you're saying you don't know who filled
10 it out?
11    A.   No, I do not.
12    Q.   Okay.  But given that you don't know who
13 filled it out, would you still agree that it does
14 indicate that your performance was substandard in
15 almost every category?
16    A.   Well, according -- it has my name on it.
17 But my question is --
18    Q.   I'm just asking for a yes --
19    A.   -- why wasn't it signed?
20    Q.   I'm just asking for a yes or no answer.
21    A.   Okay.  Okay.  Yes.
22    Q.   Okay.  You talked then about your position
23 with the Municipality in the summer of 2006.  And
24 that's when you were working again driving a water
25 truck, correct?

---

Page 96

1    A.   Uh-huh.
2    Q.   And you were terminated from that
3 position?
4    A.   Yes, I was.
5    Q.   I'm going to hand you what we'll have
6 marked as Exhibit 12.  Take a look at that, please.
7    (Exhibit 12 marked.)
8 BY MS. PAGE:
9    Q.   Do you recognize this?
10    A.   Yes, I do.
11    Q.   And what is this?
12    A.   I believe it's a performance evaluation.
13    Q.   And was this related to your employment at
14 the Municipality in 2006?
15    A.   Yes, it was.
16    Q.   Okay.  And this has a section where it has
17 different ratings up at the top.  And it gave you an
18 unsatisfactory; is that correct?
19    A.   That's true.
20    Q.   Now, do you know who signed this one, this
21 performance -- --
22    A.   David Zaloudek.
23    Q.   And who is that?
24    A.   He's one of the supervisors.
25    Q.   So this is signed?

---

Page 97

1    A.   Uh-huh.  Uh-huh.
2    Q.   And if you look under the section that
3 says "work habits," there's a "U."  Does that stand
4 for unsatisfactory, as far as you know?
5    A.   Uh-huh.
6    COURT REPORTER:  Yes?
7    THE WITNESS:  Yes.
8 BY MS. PAGE:
9    Q.   And can you read me that little section
10 under work habits, please.  Out loud, for the
11 record.
12    A.   I don't see where you --
13    Q.   On the first page.
14    A.   First page.
15    Q.   There's a box that says work habits.
16 Down -- there you go.
17    A.   "Elsa did not contact her supervisor,
18 David Zaloudek, pertaining to property damage,
19 pickup truck, caused by Elsa accidentally spraying
20 debris onto the truck by the pressure of water from
21 the water truck causing damage.  Elsa was aware of
22 the incident and her supervisor had to contact her
23 about the accident."
24    Q.   Now, if you look at the next page there's
25 a section that says "employee comments"; is that

---

Page 98

1 right?
2    A.   Yes.
3    Q.   Okay.  Is that your handwriting?
4    A.   Yes, it is.
5    Q.   And would you read that section in
6 employee comments.
7    A.   "I admit I inadvertently sprayed water
8 onto a flower planter and soft topsoil blew up onto
9 a red pickup.  I psychologically freaked out and
10 drove back to the fire hydrant and filled up with
11 water.  I drove back to C Street and washed the soil
12 off the pickup."
13    Q.   And did you dispute that you hadn't called
14 your supervisor after this incident?
15    A.   I didn't have a radio with me.
16    Q.   So you didn't --
17    A.   So I didn't dispute it.
18    Q.   -- dispute it?
19    A.   That's correct.
20    Q.   And you were discharged because of this
21 incident, correct?
22    A.   That's correct.
23    Q.   And was it your understanding you were
24 discharged because of the actual accident or because
25 you didn't immediately report it to your

---

29 (Pages 95 to 98)

**Exh. A**
**Page 21 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

**Page 99**

1  supervisor?
2      A.  Both.
3      Q.  And did you dispute this discharge?
4      A.  I tried to.  I attempted to.
5      Q.  How did you do that?
6      A.  I attempted to file an EEOC complaint.  I
7  attempted to file a grievance with the union.  And I
8  was -- last winter I was up on the Slope working
9  when I received the EEOC paperwork and I was unable
10  to complete it in a timely manner.  So I didn't
11  finish getting it processed.
12      Q.  Did you file a grievance with the union?
13      A.  Yes, I did.
14      Q.  I'm going to hand you what we'll mark as
15  Exhibit 13.  Take a look at that, please.
16      (Exhibit 13 marked.)
17  BY MS. PAGE:
18      Q.  Do you recognize this document?
19      A.  Yes, I do.
20      Q.  Is this the grievance that you filed --
21      A.  Yes, it is.
22      Q.  -- regarding your discharge?
23          Can you wait until I finish the question,
24  please.
25          What happened with this grievance?

**Page 100**

1      A.  Nothing.
2      Q.  And what do you mean by that?
3      A.  Well, the union does not -- did not
4  complete the grievance procedure and nothing
5  happened with it.
6      Q.  So they did not take it to arbitration --
7      A.  That's true.
8      Q.  -- is that what you're saying?
9      A.  That's true.
10      Q.  But they made a decision not to take it to
11  arbitration, correct?
12      A.  That's true.
13      Q.  Okay.  Aside from the job with the
14  Municipality, after your discharge from the
15  Municipality, what employment have you had since
16  then?
17      A.  I drove taxicab off and on for two years.
18  I drove a shuttle bus at the airport for
19  approximately two months.  I'm presently working on
20  a road construction job up at Hicks Creek.
21      Q.  Well, I'll go into that a little bit more
22  later.
23      A.  Okay.
24      Q.  We'll come back to that.
25          Let's turn to your employment at the

**Page 101**

1  airport.
2          When were you hired, Ms. Billingham?
3      A.  I believe it was June of 1994.
4      Q.  Okay.  And what was the position you were
5  initially hired for?
6      A.  As a laborer, wage grade 58.
7      Q.  Who hired you?
8      A.  Wayne Gibson.
9      Q.  And was this a position out of the
10  union?
11      A.  Yes, it is.
12      Q.  Was it Local 71?
13      A.  Yes.
14      Q.  Now, was that actually a custodian
15  position, was that what that --
16      A.  No.  It was a laborer position.
17      Q.  I'm going to hand you what we'll mark as
18  Exhibit 14.  Take a look at this.
19      (Exhibit 14 marked.)
20  BY MS. PAGE:
21      Q.  Do you recognize this document?
22      A.  Yes, I do.
23      Q.  And what is it?
24      A.  It is a performance evaluation.
25      Q.  And if you look at the second page, there

**Page 102**

1  is actually a second document there.
2          What is that; do you know?
3      A.  This is their personnel action.
4      Q.  And this indicates that you were
5  transferred to a labor position on December 6, 1995.
6  And that's why I'm asking you if you had been in a
7  custodian position originally.
8      A.  I was originally hired as a laborer.
9      Q.  Okay.
10      A.  At a wage grade 58, but then I believe
11  their custodian quit and so they had an opening
12  there.  And so I transferred from the labor position
13  to a custodian position on a temporary basis.  And
14  then I transferred back to a labor position.
15      Q.  So how long were you working in the
16  custodian position?
17      A.  I believe about a year.
18      Q.  So this first sheet, which you said is a
19  performance evaluation report --
20      A.  Uh-huh.
21      Q.  -- was for the period of time you were in
22  the custodian position; is that right?
23      A.  Well, it was actually -- I was actually
24  working as a laborer for approximately -- and I'm
25  not sure exactly how many months, but I worked as a

---

30 (Pages 99 to 102)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 103

1  laborer for approximately three months or -- let's
2  see.
3      There should be two other personnel
4  actions prior to this one that would show exactly
5  what I was hired as, and I do have the paperwork at
6  home.
7      Q.  We'll mark this as Exhibit 15, if you'd
8  take a look at that.
9      (Exhibit 15 marked.)
10 BY MS. PAGE:
11     Q.  Do you recognize this document?
12     A.  Yes, it's another personnel action.
13     Q.  Was this the one from when you were hired?
14 It has an effective date of May 25th, 1994, and it
15 says "appointment" on it?
16     A.  Yes, I do.
17     Q.  And it indicates laborer on this one,
18 correct?
19     A.  Uh-huh.
20     Q.  So then there should be another one that
21 would show when you were then transferred over to
22 the custodian?
23     A.  Transferred to the custodian position,
24 that's correct.
25     Q.  And I don't have that with me today.

---

Page 104

1      A.  Okay.
2      Q.  However, this performance evaluation we
3  have in front of us says 6/15/94 to 6/16/95.
4      A.  Uh-huh.
5      Q.  So does that seem an accurate time when
6  you would have started in the custodian position of
7  6/15/94?
8      A.  No, actually, this does not sound
9  accurate.
10     Q.  Okay.
11     A.  I believe that I worked as a laborer. And
12 I don't know the exact date that I transferred from
13 being a laborer to a custodian, but it was -- I do
14 not believe it was 6/15/94.
15     Q.  But we can check on that, right?
16     A.  Okay. Yeah.
17     Q.  And it's hard to see, but can you see who
18 signed this performance evaluation on signature of
19 rater?
20     A.  Uh-huh. Yeah.
21     Q.  Whose signature is that; do you know?
22     A.  I think it's Steve Pringle.
23     Q.  Was he your supervisor at this period?
24     A.  No, he was not. Wayne Gibson was actually
25 my supervisor.

---

Page 105

1      Q.  And did Wayne sign this anywhere?
2      A.  Unless this is his signature here.
3      Q.  Division signature?
4      A.  Which I cannot read.
5      Q.  But you got an acceptable rating on this
6  performance evaluation, correct?
7      A.  Yes.
8      Q.  I'm going to hand you what we'll mark as
9  Exhibit 16.
10     (Exhibit 16 marked.)
11 BY MS. PAGE:
12     Q.  Take a look at that.
13         Do you recognize this document?
14     A.  Yes, I do.
15     Q.  What is it?
16     A.  It's an evaluation.
17     Q.  Performance evaluation?
18     A.  Uh-huh.  Yes.
19     Q.  And what period does this cover?
20     A.  June of '95 to June of '96.
21     Q.  And there's a signature of a rater in this
22 one.  Whose signature --
23     A.  Greg Leader.
24     Q.  And was he your supervisor?
25     A.  Yes, he was.

---

Page 106

1      Q.  And you signed this performance
2  evaluation, correct?
3      A.  Yes, I did.
4      Q.  And this gave you a low -- well, I don't
5  want to mischaracterize this.
6          There is a rating for overall
7  effectiveness on the job with five different boxes;
8  is that right?
9      A.  That's true.
10     Q.  Okay. And there's a "U" with one box, an
11 "acceptable" with three boxes, and an "O" with one
12 box, correct?
13     A.  That's true.
14     Q.  What is your understanding as to what
15 those ratings mean?  Is the "U" unacceptable?
16     A.  Yeah.  "U" is unacceptable, and then there
17 is acceptable --
18     Q.  Is the "O" outstanding?
19     A.  Yes.
20     Q.  And then are there three levels of
21 acceptable --
22     A.  Yes.
23     Q.  -- with the three boxes?
24     A.  Yes.
25     Q.  And does it go from lower to higher?

---

31 (Pages 103 to 106)

**Exh. A**
**Page 23 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 107

1    A.  Yes.
2    Q.  So you were marked in the lowest box for
3  acceptable; is that right?
4    A.  Yes.
5    Q.  And is that considered to be
6  low-acceptable; is that how it's referred to?
7    A.  Yes, I believe so.
8    Q.  Okay.  And in the narrative section, it
9  indicates that "I find Elsa needs to be monitored
10  much more when it comes to doing her job.  There
11  seems to be a problem when it comes to understanding
12  at times what she is supposed to do"; is that right?
13    A.  I believe so.
14    Q.  And it also mentions on a couple of
15  occasions you failed to inform your supervisor when
16  something may have happened or you felt you were too
17  sick to work and needed to go home, correct?
18    A.  That's correct.
19    Q.  Okay.  Do you dispute that you, on a
20  couple of occasions, failed to inform your
21  supervisor when something may have happened or you
22  felt too sick and needed to go home?
23    A.  Well, we were -- it was --
24    Q.  Just yes or no answer, if you dispute that
25  or not.

Page 108

1    A.  Yes, I do dispute that.
2    Q.  And what is that based on?
3    A.  Well, when we were in the middle of a
4  snowstorm the supervisors did not want to be
5  bothered:  "Do not call us, unless it's" --
6    Q.  So you would just leave?
7    A.  -- "unless it's important."  I told my
8  coworker that I was leaving, Les Fetrow, and he was
9  a supervisor at one point.
10    Q.  So you didn't think it was important
11  enough to let your supervisor know that you were
12  leaving the job when you left?
13    A.  Not when they're out on the airfield, not
14  when they're in the middle of a snowstorm, no.
15    Q.  After getting this evaluation where it
16  said that on a couple of occasions you hadn't
17  informed your supervisor when something had happened
18  or you felt you were too sick to work and needed to
19  go home, was it your understanding at that point
20  that you did need to inform your supervisor if you
21  were going to leave the job and go home?
22    A.  Yes.
23    Q.  All right.  I'm going to hand you what I'm
24  going to mark as Exhibit 17.
25    (Exhibit 17 marked.)

Page 109

1  BY MS. PAGE:
2    Q.  Do you recognize this document,
3  Ms. Billingham?
4    A.  Yes, I do.
5    Q.  And what is it?
6    A.  It's a memorandum written by Wayne
7  Gibson.
8    Q.  What's the date on this?
9    A.  November 13th, 1996.
10    Q.  And what's the subject?
11    A.  Letter of instruction.
12    Q.  What's your understanding as to what a
13  letter of instruction is?
14    A.  A letter of instruction is a document
15  stating what I had done wrong and what they wanted
16  me to do in the future.
17    Q.  Was it your understanding that this was
18  disciplinary or not?
19    A.  Yes.
20    Q.  And this refers to a time when you went
21  home during the shift without telling your
22  supervisor; is that correct?
23    A.  Yes.
24    Q.  Is this the incident -- or one of the
25  incidents referred to in the performance evaluation

Page 110

1  that we just looked at?
2    A.  Yes, it is.
3    Q.  And now I'm going to hand you what we'll
4  have marked as Exhibit 18.
5    (Exhibit 18 marked.)
6  BY MS. PAGE:
7    Q.  Do you recognize this document?
8    A.  Yes, I do.
9    Q.  And what is it?
10    A.  It is a performance evaluation.
11    Q.  And what period does this cover?
12    A.  6/96 to 6/97.
13    Q.  Is this an annual evaluation again?
14    A.  Yes, it is.
15    Q.  And it has the same kind of five different
16  boxes with an overall effectiveness rate --
17    A.  Yes.
18    Q.  -- correct?  Can you wait until I finish
19  my question.
20    And you got a mid-acceptable on this one,
21  correct?
22    A.  Uh-huh.  Uh-huh.  Yes.
23    Q.  And who was the rater on this performance
24  evaluation?
25    A.  Greg Leader.

32 (Pages 107 to 110)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

## Page 111

1  Q. So he's the same rater you had on the
2  previous one --
3  A. Yes.
4  Q. -- who had given you a low-acceptable; is
5  that right?
6  A. Yes.
7  Q. And this is an improved evaluation over
8  the previous one, would you agree?
9  A. Yes.
10  Q. Okay. I'm going to hand you what we'll
11  mark Exhibit 19.
12  (Exhibit 19 marked.)
13  BY MS. PAGE:
14  Q. Would you take a look at that document,
15  please.
16  A. Uh-huh.
17  Q. Do you recognize this?
18  A. Yes, I do.
19  Q. What is it?
20  A. It's a State of Alaska personnel action.
21  Q. And what are these actual personnel
22  actions that we're looking at here? Is this
23  something you would receive as an employee?
24  A. Yes, I would.
25  Q. And this shows when there's some sort of

## Page 112

1  change in your job status; is that right?
2  A. Yes, it is.
3  Q. And this one indicates that it was for --
4  it says, "Promotion to Equipment Operator I
5  effective 6/1/1998"; is that correct?
6  A. That's correct.
7  Q. Now, did you apply for this promotion?
8  A. Yes, I did.
9  Q. And who was the decision-maker
10  regarding --
11  A. Wayne Gibson.
12  Q. -- giving you the promotion?
13  A. Wayne Gibson.
14  Q. I'm going to hand you what we'll mark as
15  Exhibit 20. Have you take a look at this document.
16  (Exhibit 20 marked.)
17  THE WITNESS: I just have one thing to
18  say. I have a question. I'm not sure -- this
19  says -- okay. Here I'm classified as a laborer wage
20  grade 58. Okay. And they call it an equipment
21  operator.
22  BY MS. PAGE:
23  Q. Okay. If you'd take a look at what we
24  marked as Exhibit 20.
25  Do you recognize this document?

## Page 113

1  A. Yes, I do.
2  Q. What is that?
3  A. Performance evaluation report.
4  Q. And again, is this an annual evaluation?
5  A. Yes, it is.
6  Q. What's the report coverage period?
7  A. From 6/15/97 to 6/16/98.
8  Q. And what rating did you get for this
9  period of time?
10  A. Lower acceptable.
11  Q. And who was the rater on this
12  evaluation?
13  A. Steve Pringle.
14  Q. What was his position at that time?
15  A. Foreman.
16  Q. Was he your supervisor?
17  A. Probably part time.
18  Q. Now, he had previously given you an
19  acceptable rating; is that right?
20  A. I believe so.
21  Q. So your rating has now gone down for
22  Mr. Pringle. Mr. Pringle gave you a lower rating
23  for this period of time, correct?
24  A. Uh-huh.
25  Q. Okay. And he indicates that you showed a

## Page 114

1  lack of job fundamentals to accomplish some very
2  basic tasks, an unwillingness to abide by some basic
3  field maintenance standard operating procedures, and
4  had difficulty following instructions, among other
5  things; is that right?
6  A. That's true.
7  Q. And Mr. Pringle in this also indicated
8  that you were considerate of your coworkers and had
9  been active in the Green Star program for
10  recyclables, correct?
11  A. That's true.
12  Q. I'm going to hand you what we'll mark as
13  Exhibit 21.
14  (Exhibit 21 marked.)
15  BY MS. PAGE:
16  Q. Do you recognize this document?
17  A. Yes. Equipment damage report.
18  Q. Now, was this an accident you were
19  involved in?
20  A. Yes. I was involved in an accident.
21  Q. What's the date on this?
22  A. 8/31/98.
23  Q. And what happened during this accident?
24  A. I was loading pallets into the back of a
25  pickup. And I think I was standing in the back of

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 115

1 the pickup and I accidentally dropped one of the
2 pallets.
3    Q.   Now, the second page of this is the
4 supervisor's accident investigation report; is that
5 right?
6    A.   Yes.
7    Q.   And is this something that your supervisor
8 filled out?
9    A.   Yes, it is.
10    Q.   And who was the supervisor?
11    A.   Casie Knoedler.
12    Q.   Okay. Under section 4 it says, "What have
13 you done thus far." Is that referring to the
14 supervisor, what the supervisor has done? Do you
15 know what that refers to?
16    A.   I believe so.
17    Q.   Is that regarding making sure this doesn't
18 happen again or --
19    A.   I believe so.
20    Q.   And this says, "I have talked with Elsa
21 and told her not to throw anything into the pickup
22 and to slow things down," correct?
23    A.   That's correct.
24    Q.   Do you recall having that conversation
25 with Mr. Knoedler?

---

Page 116

1    A.   No, I do not.
2    Q.   It says, "How will this improve
3 operations? I'm not sure. Elsa a lot of times
4 won't listen to what you tell her. Maybe this time
5 she will catch on."
6    There seems to be some comments from
7 supervisors during this period that you had problems
8 with listening to instructions; is that right?
9    A.   I'm not saying that I did, but that's what
10 they're saying.
11    Q.   Were you aware that that was a concern on
12 the part of your supervisors?
13    A.   Yes, I believe so.
14    Q.   Now, when you had this accident, did you
15 immediately call your supervisor on the telephone
16 afterwards?
17    A.   Yes, I did.
18    Q.   Why is it that you did that?
19    A.   Why did I call my supervisor?
20    Q.   Uh-huh.
21    A.   Because the window was broken.
22    Q.   Was it your understanding that when you
23 had an accident, you know, or some sort of incident,
24 that you were supposed to immediately call your
25 supervisor?

---

Page 117

1    A.   Yes.
2    Q.   And this was back in --
3    A.   '98.
4    Q.   -- '98. And at that point you knew that
5 you needed to immediately call your supervisor when
6 you had an accident, correct?
7    A.   Yes.
8    Q.   When you called your supervisor, how did
9 you do that at that point in '98? Was there some
10 sort of a radio in the truck?
11    A.   Yes, there was.
12    Q.   Did you have any kind of cell phones at
13 that time?
14    A.   We were not allowed to have cell phones.
15 Or the supervisors were, but the workers weren't.
16    Q.   All right. I'm going to hand you what
17 we'll have marked as Exhibit 22.
18    (Exhibit 22 marked.)
19 BY MS. PAGE:
20    Q.   Take a look at that, please.
21    Do you want to take a break for lunch at
22 noon?
23    Okay. I have -- I'm supposed to be back
24 at work tonight at 3:00 -- this afternoon at
25 3 o'clock, and I'd like to just get this over with

---

Page 118

1 as quickly as possible.
2    Q.   You want to keep going without a break for
3 lunch?
4    A.   I would like to. I mean, I wouldn't mind
5 taking a break to go use the bathroom, but I don't
6 really care to -- but I know if you guys want to
7 take lunch.
8    MS. PAGE: Let's go off the record for a
9 minute here.
10    (Off record.)
11 BY MS. PAGE:
12    Q.   Back on the record. And you're still
13 under oath, Ms. Billingham.
14    A.   Okay.
15    Q.   Would you take a look at what we've marked
16 as Exhibit 22, please.
17    Do you recognize this document?
18    A.   Yes. Personnel action.
19    Q.   And when was this and what was the
20 personnel action involved?
21    A.   Last title, Equipment Operator I,
22 Electronic Tech III. I think it's a typo.
23    Q.   Well, this remark says, "Title
24 change/promotion per LTC study."
25    Do you know what that means?

---

Summit Court Reporting, LLC
907/264-6776

**Exh. A**
**Page 26 of 52**

**Page 119**

1    A.   No, I do not.
2    Q.   Were you aware if there was some sort of a
3   reclassification of jobs going on during this period
4   of time, a reclassification study?
5    A.   I had heard about it, yes.  But Electronic
6   Tech III?
7    Q.   As far as you know, you were not an
8   electronics tech?
9    A.   I have no knowledge of electronics.
10    Q.   So you're not really sure what this is
11   indicating?
12    A.   No, I'm not.
13    Q.   All right.  Let's look at what we'll mark
14   as Exhibit 23.
15    A.   I'm sure that's just a typo.
16    (Exhibit 23 marked.)
17   BY MS. PAGE:
18    Q.   Do you recognize this document?
19    A.   Yes, I do.
20    Q.   What is it?
21    A.   Performance evaluation.
22    Q.   What period does this cover?
23    A.   6/98 to 6/99.
24    Q.   And again, is this an annual evaluation?
25    A.   Yes, it is.

**Page 120**

1    Q.   And who was the rater for this?
2    A.   Fred Klouda.
3    Q.   Who was Fred Klouda?  Was he a
4   supervisor?
5    A.   Foreman.
6    Q.   Foreman; okay.  And what rating did you
7   get as the overall effectiveness on the job
8   rating?
9    A.   Mid-acceptable.
10    Q.   So again, did you consider this to be a
11   good performance evaluation?
12    A.   Mid-acceptable.
13    Q.   Well, did you consider this to be a good
14   one?
15    A.   Yes.
16    Q.   He does indicate, though, "Elsa requires
17   explicit instructions and when given them she
18   usually meets the job requirements," correct?
19    A.   Yes.
20    Q.   It also says, "When performing in a higher
21   wage grade, Elsa requires constant supervision,"
22   correct?
23    A.   Yes.
24    Q.   Now, with all of these performance
25   evaluations, you -- well, let me ask you this.

**Page 121**

1    Q.   Did some supervisor or somebody go over
2   these with you every year when you got them?
3    A.   No.
4    Q.   Were you given them --
5    A.   Yes.
6    Q.   -- were you allowed to look at them?
7    A.   Yes.
8    Q.   Did the supervisor sometimes go over them
9   and discuss them with you?
10    A.   Yes.
11    Q.   And were you given an opportunity to rebut
12   them?
13    A.   Yes.
14    Q.   Did you usually rebut them?
15    A.   No.  Unless it was a bad evaluation, then
16   I rebutted it.
17    Q.   Okay.  All right.  I'm going to hand you
18   what we'll mark as Exhibit 24.
19    (Exhibit 24 marked.)
20   BY MS. PAGE:
21    Q.   Do you recognize this document?
22    A.   Yes, I do.
23    Q.   And what is it?
24    A.   Memorandum.
25    Q.   And what's the subject?

**Page 122**

1    A.   Letter of expectation.
2    Q.   What's your understanding as to what a
3   letter of expectation is?
4    A.   It's a letter of what they expect.
5    Q.   Do you understand this to be a
6   disciplinary action in any way?
7    A.   Yes.
8    Q.   What's the date on this?
9    A.   April 23rd, 2000.
10    Q.   And it actually originally said 1999; that
11   was crossed out, correct?
12    A.   That's correct.
13    Q.   And is it your understanding that 2000 is
14   the correct date?
15    A.   I believe so.
16    Q.   And this letter of expectation has to do
17   with your leaving the job early without your
18   supervisor's permission; is that correct?
19    A.   Yes.
20    But I'd like to say one thing, that Sam
21   Lacosta, the supervisor who wrote me up for this, he
22   did not tell me that one of my coworkers was allowed
23   to go to work -- go to lunch a half an hour early to
24   buy everybody's lunch.  I was not privileged to this
25   information.

**Exh. A
Page 27 of 52**

**Page 123**

1　Q.　What does that have to do with this?
2　A.　One of the coworkers was allowed to go to
3　lunch a half an hour early to buy his lunch, the
4　supervisor's lunch, and everybody else's lunches.
5　Q.　So did you think because he went early --
6　A.　I was not part of that -- that
7　opportunity.  I was not -- I was new on this shift.
8　If I had known that, I would have given him my money
9　so he could have bought my lunch too.
10　Q.　But you thought -- did you think it was
11　okay to just leave early for lunch, or did you
12　understand that you weren't supposed to be doing
13　that?
14　A.　I understand.
15　Q.　Okay.  So you knew that this letter of
16　expectation --
17　A.　Yes.
18　Q.　-- had gone in your file?
19　A.　Yes.
20　Q.　And you also knew that you had engaged in
21　conduct that was not considered acceptable,
22　correct?
23　A.　Yes.
24　Q.　I'm going to hand you what we'll mark as
25　Exhibit 25.

**Page 124**

1　(Exhibit 25 marked.)
2　BY MS. PAGE:
3　Q.　Do you recognize this document?
4　A.　Yes, I do.
5　Q.　And what is it?
6　A.　It is a performance evaluation written by
7　Steve Pringle.
8　Q.　And this is an annual evaluation,
9　correct?
10　A.　Yes.
11　Q.　And what period does this cover?
12　A.　6/99 to 6/2000.
13　Q.　And in this one you get a low-acceptable
14　rating again, correct?
15　A.　Uh-huh.  Uh-huh.  Yes.
16　Q.　And this indicates that your performance
17　barely met acceptable standards, that you required
18　very explicit instructions before understanding what
19　is expected of you, and often the instructions must
20　be repeated numerous times, and you easily forget
21　what you're told to do.  Is that correct?
22　A.　That's correct.
23　Q.　And this indicates that you refused to
24　sign this, correct?
25　A.　That's correct.

**Page 125**

1　Q.　Did you sign a rebuttal to this one?
2　A.　I'm not sure.  I would have to look
3　through my records.
4　Q.　But you did see this performance
5　evaluation?
6　A.　Yes, I did.
7　Q.　Did you go over this at all with Steve
8　Pringle?
9　A.　Probably.
10　Q.　So you understood that he was concerned
11　about your performance at this period of time; is
12　that accurate?
13　A.　Yes.
14　　　And I also want to make a statement that
15　Steve Pringle had a sexual relationship with Tracy
16　Cummins, who was the first female employee on the
17　job.  And it is alleged that he was involved in a
18　sexual relationship with her.
19　Q.　You're just basing this on some
20　allegation --
21　A.　Yes.
22　Q.　-- something somebody told you --
23　A.　Yes.
24　Q.　-- you don't have firsthand knowledge of
25　it, correct?

**Page 126**

1　A.　That's correct.
2　Q.　I'll hand you what we'll have marked as
3　Exhibit 26.
4　(Exhibit 26 marked.)
5　BY MS. PAGE:
6　Q.　And let me ask you this, in terms of your
7　allegation regarding Mr. Pringle's relationship with
8　another employee, does that make any difference on
9　the fact that you were aware that he had concerns
10　regarding your performance?
11　A.　I believe that Steve Pringle had a problem
12　with women and minorities.  But I do know that the
13　woman he had a sexual relationship was promoted.
14　Q.　First of all, you're alleging he had a
15　sexual relationship.
16　A.　I'm alleging.  That's right.  I'm
17　alleging.
18　Q.　But my question for you is, you were aware
19　that he had concerns about your particular
20　performance issues, correct?
21　A.　Yes, I am.
22　Q.　Okay.
23　A.　Oh, and it is also alleged that he fired a
24　gun at one of the black men that works at airfield
25　maintenance.  It is alleged that he had so much

36 (Pages 123 to 126)

Page 127

1 hatred for women and minorities that he fired a gun
2 at another man who worked there.
3     Q.   Again, these are allegations --
4     A.   And they're allegations.
5     Q.   -- that you don't have firsthand knowledge
6 of, correct?
7     A.   No, I do not.
8     Q.   Take a look at Exhibit 26, please.
9          And do you recognize this document?
10    A.   Yes, I do.
11    Q.   What is this?
12    A.   It is a document written by Dan Hartman.
13    Q.   And is this related to a suspension?
14    A.   Yes, it is.
15    Q.   And what's the date on this?
16    A.   July 31st, 2000.
17    Q.   Was this the first suspension that you
18 received at the airport?
19    A.   I believe so.
20    Q.   And what was the basis for this
21 suspension?
22    A.   I took a lawn mower, riding lawn mower
23 without authorization, and I mowed a lawn. And I
24 was not aware that I had hit a rock and the rock had
25 blown out a window in a pickup truck. I did not

Page 128

1 hear it. I did not see it. I had no knowledge that
2 this occurred.
3          Sam Lacosta showed up on the job site.
4 And at that same time -- I'm trying to think. I
5 think it was a woman showed up at the same time and
6 claimed that I had broken out a window in her car.
7 Sam Lacosta called safety, airport safety. They did
8 an investigation.
9     Q.   And what was the result of that
10 investigation?
11    A.   And I want -- and I want to backtrack.
12 When he gave me the instructions to use a push
13 mower, I had been using a push mower for six years.
14 Roberto Yamat had three years less seniority than
15 me, and he was a lower wage grade classification
16 than me.
17          His instructions were, Roberto, take the
18 mowers. He was allowed to take whatever mower he
19 wanted, I was not. I was instructed to take a push
20 mower.
21    Q.   So do you deny --
22    A.   He was downgrading my work assignment and
23 promoting Roberto Yamat over me. And that is why I
24 took the riding mower without authorization, because
25 I needed to use it for the job. I had been told in

Page 129

1 the past I was allowed to take any equipment I
2 needed, as long as it was within my job
3 classification that I could take.
4          Men on this job take equipment whenever
5 they need it to work on their jobs, as long as it's
6 within their job classification. Dan Hartman
7 elected to give me a three-day suspension for
8 this.
9     Q.   So are you denying that you did not have
10 authorization to take the riding mower?
11    A.   I'm not denying that. I'm saying that
12 Roberto --
13    Q.   You say that you feel you had good reason
14 not to follow your supervisor's instruction; is that
15 right?
16    A.   I'm saying that his instructions were
17 discriminatory.
18    Q.   Well, what I'm asking you is, you know,
19 whether you took the mower without authorization and
20 you knew you didn't have authorization?
21    A.   Yes.
22    Q.   Okay. Now, are you disputing that the
23 rock hit this pickup truck and broke a window?
24    A.   No. I am not disputing that.
25    Q.   You can just answer the questions. I'm

Page 130

1 going to ask you some more and then if you want to
2 add to it, you can do that.
3          The truck that was hit, was that just a
4 woman driving along the road who had no involvement
5 with employment?
6     A.   Yes. Yes, it was.
7     Q.   And do you know if she was injured at
8 all?
9     A.   She was not injured.
10    Q.   And do you know if there was a baby in the
11 truck?
12    A.   That's what they said.
13    Q.   And what was the result of the accident
14 report that was written up on this? You said that
15 the police were contacted, correct?
16    A.   That's correct.
17    Q.   Do you know what the result of the
18 accident report was?
19    A.   Yes. They had to have their window
20 replaced.
21    Q.   And did you ever talk to a Charlotte
22 Withers --
23    A.   Yes, I did.
24    Q.   -- about this?
25    A.   Yes, I did.

37 (Pages 127 to 130)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 131

1  Q. Do you recall what you said to her about
2  this accident?
3  A. No, I do not.
4  Q. Do you recall whether you said "shit
5  happens"?
6  A. No, I don't recall saying that.
7  Q. But is it possible you could have said
8  that to her?
9  A. Well, I have the whole incident
10 tape-recorded. I'll listen to it and see what it
11 says.
12 Q. The meeting with Charlotte that you have
13 tape-recorded.
14 A. Yes.
15 Q. So these are the tapes that you haven't
16 given to me yet?
17 A. Yes. That's true.
18 Q. When can you have these tapes to me,
19 Ms. Billingham? We've been waiting for months for
20 them.
21 A. October 5th.
22 Q. Well, that's the last day of discovery.
23 A. Right.
24 Q. I'm actually going to want to hold open
25 this deposition to ask you about the tapes, if I

---

Page 132

1  need some follow-up questions about the tapes since
2  you haven't provided them, so I'm going to need them
3  earlier than October 5th.
4  A. I'm working every night.
5  Q. It's been a year and a half.
6  A. I know.
7  Q. I've been patient.
8  A. And I want to apologize, but I do intend
9  to get the tapes to you and I will do it Friday --
10 or October 5th. I promise.
11 Q. I need to have the tapes before
12 October 5th. October 5th is the day by which
13 discovery needs to be completed, and I need to have
14 the opportunity to question you about the tapes, you
15 know, finishing off this deposition by October 5th.
16 So I need to have an opportunity to listen to the
17 tapes before we complete the deposition.
18 So can you have them to me by that Monday,
19 October 2nd, or is it Tuesday, October 2nd?
20 A. No. No.
21 Q. No, you can't?
22 A. October 5th is the soonest I can get them
23 to you. I'm really busy. I'm working every night.
24 I'm commuting back and forth from Anchorage to Hicks
25 Creek.

---

Page 133

1  Q. So are you telling me you're refusing to
2  give me the tapes before --
3  A. I'm not refusing. I just don't have
4  time.
5  Q. Wait. Are you telling me that you're
6  refusing to give me the tapes before October 5th?
7  A. Yes.
8  Q. And the reason for that is that you've
9  been too busy for the past year and a half to do
10 this?
11 A. I'm not going to say a reason. I'm just
12 going to say, I fully intend to get these tapes to
13 you. And I will do -- if I can do it sooner, I
14 will.
15 Q. Did I request -- when did I first request
16 these tapes?
17 A. I know. I know. A long time ago.
18 Q. And you haven't provided them to me yet,
19 correct?
20 A. That's correct.
21 Q. And you're intending to not provide them
22 to me until the very last day of discovery; is that
23 correct?
24 A. I will -- if I can get them to you sooner,
25 I will. But don't count on it being sooner than

---

Page 134

1  October 5th.
2  Q. All right. Well, I may have to file a
3  motion with the court on this. I'm just going to
4  let you know.
5  A. I'm planning on filing a motion with the
6  court anyway.
7  Q. Based on what?
8  A. The fact that I'm unable to depose
9  Charlotte Withers, Mort Plumb, and -- I'm trying to
10 think of his name. The guy who works at the
11 Department of Transportation in the upside down
12 building.
13 Q. Well, we'll talk about the depositions --
14 A. Okay.
15 Q. -- during a break.
16 A. Okay.
17 Q. See if we can work that out.
18 All right. Well, so you don't know
19 whether you told Charlotte Withers "shit happens"
20 regarding this, but you're saying that the tapes
21 should show whether or not you said that; is that
22 correct?
23 A. That's what I'm saying.
24 Q. Did you grieve this suspension, this first
25 suspension that you got?

---

38 (Pages 131 to 134)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 135

1    A.  I believe that I did.
2    Q.  And what was the outcome of that
3  grievance?
4    A.  No outcome.  No arbitration.
5    Q.  In other words, the union refused to take
6  it to arbitration; is that what you're saying?
7    A.  Yes.
8    Q.  Now I'm going to hand you what we will
9  mark as Exhibit 27.
10   (Exhibit 27 marked.)
11  BY MS. PAGE:
12   Q.  Take a look at that, Ms. Billingham.
13   A.  Yes.
14   Q.  Do you recognize this document?
15   A.  Yes, I do.
16   Q.  What is this?
17   A.  It's a disciplinary document.
18   Q.  And this, again, is in the form of
19  correspondence from Daniel Hartman; is that
20  correct?
21   A.  Yes, it is.
22   Q.  And it has to do with a second suspension;
23  is that correct?
24   A.  Yes, it is.
25   Q.  And it's dated September 7th, 2000,

Page 136

1  correct?
2    A.  Yes, it is.
3    Q.  So this is a short time after your first
4  suspension, correct?
5    A.  Yes, it is.
6    Q.  And this is -- you were suspended in this
7  case as a result of tearing a page out of a
8  foreman's logbook --
9    A.  Uh-huh.
10   Q.  -- and then initially lying about it,
11  correct?
12   A.  I believe so.
13   Q.  Would you consider this to be a serious
14  matter?
15   A.  I believe that -- I looked in what I
16  thought was a woman's purse.  And I saw -- I thought
17  a woman had left her purse in our break room.  It
18  was kind of a leather thing like this.  So I was
19  looking to see who it belonged to.
20        I saw my name written on a piece of paper
21  in there and it caught my attention.  When I saw him
22  writing me up --
23   Q.  Who are you referring to?
24   A.  Rusty Holmes.
25   Q.  So this was in fact not a woman's purse,

Page 137

1  it was some --
2    A.  Exactly.
3    Q.  -- pack or something of Rusty Holmes,
4  correct?
5    A.  Exactly.  It was a diary or something like
6  that.
7    Q.  And you saw the diary and started looking
8  through it; is that right?
9    A.  Well, I was looking to see who the purse
10  belonged to, and then I flipped through some pages
11  and I saw my name written on a piece of paper.
12   Q.  At that point did you realize it did not
13  belong to some woman, that this was in fact your
14  supervisor's?
15   A.  Yes.
16   Q.  And you knew that it was his logbook,
17  correct?
18   A.  Yes.
19   Q.  And at that point you continued to look
20  through it, correct?
21   A.  Yes.
22   Q.  Okay.  And then at some point you tore a
23  page out and ripped it up and threw it away?
24   A.  Yes.  Yes, I did.
25   Q.  And then initially when asked about it you

Page 138

1  lied and said you hadn't done that; is that
2  correct?
3    A.  Yes.  That's correct.
4    Q.  Okay.  And I asked you before if you
5  consider this a serious matter, tearing a page out
6  of a supervisor's logbook, throwing it away and then
7  lying about it?
8    A.  No, I did not consider it a serious
9  matter.  It had my name on it, he was targeting -- I
10  was being targeted.  Nobody else's names were
11  written on it.
12   Q.  You felt that you were perfectly
13  justified --
14   A.  Yes, I did.
15   Q.  -- in doing what you did?
16   A.  Yes, I did.
17   Q.  So you did not understand that your
18  supervisors felt that this was a serious matter, you
19  just disputed that; is that right?
20   A.  That's right.  Exactly.
21   Q.  And you received a five-day suspension for
22  this; is that correct?
23   A.  Exactly.
24   Q.  And did you grieve that?  Did you file a
25  grievance with the union?

Summit Court Reporting, LLC
907/264-6776

**Exh. A**
**Page 31 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 139

1   A.  I don't recall.  I believe that I did, but
2  I don't recall for sure.
3   Q.  So you don't recall what the outcome may
4  have been of any grievance you would have filed?
5   A.  No.
6   Q.  I'm going to hand what we'll mark as
7  Exhibit 28.
8   (Exhibit 28 marked.)
9  BY MS. PAGE:
10   Q.  If you'd take a look at this document,
11  please.
12   Do you recognize this?
13   A.  Yes, I do.
14   Q.  And again, what is this document?
15   A.  This is a disciplinary suspension
16  document, another one from Dan Hartman.
17   Q.  And this is dated December 26, 2000,
18  correct?
19   A.  Yes, it is.
20   Q.  And so this would be what, your third
21  suspension?
22   A.  I believe so.
23   Q.  And this involves an incident in which you
24  were told by your foreman, Fred Klouda, not to use a
25  riding four-wheeler for snow removal, and despite

---

Page 140

1  the fact that he had told you -- specifically told
2  you not to do it, you went ahead and did it,
3  correct?
4   A.  Uh-huh.  That's correct.
5   Q.  And how long a suspension did you receive
6  for this incident?
7   A.  Ten days.
8   Q.  Did you grieve this?
9   A.  Yes, I did.
10   Q.  And what was the outcome of that
11  grievance?
12   A.  No outcome.
13   Q.  Well, when you say no outcome, I mean,
14  there is an outcome.  It is either resolved, it goes
15  to arbitration, the union refuses to bring it to
16  arbitration.  I mean, what --
17   A.  Okay.  The union refused to bring it to
18  arbitration.
19   Q.  And do you know what the reason was for
20  that?
21   A.  No, I do not.
22   Q.  Did they give you a letter regarding what
23  their reason was?
24   A.  They did, but I don't recall what it says.
25   Q.  I'm going to hand you what we'll mark as

---

Page 141

1  Exhibit 29.  Take a look at that.
2   (Exhibit 29 marked.)
3  BY MS. PAGE:
4   Q.  Do you recognize this document?
5   A.  Yes, I do.
6   Q.  It's another performance evaluation, isn't
7  it?
8   Is this, again, an annual performance
9  evaluation?
10   A.  Yes, it is.
11   Q.  And what period does this cover?
12   A.  2000 to 2001.
13   Q.  Am I looking at the same one you're
14  looking at?
15   A.  It says 6/15/00 to 2/1/01.
16   Q.  So this is actually more than a year.  It
17  covers more than a year period, correct?
18   A.  Uh-huh.
19   Q.  Actually, it's less than a year period,
20  isn't it?
21   A.  Uh-huh.  Uh-huh.
22   Q.  It's about seven months.
23   Is this not an annual evaluation?  Is this
24  an evaluation, sort of an interim one?  Do you
25  recall why this was less than a year period?

---

Page 142

1   A.  It may have been.
2   Q.  Okay.  And who is the rater for this?
3   A.  Steve Pringle.
4   And, once again, I want to repeat that it
5  is alleged that Steve Pringle had a sexual
6  relationship with the first woman that went to work
7  at airfield maintenance.  And it's also alleged that
8  he fired a gun at a black man who works there.
9   Q.  And again, we already have that on the
10  record, and it's --
11   A.  I just want to repeat it for every
12  evaluation I get from Steve Pringle.
13   Q.  I don't think it's necessary to put it on
14  the record every time.  We've got that on the
15  record, and we also have on the record that this is
16  just an allegation, correct?
17   A.  That's correct.
18   Q.  And you don't have any evidence in support
19  of it; is that correct?
20   A.  I believe that there is evidence that
21  Steve Pringle did fire a gun at one of the black
22  men.
23   Q.  And what evidence is that?
24   A.  Well, this is what the man says.
25   Q.  So it's hearsay?

---

40 (Pages 139 to 142)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

## Page 143

1    A.  Well, he claims that the gun was fired at
2  him.
3    Q.  And, again, you know, in looking at these
4  employment evaluations by Steve Pringle, my question
5  to you is:  Do you understand that there were these
6  concerns with your performance during that period of
7  time?
8    A.  Yes, I do.
9    Q.  And you also understand that these
10 concerns with your performance were documented,
11 correct?
12   A.  Yes, it was.
13   Q.  And at this period of time when you got
14 this performance evaluation, you had been suspended
15 for -- on four different occasions.  Actually, I
16 think it was three different occasions -- well, let
17 me look at this.  February.
18     Yeah, three different occasions, I guess,
19 at the time of this.  For the different incidents
20 that we just discussed --
21   A.  Yes.
22   Q.  -- correct?
23   A.  Yes.
24   Q.  And so you got an unacceptable on this
25 performance evaluation, correct?

## Page 144

1    A.  Yes.  And I believe that I wrote a
2  rebuttal to it, but do you have it?
3    Q.  I did not bring the rebuttals with me
4  today.
5    A.  Okay.
6    Q.  I just brought the evaluations.
7    A.  Okay.
8    Q.  All right.  So the date of this -- and
9  actually, I -- you know, this covers a period, it
10 says it goes through February 1st, '01.  And then
11 we've got another suspension February 20th of '01.
12 So it looks like it's actually after this coverage
13 period for this performance evaluation that we just
14 discussed.
15     So I'm going to hand you that -- this
16 document, which we will mark as Exhibit 30.
17    (Exhibit 30 marked.)
18 BY MS. PAGE:
19   Q.  What is this document that we've marked as
20 Exhibit 30?
21   A.  It's another suspension signed by Dan
22 Hartman.
23   Q.  And this is dated February 20th, 2001,
24 correct?
25   A.  Uh-huh.  Yes.

## Page 145

1    Q.  And this has to do with a meeting that you
2  had with Steve Pringle --
3    A.  Yes.
4    Q.  -- involving that -- can you wait until I
5  finish the question? -- involving that annual
6  performance evaluation that we just discussed?
7    A.  Yes.
8    Q.  So did you meet with Mr. Pringle to
9  discuss that performance evaluation?
10   A.  Yes, I did.
11   Q.  And during the meeting, did you get angry
12 with him because you got an unacceptable
13 evaluation?
14   A.  Yes, I did.
15   Q.  And did you call him a bastard and walk
16 out of the --
17   A.  Yes, I did.
18   Q.  Wait until I finish the question.
19     Did you call him a bastard and walk out of
20 the meeting?
21   A.  Yes, I did.
22   Q.  And I'm going to hand you what we'll mark
23 as Exhibit 31.
24    (Exhibit 31 marked.)
25 ///

## Page 146

1  BY MS. PAGE:
2    Q.  And do you recognize this document?
3    A.  Yes, I do.
4    Q.  And what is it?
5    A.  Excerpt from my diary.
6    Q.  Was this your diary entry regarding this
7  incident with Steve Pringle when you discussed your
8  employment evaluation?
9    A.  Uh-huh.
10   Q.  And if you'd read me the part where it
11 goes, "At 3:20 p.m."  It's about a little over
12 halfway down.
13   A.  Uh-huh.
14   Q.  Read me from there to the bottom of the
15 page, please.
16   A.  So starting exactly where?
17   Q.  "At 3:20 p.m."
18   A.  Okay.  "At 3:20 p.m. Steve Pringle calls
19 me into his office and gives me my evaluation.  I
20 briefly read it and it was an unacceptable rating.
21 One part said I should be put on probation for 30
22 days.  I said, what does this mean?  I said, I don't
23 accept this, and I slammed the door and I stormed
24 out."  So now this suspension then that we were
25   Q.  So now this suspension then that we were

Summit Court Reporting, LLC
907/264-6776

**Exh. A**
**Page 33 of 52**

**Page 151**

1    Q.   Okay.  I'm going to hand you what we'll
2  mark as Exhibit 34.
3        Take a look at that, please.
4    (Exhibit 34 marked.)
5  BY MS. PAGE:
6    Q.   Do you recognize this document?
7    A.   Yes, I do.
8    Q.   Have you seen this document before?
9    A.   Yes, I have.
10   Q.   And what is this document?
11   A.   Disciplinary document.
12   Q.   Is this a disciplinary document?
13   A.   Memo for record.
14   Q.   Does it indicate, though, that there's any
15 suspension involved or any --
16   A.   No.
17   Q.   -- formal discipline involved?
18       Can you wait until I finish the question.
19   A.   Nods head.)
20   Q.   And what is your answer?  Does this
21 indicate that there was any formal discipline
22 involved in this incident?
23   A.   No.
24   Q.   Okay.  And what is this about?
25   A.   Dan Hartman and -- or, from Doug Hunter

**Page 152**

1  through Dan Hartman, they wrote me up for getting
2  stuck in the snow.
3        And I just want to add that when Bruce
4  Jokela got the trackless in the snow, nobody wrote
5  him up.
6    Q.   Was the issue here that you were stuck in
7  the snow, or you didn't call your foreman to let him
8  know?  It says here, "She did not call her foreman,
9  Fred Klouda, as she had been briefed on several
10 occasions.
11       "I counseled Elsa on February 13th, 2002,
12 on her responsibility to inform her supervisor
13 anytime she has an incident or accident.  She was
14 resistant to these instructions but did understand
15 she must comply with them."
16       Did you talk with Mr. Hunter about your
17 responsibility to inform your supervisor if you got
18 stuck in the snow?
19   A.   My supervisors had told --
20   Q.   Just answer my question.  I'm just asking
21 you, did you have a discussion with Douglas Hunter
22 about your responsibility to inform your supervisors
23 if you got stuck in the snow?
24   A.   I believe so.
25   Q.   And this says you were resistant to his

**Page 153**

1  instructions but understood you had to comply with
2  them.  Is that an accurate assessment?
3    A.   I believe so.
4    Q.   Okay.  Now, then he indicates, further
5  indicates that the next day, or February 13th, I
6  guess the same day, he says he talks to you, you got
7  the same piece of equipment stuck in the same spot
8  as you had the day before.  "On this occasion she
9  did the correct thing and called Fred" -- would that
10 be Fred Klouda?
11   A.   That's correct.
12   Q.   Okay.  "-- and informed him of the
13 situation."
14   A.   That's correct.
15   Q.   So that time, after discussing it with
16 Doug Hunter, you did call Mr. Klouda, as you had
17 been told to do, and informed him of this situation;
18 is that right?
19   A.   That's right.
20   Q.   So did you understand at this period of
21 time that you had a responsibility and it was a
22 requirement that you call your supervisor if you had
23 an accident or incident, such as getting stuck in
24 the snow?
25   A.   That's right.  But I want to add

**Page 154**

1  something, that in the past my supervisors, Fred
2  Klouda and Steve Pringle, had said:  Do not call us
3  when we're on the airfield unless it's an
4  emergency.
5    Q.   All right.  But we've had two --
6    A.   And --
7    Q.   -- we've had two occasions now where you
8  have been specifically instructed that, you know, if
9  you're going to go home, if you have an incident, if
10 you have an accident, you are to call your
11 supervisors immediately.
12       You said you understood that with regard
13 to --
14   A.   Yes, I did.
15   Q.   -- Casie Knoedler in the past and --
16   A.   But see --
17   Q.   Wait.  Wait.  Wait.  Again you're being
18 instructed here on February 13th, again, that if
19 this happens you are to call your supervisor
20 immediately, correct?
21   A.   I believe so.
22   Q.   Okay.  And I'm going to hand you what
23 we'll mark as Exhibit 35.
24   A.   But I just want to add that when I got
25 this truck stuck the second time, I had been told by

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 155

1   Fred Klouda to attempt to move this pile of snow,
2   frozen, hard pile of snow. I told Fred Klouda I did
3   not think the truck could do the job.
4       Q.   It appears to me, in looking at this, that
5   the concern in this memorandum, Ms. Billingham, is
6   that you did not call your supervisor when you got
7   stuck in the snow, and that that was an issue.
8       Would you not agree with that?
9       A.   They -- Doug Hunter made it out to be an
10  issue, yes, he did. In the past I had been stuck
11  millions of times, and I didn't call my supervisor
12  because I did not feel that getting stuck in the
13  snow is an incident.
14      Q.   Well, this --
15      A.   It's something that happens on a regular
16  basis.
17      Q.   Well, this indicates you had been briefed
18  on several occasions that you were to call your
19  foreman if that happened. And certainly at this
20  period of time you understood if there was an
21  incident or an accident you needed to call your
22  foreman immediately, correct?
23      A.   That's correct.
24      Q.   Okay. And I'm handing you here what we
25  will mark as Exhibit 35.

Page 156

1       (Exhibit 35 marked.)
2   BY MS. PAGE:
3       Q.   Do you recognize this document?
4       A.   No.
5       Q.   You don't recognize this?
6       A.   Huh-uh.
7       Q.   Well, this is -- it's Ted Stevens
8   Anchorage International Airport airfield maintenance
9   safety policy.
10      Are you contending that you have never
11  seen this before?
12      A.   I may have seen it. What is it a part of?
13  Was it out of -- let's see. It says here that it's
14  out of Ted Stevens airfield maintenance safety
15  policy.
16      Q.   Do you know if the airfield maintenance
17  had a safety policy?
18      A.   Well, yes, I do. They had several books
19  written up.
20      Q.   And had you had an opportunity to review
21  those books?
22      A.   Yes, I have.
23      Q.   And were you aware as to what the written
24  policy was with regard to accident and incident
25  reporting?

Page 157

1       A.   Yes.
2       Q.   And this has a little section here on
3   accident and incident reporting, correct?
4       A.   Yes.
5       Q.   And it says it's important that you report
6   all accidents and incidents that result in injury,
7   illness, or damage, however slight, to your
8   supervisor immediately.
9       Is that your understanding as to what
10  your --
11      A.   Yes.
12      Q.   -- requirements were?
13      A.   Yes.
14      MS. PAGE: I think this would be a good
15  time to take a short break.
16      THE WITNESS: I agree.
17      MS. PAGE: Okay. Let's do that.
18      (Off record.)
19  BY MS. PAGE:
20      Q.   We're going to go back on the record. And
21  I want to remind you that you're still under oath.
22      A.   Okay.
23      Q.   Okay. Going over some suspensions that
24  you had.
25      A.   Uh-huh.

Page 158

1       Q.   I'm going to hand you what we'll mark as
2   Exhibit 36.
3       Take a look at that.
4       (Exhibit 36 marked.)
5   BY MS. PAGE:
6       Q.   Do you recognize this document?
7       A.   Yes, I do.
8       Q.   And what is this one?
9       A.   This is a suspension.
10      Q.   And when you say it's a suspension, it's a
11  notification of suspension --
12      A.   Okay. Notification.
13      Q.   -- is that correct?
14      A.   That's correct.
15      Q.   And what is the date on this one?
16      A.   The date is July 25th, 2002.
17      Q.   And this indicates -- well, let me put it
18  this way. This refers to an incident in which you
19  didn't follow directions to mow at specific areas
20  and to water specific flowerbeds; is that correct?
21      A.   That's correct.
22      Q.   And you were given at this point a 30-day
23  suspension, correct?
24      A.   That's correct.
25      Q.   Okay. And this is your -- my

44 (Pages 155 to 158)

**Page 159**

1 understanding is this is your fifth suspension,
2 correct?
3    A.   You're keeping track; not me.
4    Q.   So you're not sure how many this was?
5    A.   No.
6    Q.   Okay.  And if you'll note on the second
7 page, it says, "You must be aware that any future
8 occurrences of this nature may be cause for your
9 dismissal.  Please take this warning seriously, as
10 this is your last chance to change your behavior,"
11 correct?
12    A.   Yes.
13    Q.   And did you receive a copy of this
14 letter?
15    A.   Yes, I did.  But I also received a copy of
16 the original e-mail that Steve Pringle had written
17 to Dan Hartman, and I also have this incident
18 tape-recorded.
19         Steve -- Steve Pringle had originally said
20 that on June 21st and June 25th these incidents
21 occurred.  I had checked in my diary.  I was not at
22 work on either one of those days.
23    Q.   So you're saying he got the dates wrong;
24 is that right?
25    A.   Yeah.  He got --

**Page 160**

1    Q.   But you're not denying that the incidents
2 occurred, correct?
3    A.   No.
4    Q.   You're just denying -- you're saying that
5 the dates are wrong?
6    A.   But I am denying this.  Dan Hartman made a
7 false statement here.  He said, "You disregarded his
8 earlier instruction and proceeded to mix gas for the
9 trimmer."  That is a false statement.  That is Dan
10 Hartman's version of what he thinks happened.
11         Dan Hartman was not there.  He -- I did
12 not talk to Dan Hartman.  I had not seen him.  This
13 was Dan Hartman's version, his version when he wrote
14 this up, of what happened.  I did not mix any gas
15 for the trimmer.  That's a false statement.
16    Q.   But this is Dan Hartman's understanding as
17 to what happened, correct?
18    A.   It's his version, yes, it is.
19    Q.   Okay.
20    A.   And he was not there.
21    Q.   And you dispute that one particular --
22    A.   Yes, I do.
23    Q.   Elsa, please, please, please.  Let me
24 finish the sentence before you answer the question,
25 and then answer it.

**Page 161**

1         So I'm saying you dispute that particular
2 part of this letter regarding your suspension,
3 correct?
4    A.   Correct.
5    Q.   Okay.
6    A.   And I also --
7    Q.   And you dispute the days that this
8 occurred on --
9    A.   That's --
10    Q.   -- correct?
11         But for the rest of the substance of this,
12 that you basically had failed to follow the orders
13 regarding where you were to mow and where you were
14 to water, you're not disputing that, correct?
15    A.   I am disputing where I was supposed to
16 mow, because I mowed exactly where I was supposed to
17 mow.
18         But I am disputing this first sentence
19 here, "Your foreman Steve Pringle reported that on
20 June 24th and June 26th you failed to follow his
21 orders."  Steve Pringle did not say that.  He says
22 that I -- I believe he said June 21st and June
23 25th.
24    Q.   Right.  And we've already been through
25 that.

**Page 162**

1         My understanding is you're saying that the
2 dates are wrong, but with regard to the substance of
3 this and the dates aside, you're not disputing that
4 he -- that Steve Pringle reported that you failed to
5 follow his orders, correct?
6    A.   That's correct.
7    Q.   Okay.  Now, you said this incident is on
8 tape.  What are you referring to when you're
9 referring to this incident --
10    A.   The hearing --
11    Q.   Please wait until I finish the
12 question. -- this incident; are you referring to the
13 union hearing?
14    A.   Yes.
15    Q.   Okay.  And are those the tapes that you
16 have --
17    A.   Yes.
18    Q.   -- not -- are those the tapes that you
19 have not turned over to me yet?
20    A.   Yes.
21    Q.   Okay.  And are those the tapes that you're
22 refusing to turn over until the last day of
23 discovery?
24    A.   Yes.
25         I'm not refusing.  I'm going to try to get

Page 163

1   them to you earlier, but I doubt seriously I'll be
2   able to.
3       Q.   Okay.  And I'm going to hand you what we
4   will mark as Exhibit 37.
5       (Exhibit 37 marked.)
6   BY MS. PAGE:
7       Q.   Do you recognize this document?
8       A.   Yes, I do.
9       Q.   What is that?
10      A.   It is a final warning and discipline
11  letter.
12      Q.   And this is dated --
13      A.   Written by Dan Hartman.
14      Q.   And this is dated September 26, 2002,
15  correct?
16      A.   Yes, it is.
17      Q.   And this letter is a formal notification
18  of misconduct, correct?
19      A.   Yes, it is.
20      Q.   And this -- this indicates that you
21  disobeyed an explicit directive not to operate or
22  drive the flush truck.  And that you also attempted
23  to persuade a coworker, Mr. Martin, to change his
24  story concerning the events that took place
25  regarding the incident where you were told not to

Page 164

1   drive the flush truck; is that right?
2       A.   That's correct.
3       Q.   Okay.
4       A.   But I am disputing that I tried to
5   persuade Mr. Martin to change his story.  I did not
6   attempt to persuade him to change his story.
7       Q.   Do you know if Mr. Martin indicated that
8   you had attempted to persuade him to change his
9   story?
10      A.   I do not know.
11      Q.   So you don't know what he may have told
12  Dan Hartman or other managers out at airfield
13  maintenance --
14      A.   No, I do not.
15      Q.   You do not know what he may have told Dan
16  Hartman or either managers at airfield maintenance,
17  correct?
18      A.   That's correct.
19      Q.   And I'm going to hand you what we'll mark
20  as Exhibit 38.
21      (Exhibit 38 marked.)
22  BY MS. PAGE:
23      Q.   Do you recognize this document?
24      A.   Yes, I do.
25      Q.   What is this?

Page 165

1       A.   It's an excerpt out of my diary.
2       Q.   And this is referring to a discussion --
3   well, this is referring to the whole incident we've
4   been talking about, correct?  Involving your
5   coworker --
6       A.   Uh-huh.
7       Q.   -- Jason Martin; is that right?
8       A.   Yes.
9       Q.   Will you read me the bottom portion of
10  this, starting about a third of the way from the
11  bottom where it says, "I saw Jason Martin outside of
12  Dan Hartman's office."
13      A.   Okay.  "I said, Jason, tell me what you
14  said.  You said no, you didn't want me to drive the
15  truck.  He said, 'I said, I should drive the truck.'
16  I said then you said, 'okay, go ahead.'  He said, I
17  didn't say 'okay.'  At the hearing Charlotte said,
18  did you ever tell Jason to change his story and tell
19  him to go to Doug Hunter's office.  I said no.  Dan
20  Hartman said, was anyone around.  I said no.  He
21  said -- he said 'Ed Cook.'  I said maybe when I got
22  in the truck with Jason, Ed Cook was outside of the
23  truck.  I taped the conversation and gave the tape
24  to Jim Dommek.  Jim Dommek made copies of the tape."
25      Q.   So you had a conversation with Jason

Page 166

1   Martin regarding what happened that day --
2       A.   Uh-huh.
3       Q.   -- where you had been told not to drive
4   the water truck, correct?
5       A.   (Nods head).
6       Q.   And is it possible that Ed Cook witnessed
7   that conversation?
8       A.   Well, we were inside a truck.  And if he
9   was outside of the truck, I don't think he could
10  have heard the conversation.
11      Q.   But is it possible he could have?
12      A.   He could have seen me in the truck with
13  Jason Martin.
14      Q.   So you don't know whether or not Ed Cook
15  overheard the conversation; is that correct?
16      A.   No, I do not.
17      Q.   And you don't know what Ed Cook might have
18  told the management of airfield maintenance
19  regarding the conversation; is that right?
20      A.   That's right.
21      Q.   I'm going to hand you what we will mark as
22  Exhibit 39.
23      (Exhibit 39 marked.)
24  BY MS. PAGE:
25      Q.   Do you recognize this document?

Exh. A
Page 37 of 52

## Page 171

1  equipment that he assigns, which is disruptive; and
2  that you've had incidents with failure to follow
3  instructions; that you're argumentative and defiant;
4  and that your skill and proficiency level at higher,
5  complex equipment is below acceptable; but you're
6  kind and respectful to the public.
7      It says, "Overall, Elsa must stop arguing
8  about equipment assignments and concentrate on her
9  job as defined in her position description."
10     Did you review Mr. Klouda's assessments?
11     A.  Yes, I did.  And I did write a rebuttal to
12  it.
13     I'm surprised you don't have the rebuttals
14  with these.
15     Q.  Well, I really figured that if you wanted
16  to include rebuttals as part of your case that you
17  can do that.  But I really had just wanted to make
18  sure that you had seen all of these performance
19  evaluations.  And --
20     A.  Well, the State keeps the rebuttals with
21  the performance evaluation as part of the record.
22     Q.  Well, we can include -- you know, we can
23  include the rebuttals with these when filing these,
24  that's fine.
25     For purposes of this deposition, I was --

## Page 172

1  have an awful lot of exhibits, and I'm trying to
2  keep the bulk down.  And, you know, my interest is
3  in making sure that you had seen the performance
4  evaluation.
5      A.  Okay.
6      Q.  I'm aware that you've seen the rebuttals,
7  since it's my understanding that you would have
8  written them.  And so I'm trying to establish that
9  you've seen these and you knew what they were.
10     No indication here that I'm trying to say
11  you didn't write a rebuttal or that there isn't a
12  rebuttal there.  But, as I said, I, you know, tried
13  to put these exhibits together so we don't have a
14  huge number of pages.
15     All right.  At some point in 2003, was it
16  your understanding that you were going to be
17  terminated from employment at airfield
18  maintenance?
19     A.  I didn't know.
20     Q.  Were you informed that at some point?
21     A.  Yes.
22     Q.  What happened?  How were you informed that
23  you were going to be dismissed?
24     A.  I was given numerous suspensions.  I was
25  given poor evaluations, which I wrote rebuttals

## Page 173

1  to.
2      Q.  And then at some point were you brought in
3  and told that you were going to be dismissed from
4  employment?
5      A.  Yes, I was.
6      Q.  Okay.  And who did you meet with?
7      A.  Dan Hartman, Charlotte Withers.  I believe
8  the union representatives were there.  I believe
9  that --
10     Q.  Do you recall who was there from the
11  union?
12     A.  I want to say Dale Johnson, but I'm
13  actually not sure.  It may have been Billy Meers
14  and -- I can't think of his name.  The head guy over
15  the union.
16     Q.  Would it be Jim Ashton?
17     A.  Jim Ashton.  Right.  Exactly.
18     Q.  So you said that you had had a number of
19  suspensions and some performance evaluations that
20  had been low-acceptable and unacceptable, which you
21  rebutted.
22     And then did you have an additional
23  incident where you had an accident and you didn't
24  immediately inform your supervisor about it?
25     A.  Yes, I did.

## Page 174

1      Q.  And I'm going to hand what you we'll mark
2  as Exhibit 42.
3      (Exhibit 42 marked.)
4  BY MS. PAGE:
5      Q.  Do you recognize this document?
6      A.  Yes, I do.
7      Q.  And what is this?
8      A.  This was a letter dismissing my
9  employment, signed by Mort Plumb.
10     Q.  And who is Mort Plumb?
11     A.  Director of the airport.
12     Q.  And what's the date on this?
13     A.  May 8th, 2003.
14     Q.  Now, did you ever receive -- actually
15  receive this letter?
16     A.  Yes, I did.  It was handed to me at one of
17  their meetings.
18     Q.  Okay.  This has a note on the bottom.  It
19  says, "This letter was never sent because a letter
20  of dispute was signed June 10, 2003, to give
21  Ms. Billingham another chance."  Is that accurate?
22     A.  No, that is not accurate.
23     Q.  How so?
24     A.  I dispute that, because -- and I'm not
25  sure what day it was.  I believe it might have been

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 175

1  this day right here.
2      Q.   And you're pointing to something on the
3  document?
4      A.   May 8th, 2003, when they had the hearing.
5  And I'm not sure if this is the exact day or not.
6  But I -- Charlotte Withers handed me this letter.
7  She gave me --
8      Q.   Who is Charlotte Withers?
9      A.   She's personnel with the State of Alaska,
10  human resources.
11     Q.   So you're saying she handed you the
12  letter.  And what are you disputing about the
13  fact --
14     A.   I'm disputing that she never mailed this
15  letter to me.
16     Q.   Okay.
17     A.   This letter was not sent, but it was
18  handed to me --
19     Q.   It was handed to you?
20     A.   -- at a meeting.
21     Q.   And at that meeting, were you dismissed
22  from employment?
23     A.   Yes, I was.
24     Q.   To your understanding, you were dismissed
25  from employment?

Page 176

1      A.   I was given this letter.
2      Q.   Okay.  And then what happened?  Were
3  you --
4      A.   Well, I read the letter.
5      Q.   Okay.
6      A.   Saying that I was dismissed from my
7  employment.  And then the union said, well, we can
8  go talk about it.  So I went with them into another
9  room.  And they said we could possibly keep your job
10  if you would agree to sign a dispute resolution,
11  letter of dispute resolution.  Would you be willing
12  to do that?  And I said, yes, I would.
13          So then they came back and they discussed
14  it with Charlotte Withers and Dan Hartman.  So they
15  agreed to write up a dispute -- a letter of dispute
16  resolution.
17     Q.   And was it your understanding that this
18  was sort of basically a last chance agreement, that
19  you would be given an opportunity to continue with
20  your employment at the State under the terms of this
21  agreement?
22     A.   Yes, I was.
23     Q.   So it was your understanding that you were
24  going to be dismissed, but then the union intervened
25  and you agreed to this last chance agreement or

Page 177

1  letter of dispute resolution, correct?
2      A.   Yes, I did.
3      Q.   Were you there when everyone was
4  discussing the terms of the agreement?
5      A.   No, I was not.
6      Q.   Where were you?
7      A.   They didn't exactly discuss the terms of
8  it at this meeting.  I believe that that was done at
9  some other place and some other time.  And I don't
10  know exactly when, because I don't believe that I --
11  I believe that I signed that letter, the dispute
12  resolution -- I think it was June 10th or sometime
13  in June.  I'm not exactly sure what -- I -- you
14  know, if I had a copy of it, then I would -- or
15  maybe you've got a copy of it.
16          But I was just under the impression that
17  they were going to write up a dispute letter of
18  resolution, or letter of dispute resolution.
19          So I think at that time they said, well,
20  we're going to put you on a 30-day suspension.  And
21  I said, okay.  So I was on a 30-day suspension.
22          And then when I got back from the 30-day
23  suspension, that's -- apparently that's when this
24  dispute letter of resolution period, it was a
25  year-long period, was supposed to go into effect.

Page 178

1      Q.   And what was your understanding as to what
2  the terms were for that year-long period under the
3  letter of dispute resolution?
4      A.   Well, they had basic guidelines set on
5  this letter.
6      Q.   And did you agree to return to work under
7  the terms of that letter of dispute resolution?
8      A.   Well, I had no other choice.  If I wanted
9  to work, I had to sign it.  I didn't have a choice.
10  I was terminated from my job, according to this
11  letter here.  I was terminated.  If I wanted to
12  work, I had to sign the dispute letter of
13  resolution.  If I didn't want to work, then I could
14  go home and collect unemployment.
15     Q.   So my question to you is, did you agree to
16  return to employment at airfield maintenance under
17  the terms of the letter of dispute resolution?
18     A.   Yes, I did.
19     Q.   Let's go back to this incident with --
20  that contributed to --
21     A.   Excuse me, just a second.  I'm going to
22  throw this in the trash.
23     Q.   -- contributed to your receiving this
24  letter on May 8th, 2003.
25          This indicates that on April 16th, you

49 (Pages 175 to 178)

**Exh. A**
**Page 39 of 52**

Page 179

1    were driving a pickup truck and you backed it into a
2    stop sign, and then you failed to immediately
3    contact your supervisor but instead drove the pickup
4    truck to the shop and then reported it. You know,
5    even though it had been made clear to you that there
6    was a requirement that you call your supervisor
7    immediately upon any accident. Is that correct?
8        A.   That's correct.
9        Q.   Now, this indicates in this letter that
10   you actually had a disciplinary hearing and you
11   admitted you failed to call your supervisor
12   immediately, correct?
13       A.   That's correct.
14       Q.   And this letter also indicates that the
15   decision to dismiss your employment in May of 2003
16   was based on your poor work history, past
17   disciplinary record, including this most latest
18   incident in which you had refused to -- or which you
19   had not properly contacted your supervisor; is that
20   correct?
21       A.   That's correct.
22       Q.   Okay. And I'm going to hand you what
23   we'll mark as Exhibit 43.
24           (Exhibit 43 marked.)
25   ///

Page 180

1    BY MS. PAGE:
2        Q.   Do you recognize this document?
3        A.   Yes, I do.
4        Q.   Is this the letter of dispute resolution
5    that you were referring to before?
6        A.   Yes, it is.
7        Q.   Now, you didn't -- this looks like you
8    didn't actually sign the document. Am I correct in
9    that?
10       A.   Actually, I think I did sign one -- they
11   may have had a copy of this and I may have signed
12   that.
13       Q.   But this actually indicates that Art
14   Chance signed it for the State of Alaska and Don --
15       A.   Valesko.
16       Q.   -- Valesko signed it for Jim Ashton on
17   behalf of the union representing the Public
18   Employees Local 71, correct?
19       A.   Yes.
20       Q.   Now, before you returned to work at
21   airfield maintenance, had you had an opportunity to
22   review this letter of dispute resolution?
23       A.   Yes, I had.
24       Q.   So you understood what the terms were,
25   correct?

Page 181

1        A.   Yes.
2        Q.   And I'm going to hand you what we'll mark
3    as Exhibit 44.
4            (Exhibit 44 marked.)
5    BY MS. PAGE:
6        Q.   Do you recognize this?
7        A.   Yes, I do.
8        Q.   And this actually is a performance
9    evaluation covering the period between December
10   16th, 2002, to June 10th, 2003, correct?
11       A.   Correct.
12       Q.   So this goes up to somewhere around the
13   period of time when you returned to work under the
14   terms of the letter of dispute resolution; is that
15   right?
16       A.   Yes.
17       Q.   So for this six-month period here, prior
18   to your returning to work under the letter of
19   dispute resolution, you had received an unacceptable
20   evaluation; is that correct?
21       A.   That's correct.
22       Q.   And this one was rated with Fred Klouda,
23   correct?
24       A.   Uh-huh. That's correct.
25       Q.   And this indicates that the rating was

Page 182

1    discussed with you, correct?
2        A.   That's correct.
3        Q.   And again, Fred attached a narrative,
4    which is the last page of this exhibit, correct?
5        A.   That's correct.
6        Q.   And he lays forward again concerns about
7    your performance similar to those in past
8    performance evaluations, correct?
9        A.   That's correct.
10           I do have something to dispute on here,
11   though.
12       Q.   Okay.
13       A.   He said that I was given three additional
14   training sessions on how to use an airless paint
15   sprayer. That's a false statement. I was given two
16   training sessions, and then I tested several
17   times -- I tested several times on the airless paint
18   sprayer. I'm not exactly sure how many times.
19           One time I asked Sam Lacosta to test me;
20   he said he had no idea how to run an airless paint
21   sprayer. I asked Jeff Bosch to test me; he said he
22   had no idea how to run an airless paint sprayer. So
23   I asked Mark Koskovich. So he's saying it was a
24   training session. It was not a training session, I
25   was testing.

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 183

1    Q.   So you're saying you were given two
2  additional training sessions, but not a third that
3  you were testing on?
4    A.   Exactly.  I was testing.
5    Q.   Did you file some sort of a rebuttal
6  indicating that with this performance evaluation?
7    A.   I believe that I did.
8    Q.   Okay.
9    A.   Also, I had something else I want to
10 dispute.  It says right here that I wanted to be
11 signed off as partially proficient on the compacter.
12 And he says here that I could not perform the
13 preoperational task of checking the oil.  That is
14 not true.  I could perform the task of checking the
15 oil on the compacter, and I signed off on my
16 training records.
17   Q.   Was there something else that you had not
18 been able to perform the pre-operational task of
19 checking the oil with some other piece of
20 equipment?
21   A.   I'm not sure.  But I dispute both of these
22 things here.
23   Q.   All right.  But you don't dispute that
24 your supervisors had serious concerns about your
25 performance and your ability to perform --

---

Page 184

1    A.   But I just want to say that --
2    Q.   Elsa, you don't dispute that your
3  supervisors had serious concerns about your
4  performance; is that correct?
5    A.   I don't dispute that.  But I do dispute
6  that these two things here -- I was signed off on my
7  training records.
8    Q.   You need to indicate what you're pointing
9  to, for the purposes of the court reporter here.
10 You're pointing to the little bullets on the
11 evaluation sheet -- no, it's all right, you need to
12 tell her.
13         You're pointing to the two bullets on the
14 evaluation sheet that Fred Klouda attached to your
15 performance evaluation that you just talked about,
16 correct?
17   A.   That's correct.  I dispute these two.
18   Q.   Right.  And those are what we just talked
19 about.
20   A.   Right.
21   Q.   Now, when you returned to work, the terms
22 of the letter of dispute resolution, which I may
23 also call the last chance agreement, it says:  It is
24 agreed between the parties that the following
25 constitutes full and final resolution of the above

---

Page 185

1  referenced dispute for Elsa Bellingham, and that you
2  agree to voluntarily demote to a wage 58 laborer,
3  sub-journey one, effective June 11th, 2003; to be
4  placed on a 30-day suspension; during the first year
5  as a wage grade 58, you would not be upgraded to
6  higher level equipment, nor be entitled to training
7  other than wage grade 58 equipment and safety
8  training; and that if your performance didn't meet a
9  mid-acceptable level or higher after one year as a
10 wage grade 58 you would be dismissed.  It indicates
11 this would be your last chance to change your
12 behavior.  One more act of unacceptable behavior
13 will result in dismissal.
14         And you had just said to me that you read
15 and understood the terms of the letter of dispute
16 resolution before you returned to work after the
17 30-day suspension, correct?
18   A.   Yes, I did.
19   Q.   Now, once you returned to work, did you
20 have some discussion with your union or with
21 management about receiving interim evaluations to
22 let you know how you were doing and whether you were
23 maintaining the acceptable level of performance
24 required to maintain your employment with airfield
25 maintenance?

---

Page 186

1    A.   Yes.  Dan Hartman had a hearing in his
2  office, and I believe Steve Pringle was there.  And
3  they -- I'm not exactly sure who all was there.  But
4  I was informed that I would be getting two-week
5  evaluations.
6    Q.   And this was by supervision at airfield
7  maintenance?
8    A.   Yes.
9    Q.   Did you discuss that with your union
10 representatives?
11   A.   Yes, I did.  I believe that I did.
12   Q.   And what did you discuss with the union
13 representatives about that?  Were they supportive of
14 getting the two-week evaluations?
15   A.   Yes, they were.
16   Q.   So in your mind they thought that was a
17 good idea?
18   A.   Yes.
19   Q.   I'm going to hand you what we'll mark as
20 Exhibit 45.
21         (Exhibit 45 marked.)
22 BY MS. PAGE:
23   Q.   Do you recognize this document?
24   A.   Uh-huh.
25   Q.   And what is this?

---

51 (Pages 183 to 186)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 187

1    A.  It is a performance evaluation, a
2  two-week -- one of the two-week performance
3  evaluations that I was receiving.
4    Q.  And this is dated July 1st, 2003,
5  correct?
6    A.  Yes, it is.
7    Q.  So this would have been soon after you
8  returned from your --
9    A.  Yes, it was.
10    Q.  -- 30-day suspension?
11    This would have been soon after you
12  returned from your 30-day suspension?
13    A.  Yes, it was.
14    Q.  And this is a little hard to read, because
15  it looks like someone highlighted it, but this has
16  an overall work performance of low-acceptable,
17  correct?
18    A.  That's correct.
19    Q.  So was this actually something in writing
20  that was given to you?
21    A.  Yes, it was.
22    Q.  And then did you meet with Dan Hartman or
23  anyone else to discuss this?
24    A.  I -- I believe that I was discussing it
25  with Dan Hartman and Bruce Jokela, and I think Doug

Page 188

1  Hunter was there.  Because I wrote a rebuttal on the
2  first one.  This was the first one they gave me and
3  I wrote a rebuttal.
4    Q.  Is this the rebuttal, your handwritten
5  portion on there?
6    A.  Yes, it is.  But it actually was on the
7  back of the page too.  I had written more.
8    And then after I wrote the rebuttal, I was
9  told by Doug Hunter and Dan Hartman that I was not
10  allowed to write any more rebuttals.
11    Q.  And did they give you some reason?
12    A.  No, they did not.
13    Q.  Well, this does have a section that says
14  "remarks" on it, correct?
15    A.  I don't know.
16    Q.  Well, under where you signed it, it says
17  "remarks."
18    A.  Oh, okay.  Right.  And that's what I
19  wrote.
20    Q.  It would appear to be a section where you
21  could write your remarks about it, correct?
22    A.  Okay.
23    Q.  Did they indicate to you that the purpose
24  of these memoranda for the record were to help you
25  see where there might be deficiencies in your

Page 189

1  performance so that you could get to a level that
2  would allow you to maintain your employment with
3  airfield maintenance?
4    A.  Yes.
5    Q.  And so did the purpose of writing a
6  rebuttal have to do with the fact that the purpose
7  of this is not a formal employment performance
8  evaluation, but the purposes of this is to help you
9  to reach the level that you needed to maintain your
10  employment?
11    A.  That's correct.  But I also want to add
12  that when I was demoted to a wage grade 58 labor
13  position, I had previously passed my probation as a
14  wage grade 58 labor position.  So I just want to add
15  that.
16    Q.  But you agreed to be demoted to the wage
17  grade 58 as part of the terms of the letter of
18  dispute resolution?
19    A.  After I was terminated from my
20  employment.
21    Q.  I'm not disputing that.  I'm saying you
22  agreed to demote to a wage grade 58 before you
23  returned to work under the terms of the letter of
24  dispute resolution, correct?
25    A.  Yes, I did.

Page 190

1    Q.  And you understood that a violation of a
2  terms of the letter of dispute resolution would
3  result in your dismissal; is that correct?
4    A.  Yes, I did.
5    Q.  And you understood you were being given a
6  last chance to come back to employment and to show
7  that you could meet the terms of the letter of
8  dispute resolution, correct?
9    A.  Yes, I could.
10    Q.  So, now, did Dan Hartman and Bruce -- was
11  Bruce Jokela your supervisor during this period of
12  time once you returned to work?
13    A.  Yes.  Yes, he was.
14    Q.  Okay.  Did they continue to meet with you
15  on a regular basis to let you know how your
16  performance was going?
17    A.  Yes, they did.
18    Q.  At some point did you indicate to them
19  that you didn't want to meet with them anymore and
20  you didn't want to get these periodic evaluations?
21    A.  I'm not sure.
22    Q.  You don't recall?
23    A.  No, I don't.
24    Q.  I'm going to hand you what we'll mark as
25  Exhibit 46.

52 (Pages 187 to 190)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 191

1    (Exhibit 46 marked.)
2    BY MS. PAGE:
3    Q.    Do you recognize this document?
4    A.    Yes, I do.
5    Q.    And this has a date of November 20th,
6    2003, correct?
7    A.    Yes.
8    Q.    And it's signed by Bruce Jokela on
9    November 18th, 2003, correct?
10   A.    Yes.
11   Q.    And this cuts off a bit, but there's some
12   handwriting at the bottom that says, "Elsa was given
13   this feedback and refused to sign and also requested
14   not to go" -- can't read what it says there, because
15   it's covered by a fax line.
16         Does that, to the best of your
17   recollection, strike you as accurate, that when you
18   were given the feedback you refused to sign this?
19   A.    I believe so.
20   Q.    And did you also indicate that you didn't
21   want to receive any more of this feedback?
22   A.    I do not know.
23   Q.    Now, one of the terms of the letter of
24   dispute resolution was that you would remain at the
25   wage grade 58 position for a period of one year,

Page 192

1    correct?
2    A.    That's correct.
3    Q.    At some point during that one-year period,
4    did you start to apply for promotions out of the
5    wage grade 58 position?
6    A.    Yes, I did.
7    Q.    And you're aware that under the terms of
8    the letter of dispute resolution you were not
9    allowed to do that, correct?
10   A.    Yes.
11   Q.    I'm going to hand you what we'll mark as
12   Exhibit 47.
13   (Exhibit 47 marked.)
14   BY MS. PAGE:
15   Q.    Do you recognize this document?
16   A.    Yes, I do.
17   Q.    And what is this?
18   A.    It's an excerpt from my diary.
19   Q.    And this has a date of September 30th,
20   2003, correct?
21   A.    That's correct.
22   Q.    So this would have been several months
23   after you returned to work in July of 2003 --
24   A.    That's correct.
25   Q.    -- under the letter of dispute resolution,

Page 193

1    correct?
2    A.    That's correct.
3    Q.    And down at the bottom, if you'd read me
4    just that last little paragraph there, it says,
5    "Today I turned in my resume."
6    A.    Uh-huh.  That's correct.
7    Q.    So this says you turned in your resume for
8    a wage grade 54 position.  And then it says, "I
9    told" -- and I can't read this.  "I told"
10   somebody -- Nick?
11   A.    Yeah.  Nick.
12   Q.    -- "the HRC has encouraged women and
13   minorities to apply for promotions."
14   A.    That's correct.
15   Q.    What is the HRC that you're referring
16   to?
17   A.    Human Rights Commission.
18   Q.    And then on the next page, which is for
19   April 20th, 2004, which is some months later, it
20   says "I signed the list of testing," correct?
21   A.    That's correct.
22   Q.    Is that also for a promotion?
23   A.    Yes, it is.
24   Q.    So you've got at least two times here when
25   you're under the letter of dispute resolution where

Page 194

1    you went ahead and signed up for promotions, even
2    though you knew under the letter of dispute
3    resolution that you couldn't do so, correct?
4    A.    That's correct.
5    Q.    So this was kind of an "in-your-face, I'm
6    going to do it anyway even though I am under this
7    letter"; would you agree that it's kind of an
8    in-your-face thing to management?
9    A.    Yes, it is.
10   Q.    And I'm going to hand you what we'll have
11   marked as Exhibit 48.
12   (Exhibit 48 marked.)
13   BY MS. PAGE:
14   Q.    Do you recognize this document?
15   A.    Yes, I do.
16   Q.    And what is this?
17   A.    Memo for the record.
18   Q.    And this is dated March 1st, 2004,
19   correct?
20   A.    Yes.
21   Q.    And this has to do with what we were just
22   discussing, which was that you were violating the
23   requirements of the letter of dispute resolution by
24   applying for these positions outside of wage grade
25   58, correct?

Page 195

1    A.   That's correct.
2    Q.   Now, during this period of time where you
3  were working at airfield maintenance, from July of
4  '03 over the next year, under the terms of the
5  letter of dispute resolution, aside from this issue
6  of applying for these promotions, were you meeting
7  the terms of the letter of dispute resolution?
8    A.   I have no idea.
9    Q.   Why do you have no idea?
10   A.   This was something that Dan Hartman, Doug
11 Hunter, and Bruce Jokela had concocted.  This was
12 airfield management and the union put together this.
13 It's a contract within a contract.  They put me on a
14 different contract than everybody else at airfield
15 maintenance.
16   Q.   And they were allowed to do that.  Do you
17 dispute that?
18   A.   I dispute that.  I believe it's
19 discriminatory.
20   Q.   Do you not understand what a letter of
21 dispute resolution is?
22   A.   I do not know, I've never seen a dispute
23 letter of resolution before, but I feel that to
24 target me as a woman and put me on a different
25 contract than everybody else at airfield

Page 196

1  maintenance, I believe that's illegal.
2    Q.   Are you aware of whether --
3    A.   I believe that is illegal.
4    Q.   Are you aware of whether other individuals
5  at airfield maintenance have been under letters of
6  dispute resolution?
7    A.   No, I'm not aware of anything.
8    Q.   So you don't know one way or the other?
9    A.   No.
10   Q.   And you did agree to the terms of this
11 letter; is that correct?
12   A.   Under duress.  I was terminated from my
13 job.  I didn't have an option.  I did -- I was
14 coerced into signing that.
15   Q.   And who are you saying you were coerced
16 by?
17   A.   The State and the union.
18   Q.   And how were you coerced into signing
19 it?
20   A.   Well, if I wanted to work, I had to sign
21 that letter.
22   Q.   You could have chosen to not come back to
23 work and --
24   A.   That's right.
25   Q.   -- grieved the termination, correct?

Page 197

1    A.   I could have gone and collected
2  unemployment.  I had two choices, either work or
3  collect unemployment.
4    Q.   And you agreed to come back to work under
5  the terms of this agreement, correct?
6    A.   Correct.
7    Q.   Now, I had asked you if you, during that
8  next year, met the terms of this agreement.  And
9  I'll ask you --
10   A.   Obviously I did not, because I'm not
11 working there anymore.
12   Q.   Okay.  So one of the -- one of the terms
13 was that your performance had to reach a
14 mid-acceptable level or higher after a year or you
15 would be dismissed.
16       Did your performance reach a
17 mid-acceptable level or higher during that next
18 year?
19   A.   Obviously not.
20   Q.   So your dismissal was in accordance with
21 the terms of the letter of dispute resolution,
22 correct?
23   A.   If that's what you people are saying,
24 yeah.
25   Q.   Well, you've read it, I mean.

Page 198

1    A.   Yes, I have.
2    Q.   And you would agree that was one of the
3  terms, correct?
4    A.   I believe so.
5    Q.   Now, who -- well, let me ask you this.
6       When was it that you were dismissed from
7  employment at airfield maintenance?
8    A.   June 2004.
9    Q.   And how were you informed that you were
10 going to be dismissed?
11   A.   I believe that I was given a letter.  I'm
12 not sure.
13   Q.   Were you informed as to the reasons for
14 your termination?
15   A.   Yes, I was.
16   Q.   And what's your recollection as to what
17 the reasons were that you were being terminated?
18   A.   Because I did not meet the terms of the
19 dispute resolution.
20   Q.   Did you grieve your termination in June
21 2004 with the union?
22   A.   Yes, I did.
23   Q.   And who was it at the union that was
24 processing your grievance?
25   A.   Dale Johnson.

54 (Pages 195 to 198)

**Exh. A**
**Page 44 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 199

1    Q.   Did the union take it to arbitration?
2    A.   No, they did not.
3    Q.   And what was the reason that they didn't
4  pursue the grievance on your behalf?
5    A.   I believe that all the letters that were
6  placed against me, the file that was put on me, all
7  the letters that were put in my file, that I was not
8  even aware of that were put in my file.
9    Q.   What letters are you referring to that
10 were put in your file you were not aware of?
11   A.   Letters from coworkers.
12   Q.   So I'm talking about now the union, why
13 they had decided not to pursue arbitration.  And
14 you're saying it's because of letters --
15   A.   It was because of my file and all the
16 letters and the suspensions and the -- everything.
17   Q.   Did someone at the union talk to you about
18 why they were not going to pursue arbitration?
19   A.   I don't remember.
20   Q.   Do you recall if you got a letter from
21 their attorney about it?
22   A.   Yes, I did, actually.
23   Q.   I'm going to hand you what we'll mark as
24 Exhibit 49.
25        And also what we'll mark as Exhibit 50.

Page 200

1    (Exhibits 49 and 50 marked.)
2  BY MS. PAGE:
3    Q.   And if you'd take a look at Exhibit 49.
4        Do you recognize that document?
5    A.   Yes, I do.
6    Q.   And what is it, please.
7    A.   It's a letter from Kevin Dougherty.
8    Q.   And the date is December 6, 2004,
9  correct?
10   A.   Yes.  Yes, it is.
11   Q.   And was Kevin Dougherty the attorney for
12 Public Employees Local 71 at that time?
13   A.   Yes, he was.
14   Q.   And he notes in here that he reviewed the
15 employer's just cause for the dismissal based on
16 your six previous disciplinary suspensions that led
17 to the last chance agreement, your failure to reach
18 a mid-acceptable level in the State evaluations
19 based on the five months of acceptable and three
20 months at low-acceptable evaluations.
21        The union thoroughly reviewed your case
22 file, interviewed coworkers and superiors.  And it
23 says, "Given the clear findings that the employer
24 had reasonable grounds to terminate, Local 71
25 properly determined that the grievance lacked

Page 201

1  sufficient merits to proceed to arbitration."
2        Is that an accurate assessment of what
3  Kevin Dougherty wrote to you?
4    A.   Yes, it is.
5    Q.   And if you would look at what we've marked
6  as Exhibit 50.  What is this?
7    A.   Excerpt from my diary.
8    Q.   And this is dated December 9th, 2004,
9  correct?
10   A.   Yes, it is.
11   Q.   And you say in here, "I received a nasty
12 letter from Dougherty reciting all of my
13 suspensions, blah, blah," correct?
14   A.   That's correct.
15   Q.   Were you referring to this letter that --
16   A.   Yes, I was.
17   Q.   Can you wait until I finish.  -- referring
18 to the letter that we had as Exhibit 49?
19   A.   Yes.
20   Q.   Okay.  With regard to Kevin Dougherty's
21 evaluation on behalf of the union on the merits of
22 your termination -- have you ever met with Kevin
23 Dougherty; do you know him?
24   A.   No, I have not.
25   Q.   Do you know what his age is?

Page 202

1    A.   Actually, I did meet with him on one
2  occasion.  And I don't recall exactly when it was.
3  I had filed an EEOC complaint against the union.
4  And they had agreed to mediate my case, so they had
5  a hearing, actually.  And I don't recall when it
6  was.  But there was someone representing the EEOC
7  there, and Kevin Dougherty was there.  And I think
8  Billy Meers might have been there.
9    Q.   So was this --
10   A.   So I met Kevin Dougherty.
11   Q.   At that point in time?
12   A.   At that point.
13   Q.   When he wrote the letter, you had never
14 met him, though?
15   A.   No.  I had never met him.
16   Q.   And you said you filed an EEOC charge
17 against the union.  Was that for failure to bring --
18   A.   Failure to represent me.
19   Q.   For this particular termination?
20   A.   Yes.
21   Q.   With airfield maintenance?
22   A.   Yes.
23   Q.   So it was a failure for them to bring it
24 to arbitration; is that what you alleged?
25   A.   Yes.

Summit Court Reporting, LLC
907/264-6776

**Exh. A**
**Page 45 of 52**

### Page 203

1  Q.  And did you allege that that was
2  discriminatory?
3      A.  Yes, I did.
4      Q.  Based on what?  In other words, based on
5  sex?  Age?  What categories?
6      A.  Based on my sex and age, and the fact that
7  I had been discriminated against by the State and
8  the union failed to represent me.
9      Q.  So did you actually bring an unfair labor
10  practice charge against them as well?
11      A.  Yes, I did.
12      Q.  Now, how was the EEOC charge resolved?
13      A.  Well, they had a hearing and they had a
14  mediation hearing, which basically we all got
15  together, and then -- then we more or less resolved
16  the dispute to -- not to my satisfaction, but the
17  EEOC representative was there and he was more or
18  less kind of the go-between.  And I don't recall his
19  name now.  He was from out of state, so...
20      Q.  So you reached some sort of settlement --
21      A.  Yes.
22      Q.  -- during mediation?
23      A.  Yes, we did.
24      Q.  Do you remember what the terms of the
25  settlement were?

### Page 204

1      A.  Basically, they took my name off of the
2  State's list for rehiring.  And then they bumped my
3  name up on the union list a couple years, I believe.
4  And I believe that was it.
5      Q.  So now, the union was your representative?
6      A.  Right.
7      Q.  These were the individuals who were
8  representing you --
9      A.  Right.
10      Q.  -- before the employer?
11      A.  Right.
12      Q.  And so you said to the EEOC, "I believe
13  the union is also discriminating against me, and
14  they failed to properly represent me."
15      So in an unfair labor practice charge,
16  which you said you also filed, how was that
17  resolved?
18      A.  Basically, it went nowhere.  And I don't
19  recall the woman's name who handled it, but she was
20  over at the Department of Labor.
21      Q.  When you say "it went nowhere," do you
22  mean she found that there was no merit to your
23  charge?
24      A.  Well, she told me that they never rule
25  against the union.  She said that's their

### Page 205

1  position.
2      Q.  I'm not asking -- I'm asking you, did she
3  find there was no merit to your charge?
4      A.  That's correct.
5      Q.  And you don't remember her name?
6      A.  No.
7      Q.  So the EEOC also didn't find there was
8  merit to your charge, you mediated it and resolved
9  it between yourself and the union, correct?
10      A.  That's correct.
11      Q.  Now, do you believe that Mr. Dougherty,
12  the union's attorney, was personally acting
13  discriminatorily towards you in reaching the
14  conclusion that he did?
15      A.  Yes, I do.
16      Q.  And based on your sex?
17      A.  Yes.
18      Q.  And what evidence do you have that he
19  based his decision on sex discrimination?
20      A.  Well, number one, for the union to put me
21  into a contract like that, a last dispute
22  resolution, I believe that that contract in itself
23  is discriminatory, and it's not the union contract,
24  it's a different contract.  And I believe that is
25  discriminatory.

### Page 206

1      Q.  So you're saying that the letter of
2  dispute resolution itself was discriminatory?
3      A.  Yes, I do.
4      Q.  Are you saying that the termination also
5  was discriminatory?  Are you saying the
6  discrimination arises from the contract?
7      A.  Yes.
8      Q.  Yes to what?
9      A.  Yes to all of the questions.
10      Q.  Are you saying that the termination itself
11  was discriminatory?
12      A.  Yes.
13      Q.  But you're also saying the letter of
14  dispute resolution was -- that you agreed to --
15      A.  Yes.
16      Q.  -- was discriminatory?
17      A.  Yes.
18      Q.  And then I'm asking you about
19  Mr. Dougherty's letter.  And you're saying he was
20  discriminating against you because the union agreed
21  to enter into the letter of dispute resolution; is
22  that what you're saying?
23      A.  Yes.
24      Q.  Let me ask you a little bit about, you
25  know, your general allegations of discrimination.

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

**Page 215**

1  A.  I'm just basing it on the information I'm
2  getting back in discovery.
3  Q.  My question to you is, in not just
4  accidents -- you seem to be limiting this to just
5  accidents.  I'm talking about other issues that you
6  had.  And we've gone through this, you know, with
7  basically conduct where, you know, you're failing to
8  follow directions or, you know, calling your
9  supervisor a bastard, things like that.  You know,
10  there's -- there are a lot of things that sort of
11  went on for a number of years that led to the last
12  chance agreement.
13       Do you know of anyone with a similar
14  disciplinary history, both for accidents and for
15  other things, such as failure to follow directions,
16  argumentative conduct, and insubordination?
17  A.  Okay.  Number one, if you get in an
18  accident, you're not following instructions, because
19  you're not supposed to be getting in accidents.  Tim
20  Hanley was involved in accidents.
21  Q.  Elsa, I'm going to just ask you once more.
22  If you don't want to answer it, that's fine.
23       But do you know of anyone that has a
24  similar, overall, both with regard to accidents and
25  with regard to the other issues you were disciplined

---

**Page 216**

1  for?
2  A.  No, I do not.
3  Q.  That's my question.
4       Now, again, I want to go back to -- well,
5  let me ask you this.  You're talking about this as
6  being a gender and an age issue, correct?  Do you
7  know what the age was for the decision makers?  And
8  you said you really didn't know who the decision
9  makers were for your termination, but -- well, let
10  me ask you, do you know what Dan Hartman's age is?
11  A.  No, I do not.
12  Q.  Would you estimate he's older than you?
13  A.  Yes, I would say so.
14  Q.  And with regard to your supervisors, do
15  you know what any of their ages were?
16  A.  They were all about my age.
17  Q.  But are you contending that they
18  discriminated against you based on your age then?
19  A.  And because I am a woman.
20  Q.  So a combination of the two --
21  A.  Yes.
22  Q.  -- is what you're saying?
23  A.  Yes.
24  Q.  How did you get along with the other women
25  that you worked with?

---

**Page 217**

1  A.  I had a working relationship with them.  I
2  worked with them.  I did not socialize with them
3  after work.
4  Q.  Did they have any issues with your
5  performance or your attitude, with your women
6  coworkers?
7  A.  I do not know.
8  Q.  Let me --
9  A.  I was actually attacked by one of the
10  woman.  Sharell Wendorff attacked me on one
11  occasion.
12  Q.  Well, let's talk about some of these other
13  women.
14       I'm going to hand you what we'll mark as
15  Exhibit 51.
16  (Exhibit 51 marked.)
17  BY MS. PAGE:
18  Q.  Do you recognize this document?
19  A.  Uh-huh.
20  Q.  And what is it?
21  A.  Excerpt from my diary.
22  Q.  And it's dated February 22nd -- 1996; do
23  you think?  There isn't a date right up near there,
24  but there is a little calendar that says 1996.
25  A.  Uh-huh.  Yep.

---

**Page 218**

1  Q.  Does that seem accurate?
2  A.  Yes.
3  Q.  And you refer to Suzanne Singer in this.
4  A.  Yes.
5  Q.  Who is Suzanne Singer?
6  A.  That's another woman I worked with on
7  another construction job.
8  Q.  And do you want to read what you say in
9  your journal here about Suzanne Singer?
10  A.  "I wonder what kind of garbage she will be
11  spreading about me.  Fortunately she will only be
12  here a month.  She is a ghost coming back to haunt
13  me."
14  Q.  What were you referring to there?
15  A.  Nothing specifically.
16  Q.  Nothing specifically?  What is that -- I
17  mean, you just said -- had she spread garbage about
18  you before?
19  A.  I do not know.
20  Q.  Then why did you say she was a ghost
21  coming back to haunt you?
22  A.  I don't know.  I don't know why I wrote
23  that.
24  Q.  What was the job you had worked on with
25  her before?

---

Summit Court Reporting, LLC
907/264-6776

**Exh. A**
**Page 47 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 219

1   A. It was up at Red Dog. It was a
2   construction job.
3   Q. This seems to indicate she was not going
4   to say positive things about you.
5        Is that an accurate assessment in your
6   mind?
7   A. That's an accurate assessment.
8   Q. Is it fair to say that you didn't think
9   that Suzanne Singer thought highly of your work?
10  A. I don't think Suzanne Singer had anything
11  to say about my work, because I did a good job.
12  I've done a good job on every job I've been on.
13  Q. So what would the garbage be that she'd be
14  spreading about you?
15  A. Rumors. Stuff that may have happened,
16  that people might say, people talk and not -- and
17  talk is cheap. Not everything's the truth.
18  Q. I'm going to hand you what we'll mark as
19  Exhibit 52.
20  (Exhibit 52 marked.)
21  BY MS. PAGE:
22  Q. If you'd take a look at that.
23       What is this document? Do you recognize
24  it?
25  A. Uh-huh.

Page 220

1   Q. Is this, again, a page from one of your
2   journals?
3   A. Yes it is.
4   Q. And it looks like December 26, 2001. Does
5   that seem accurate?
6   A. Yes, it is.
7   Q. And here you're referring to someone named
8   Debby Dallas, correct?
9   A. That's correct.
10  Q. And what do you say about Debby?
11  A. "She was hired as a laborer. Debby
12  follows me from job to job and proceeds to bad-mouth
13  me to my coworkers. She'll fit right in with this
14  crowd."
15  Q. So this is something quite similar to what
16  you said about Suzanne Singer, correct?
17  A. That's correct.
18  Q. So is Debby someone, I guess according to
19  this, that you had worked with --
20  A. Yes.
21  Q. -- prior to working with the State?
22  A. Yes. And I've worked with her since.
23  Q. What jobs did you work with Debby Dallas
24  on?
25  A. I've worked with her at Red Dog. I've

Page 221

1   worked with her this winter for ASRC.
2   Q. And do you know what her opinion of your
3   work performance is?
4   A. No. I really don't.
5   Q. But you anticipated that she would be
6   bad-mouthing you.
7   A. Yes.
8   Q. Whatever that means.
9   A. Yes.
10  Q. Can you give me some sense of what you
11  mean by bad-mouthing?
12  A. Well, she bad-mouths everybody, so...
13  Could be anything, could be false allegations, false
14  statements, rumors, whatever.
15  Q. I'm going to hand you what we'll mark as
16  Exhibit 53.
17  (Exhibit 53 marked.)
18       THE WITNESS: Oh, yes, this is the one.
19  BY MS. PAGE:
20  Q. You referred earlier -- do you recognize
21  this document?
22  A. Yes, I do.
23  Q. What is this?
24  A. This is the letter written by Sharell
25  Wendorff.

Page 222

1   Q. And you had referred to this earlier about
2   an incident that you had had with some other woman,
3   correct?
4   A. Yes.
5   Q. Okay.
6   A. She -- actually, she said she knew about
7   me getting fired from Bradley Lake. And, to the
8   best of my knowledge, I did not know her then. I
9   had never met her. I had never even seen her. I
10  did know her ex-husband Don Bellamy.
11  Q. Let me ask you what this is. This appears
12  to be an account written by Sharell about a run-in
13  that you and she had in 1998.
14  A. Exactly.
15  Q. Okay. And according to this, you and she
16  had both been told to clean sidewalks that morning.
17  She did that and you kept driving by and she got
18  angry, and then you had a confrontation, correct?
19  A. Uh-huh.
20  Q. And I'm going to hand you what we'll mark
21  as Exhibit 54.
22  (Exhibit 54 marked.)
23  BY MS. PAGE:
24  Q. Take a look at that.
25  A. But I also want to say that this is a

60 (Pages 219 to 222)

**Exh. A**
**Page 48 of 52**

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

Page 223

1  false statement. She wrote here that she knew about
2  me getting fired from Bradley Lake, and that "she
3  had blew up an engine in a dump truck." Number one,
4  I was not driving a dump truck. I was driving a
5  3308 Terex.
6      Q. You're talking about back at Bradley Lake,
7  correct?
8      A. Yeah. Exactly.
9      Q. I mean, my concern with this is --
10     A. Okay. But this is a false statement. She
11  ruined the engine. She's not a mechanic, she wasn't
12  there, so how can she make a statement? I didn't
13  even know her back then.
14     Q. What I want to know is, is this, as far as
15  you know, a statement that Sharell gave to airfield
16  maintenance regarding the incident that you and she
17  had?
18     A. Yes, it is.
19     Q. And then if you'd look at what we've
20  marked as Exhibit 54 here, Ms. Billingham, this
21  one?
22     A. Yes.
23     Q. Do you recognize that document?
24     A. Yes, I do.
25     Q. Is that your statement that you gave to

Page 224

1  airfield maintenance?
2      A. Yes, it is.
3      Q. Regarding the same incident, correct?
4      A. Yes, it is.
5      Q. So you two had a run-in and there was --
6      A. No. She attacked me.
7      Q. That's your account of what happened,
8  correct?
9      A. That's correct.
10     Q. Okay. But this was back in 1998; is that
11  correct?
12     A. Yes. Correct.
13     Q. And did Sharell call you a lazy piece of
14  shit?
15     A. I believe so.
16     Q. And is it your sense that Sharell had some
17  issues with your job performance?
18     A. I have no idea.
19     Q. But she did call you a lazy piece of
20  shit?
21     A. Yes, she did.
22     Q. And Sharell has since had some medical
23  problems?
24     A. Yes, she has.
25     Q. And is she able to testify right now; do

Page 225

1  you know?
2      A. I know nothing about her. I didn't know
3  her before she came to airfield maintenance. I had
4  never seen her before. I had never even met her
5  before. I know nothing about her. And all I know
6  is that she left. She allegedly had a brain
7  aneurysm. And I haven't heard anything more about
8  her.
9      Q. Now, do you contend that Sharell got
10  better treatment at airfield maintenance than you
11  did?
12     A. She was promoted over me.
13     Q. But you also say that she's one of the
14  older, unattractive women there; is that correct?
15     A. Yes, she is. Or, I don't know, some of
16  the guys might have thought she was attractive.
17     Q. And you also identify as another older,
18  unattractive woman is Becky Gagnon; is that how
19  that's pronounced?
20     A. Yes. That's correct.
21     Q. Do you think Becky was given preferential
22  treatment over you?
23     A. Yes, she was.
24     Q. And how did you get along with Becky?
25     A. I got along with her okay.

Page 226

1      Q. Do you know what her sort of evaluation of
2  your performance would be?
3      A. I've got a question.
4      Q. Uh-huh.
5      A. She's allowed to evaluate my performance,
6  but then why am I not allowed to evaluate her
7  performance?
8      Q. I'm just asking you if --
9      A. Why is it the coworkers are allowed to
10  evaluate my performance?
11     Q. I'm just asking you if you know what her
12  evaluation of your performance would be. If you've
13  had any incidents that would let you -- give you
14  some indication as to whether or not she felt your
15  performance was good.
16     A. I know that she probably bad-mouthed me
17  every chance she'd get.
18     Q. Why is that?
19     A. I do not know.
20     Q. I'm going to hand you what we'll mark as
21  Exhibit 55.
22     A. Are these for me to keep?
23     Q. Yes.
24         Take a look at that, please.
25     (Exhibit 55 marked.)

61 (Pages 223 to 226)

**Exh. A**
**Page 49 of 52**

Page 231

1  Cummins was married to -- well, she had a sexual
2  relationship with Steve Pringle. She got
3  preferential treatment. And Peggy Merschman, her
4  ex-husband used to work there. They all knew him.
5      Q. So you're saying because of a friendship
6  with her ex-husband --
7      A. Yes. Her ex-husband.
8      Q. -- you believe she got preferential
9  treatment?
10     A. Yes, I do.
11     Q. But you also said that she is an older,
12  unattractive woman?
13     A. But she is, and they did not promote her
14  to a wage grade 53, either. They did not promote
15  me. They did not promote Teen Anderson. They did
16  not promote Peggy Merschman. And they did not --
17  Sharell Wendorff, they did promote her to 54.
18     Q. She did get promoted to a wage grade 54
19  position?
20     A. Peggy did.
21     Q. Peggy did?
22     A. Yes, she did.
23     Q. So she was promoted over you?
24     A. But they did not promote her to a wage
25  grade 53.

Page 232

1      Q. So you're contending that -- because in
2  your interrogatory response you say, you know, the
3  reason that you're saying that you were
4  discriminated against based on age is that older,
5  unattractive women were discriminated against.
6         But you're also saying all these older,
7  unattractive women that you've listed here were
8  treated better than you, correct?
9      A. They were treated better than me, that's
10  true.
11     Q. So is it possible that there are other
12  factors here other than age and gender that came
13  into play?
14     A. There were other factors. And, like I
15  said, the women who were married to men --
16     Q. Right.
17     A. -- who worked there got special
18  treatment.
19     Q. Or, in this case, you're saying her
20  ex-husband.
21     A. Her ex-husband.
22     Q. Do you know how long she had been divorced
23  from this man that you're contending that --
24     A. No, she's still married to him.
25     Q. Oh, I thought you said it was her

Page 233

1  ex-husband that was friends.
2      A. Okay. I made a mistake. They're still
3  married. And the supervisors all knew her
4  husband.
5      Q. How did you and Peggy get along?
6      A. Not good.
7      Q. And why was that?
8      A. I can't really answer that.
9      Q. Is it --
10     A. I got along with her just fine. She
11  didn't get along with me.
12     Q. Is it fair to say she didn't want to work
13  with you?
14     A. That's fair to say. But I do want to say
15  that she did call me up at home when she left her
16  employment.
17     Q. Let me ask you about, you know, your
18  evidence that your employment, while you were at the
19  airport, was acceptable.
20         What evidence do you have in support of
21  your contention that -- well, let me ask you this.
22  Do you contend that your performance at airfield
23  maintenance during the last year of your employment
24  was acceptable?
25     A. Yes, it was.

Page 234

1      Q. And what evidence do you have in support
2  of that contention?
3      A. Well, I wasn't involved in any accidents.
4  I picked up -- I just -- you know, I just can't say,
5  because the type of work I did, there's no --
6  there's no -- there's no way to define it, because a
7  laborer picks up mountains of garbage. A laborer
8  picks up -- does tons of dirty, hard, arduous work.
9  And there is no way to define it. There is no way
10  to determine how much work a laborer does at the
11  airport.
12     Q. So --
13     A. There's no way that you can -- you know,
14  okay, they -- they have dump trucks that come twice
15  a week, I think, to airfield maintenance.
16     Q. So let me ask you this. Do you know of
17  anyone who would testify at trial to say that your
18  performance during your last year of employment at
19  airfield maintenance was acceptable?
20     A. Yes, I do.
21     Q. Who is that?
22     A. Jim Dommek.
23     Q. Anybody else?
24     A. Let's see. Yes, I believe that -- let me
25  think.

63 (Pages 231 to 234)

Elsa Billingham
September 25, 2007

Billingham v. State of Alaska, DOT/PF
Case No. 3:05-cv-0240 (TMB)

---

Page 255

1    Q. And I'm going to give you what we'll mark
2  as Exhibit 58.
3       Take a look at that, Ms. Billingham.
4  (Exhibit 58 marked.)
5  BY MS. PAGE:
6    Q. Do you recognize this document?
7    A. Yes, I do.
8    Q. What is it?
9    A. EEOC complaint.
10   Q. And in this document you're saying that
11 you believe you've been blacklisted by --
12   A. Yes.
13   Q. -- the Department of Transportation and
14 the union, correct?
15   A. That's correct.
16   Q. Okay. Now, how many EEOC complaints did
17 you file against airfield maintenance during your
18 employment there?
19   A. I filed one in 2002. I think I filed
20 another one in January of 2004. Let's see what the
21 date of this one is. This one is December 2004.
22      Then I believe after I was terminated from
23 my job in June of 2004, I believe I filed another
24 one then.
25   Q. And every time you filed an EEOC

Page 256

1  complaint, did you co-file a complaint with the
2  Human Rights Commission?
3    A. They automatically do that. That's part
4  of their thing. They work together on these.
5    Q. Now --
6    A. At least that's my understanding of it.
7    Q. Now, in the EEOC complaints that you
8  filed, did you prevail on any of the complaints?
9    A. No, I did not.
10   Q. And what about the Human Rights Commission
11 complaints, did you prevail on any of those?
12   A. No, I did not.
13   Q. And you didn't prevail on any of your
14 union grievances either, correct?
15   A. No, I did not.
16   Q. So let's go back to this exhibit that
17 we're looking at with the EEOC complaint where you
18 allege blacklisting.
19      What are you basing this particular
20 retaliatory blacklisting complaint on?
21   A. I'm basing it on the fact that I had
22 originally testified to the State, in the State's
23 inquiry, or whatever you want to call it, I
24 testified.
25      Then again, in 2002, I filed a written

Page 257

1  formal complaint with the EEOC. Then I had written
2  the affidavit for Dennis Beegan on his age
3  discrimination complaint. And I had been
4  interrogated by Kathleen Strasbaugh, or whatever her
5  name is, and the other attorney who was with her.
6       And then I had actually filed another
7  charge of discrimination. And I'm not sure if
8  this -- this is the one that I filed in -- it looks
9  like 2004. But I filed this one against the
10 union.
11   Q. But my understanding is that you said your
12 termination was retaliatory based on those things
13 that you just listed --
14   A. That's what I believe.
15   Q. -- and that we've talked about.
16      Okay. But my understanding is you had
17 sort of a separate allegation that you, you know,
18 you couldn't get jobs from the State after your
19 termination. Is that part of your --
20   A. That's -- that's --
21   Q. Wait. Wait. Wait. Is that part of this
22 lawsuit?
23   A. Yes, it is.
24   Q. Okay. So my question is, you know, how
25 did the State blacklist you, as you say? In other

Page 258

1  words, what was it that the State did after you were
2  terminated that you are contending was illegal?
3    A. Well, what I'm contending is, after I was
4  terminated from my job with airfield maintenance, I
5  was hired by construction engineering. I was hired
6  by Joe Owens to work. And he told me the job would
7  last about three months.
8       And I was in training. It was an
9  engineering tech position. And I had been there for
10 three days. And then Joe Owens told me, he handed
11 me a letter saying that my employment was
12 terminated, and -- that's the letter. That is the
13 letter. I figured you'd have a copy of it.
14   Q. All right. I'm going to hand you what
15 we'll mark as Exhibit 59.
16   (Exhibit 59 marked.)
17 BY MS. PAGE:
18   Q. If you can take a look at this.
19      And I'm going to ask you if you are
20 familiar with document?
21   A. Yes, I am.
22   Q. Is this the letter that you were just
23 referring to that you got from Joe Owens informing
24 you that your services would no longer be needed as
25 a non-permanent engineering technician?

69 (Pages 255 to 258)

**Exh. A**
**Page 51 of 52**

Page 259

1  A.  Yes, it is.
2  Q.  Okay.  And you understood that this
3  position was a non-permanent position and you could
4  be let go at any time; is that right?
5  A.  Yes, it was.
6  Q.  Okay.  Now, was it your understanding that
7  you were eligible for rehire with Department of
8  Transportation and Public Facilities after your
9  termination from airfield maintenance?
10  A.  It was my understanding that that letter
11  of dispute resolution, that letter said that that
12  letter had nothing to do with any other job
13  positions that I would go on.
14  Q.  Well, once you were terminated from the
15  airport, when you didn't meet the terms of the
16  letter of dispute resolution, did you believe that
17  you could reapply for positions at the airport?
18  A.  I believed that I could, yes, I did.
19  Q.  And what did you base that on?
20  A.  Well, I just based it on the fact that I
21  have a legal right to work.  I'm an American citizen
22  and I have a legal right to work.
23  Q.  Now, when you had jobs with the union and
24  the employers would say, basically, Ms. Billingham
25  is on our do-not-rehire list, did you understand

Page 260

1  that to be something that the employer had the right
2  to do?
3  A.  I don't know.
4  Q.  So do you know whether the State can,
5  under its statutes and personnel regulations, place
6  someone on what's essentially a sort of
7  do-not-rehire status?
8  A.  I do not know.  I'm not familiar with all
9  of the State's regulations.
10  Q.  Did you understand --
11  A.  But I was hired by Joe Owens.
12  Q.  Did you understand, at the time you
13  received this letter from Joe Owens, that the basis
14  for this was that you were not to be rehired by the
15  Department of Transportation and Public
16  Facilities?
17  A.  Yes, he did.  He told me that it had
18  nothing to do with him or his department.  He said
19  he was told by his supervisor, Pat Wittrock, not
20  to -- to terminate my employment.
21  Q.  And was that because you were on a
22  do-not-rehire list for the department?
23  A.  He did not say that.
24  Q.  Now, when you were terminated from your
25  job with the Municipality, did you also claim that,

Page 261

1  you know, basically they blacklisted you after
2  that?
3  A.  Yes, they did.
4  Q.  Yes, they did, or you claim that they
5  did?
6  A.  I claim that they did.
7  Q.  Okay.  And did you file a grievance based
8  on that?
9  A.  Yes, I did.
10  Q.  And what was the outcome of that
11  grievance?
12  A.  There was no outcome.
13  Q.  What did you base that allegation on, that
14  the Municipality had blacklisted you, what was the
15  basis for that allegation?
16  A.  I was told that I was ineligible to apply
17  for any more jobs with the city.
18  Q.  So did you know whether that was something
19  the Municipality could do under their personnel
20  statutes and regulations?
21  A.  No, I don't know anything.
22  Q.  And when you said that the grievance
23  didn't go anywhere, again, are you saying that the
24  union refused to proceed to arbitration?
25  A.  That's correct.

Page 262

1  Q.  Now, as part of your lawsuit, it's my
2  understanding that you're seeking damages,
3  compensatory damages from embarrassment,
4  humiliation, and emotional distress; is that
5  right?
6  A.  That's correct.
7  Q.  And what are you basing this on?
8  A.  Well, I am basing it on the fact that
9  because of my age and because I'm a woman I can no
10  longer find full-time permanent employment in the
11  field that I've worked in for 30 years.
12  I am basically blacklisted.  Not only by
13  the State, but by the city and the school district,
14  and I've never even worked for the school
15  district.
16  Q.  Why do you say you're blacklisted from the
17  school district?
18  A.  Because the union told -- Teamsters Union
19  told me that "they do not want us to send you out
20  there to apply for any more jobs," is what they told
21  me.
22  Q.  Have you applied for jobs in the past
23  with --
24  A.  Yes, I have.
25  Q.  -- with the school district?

70 (Pages 259 to 262)