Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,           )
                           )
      Plaintiff,           )
                           )
vs.                        )
                           )
STATE OF ALASKA, DEPARTMENT)
OF TRANSPORTATION AND PUBLIC)
FACILITIES,                )
                           )
      Defendant.           )
_____)
Case No. 3:05-cv-0240 (TMB)

**COPY**

DEPOSITION OF JAMES ASHTON

Pages 1 - 72, inclusive

Wednesday, September 26, 2007, 1:47 p.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

**Exh. B**
**Ashton Deposition**

Case 3:05-cv-00240-TMB Document 87-7 Filed 11/06/2007 Page 2 of 17

James Ashton  
September 26, 2007

Billingham v. State of Alaska  
Case No. 3:05-cv-0240 (TMB)

Page 2

1  A-P-P-E-A-R-A-N-C-E-S

2  For Defendant:

3  ATTORNEY GENERAL'S OFFICE
   BY: Brenda B. Page, Esq.
4  1031 West 4th Avenue, Suite 200
   Anchorage, Alaska, 99501
5  907/269-5100

6

7  For Public Employees Local 71:

8  ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
   BY: Kevin B. Dougherty, Esq.
9  2501 Commercial Drive, Suite 140
   Anchorage, Alaska, 99501
10  907/276-1640

11

12  Reported By:

13  Katherine L. Novak, RPR
    Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1 were you working somewhere else?
2   A.  Yes, I was.  I was a heavy-duty mechanic
3 working for the State of Alaska, Department of
4 Transportation.  Did mechanic work and some
5 equipment operating.
6   Q.  Did you do any work at the airport?
7   A.  No.  I was -- previously I was living in
8 Fairbanks, and I actually worked up in Fairbanks and
9 on the North Slope, the Haul Road.
10   Q.  And in your position with the State as a
11 heavy-duty mechanic, did you have any affiliation
12 with the union at all at that time?
13   A.  Well, yes, I was a union member, I was a
14 shop steward.
15   Q.  You were a shop steward?
16   A.  Yes.
17   Q.  How long were you a shop steward?
18   A.  Oh, gosh.  Just roughly, I think I was
19 probably a shop steward six years.  As I recall.  It
20 could be more.
21   Q.  And was that the same union --
22   A.  Yes it was.
23   Q.  -- that we're talking about?
24   A.  Yes, it was.
25   Q.  Any other union work prior to that?

Page 9

1   A.  No.  I didn't belong to another union
2 prior to this, no.
3   Q.  And as business manager right now, what
4 are the duties of your position?
5   A.  To oversee the operations of the union
6 from our three offices:  One in Anchorage, one in
7 Fairbanks, one in Juneau.  Negotiate the various
8 contracts.  We currently represent roughly 2,400
9 employees with four different contracts.  So State
10 of Alaska, the Municipality of Anchorage, the Haines
11 Borough, and the Anchorage School District.
12       And I'm in charge of the fiduciary
13 responsibilities for the union in my capacity as the
14 secretary/treasurer.
15   Q.  And you stated you have roughly 2,400
16 employees.  For the State of Alaska portion --
17   A.  State of Alaska is probably about 1800.
18   Q.  1800?
19   A.  Yes.  Give or take.
20   Q.  And you said you've been business manager
21 for about three years.  So do you remember actually
22 what month you became business manager?
23   A.  It was -- well, I was elected into the
24 position, so there is a very definite date on that,
25 but I don't recall right off.

Page 10

1   Q.  Do you have any recollection of what
2 that -- it seems to me it was --
3   MR. DOUGHERTY:  June.
4   THE WITNESS:  -- June of --
5 BY MS. PAGE:
6   Q.  Of 2004?
7   A.  Yes.  Yeah.
8   Q.  And when you were assistant business
9 manager prior to that, what were your duties?
10   A.  Well, pretty parallel to the ones I have
11 now, except I -- you know, I had qualified immunity
12 and I could always blame my boss.
13       I was in the process of more or less kind
14 of being groomed for the position.  He turned over a
15 large amount of the authority and responsibility to
16 the position, because he was getting closer towards
17 retirement, and so --
18   Q.  Who was the actual business manager at
19 that time?
20   A.  Don Valesko.
21   Q.  For the whole time you were assistant?
22   A.  That's correct.
23   Q.  And then when you were just, you know,
24 working as a business rep, did you represent the
25 full scope of employees with the union, or did you

Page 11

1 represent only a certain group of them?
2   A.  In my original position as a business
3 representative, I was stationed up in Fairbanks, as
4 I said.  And Fairbanks has just State of Alaska
5 employees.  And with that we would have people that
6 work for the Pioneer Homes, for the equipment
7 operators, mechanics, building maintenance, and
8 National Guard employees, that type of thing.  But
9 it was predominately -- it was all State of Alaska.
10       When I got promoted to the business
11 assistant manager, I was still stationed in
12 Fairbanks, but found myself down in Anchorage a lot
13 taking care of issues down here.  So somewhere along
14 the line we had agreed that I would transfer my
15 position and move to Anchorage.
16       So when I moved to Anchorage, then I
17 assumed the responsibility of representing people
18 under the other three contracts.
19   Q.  And when did you move to Anchorage?
20   A.  About five years ago.  In that area.
21   Q.  So that would be in 2002?
22   A.  Yeah.  I believe.  2001, 2002.  I'm sorry,
23 I'm kind of sketchy on all that.
24   Q.  That's okay.  It doesn't matter any more
25 than getting the year down at this point.

Page 16

1    peers to consider her equal.
2         However, the administration is much more
3    lenient in that regard. And that causes issues from
4    the male employees, you know, grumbles about
5    preferential treatment and they don't have to go out
6    there and, you know, plow when it's like that
7    because they can't change chains. So we're always
8    dealing with that dichotomy. But it's the nature of
9    the beast. And if it wasn't that, it would be
10   something else causing the concern, so...
11        Q.  So you talked about when you first came
12   down to Anchorage and your first dealings with
13   Ms. Billingham.
14        Did she actually file a formal grievance
15   at that point; do you know?
16        A.  I don't believe she did. No, I don't
17   believe she did. She was -- when she'd come in it
18   was -- and I believe it was because she heard there
19   was basically somebody new in the office.
20        And it was my understanding after she left
21   and I talked to the other reps that the position
22   was, well, she's already gone through us on kind of
23   the same issue, we told her the same thing. She was
24   looking for a different answer to the same issue.
25   And I said, well, I'm glad we're all, you know,

Page 17

1    singing off the same sheet of music.
2         And I took that opportunity to go out to
3    the airport and meet the, you know, the supervisors
4    and people out there at that point, within the next
5    few weeks, just to kind of get a feel for who the
6    people were, who the supervisors were, how they
7    delegated authority and job assignments.
8         Q.  And was Dan Hartman working out there at
9    that point in time?
10        A.  Yes, he was. Yes.
11             I believe, yeah. It seems like he's been
12   there forever. So, yeah, I believe he was.
13        Q.  But since you really started working with
14   the airport you've been working with Dan?
15        A.  Yes. Yeah.
16        Q.  I'm going to hand you some different
17   grievances here and ask that you take a look at
18   them. And we'll mark this as Exhibit No. 1.
19        (Exhibit 1 marked.)
20   BY MS. PAGE:
21        Q.  And if you could take a look at it and
22   tell me if you have seen this one before.
23        A.  Not -- well, you know, I may have reviewed
24   this in the case of doing my investigation with some
25   of Elsa's issues. So I may have done it. Mike Otto

Page 18

1    was a business rep that was in place when I
2    transferred down, and I worked with Mike for a
3    couple of years.
4         Q.  And the date on this is January of '99,
5    correct?
6         A.  Uh-huh.
7         Q.  So this obviously would have been
8    something that would have been processed before you
9    got down to Anchorage, correct?
10        A.  Correct. That's correct.
11        Q.  And so this is, though, I mean, if you can
12   just tell me, does this look like a regular
13   complaint form for the union?
14        A.  Yes. This is a standard grievance form.
15   And the grievant has, you know, filled out what the
16   issue of their complaint is and what they were
17   looking for in a remedy. And we pay close attention
18   to that, because, you know, for some of the members
19   the remedy is a wish list, for us the remedy is
20   something that's black and white. It's whatever,
21   you know, whatever the infraction would allow and
22   not necessarily what you'd like to see.
23        Q.  And again, this was not something that was
24   processed by you. And the second part of the
25   exhibit is actually a letter to Ms. Billingham; is

Page 19

1    that right? Have you seen this one before?
2         A.  Well, I haven't seen this. I don't recall
3    seeing this, but I may have reviewed it. Because,
4    like I said, I did go through some of these when I
5    was trying to kind of brush myself up on the
6    individuals and the cases.
7         But this looked very similar to -- quite
8    frankly, very similar to the discussions that I have
9    had with the grievant on several different
10   occasions.
11        Q.  And the reason I wanted you to look at
12   this is because, actually, the contents of this
13   letter seem to be somewhat similar to what you were
14   just talking about, in terms of, you know, there are
15   certain things that an equipment operator needs to
16   do to be proficient. And this letter discusses a
17   little bit about how she, Ms. Billingham, could gain
18   some proficiency in working with some of the
19   coworkers out there.
20        Is this something that you personally
21   talked to Ms. Billingham about also?
22        A.  Exactly. This same subject, and in all
23   honesty, I think I probably used pretty close to the
24   same logic and the same words in discussing it with
25   her.

Page 20

1  The airport -- if I could just expand a
2  little. The airport actually was one of the first
3  areas in our area that came up with what I consider
4  to be a very fair type of a training, progressive
5  training and promotional opportunity program.
6  A lot of the other places there can be a
7  certain amount of favoritism involved because, you
8  know, if they like you and they put you on a
9  particular something, you get proficient, you kind
10  of have a foot up on someone else.
11  The airport's policy that they have put
12  together actually gave everybody the opportunity to
13  come in and work with everything. And once you got
14  proficient in it, you went to any of your foremen
15  and said, I'd like to be checked out on this, they'd
16  sign you out and you just -- you had an opportunity,
17  regardless of whether people liked you or not, to
18  promote up.
19  And I thought it was a real fair type of
20  program that they had put together. Mr. Hartman was
21  real fair with all the employees out there. And the
22  only ones that really had any issue with it, in my
23  experience and cases that I've dealt with, are ones
24  that just flat didn't want to go through the hoops.
25  They wanted to get it by virtue of showing up and

Page 21

1  being there and...
2  Q. So have you had a chance to actually look
3  at this letter?
4  A. I can read through it now, but I was just
5  glancing at it while we were talking.
6  Q. I was just going to ask if you would agree
7  with the conclusions in this letter and agree with
8  the advice that was given to Ms. Billingham?
9  A. If you give me just a moment, I'll review
10  it real quick.
11  Q. You bet.
12  A. Yeah. That is very good advice. And
13  again, you know, as I finish reading through it and
14  stuff, it is very, very parallel to exactly what I
15  said to her in person, on several occasions.
16  Q. And what has been Ms. Billingham's
17  response the times that you gave her similar advice
18  personally?
19  A. Well, my position on this is that it
20  was -- she never took ownership for what she was and
21  was not getting. She never said, well, yeah, I
22  probably could or should do that. It was always
23  somebody else's fault or some other reason as to why
24  that didn't happen.
25  And an example would be when they -- and I

Page 22

1  actually was out there at the time when they were
2  talking about getting some experience in the water
3  pump. Six-inch water pump, they utilize it during
4  seasonal part times of the year. Everyone needs to
5  be signed off.
6  She was adamant over the fact she didn't
7  need that because the times that she'd ever use it
8  are rare. And when they do, the hoses are big and
9  they wouldn't have her doing it anyway, et cetera.
10  And I was just -- I was imploring with
11  her, look, you have people out there, go do it now,
12  it's there, it's set up, go work with them, get it
13  signed off and then you don't have to worry about
14  it, because you're probably right, you probably
15  won't, but at least you'll have it signed off. And
16  she just said, no, I'm not going to.
17  And then that was part of the reason that
18  she wasn't allowed opportunities, you know, it --
19  well, and I'm not going to say not allowed. That's
20  the reason she didn't earn a chance at
21  opportunities, because she just flat refused to do
22  some of those things. And it was there. It was set
23  up. There was people that would help her, and it
24  was bull-headed saying no, I won't do it.
25  Q. I'm going to hand you what we'll have

Page 23

1  marked as Exhibit 2.
2  Take a look at this, Mr. Ashton, once you
3  get it.
4  (Exhibit 2 marked.)
5  BY MS. PAGE:
6  Q. And again, this is kind of a composite,
7  with the first page being the grievance form and the
8  second being some correspondence.
9  But your name does show up on the
10  letterhead, on the correspondence.
11  A. Uh-huh. Assistant business manager.
12  Q. Second page.
13  A. Yes, ma'am.
14  Q. Do you know if you've seen these documents
15  before?
16  A. I probably did review it again. And, you,
17  know, a lot of these after four years and going
18  through lots of them, you know, it's hard to say
19  that, yes, I absolutely read this one.
20  But Valerie Baffone was a business rep
21  that was working there when I transferred down, so I
22  worked with Valerie for a period of time too.
23  Q. And so what is this first document and
24  what is the second page?
25  A. Okay. The first one is our standard

Page 24

1  grievance form in which the grievant, Elsa
2  Billingham, says that she was denied a promotion to
3  a wage group 54 operator, and that her remedy is
4  she'd like to be retroactively placed to a 54
5  position.
6           And then in the -- I don't see -- it says
7  "see attached statement," and I don't see what that
8  statement might have been; it's not here.
9           But the second letter is the union's
10 response to Elsa saying that they'd investigated the
11 grievance and they discussed it with the employer
12 and they have a right to set reasonable testing
13 standards. And it's obvious that she did not want
14 to take the test or did not pass the test or did not
15 do the things she needed to do in order to be
16 tested.
17          And if I finish reading this, it may say
18 either way. Because there was several times that
19 Elsa wasn't allowed to test because she didn't go
20 through and do simple things, like getting the water
21 pump checked off or getting the brush cutter checked
22 off.
23          And her response to that is, I've got a
24 brush cutter at home, I use it at home every
25 weekend, I shouldn't have to come in here and prove

Page 25

1  to them that I can use it.
2           And I said, well, that is the employer's
3  requirement. And if you can use it, it's a
4  non-brainer, just go do it and then it's done. And
5  she -- it was one of those things where: I don't
6  think I need to do that.
7       Q.  Would you characterize Ms. Billingham as
8  argumentative?
9       A.  Yeah. She's argumentative, but not to the
10 point of being real vocal, in my experience anyway.
11 She just kind of, you know, blows up and refuses to
12 do things.
13          My biggest initial reaction to Elsa is no
14 ownership, ever. It's always somebody else's fault.
15 It's never her fault. Someone else is always to
16 blame. And, you know, sometimes we are wrong.
17      Q.  Well, in your view, is that problematic,
18 that refusing to take ownership of conduct?
19      A.  Well, I believe it can be if a person is
20 overboard on it. If you're working for someplace
21 and your boss says: This is what I'd like you to do
22 and how I'd like you to do it, and you don't
23 necessarily agree with that, but your boss says
24 that's what they want. My experience, through my
25 working career, has been, you do it that way,

Page 26

1  whether you think -- you know, some bosses are open
2  and say, well, do you have a suggestion, let's talk
3  about it, other bosses do not. If they don't, then
4  you do it their way.
5           And Elsa had a real, real hard time
6  understanding or adhering to that concept. It was
7  her way and nobody else's way made sense.
8           And unfortunately, most of the time when
9  that happened, some sort of adverse reaction
10 happened that was, you know, an accident or
11 something of that regard, so...
12      Q.  Well, after that first time when she came
13 in and talked to you.
14      A.  Uh-huh.
15      Q.  And I've got several other grievances that
16 she's filed in here, but I mean, in a general sense,
17 give me some idea as to what your continued contact
18 was with Ms. Billingham.
19      A.  Okay. After the initial time when she
20 talked with me, and as I said, at the beginning of
21 the conversation I was definitely concerned, I was
22 definitely -- wanted to investigate. When we
23 finished it, I had my own life lessons to kind of
24 fill in, my own experience in being -- you know,
25 having -- operating equipment and stuff, going,

Page 27

1  well, there is usually three sides to a story, you
2  know, one side, one side, and then probably
3  somewhere in the middle what may have happened, and
4  I wanted to see in the middle.
5           So I went out to the airport and
6  introduced myself to the administration out there.
7  And again, I was pretty new in town. The people who
8  had been out there, specifically -- Valerie had a
9  very hard-line approach to the way she pursued
10 disputes.
11      Q.  And you're talking about Valerie
12 Baffone?
13      A.  Valerie Baffone, yes, that's actually on
14 this grievance here.
15      Q.  Right.
16      A.  And Valerie's approach on it, as I said,
17 was real hard line and argumentative and
18 confrontational and stuff.
19          Mine is mostly to walk in, look, we're
20 trying to get to the same place, let's figure out
21 how jointly we can fix this, how can we both help
22 get there.
23          And so I went in and introduced myself and
24 we talked. And they said it was kind of refreshing
25 to be able to work with someone with that, you know,

Page 28

1 thought process. So we kind of talked about what we
2 could do and how we could maybe -- and I said --
3 and, you know, I'm under oath, I told them that, in
4 my investigation so far what I found is that they
5 actually were justified in not allowing the
6 promotions and stuff, but it could be an issue of
7 perception and how could we deal with the perception
8 issue, do something.
9     And the result of that was that Dan
10 Hartman, and then actually went above and beyond for
11 her, stepped way out of the bounds, and so if we're
12 talking about discrimination, I think that we had
13 about 99 percent of the rest of the crew could have
14 had a pretty viable argument, because she was given
15 additional -- additional understanding on some of
16 these things, and was trying to work with them.
17     And I feel part of that was due to me
18 saying, can we work together, can we do this, and,
19 you know, and they didn't want people slamming doors
20 and hollering. And they thought this is a much
21 nicer way, let's see if it works.
22   Q. So you're saying that you feel that she
23 was actually given preferential treatment?
24   A. I do, yes. Yes.
25     A point in case is when -- and you'll

Page 29

1 probably get to that when -- I'm assuming her
2 termination one, when we did the last chance letter
3 of agreement.
4     That last chance letter of agreement
5 actually came on the heels of five suspensions. No
6 employee gets five suspensions and stays working.
7 It just doesn't happen this way.
8   Q. Are you aware of any other employees?
9   A. I am not. In 17 years of doing this, this
10 is the only individual that I know of that has ever
11 been given a chance to continue employment after
12 five suspensions. Two of those suspensions were 30
13 days.
14     And traditionally, you're getting a
15 written reprimand. You have an issue, you need to
16 resolve it -- well, you're talked to. Then you're
17 given a written reprimand. Then you're given a
18 suspension saying you need to fix this issue.
19     If the individual doesn't after that,
20 traditionally that's kind of the last time they
21 talk, other than handing them paperwork and getting
22 keys. We've been able to work things and give
23 people opportunities and stuff.
24     And so when I got involved in this, and
25 the one I got in was actually her fifth suspension,

Page 30

1 which originated as a termination. And instead of
2 the termination it got turned around to another
3 suspension and the last chance agreement, which they
4 kind of fudged on with her and gave her a couple of
5 last chances at the last chance too, so...
6   Q. Well, let's go through some of these other
7 grievances.
8     We'll mark this one as Exhibit 3.
9     (Exhibit 3 marked.)
10 BY MS. PAGE:
11   Q. Do you know if Ms. Billingham grieved
12 every time she was suspended?
13   A. Yes. You know, I can't say with absolute
14 certainty, but my experience with her is she
15 grieved, not just every suspension, she grieved
16 almost every evaluation. She grieved every time she
17 was talked to.
18   Q. And I don't have all of her grievances
19 here, but I have included at least some of them.
20     Do you recognize this document that I've
21 handed to you?
22   A. I'm familiar with this one, yes. We
23 discussed this as it kind of pertained to -- you
24 know, there was -- at the point that I got involved,
25 obviously, there was a large degree of progressive

Page 31

1 discipline involved, and so some of these were
2 definitely coming up, well, this is what happened
3 and this is why she was -- you know, has a
4 suspension and this was the reason for it, so...
5   Q. And what is this document, if you could
6 identify it.
7   A. This is when she reviewed the foreman's
8 book and didn't like what was written there and tore
9 a page out of it, I believe; I need to read but I
10 think this was that one. She tore the page out of
11 his working log. And then denied doing it.
12     And then when witnesses came forward and
13 said it happened, then she was sort of caught
14 flatfooted with it. Is that this one? Because of
15 tearing out a page -- yes.
16   Q. That's what it appears to be.
17   A. Okay. Yes.
18   Q. So the first page is, again, one of your
19 typical grievance forms.
20   A. Uh-huh.
21   Q. Do you recognize the handwriting on the
22 second page?
23   A. Well, yes. I mean, I'm not a handwriting
24 expert, but that appears to be Elsa's handwriting.
25 We have a large amount of it on file.

10 (Pages 28 to 31)

Page 32

1    Q. And then the third page, which is marked
2  PEU 0258 in the corner, does that appear to be
3  correspondence to Ms. Billingham in response to this
4  grievance from the union?
5    A. Yes. Yes. And this is the business rep
6  Valerie Baffone again who tells that we did the
7  investigation and that a determination was made that
8  it lacked merit. And she makes note, based on an
9  arbitrator's interpretation. And quite often, when
10 we have one that's getting close -- when we take on
11 a grievance we try to get it resolved through the
12 steps.
13        We file it at step one, and see. If not,
14 then we go outside to the commissioner's level. And
15 if the commissioner of the department doesn't agree,
16 then we go to the commission of administration,
17 that's step three. And if we don't get what we feel
18 is a good fair resolution there, then we can request
19 arbitration.
20        And so when we go to arbitration, before
21 we take anything to arbitration, we review previous
22 cases, similar cases, parallel cases, and see how
23 arbitrators rule, why they rule that way. And so in
24 stating this it's pretty obvious that we have
25 another case where an individual, you know,

Page 33

1  destroyed State property and lied about it.
2    Q. Now, to the best of your recollection, did
3  any of Elsa's grievances actually go to
4  arbitration?
5    A. I don't know if -- let me -- no. No. I
6  don't believe that we've ever -- in the time that I
7  was there, that we've ever arbitrated any of her
8  grievances. Because, in all honesty, there wasn't
9  enough foundation to it.
10        If we would have felt that the individual
11 had been wronged, if we would have felt that, you
12 know, that the supervisor wasn't as forthright as
13 they could have been and stuff, then we sure would
14 have taken it on.
15        But my experience with the employer was
16 that, at the time that I got involved, when we came
17 in and we talked about it, a lot of times we came up
18 with some kind of softer, passive resolution to keep
19 it from -- going to arbitration, we would not
20 prevail in arbitration, and that would cost $6,000
21 and it would set a bad precedence. And Local 71
22 prides itself on the fact that we don't take on
23 frivolous cases. If we arbitrate it, it's because
24 we're very, very set on the fact that somebody was
25 done wrong.

Page 34

1    Q. I want to go back a little bit to this,
2  the particular substance of this grievance where you
3  said Ms. Billingham -- well, let me ask you this.
4  Did Ms. Billingham eventually admit to destroying
5  this page of her supervisor's journal?
6    A. It's my understanding that when the
7  witnesses came forth and said, yes, we saw you, then
8  she said, well, yeah, I did. So she did admit when
9  she found out there were people that did observe her
10 doing that.
11    Q. In your mind, is that a serious offense
12 for an employee to engage in that kind of conduct?
13    A. Well, in the professional world, and
14 looking at it with my business manager's hat on,
15 this could and has been in the past a termination
16 offense with people.
17        A supervisor is entitled to a diary, slash
18 a working log, where they maintain their own
19 personal notes on employees and issues. And some of
20 these things are necessary for monitoring what type
21 of training is needed, monitoring how a safety
22 situation may need to be addressed and stuff. So
23 it's kind of critical information. It's not just
24 them writing nasty things about an employee.
25        And so it is -- it is a pretty bad offense

Page 35

1  when you get into that and start tampering with or
2  altering the supervisor's written diary or written
3  log. And I have seen people suspended and
4  terminated for similar offenses.
5    Q. So in your mind, a five-day suspension is
6  an appropriate discipline for that?
7    A. I believe that a five-day suspension was a
8  kind discipline for that offense. You know,
9  compared to other types that I've seen.
10   Q. All right. Well, I'm going to hand you
11 another exhibit here. And we'll have this marked as
12 Exhibit 4.
13       (Exhibit 4 marked.)
14 BY MS. PAGE:
15   Q. Do you recognize this document?
16   A. I do recognize this one, yes.
17   Q. What is this?
18   A. This was a grievance that Ms. Billingham
19 had filed in reaction to discipline she received
20 because she disobeyed specific instructions. And
21 the reason I am a little familiar with this one is
22 because this was actually when I had my discussion
23 with them, my first one when we changed her
24 termination to a 30-day suspension, this was brought
25 up in the discussion.

Page 36

1   And it was her inability to follow orders
2   and the fact that she -- this, again, was the
3   employer's statement. That she always had a better
4   idea and it didn't matter what the supervisor said,
5   her idea was going to prevail and she was going to
6   find a way of doing it.
7       Their concern was she wasn't very -- I
8   shouldn't say qualified. She wasn't very safe in
9   operating the four-wheeler with the plow on it.
10  They were on a very busy sidewalk by -- where a lot
11  of public were passing by. They didn't want the
12  plow out there with all the people going back and
13  forth.
14      So they wanted that ice and snow removed
15  by hand because it was the safest way of doing it
16  for people in the area. And they had instructed her
17  of that. And after doing it for awhile, she took it
18  upon herself to just go get the vehicle and use the
19  vehicle to do it.
20  Q.  And the second page of this again appears
21  to be correspondence from Valerie Baffone; is that
22  right?
23  A.  That's correct, yeah. And this almost
24  looks like a standard -- a standard form letter
25  going, you know, I investigated again and it's

Page 37

1   again, and this is almost like -- I mean, there
2   isn't much substance to it, other than just the
3   boilerplate, we've looked, it's not a grievance,
4   please go back to work, type letter.
5   Q.  And basically says that it lacks merit,
6   correct?
7   A.  Correct.
8   Q.  All right. I'll hand you another one
9   here, which we'll mark as Exhibit 5.
10      (Exhibit 5 marked.)
11  BY MS. PAGE:
12  Q.  Do you recognize this document?
13  A.  I do recognize this document. But I --
14  I -- and this is my writing on there, that filled in
15  the actual grievance form, where it says unfair
16  suspension and to be made whole, that's my
17  writing.
18  Q.  Okay.
19  A.  And since I don't see anything with this,
20  to be honest, I don't know what this suspension may
21  have been, but it's pretty obvious that the
22  suspension stuck.
23      Again, an individual always has a right to
24  grieve an issue. If they feel that they were
25  treated unfairly, they -- you know, our policy

Page 38

1   within the local is that they always can grieve the
2   issue, we will give them their day in court, we will
3   investigate, we'll see what's going on.
4       So she received a suspension for something
5   here. And she probably brought in the form. And
6   again, I'm speculating, because I don't know. The
7   fact that I filled in would probably mean that the
8   form was left on my desk with no substance to it.
9       And so, in order to conform with the time
10  constraints on filing in a timely manner, I probably
11  just filled in the outline, and then had the
12  discussions regarding what might have been, just to
13  make sure we -- you know, she couldn't come back and
14  say, well, you guys didn't do anything, it was
15  untimely and you didn't even try to represent me.
16      And again, that's speculation, because I
17  honestly don't know. But with that being in my
18  writing, then that's probably what happened, is if
19  there was no base to it and a grievance was left on
20  my desk, then...
21  Q.  And again, we don't have as exhibits all
22  of the grievances that she filed. But as you had
23  said before, you had knowledge of and involved with
24  at least the grievances I guess from the time that
25  you came down to Anchorage; is that right?

Page 39

1   A.  Correct.
2       And we did go back and review, because
3   when I really did jump into the heart of the matter
4   was when she was terminated. And at that point I
5   had -- because I had already been out there and met
6   everyone, I talked to people, and we kind of worked
7   with trying to, as I stated earlier, the perception
8   issue of, even if it's not that way, if people think
9   it is. And so they were kind of -- the employer was
10  kind of working on that and stuff, and so we had a
11  pretty good working relationship.
12      And so we got the call to go out there and
13  have the meeting. And actually, it was myself and
14  Billy Meers went out there with me. Because I was
15  at the point where I was turning over some of this
16  stuff and assuming more duties for the business
17  manager's position. And so I had Billy go out there
18  for this one. And we found out at the time that it
19  was a termination and that Elsa was going to be
20  fired.
21      And when they said that, of course, you
22  know, I went, whoa, can we talk for just a minute?
23  And they go, well, yeah.
24      So Billy and Elsa left the room and I
25  talked with the employer. And I explained to them

Page 40

1  that, you know, that I just got here, I haven't had
2  that much of an opportunity to work with Elsa and,
3  you know, I'd like to believe that everybody has
4  redeemable qualities and that maybe if we give it a
5  chance and that, you know, I kind of devote some
6  extra time and effort to working with her, maybe we
7  could convince her to do this other training and to
8  do that. And if not, maybe she would be content in
9  another position, because it's much easier to find
10 another place to go if you're still employed.
11      And I said, you know, if she's truly not
12 happy here and if this truly isn't working, it sure
13 would be a lot easier if she still had a job when
14 she went looking for one than if she's unemployed.
15      And they listened. And in fact, I believe
16 it wasn't so much Dan Hartman as it was the airport
17 manager, Mort Plumb at the time that told me, well,
18 based on the fact that you're kind of giving your
19 word that you'll help us with this, that's the only
20 reason we'll consider anything different.
21      So we discussed it. And the very least
22 they would settle for was the 30-day suspension; a
23 demotion to a lower wage group, which would give
24 them an opportunity to have her doing more of the
25 things that, you know, that would help them, that

Page 41

1  would assist them. Because I kind of pointed out
2  they were a little bit low in some of their -- or
3  short-staffed in some of the positions. And it
4  would be, you know, hard to find people. You know,
5  I was doing what I could to market her.
6       And so they said based on that that they
7  would do that, but they wanted to have reoccurring
8  meetings with her and follow up on her performance
9  and attitude. And, I mean, you know, they came down
10 pretty hard. And the position that I was in, I
11 pretty much had to accept just about anything they
12 do short of termination, because we didn't have a
13 leg to stand on. Again, this is on the heels of
14 five -- or four suspensions and that's unheard of in
15 and of itself.
16     Q. Let me back up. First of all, when was
17 this particular meeting; do you recall?
18     A. You know, I do not. There should be on
19 the -- one of the letters on the date on it. I'm
20 sorry I don't remember the exact date.
21     Q. Well, let me...
22     A. And it's probably not in the record, but
23 the employer actually had the termination paperwork
24 filled out for that meeting.
25     Q. Let me give you a couple of documents.

Page 42

1  Let's have this one marked as Exhibit 6.
2      (Exhibit 6 marked.)
3      MS. PAGE: We'll have this one marked as
4  Exhibit 7, and then this one marked as Exhibit 8.
5      (Exhibits 7 and 8 marked.)
6  BY MS. PAGE:
7      Q. If you'd take a look at Exhibit 6, this
8  one here, first of all.
9         Do you recognize that document?
10     A. Yes, I do. That was the agreement that we
11 drew up at that time.
12     Q. Okay. At the meeting?
13     A. Yes. It was the last chance agreement.
14     Q. And we'll come back to that and talk about
15 that a little bit more.
16     A. Okay.
17     Q. And if you'd look at Exhibit 8. Do you
18 recognize that document?
19     A. Yes, I do.
20     Q. And what is that?
21     A. That was my response to Elsa regarding her
22 letter that she sent me, Exhibit 7. Do I have these
23 crossed?
24     Q. No. I wanted to just refer you to the
25 sort of third paragraph, the one after the quoted

Page 43

1  paragraph. It starts out with, "Our discussion"?
2      A. Uh-huh.
3      Q. In that paragraph you indicate that the
4  meeting was held on Friday, May 9th, 2003.
5      A. Yeah. That was a typo. I'm sure she
6  meant 2002, because the meeting didn't happen
7  before. And I quoted what she wrote in here.
8  Okay.
9      Q. Well, was the meeting on May 9th, 2003
10 then?
11     A. No -- well, May 9th. Oh, I'm sorry.
12        It was held, yes, on Friday, May 9th,
13 2003. Yes, that's correct. I was correcting her
14 date.
15     Q. Which was June, she had said June 9, 2003.
16     A. Yes. And she had said June 2003.
17     Q. So on May 9th, 2003, you got called out to
18 the airport. Now, you said that you met with
19 management there. And was that Dan Hartman? Who
20 else was at that meeting for management?
21     A. If I remember correctly, Mort Plumb was
22 there, Charlotte Withers at the time, Mushat now,
23 Charlotte was there, I believe. Dan Hartman was
24 there. I was there. Billy was there. Elsa was
25 there. And Dan -- Doug --

Page 44

1  Q. Hunter?
2  A. Doug Hunter, yes, was here, I believe.
3  Q. So both you and Billy Meers were there
4  representing Elsa?
5  A. That's correct. Yes.
6  Q. Now, was it not until you got out to the
7  meeting that you found out that management was
8  intending to terminate Ms. Billingham?
9  A. No, we -- you know, professional courtesy,
10 they kind of gave us a heads-up on it, and so I was
11 contemplating what I could do because, quite
12 honestly, I kind of thought I was out of arrows, you
13 know. And so on the way out there I was
14 contemplating how do we resolve this.
15 Q. So had you talked to Dan Hartman then
16 before the meeting, about her termination?
17 A. I don't recall if it was Dan or if it was
18 Charlotte, but one of them called me and gave me the
19 heads-up, that I want you to know that we're going
20 to terminate her at this meeting.
21 Q. Did they express to you what the reasons
22 were why they were terminating her at the meeting?
23 A. Yes. Yes.
24 Q. What was your understanding?
25 A. You know, I would have to refresh my

Page 45

1  memory again, because there were so many -- it seems
2  to me that the standard issue was just the inability
3  to follow instructions and the number of accidents
4  that occurred as a result of that, and equipment
5  damage, and that -- it seems like it was a
6  culmination of a lot of those issues. And I don't
7  know if it was just a small accident that was the
8  straw.
9  Q. Do you recall if there was an accident
10 where she backed a pickup truck into a sign?
11 A. Yes. There was at least one of those.
12    If I'm thinking correctly on that one, and
13 that might be a -- is it in the body of the letter
14 here? Because, if I remember correctly, there was
15 one where they had assigned her to go out and help
16 clean up some areas in the median.
17    And she had specific instructions: Do not
18 get in the vehicle, we've got someone there with you
19 to operate the equipment, you just do that part.
20    She stated in the field that they were
21 doing it, they finished up, and she wanted to move
22 the vehicle a little closer to do something. She
23 thought, well, the operator that was with her wasn't
24 there, it wasn't that big of a deal, she was fully
25 qualified, so she jumped in the vehicle, backed up

Page 46

1  and ran over a sign.
2     And her rational was, well, it wasn't her
3  fault really, that, you know, the sign was kind of
4  hard to see. You know, never mind that I was told
5  not to and never mind that -- and I fixed it anyway,
6  so they can't be mad at me because I went back to
7  the shop and got the pieces necessary to fix the
8  sign.
9  Q. But in your mind, then, it wasn't one
10 particular incident or accident that resulted in her
11 termination, but it was a culmination of --
12 A. Yes.
13 Q. -- conduct and performance?
14 A. Yeah. I clearly remember that their
15 attitude was, this was the straw, we're just done,
16 we just don't want to do this anymore, because it's
17 a continuing, never-ending process, and this was the
18 straw.
19 Q. Now, when you --
20 A. Those are my words, by the way.
21 Q. When you went out there, then, and you met
22 with management, without -- without Elsa there at
23 that particular time; is that right?
24 A. Well, we went in together, and all of us
25 together sat down for the meeting. Management

Page 47

1  presented their case, which was the termination
2  letter and that, you know, she was terminated.
3     And at that point I said, could I talk to
4  you privately for just a moment? And at that point
5  Billy and Elsa left the room and that's when I
6  talked with them, yes.
7  Q. And you said before that you thought that
8  basically, had they terminated her at that
9  particular point in time -- well, I guess let me ask
10 you this way. Had they terminated her at that
11 particular point in time, do you think that they
12 would have had good cause to terminate her?
13 A. Yes, I do. And my professional opinion on
14 that also is that I would have recommended to the
15 rest of the staff that we not proceed to arbitration
16 with it. It was a very, very weak case.
17    So I believe we would have processed it,
18 we would have done the investigation, and we
19 probably would have responded in such that the
20 investigation showed that there was no merit and
21 that she wasn't done wrong, there wasn't a contract
22 violation, and that would have been that.
23 Q. So let's look at Exhibit 6, again, which
24 is the letter of dispute resolution, which we've
25 also been referring to as the last chance letter.

Page 48

1   After you talked to Dan, and Elsa wasn't
2   there --
3   A. Uh-huh.
4   Q. -- did you then all meet together with
5   Ms. Billingham back amongst you to discuss the terms
6   of this agreement?
7   A. Absolutely. Elsa always had an option of
8   either accepting what I was able to come up with,
9   with the administration, or accepting the
10  termination and grieving it and taking that process.
11      I asked Elsa to leave, because it was one
12  of those -- it was a diplomatic issue in that I
13  needed to hat-in-hand with the administration, and I
14  said, look, I'm new to this area, we've got a good
15  working relationship, it would mean a lot to me if
16  you guys worked with me on this issue. I was sort
17  of asking a favor from them.
18      And that was, you know, not quite as
19  professionally as it possibly could have been, but I
20  also had a lot of faith in their judgment and in the
21  fact that they really were giving everybody out
22  there a fair shake at promotions and training,
23  et cetera, so...
24      And, on that same note, I also wanted to
25  say: And I agree with you, that Elsa has a real

Page 49

1   problem following orders. Elsa has a real problem
2   operating equipment efficiently and safely. I
3   understand those things. You guys are correct.
4   But, maybe together we can salvage this.
5       So that was the reason that I asked Elsa
6   to leave, because people don't like to hear that
7   about themselves.
8   Q. So when you did discuss the terms of the
9   agreement with Ms. Billingham, what was her
10  reaction?
11  A. She was very appreciative. She was, you
12  know, in tears. She was so happy. She said, you
13  know, as long as I keep my job, that's the most
14  important thing. And, you know, basically it was,
15  thank you very much, I really -- I really appreciate
16  what you've done.
17      And we walked out of there and I felt kind
18  of good about, you know, everything and about myself
19  and about how it all worked. And I was very -- very
20  pleased with the fact that the administration was
21  willing to give her yet another chance.
22  Q. Have you been involved in other situations
23  where you've drawn up one of these letters of
24  dispute resolution?
25  A. Yes, I have.

Page 50

1   Q. Can you give me some approximation of how
2   many other times?
3   A. On last chance agreement, I think very,
4   very roughly, probably eight of them, eight or
5   nine.
6   Q. In how long a period of time are we
7   talking about?
8   A. In the last ten years. Yeah.
9   Q. In your opinion, you know, in your
10  position, was there anything on the part of
11  management at airfield maintenance that you believe
12  indicated that they were acting in bad faith in any
13  way in agreeing to this letter of dispute
14  resolution?
15  A. Oh, absolutely not. It -- as I said
16  earlier, it actually made me feel good and surprised
17  me that they were willing to continue to work with
18  an individual. There's a lot of places that, you
19  know, a long time prior to that would have been
20  terminated.
21      So, no, I think that they went well above
22  and beyond in trying to work with her.
23  Q. And there's nothing that was done that is
24  not in accordance with the collective bargaining
25  agreement in entering into a contract like this, is

Page 51

1   there?
2   A. Not at all, no. And that's the reason we
3   have those, is that sometimes the black and white of
4   the contract doesn't cover all the what-ifs of real
5   life, and so we have the option and ability.
6       I might add, if it helps, is that part of
7   the reason this seemed like the best resolution is
8   that Elsa had come in prior to -- prior to our
9   meeting and had indicated to me that she was talking
10  to a counselor, that, you know, her world was very,
11  you know -- she had a lot of stress and issues going
12  on in her personal world, and that she's really not
13  cut out for this, maybe not, et cetera, et cetera.
14      And I had suggested, well, why don't we
15  look at a transfer someplace, why don't we -- you
16  know. Which was my thought process in this, that
17  it's easier to transfer to another position, because
18  then with the State of Alaska you maintain your
19  State seniority, you maintain your benefit accruals,
20  you main -- you know, you're a State employee, you
21  know how that works.
22      And that was her best option, I felt, that
23  if she really, truly wanted to get out of there, the
24  worst thing she could do was quit and try to start
25  from scratch. The best thing she could do is

Page 52

1  maintain employment and then look for someplace else
2  to go.
3      And that was kind of the gist of the
4  conversation that we had prior to that. So with
5  this, when we were done, and I don't recall exactly
6  how, I may have said it, but with this, what I said
7  is now we bought the time for you to look around,
8  see what else is out there. And it seems like there
9  was something. It was a custodial position at
10 someplace, which, you know, might not have been what
11 she was looking for, but there was at least other
12 places to go to get out from this.
13     And so I looked at this as being a way to
14 continue her accrual rates, to continue her benefit
15 package, and look for some other place to go.
16     Q.  Do you know if she did apply for any other
17 positions with the State?
18     A.  I recall having talked with her on, and I
19 believe it was Custodial I, and she wasn't
20 interested, that she -- it was -- it was one of
21 those things where she'd come in at one point and
22 be, you know, very hat-in-hand, just, you know, I
23 just can't do this anymore, you know, and I'm just
24 not cut out for this, to -- this letter is an
25 example, where she -- then she'll respond back with

Page 53

1  a letter that just knocks you off your feet, and you
2  go, my gosh, I didn't think we were here.
3     Q.  Well, let's talk about this letter. And
4  this would be Exhibit 7. What is this?
5     A.  It was a certified letter that showed up
6  in the mail, that absolutely caught me flat-footed.
7  It surprised me completely, because I was feeling
8  pretty good about, you know, our resolution, where
9  we were, and about starting fresh when we got back
10 out there. And then addressing moving -- you know,
11 moving to a different place, where some of these
12 issues that she felt were expressly against her
13 wouldn't be there.
14     Q.  And she seems to say here that you had
15 expressed to her that the union would not represent
16 her and would not allow her to file a grievance.
17 And then she requests a written statement of what
18 the union proposes to do to represent her.
19     And then is Exhibit 8 your response to her
20 correspondence?
21     A.  Yes, it is. Yes.
22     Q.  Okay.
23     A.  And in response to, you know, that the
24 union said that she could not, you know, grieve that
25 and that we wouldn't represent her, I believe that

Page 54

1  one of the other exhibits points just to the
2  opposite, Exhibit 5, where something got dropped off
3  and I processed it just without -- because we do
4  allow people to grieve, you know, we don't tell
5  people you cannot. We may not agree that there's
6  much meat to the argument, but we will certainly
7  investigate and see.
8      Q.  And if you look at the substance of this
9  letter that you wrote to Ms. Billingham -- and this
10 is dated May 19th, 2003, correct?
11     A.  That's correct.
12     Q.  And is this a letter that you wrote
13 yourself?
14     A.  Yes, it is.
15     Q.  You do correct her in here as to the day
16 of the meeting, as we discussed before, and put it
17 at May 9th, 2003.
18     And you indicate in here that
19 Ms. Billingham was involved in the discussions of
20 the terms of the last chance agreement, correct?
21     A.  That's correct.
22     When we discussed some other option
23 instead of termination, and the administration came
24 up with what they wanted as minimum requirements,
25 the grievant always has the opportunity to say, I

Page 55

1  will accept that or I won't.
2      And so they went up, and I don't remember
3  who, but I believe it was Doug Hunter that actually
4  went out and drafted up, with Charlotte's
5  assistance, I believe, but anyway, they drafted
6  something up. And then during that period of time,
7  Elsa came back in. And I remember Mort Plumb
8  telling her specifically that the only reason we're
9  even considering this is because Jim kind of gave us
10 his word that, you know, you guys would work
11 together to address most of these things without us
12 having to get in the middle of everything every
13 time.
14     And they brought back the letter. We
15 presented it to Elsa. She had an opportunity to
16 read it. They explained what it entailed, what the
17 provisions of it were and stuff. And I looked to
18 her and I said, okay, your choice. We do the letter
19 or, you know, we accept the termination and then
20 fight it.
21     And she -- you know, she agreed -- and I
22 told her and I believe I told her that, you know,
23 there isn't a whole lot of meat to the termination,
24 I just want you to know, you know. And I was being
25 honest, I wasn't trying to persuade her either --

### Page 56

1  well, that's not true. I was trying to persuade
2  her. I was thinking and knew that the very best she
3  was going to get is the agreement that I had,
4  because the termination, had it stood or had it
5  remained, would have stood.
6      So I was telling her, this is the one in
7  the hand and you ought to take this one, but it is
8  your choice.
9      Q.  So you thought the option of taking the
10 last chance agreement was by far the better option
11 for Ms. Billingham?
12     A.  Absolutely. Because then she could look
13 at other places to transfer and retain all of her
14 rights and stuff.
15     Q.  So would you consider your recommendation
16 that she take that option as coercion?
17     A.  No. No. Absolutely not.
18         It was very open. And as I said, it -- I
19 remember at the time she was very happy. It was,
20 you know, thank you so much, and she was giving hugs
21 and we sat out there and she was in -- we went back
22 out into the hallway and she was -- she was in tears
23 and she thanked us very much, and said, well, you
24 know, you've got a little bit of time -- and again,
25 it's been four years, so I don't recall the exact

### Page 57

1  thing.
2      But to the extent of, you've got a little
3  bit of time now, kind of take a deep breath, come
4  back, we will start fresh. If you have an issue or
5  something, you call me, because I told them we would
6  do it that way. And I tried to put a positive spin
7  on the 30-day suspension, if that's possible.
8      Q.  But you came in there as her union
9  representative and you persuaded the employer to
10 give her another chance at employment, correct?
11     A.  That is correct, yes.
12     Q.  So rather than coercing her into
13 something, you did something to her benefit that
14 would give her another opportunity?
15     A.  That's correct.
16         That's why her letter just took me by
17 absolute surprise. And, as you can tell from the
18 wording of my letter, I was upset. I was --
19 actually, I was personally hurt. Because it was one
20 of those things where I felt we really did a good
21 thing and then you get something like this, you're
22 going, wow.
23     Q.  Now, Ms. Billingham did come back to work
24 under the terms of the last chance agreement,
25 correct?

### Page 58

1      A.  Yes, she did.
2      Q.  So despite this letter that she wrote in
3  Exhibit 7, she did understand what the terms were
4  and agreed to them when she came back to work,
5  correct?
6      A.  That's correct.
7          I mean, I can't speak for her, but we went
8  over it and she didn't have any other questions when
9  we finished.
10     Q.  Is there any evidence that you know of
11 that the Department of Transportation and Public
12 Facilities was discriminatory in any way in entering
13 into this last chance agreement?
14     A.  No. Not at all.
15     Q.  Were they retaliatory in any way?
16     A.  No. To the contrary, it was -- it was a
17 real show of good faith for them to allow another
18 chance at a last chance on yet another issue.
19     Q.  Now, once Ms. Billingham returned to work
20 at airfield maintenance under the terms of the last
21 chance agreement, did you continue to have any
22 involvement with her?
23     A.  I did marginally. Originally because I
24 had told them I would do my best to keep things on
25 as much an even keel as I could, as far as being a

### Page 59

1  mediator if there need be and that type of thing.
2  Part of the reason I brought Billy in is that, you
3  know, I had the other duties I was going to be
4  doing, and so I asked Billy, you know, to kind of be
5  available also, Billy Meers.
6      And the issue started almost immediately,
7  because they did their first -- part of the
8  provisions were that she would have reoccurring
9  performance evaluations, just to keep checks and
10 balances on where -- you know, where she was and if
11 she was making the correct headway and if, you know,
12 things were going smooth. And on almost the very
13 first one she was -- she was confrontational, didn't
14 agree and didn't buy into it.
15     Q.  Now, were any union representatives
16 involved in those meetings, or were those meetings
17 just between Ms. Billingham and management?
18     A.  I don't recall if we were or not, to be
19 honest. Normally, we don't need to be there for
20 evaluation reviews, because our grievance process
21 for evaluations reviews is simply: if you don't
22 agree, you write a rebuttal.
23     So there's no discipline from the
24 employer's side and there really isn't any contrary
25 action on the union side. So we may at times go

Page 60

1  into one if we think we can mediate or discuss, you
2  know, what might be on there, but a lot of times we
3  don't.
4      Q.  So at some point did Ms. Billingham just
5  refuse entirely to engage in these periodic
6  discussions?
7      A.  Yes, she did.  She basically told them, I
8  don't care, I don't -- you know, I don't care what
9  you're writing down, I don't want to sign them, I
10 don't want any part to do with that at all, which
11 was one of the provisions of staying employed there,
12 is to try to correct some of those things they were
13 noting.
14     Q.  Did you view these meetings and these sort
15 of periodic evaluations as a tool to help her meet
16 the requirements of the last chance agreement?
17     A.  Yes.
18         And it isn't unique.  We have other places
19 where people have gotten crossways with the
20 administration, made some bad choices.  And it's
21 pretty traditional for them to say, we're going to
22 do more reoccurring evaluations, to kind of help
23 prod you along in the direction we'd like.
24         So this wasn't the first time I had seen
25 that nor the last.  It was pretty standard operating

Page 61

1  practice.
2      Q.  Now, did Ms. Billingham come to you at any
3  point and say, I don't like these evaluations or I'm
4  not going to participate in these anymore?
5      A.  Honestly, I don't remember whether she did
6  or not, because I believe during that point she may
7  have been communicating with Billy or something.  I
8  cannot recall her calling me and saying, I don't
9  like this.
10         I believe that I talked with Dan Hartman
11 on an unrelated issue about something.  And he
12 mentioned that she didn't want to do those anymore
13 and it was being a problem.  And I said, well, I
14 will have Billy or Dale or Ralph -- well, Ralph
15 wasn't on at that time, I'm sorry.  Billy or Dale
16 contact her and see if we can do something, because,
17 you know, I gave them my word we would do what we
18 could to minimize.
19     Q.  Yeah.  So did you have any other, other
20 than what we've talked about in that final period of
21 her employment, any other involvement with her?
22     A.  Not necessarily one on one.  We were
23 involved in -- it seems like a couple of times if
24 she got dispatched for a position and didn't get
25 hired for some reason or something, that she would

Page 62

1  file a complaint or something.  And it was, like,
2  just threw our name in there also.
3         And, you know, the ladies in the office
4  for doing the job calls are very meticulous, as you
5  know when you talked with Tracy, they're very
6  meticulous about their recordkeeping and stuff, and
7  everything there is, you know, is without question.
8         So I wasn't concerned about those.  And I
9  believe Kevin represented us on one, and we
10 mitigated something, just to make it go away and not
11 because we felt that there was any harm in it.  And
12 we discussed it briefly.  And it was more important
13 to me to just put it behind us and move on so that
14 we could start representing people and stop
15 defending something we didn't do, so...
16     Q.  What you're just referring to, which my
17 understanding is some charges that Ms. Billingham
18 may have brought against the union itself --
19     A.  Correct.
20     Q.  -- those didn't occur until after she was
21 actually terminated from airfield maintenance; is
22 that right?
23     A.  That's correct.  Yeah.
24     Q.  So let's talk about her termination a
25 little bit.

Page 63

1      A.  Okay.
2      Q.  Did you have involvement in the
3  termination process or the grievance over the
4  termination process?
5      A.  I would have had oversight, but not
6  necessarily -- by virtue of being the assistant
7  business manager, the grievances and stuff, we have
8  staff meetings and we discuss the cases that we
9  have, where we're at.  We, you know, get information
10 from each other and that type of thing.  And we
11 contact our attorneys when we need to for advice on
12 things.  So I would have had oversight on it, and we
13 would have discussed it and we would have taken a
14 look.
15         And without it being real clear in my
16 mind, I can tell you that based on the history and
17 the level and everything, we probably said, well, if
18 she got terminated, there really isn't much more we
19 can do, because this was a last chance, the
20 provisions were pretty lined out.  We had gone over
21 it as clear as we can.  So, you know, obviously if
22 she's terminated, we'll address it, but we're not
23 going to change it.
24     Q.  So in terms of any final meeting with
25 Ms. Billingham when she was terminated, you weren't

### Page 64

1  present at anything like that?
2  A. I don't recall being there, no. I don't
3  think so. It doesn't stick in my mind.
4  Q. And did Dale Johnson actually handle --
5  well, did she actually file a grievance regarding
6  her termination?
7  A. I'm sure she did. I -- you know, I -- I'm
8  sure she did. She filed a grievance any time she
9  felt something wasn't --
10 Q. And did Dale Johnson handle that; do you
11 know?
12 A. Yes. He would have been the rep assigned
13 to it, because he was the one I put out at the
14 airport.
15 Q. And you had mentioned that you may have
16 consulted with your attorney regarding that.
17 A. Uh-huh.
18 Q. Do you recall if Kevin Dougherty was
19 actually consulted with regarding Ms. Billingham's
20 termination?
21 A. Well, I don't know for sure, but I'm sure
22 that either Dale or Kevin could tell you on that.
23 My guess is it probably did happen, but --
24 because when we're talking about something as
25 serious as a termination, we don't take it lightly.

### Page 65

1  Even with a case we put an extensive amount of time
2  into, we still want to make sure that everything is
3  crossed and dotted and that there isn't anything we
4  might be able to bring up again to -- you know,
5  someone losing their job is a serious thing in our
6  book.
7  Q. Well, I am going to have another exhibit
8  here. We'll mark this as Exhibit 9.
9  (Exhibit 9 marked.)
10 BY MS. PAGE:
11 Q. Mr. Ashton, have you seen this document
12 before?
13 A. You know, I do remember seeing it now,
14 yes.
15 Q. And what is this?
16 A. This is when Dale did consult with our
17 attorney Kevin Dougherty and said, this is the case,
18 this is where we're at; can you help me with it.
19 Q. Would you agree with Mr. Dougherty's
20 conclusions as set forth in that letter?
21 A. I will review it, but I am sure I do.
22 Q. No. Take your time and review it, please.
23 A. Kevin has never steered me wrong.
24 Yeah, I do remember this. Yes, I do. I
25 completely agree with...

### Page 66

1  Yes. Yeah.
2  Q. So do you agree with his conclusions that
3  the State was justified in terminating Elsa
4  Billingham's employment?
5  A. Yes, I do.
6  Q. And was it done in accordance with the
7  collective bargaining agreement?
8  A. Yes, it was.
9  Q. And was it done in accordance with the
10 last chance agreement?
11 A. Yes, it was.
12 Q. And do you know of any evidence that would
13 indicate that Ms. Billingham's termination was
14 discriminatory toward her?
15 A. Not at all.
16 Q. And do you know of any evidence that
17 Ms. Billingham's termination was retaliatory toward
18 her?
19 A. Not at all.
20 Q. Now, you had mentioned before that after
21 Ms. Billingham was terminated she did bring some
22 charges against the union itself.
23 A. Uh-huh.
24 Q. Were you -- I guess, how involved in those
25 were you?

### Page 67

1  A. Again, because I am supposed to have the
2  direct oversight, I was involved. But my honest
3  involvement was marginal, at best.
4  I remember it being done. I remember it
5  being quite an inconvenience. I was very
6  comfortable with the administration of our hiring
7  hall and the fact that the people that do that for
8  me are very by the book, and so I was very secure
9  that nothing had been done wrong. And so I didn't
10 put a lot of time and effort into monitoring it.
11 Q. And in your representation of
12 Ms. Billingham, did you discriminate against her
13 based on her age?
14 A. No. I'm not even sure what age she is.
15 Q. Did you discriminate against her on the
16 basis of her sex?
17 A. No.
18 Q. And did you retaliate against her in any
19 way?
20 A. No.
21 Q. Did the fact that she did file some
22 charges against the union after she was terminated
23 have any effect on the conclusions that you drew
24 regarding management's conduct out at airfield
25 maintenance before she was terminated?

**Page 68**

1  A. Oh, no, not at all. In fact, I'm not sure
2  which came first on that. But neither one would
3  have affected the other, because -- I mean, that's
4  the way business is, you know, it happens. And when
5  somebody loses their job it's pretty normal for them
6  to be upset and look for ways of -- you know, and I
7  don't blame people for that, so...
8  Q. Let me see what else I may have here.
9      After Ms. Billingham was terminated from
10 airfield maintenance, did she get other employment
11 through Local 71; do you know?
12 A. Yeah. I remember conversations of such,
13 because an issue arose of it. There was one where
14 there was a job position available at -- with the
15 State of Alaska again. She was dispatched for that.
16 And the department had written a letter saying: do
17 not hire this individual. She was in a
18 non-permanent -- which has no employment rights
19 anyway. I mean, you can be terminated at any point.
20 And she was there for a relatively short time and
21 they let her go and she felt that that was because
22 of that. But it was a non-permanent position.
23 There is no guarantee to that.
24     And then we dispatched her again to a
25 position with the Municipality, I believe a couple

**Page 69**

1  of different positions at the Municipality. She was
2  terminated from one of those. Possibly both, I
3  don't know, because I -- unless I'm asked about it I
4  don't follow it. Because if it's under the
5  probationary provisions of our contract, there isn't
6  any guides for us to do anything to address it.
7  Q. Were you aware of the reasons she was
8  terminated from the Municipality?
9  A. As I recall, when we had one of our staff
10 meetings, they were talking about her watering some
11 plants. And she had used far too much pressure on
12 the water hose and literally blew the soil and stuff
13 onto a private vehicle in the vicinity. And then --
14 and again, I could be wrong in this.
15     And then, instead of reporting that, then
16 she attempted to clean up the issue by then pressure
17 washing the vehicle off with a power hose, which
18 scratched the paint. And, if I recall, it cost the
19 employer a few thousand dollars to repair that
20 vehicle.
21 Q. So would you consider that similar conduct
22 to the kind of problems that she had had when she
23 was at airfield maintenance?
24 A. Very much so. There was so many that
25 weren't documented that were just -- where we'd go

**Page 70**

1  out there and have the meeting and discuss what had
2  happened. And there wasn't necessarily anything
3  written up there or, you know, any sort of adverse
4  action, but it was -- quite a bit of that. It was
5  just an inability or a desire not to follow the
6  instructions.
7  Q. After she was terminated from the
8  Municipality, was she placed on a do-not-rehire list
9  for the Municipality; do you know?
10 A. I honestly don't know whether they had or
11 not. The employers have a right if they're not
12 interested, you know, in interviewing someone again
13 for whatever reason, they will do that.
14     And sometimes the provisions are, let them
15 seek employment someplace else for a year or so, get
16 some additional experience, then, you know, we'd be
17 more than happy to take a look.
18     Obviously we can't force anybody to hire
19 anybody, so -- and we have had individuals that
20 have, so to speak, burned bridges and come in there.
21 And I've been very honest and said, you're kind of
22 wasting your money by giving us the money, because
23 we're not going to be able to send you anyplace.
24 So, you know, in a situation like that we would tell
25 someone not to.

**Page 71**

1      I believe that Elsa is currently
2  dispatched for the possibility of a job at Kulis.
3  We dispatched two people and she's one of the
4  applicants. They have yet to fill the position.
5  So, you know, it's my knowledge they haven't chosen
6  either one yet.
7      So we're still doing, you know, our part
8  in regards to the hiring hall and dispatching her to
9  places that will consider her, but's that's all we
10 can do.
11 MS. PAGE: Let me see if I have anything
12 else.
13     I don't have any further questions,
14 Mr. Ashton.
15 MR. DOUGHERTY: And I have no questions.
16 Thank you.
17 MS. PAGE: We're done.
18 THE WITNESS: All right. Well, thank
19 you.
20 MS. PAGE: We'll go off the record.
21 (Proceedings concluded at 3:04 p.m.)
22 (Signature waived.)
23     -oOo-