Case 3:05-cv-00240-TMB   Document 87-9   Filed 11/06/2007   Page 1 of 8

Kevin Dougherty  
September 26, 2007

Billingham v. State of Alaska  
Case No. 3:05-cv-0240 (TMB)

Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,        )
                        )
      Plaintiff,     )
                        )
vs.                     )
                        )
STATE OF ALASKA, DEPARTMENT )
OF TRANSPORTATION AND PUBLIC )
FACILITIES,             )
                        )
      Defendant.     )
_____)

Case No. 3:05-cv-0240 (TMB)

**COPY**

DEPOSITION OF KEVIN DOUGHERTY

Pages 1 - 27, inclusive

Wednesday, September 26, 2007, 11:15 a.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

**Exh. C**
**Dougherty Deposition**

Case 3:05-cv-00240-TMB   Document 87-9   Filed 11/06/2007   Page 2 of 8

Kevin Dougherty
September 26, 2007

Billingham v. State of Alaska
Case No. 3:05-cv-0240 (TMB)

Page 2

```
 1                  A-P-P-E-A-R-A-N-C-E-S

 2   For Defendant:

 3   ATTORNEY GENERAL'S OFFICE
     BY:  Brenda B. Page, Esq.
 4   1031 West 4th Avenue, Suite 200
     Anchorage, Alaska, 99501
 5   907/269-5100

 6


 7   For Public Employees Local 71:

 8   ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
     BY:  Kevin B. Dougherty, Esq.
 9   2501 Commercial Drive, Suite 140
     Anchorage, Alaska, 99501
10   907/276-1640

11


12   Reported By:

13   Katherine L. Novak, RPR
     Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

1  ANCHORAGE, ALASKA; WEDNESDAY, SEPTEMBER 26, 2007
2         11:15 A.M.
3              -oOo-
4            KEVIN DOUGHERTY,
5  called as a witness herein, having
6  been first duly sworn upon oath, was
7  examined and testified as follows:
8            EXAMINATION
9  BY MS. PAGE:
10     Q.  This is the deposition of Kevin Dougherty
11  in the case styled Elsa Billingham versus the State
12  of Alaska, Department of Transportation and Public
13  Facilities, 3:05-cv-0240, which currently is pending
14  in the United States District Court for the District
15  of Alaska.
16          This deposition is taken by notice and
17  agreement of the parties pursuant to the Federal
18  Rules of Civil Procedure. It will be used for
19  discovery, cross-examination, and all other purposes
20  permitted by law.
21          Mr. Dougherty, could you please state your
22  full name for the record?
23     A.  Kevin B. Dougherty.
24     Q.  Have you ever been known by any other
25  name?

**Page 5**

1     A.  No.
2     Q.  And as you know, my name is Brenda Page.
3  And I represent the State of Alaska, Department of
4  Transportation and Public Facilities in this
5  litigation.
6          What is your occupation, Mr. Dougherty?
7     A.  I am general counsel for the Alaska
8  District Council of Laborers.
9     Q.  And how long have you been doing that?
10     A.  Since 1981.
11     Q.  And we've had some depositions today in
12  this case for employees for Public Employees Local
13  71.
14          Have you been representing them in those
15  depositions?
16     A.  Yes, I have.
17     Q.  And do you still work directly for Public
18  Employees Local 71 as an attorney?
19     A.  Yes. I do on a part-time basis, yes.
20     Q.  And when did you start working for Public
21  Employees Local 71?
22     A.  Also in 1981.
23     Q.  And can you give me some sense as to what
24  is entailed in your representation of the union?
25     A.  Yes. The Alaska District Council of

**Page 6**

1  Laborers is comprised of three unions. Two in the
2  public -- excuse me. Two in the private sector, one
3  in the public sector. Local 71 is the public
4  sector, blue collar unit, which represents labor,
5  trade and craft employees. And as general counsel,
6  I'm their attorney for any counsel or litigation.
7     Q.  I'm going to assume that you've been
8  involved in a lot of depositions, so I don't need to
9  go over any basic background rules.
10     A.  Yes, I have. I do understand.
11     Q.  Are you taking any medication that might
12  affect your testimony today?
13     A.  No.
14     Q.  And can you think of any reason why you
15  cannot answer the questions I'm going to ask you
16  completely, accurately, and truthfully?
17     A.  No.
18     Q.  And you mentioned that there were two
19  private unions that you also represent. What are
20  those?
21     A.  Local 341 is a construction union located
22  in Anchorage. And Local 942 is a construction union
23  located in Fairbanks.
24     Q.  And during this period of time, since '81
25  when you've served as general counsel to these

**Page 7**

1  unions, has it been in Anchorage for the whole
2  period? Have you been located in Anchorage?
3     A.  Yes. I've been located in Anchorage,
4  yes.
5     Q.  But do you work throughout the state?
6     A.  The jurisdiction -- yes, I have clients,
7  the three unions have jurisdiction over the entire
8  state, so occasionally I might travel all around the
9  state, yes.
10     Q.  Do you know the plaintiff in this case,
11  Elsa Billingham?
12     A.  I've met Ms. Billingham, yes.
13     Q.  And when did you first become aware of
14  her?
15     A.  I would have became aware of
16  Ms. Billingham when Local 71 requested that I review
17  her termination paperwork, and that would have been
18  in the year 2004. I don't think I can place a
19  month.
20     Q.  And when you say Local 71 requested that
21  you review her termination paperwork, are you
22  referring to someone specifically?
23     A.  Yes. I was contacted by Dale Johnson at
24  Local 71 to review the file.
25     Q.  And is that something that you do

Page 8

1 regularly as part of your duties as counsel?
2    A.  It is part of my duties.  It occurs
3 periodically when there is a question or a need to
4 have it reviewed, especially if the employee has
5 been terminated and questions that.
6       And as a legal safeguard, occasionally it
7 does occur.
8    Q.  And was it conveyed to you, or did you
9 have an understanding as to why you were being asked
10 to review Ms. Billingham's termination paperwork?
11    A.  Yes.  I don't think I recall the
12 conversations, but by telephone I was asked by Dale
13 to review the file, because Elsa Billingham
14 disagreed with the termination.
15    Q.  And did you review her file?
16    A.  I did, yes.
17    Q.  And what exactly did you do in the review?
18 What did you look at?
19    A.  A review like that, I did actually read
20 all the disciplinary findings, pretty extensive file
21 in her case.  So we would have had prior warnings,
22 suspensions, accident reports.  And letters back --
23 back and forth between the union and the employer.
24    Q.  I'm going to hand you what we will mark as
25 Exhibit 1.

Page 9

1       (Exhibit 1 marked.)
2 BY MS. PAGE:
3    Q.  Do you recognize this document?
4    A.  Yes, I do.  I can identify it as a letter
5 I drafted and mailed, dated September 21, 2004, to
6 Dale Johnson regarding the Elsa Billingham
7 termination.
8    Q.  And that's your signature on the letter?
9    A.  Yes, it is.
10    Q.  You sort of break this down into several
11 different categories.  Can you give me some sense as
12 to what you were looking at and how these categories
13 factored into your conclusions?
14    A.  Yes.  It began with an understanding that
15 progressive discipline is a concept employers should
16 follow in labor relations, in certain types of
17 disciplinary action; this was one.  I think it would
18 be too complicated to go through all.
19       But when you have safety or
20 insubordination charges, as we had here, typically
21 the employers should go through progressive
22 discipline.  And they had, as you see on page 1.
23 There are a number of occasions where she had been
24 suspended, which are quite severe forms of
25 disciplines.  So it was clear that the employer had

Page 10

1 gone through -- had not jumped to termination
2 immediately, had done the progressive discipline
3 process.
4       I also looked at the nature of what type
5 of infractions had occurred, whether or not they
6 involved any lack of performance by the employee, as
7 opposed to something that was not the fault of the
8 employee.  And I've got that on page 2, A, B, C, D.
9       And then we finally, as you know through
10 the record, in June of 2003, as talked about on
11 page 2, there was a last chance agreement, as I call
12 it, it's also called the LDR, that was executed.
13 This is pretty common in labor relations.  It's a
14 good settlement framework, almost like an ADR
15 process, to give the employee one more chance; also
16 gives the employer a chance to focus on what conduct
17 must be complied with.  And I think all the parties
18 hope that that will accomplish the objective of
19 getting the employee to comply with the job
20 requirements.
21       But the major caveat is that the employer
22 can terminate without challenge if there's one
23 violation.  So --
24    Q.  Of the terms of the agreement?
25    A.  Of the terms of the agreement, right.

Page 11

1       Also, as you see part 4, at the time that
2 this was -- that this was compiled to letter, and I
3 had done the review, there was a claim by
4 Ms. Billingham that there had been some sort of
5 disparate treatment.
6       So I reviewed not only her file, but got
7 other information through Local 71 about similarly
8 situated employees who had also been subject to the
9 last chance agreement process.  And as you see,
10 keeping the names confidential at the bottom of
11 page 3, there are some -- you know, I won't mention
12 the full names, but John S. and Gerald S., I think
13 there have been more since that time, who have been
14 subject to it.
15       It's not that uncommon, of course, to have
16 people go through this process and our -- or my
17 objective at that point was to see if there was any
18 indication that she was singled out, and we didn't
19 find anything of that nature.  There was nothing
20 indicating disparate treatment.
21    Q.  So when you say there was nothing
22 indicating disparate treatment, were you looking at
23 both the disparate treatment in terms of entering
24 into the last chance agreement itself, or the
25 termination under the terms of the last chance

Page 12

1  agreement?
2  A. We looked -- we would have looked at both.
3  The disparate treatment would first -- we'd first
4  look at whether or not there was anything out of
5  order, in terms of the employer's disciplinary
6  process, and there wasn't. It was really routine,
7  customary business for an employer when you have
8  that many prior disciplinary actions taken against
9  her. And there were actual facts of either
10 accidents or damage to property; therefore, there
11 was a routine basis for the employee to have
12 discipline.
13 Q. Let me ask you, go back to a couple of
14 things in here.
15 A. Sure.
16 Q. But if you look at the first section,
17 progressive discipline followed, and you list the
18 different suspensions. And first of all, the
19 suspensions start out three-day, five-day, ten-day,
20 and is that standard, in terms of the suspensions
21 increasing with each --
22 A. Yes, it is standard.
23 Q. And then you say, "Such a lengthy record
24 of disciplinary action indicates that this employee
25 has a long history of unacceptable performance

Page 13

1  including the following."
2  And you list, as you said, four different
3  areas here. Safety infractions, failure to follow
4  directions, substandard work performance, and
5  intentionally destroying a foreman's document.
6  In your mind, are all of these types of
7  discipline important in looking at -- I guess what
8  I'm trying to say is, important in looking at, you
9  know, what the cause is for determining the
10 seriousness and the appropriate response?
11 A. Yes. If I'm following your question,
12 yeah, they're important because if they indicate
13 insubordination -- in other words, this was conduct
14 that wasn't just a mistake, they were either
15 intentional acts or a failure to act where she would
16 have known what the standard of care was. I mean,
17 she knew she was required to operate a piece of
18 equipment in a certain way and she chose not to.
19 So there was volitional decisions that she
20 made that, you know, did not meet the standard, as
21 opposed to something that was unintentional.
22 Q. Okay. And you did answer what I was
23 trying to ask you.
24 A. Okay.
25 Q. The sort of follow-up is, it's interesting

Page 14

1  to me that you've got this intentionally destroying
2  a foreman's document. What to you was the
3  significance of that?
4  A. Well, I guess there was a lot that might
5  have been significant about that. I think one was
6  that it indicated an unwillingness to properly deal
7  with management instructions that she might have
8  disagreed with.
9  You know, there is a level of -- when they
10 talk about insubordination, obviously the converse
11 is you're supposed to be, to some degree,
12 subordinate to your supervisor, so you wouldn't
13 intentionally destroy a document. You've got an
14 obligation to work with the employer, but you --
15 again, the intentional act was significant there.
16 Q. And then I want to talk a little bit more
17 about the last chance agreement, letter of dispute
18 resolution.
19 A. Sure.
20 Q. Were you involved at all in the actual
21 negotiation process with Ms. Billingham's last
22 chance agreement?
23 A. Not at all, no.
24 Q. So you just looked at it after the
25 termination?

Page 15

1  A. Yes.
2  Q. I want to make sure that I understand what
3  the union's view is, as to how a last chance
4  agreement or letter of dispute resolution fits in
5  with the collective bargaining agreement.
6  Can you just sort of explain that to me?
7  A. Yes. The collective bargaining agreement,
8  you know, gives a general standard in discipline,
9  basically, the just cause standard.
10 And there's, you know, volume sets on the
11 definition of that, both cases and interpretations,
12 for at least seven years of law.
13 So in this particular case when you have a
14 last chance agreement or a letter of dispute
15 resolution, you're really customizing in great
16 detail a remedy when there is a dispute about what a
17 discipline -- what the discipline should be.
18 So it is a -- it's a settlement, it's a
19 resolution, that usually has compromise in it to
20 give the management the protections they want and
21 promises they want for the future. But, in all
22 cases, that I'm aware of, that last chance agreement
23 means the employee has a chance to go back to work,
24 but they are subject to a very rigorous process of
25 complying with standards that might be different

Page 16

1 from the employee that hadn't had the prior
2 discipline.
3     So it's very clear that they're informed
4 what the standards are, both in writing and
5 typically verbally, they're counseled about it by
6 the employer and the union, so they should have
7 expectations. But they're also -- they should be
8 fully aware that if they breach anything, they would
9 be terminated. There's no question. And they would
10 not have the right to challenge that termination if
11 they do breach that agreement.
12     Q. So is it considered then, is it accurate
13 to say, that the last chance agreement is considered
14 a supplement to the collective bargaining
15 agreement?
16     A. You know, yes, it is, for that employee.
17     Q. Exactly.
18     A. Yes.
19     Q. And it's specific to that employee, so it
20 basically is saying: We are going to put these
21 specific requirements on top of our general
22 collective bargaining agreement requirements --
23     A. Yes.
24     Q. -- that you need to make?
25     A. That is correct.

Page 17

1     Q. Okay.
2     A. Yes. Because, by analogy, there are
3 occasions where labor, management, the union, and
4 the employer will write a clarification letter of
5 agreement that is on top of or in addition to the
6 agreement that might apply to everyone generally,
7 getting greater focus on any issue.
8     In this case, or any last chance
9 agreement, it would be similar but focused on one
10 employee. So, you know, John Doe would have a last
11 chance agreement focused on his conduct for that
12 particular employment situation.
13     Q. Now, you indicated earlier that you looked
14 at whether there was disparate treatment toward
15 Ms. Billingham for actually entering into the last
16 chance agreement, correct?
17     A. Correct.
18     Q. And in your mind in viewing that, my
19 understanding is you said you didn't believe there
20 was disparate treatment, correct?
21     A. Correct. Yes.
22     Q. And you did name these other two
23 individuals in the letter by their first name. One
24 is John S. and the other is Gerald S.
25     Am I correct in assuming that they're both

Page 18

1 males?
2     A. Correct. They are, yes.
3     Q. Do you have any sense as to what their
4 ages were?
5     A. I do -- I only do have a sense, I can
6 answer it that way. John S., and I could give you
7 the name if you need it, but John S. is at least in
8 his 40s, so he's age 40 or above. And Gerald S. I
9 know is male, but I don't know his age.
10     Q. So again, is it accurate to say, then,
11 that a last chance agreement or a letter of dispute
12 resolution, the purpose of the letter is to set
13 higher standards of performance expectations for
14 that particular individual?
15     A. Yes. And more specific.
16     Q. And then an employee who violates the
17 terms of the last chance agreement, I'm
18 understanding from what you said, can be terminated
19 for that violation itself, and you don't need to
20 necessarily have the just cause standard that you
21 would have if they were not under a last chance
22 agreement; is that right?
23     A. That is also correct, yes.
24     Q. And my understanding, from your
25 conclusions then in this letter.

Page 19

1     A. Sure.
2     Q. Is that the employer had grounds to
3 dismiss Ms. Billingham; is that correct?
4     A. That is correct, yes.
5     Q. Did you actually do any sort of
6 determination as to just cause?
7     A. Well, in two ways. I'm familiar enough
8 with the standard. I did also read the contract,
9 the CBA, which really had boilerplate standard
10 language. I don't think it was even needed that I
11 look at any cases. I know enough about safety
12 infractions. When there is an intentional violation
13 of a safety directive, in public or private sector,
14 you can be terminated.
15     In this case also it caused some damage.
16 And that, the impact of the safety violation by
17 itself, can carry greater weight. So that alone was
18 enough to say -- to know somebody could be
19 terminated.
20     Q. Which safety violation are you referring
21 to?
22     A. Well, for example, the one with the mower
23 that damaged some property, was one where it was
24 clear that she knew that the mower should not have
25 been operated without the protective shield, I

### Page 20

1  forget the name of it. So it was an intentional
2  disregard and it did cause some damage. And it also
3  had an impact on the public relations between the
4  employer and a member of the general public that had
5  a window broken
6      So part of what occurred -- just to finish
7  on that. So we had that alone. But, to be honest,
8  on top of that we had other problems that would just
9  weigh to it. I mean, once you cross that just cause
10 termination threshold, the additional violations
11 just nail it down tighter. It wasn't very difficult
12 to review and see that the employer had grounds to
13 terminate.
14     Q. So is this letter an accurate reflection
15 of your conclusions as to the grounds for
16 Ms. Billingham's dismissal?
17     A. Yes. Certainly.
18     Q. And did you conclude that the employer had
19 acted in accordance with the terms of the collective
20 bargaining agreement and last chance agreement in
21 terminating Ms. Billingham?
22     A. Yes. As stated in the conclusion, it was
23 very clear to me that the employer had grounds to
24 terminate, as I indicated in the conclusion. They
25 had followed discipline. There had also been a last

### Page 21

1  chance agreement which tightened the standard which
2  Ms. Billingham should have complied with. And she
3  failed to comply with that standard.
4      And of course there had been numerous
5  documentations in the file. Some of them hadn't
6  been challenged, I hadn't mentioned that earlier.
7  But some of the documents which refer to
8  unacceptable work performance she had not
9  challenged. Those that had, of course some of them
10 had been finalized in suspensions. So the record
11 was reliable and not really anything that could be
12 refuted.
13     Q. And prior to looking at this termination
14 decision, it's my understanding from what you said
15 previously, you had not been involved in any other
16 grievances with Ms. Billingham; is that right?
17     A. That is correct. I had not been familiar
18 with her in the past.
19     Q. Now, once you sent this letter off -- and
20 this went to Dale Johnson, correct?
21     A. Yes.
22     Q. -- did you also contact Ms. Billingham to
23 let her know what you had concluded?
24     A. Yes, I did. She had contacted the local
25 union at some occasion after, I don't have the date,

### Page 22

1  I know you have a letter related to that. She
2  contacted the union, and it was their opinion that
3  the best course would be for me to just directly
4  communicate to her, rather than have it go through
5  the local union. So I did send a letter to her.
6      Q. We'll have that marked as an exhibit.
7      (Exhibit 2 marked.)
8  BY MS. PAGE:
9      Q. Is this the letter that you were referring
10 to?
11     A. Yes.
12     Q. And this is dated December 6, 2004,
13 correct?
14     A. It is. Yes.
15     Q. And am I correct in assuming that you
16 actually did mail this to Ms. Billingham?
17     A. Yes, we did.
18     Q. Now, this appears to summarize your
19 conclusions and then answer some questions,
20 apparently, that she had about the union's
21 representation of her, am I --
22     A. That is correct.
23     Q. Okay.
24     A. She had sent a letter with a number of
25 questions that she posed to the union, yes.

### Page 23

1      Q. And after you sent this letter to
2  Ms. Billingham, did you have any further contact
3  with her?
4      A. I don't think so. We had correspondence
5  that -- so I had no contact with her, but we did
6  have correspondence where she had filed with the
7  Alaska Labor Relations Agency. So we would have
8  processed that complaint, but there would not have
9  been any communication with her.
10     Q. So after you gave your advice to Dale
11 Johnson, did the union at that point, as well as,
12 you know, your letter going out to Elsa, inform Elsa
13 that the union would not be taking her grievance to
14 arbitration?
15     A. That is correct, yes.
16     Q. And at that point did she file an EEOC
17 complaint against the union; do you know?
18     A. Yes, she did file an EEOC charge. I don't
19 have the date in front of me, but I represented the
20 union in that process, yes.
21     Q. And how was that resolved?
22     A. We processed that through an ADR process,
23 which the EEOC offers as a mechanism just to shorten
24 the process. And it was my decision that this was
25 pretty clear on the merits that it was frivolous and

Page 24

1   it would be one worthwhile to take through that ADR
2   mediation process, so we did meet with the EEOC
3   mediator. I'm not sure I have his name, unless it's
4   in the file. And we actually resolved it at that
5   time.
6       Q. And then you said she also filed something
7   with the Alaska Labor Relations Agency. Was that an
8   unfair labor practice allegation against the
9   union?
10      A. Yes, it was. Yes. It was cast as a
11  failure to represent, which is part of the ALRA
12  process in the statute on labor relations.
13      Q. And how was that resolved?
14      A. That was dismissed by that agency.
15      Q. On behalf of the union, basically?
16      A. Dismissed by finding in favor of the
17  union, yes.
18      Q. Now, at the time you reached these
19  conclusions that you set forth in your letter of
20  September 21st, 2004, to Mr. Johnson, Ms. Billingham
21  had not filed her EEOC complaint or her unfair labor
22  practice complaint against the union, had she?
23      A. No, she had not.
24      Q. So these conclusions were not affected in
25  any way by allegations she made against the union,

Page 25

1   were they?
2       A. That's true, they weren't.
3       Q. Okay. Let me see if I have anything else.
4       When you reviewed the termination
5   decision, you said you went through her file. Did
6   you talk to any individuals, either Ms. Billingham
7   or any of the management out at airfield
8   maintenance?
9       A. No. Let me walk through that, to make
10  sure I'm fully accurate, but I'm certain I did not
11  talk to management, for a number of reasons. And I
12  did not talk with her.
13      And I may have talked to the union,
14  certainly, to -- I have a feeling I would have done
15  that, to ask questions, just to be thorough. So it
16  would have just been with the client, not with
17  anyone beyond that.
18      Q. And have you dealt with Ms. Billingham
19  with any other employers other than airfield
20  maintenance?
21      A. No. Let me -- again, let me thoroughly
22  think through that.
23      No, I have not. As you might be aware, I
24  have heard through the local union that she has had
25  other disciplinary problems with other employers,

Page 26

1   but I haven't dealt with her, directly or
2   indirectly, or even had to review it, I just heard
3   about it.
4       MS. PAGE: I don't have any other
5   questions.
6       THE WITNESS: Thank you.
7   (Proceedings recessed at 11:46 a.m.)
8   (Signature waived.)
9           -oOo-

Page 27

1           REPORTER'S CERTIFICATE
2
3       I, KATHERINE L. NOVAK, RPR,
4   Registered Professional Reporter, and Notary Public
5   in and for the State of Alaska, do hereby certify:
6       That the witness in the foregoing
7   proceedings was duly sworn; that the proceedings
8   were then taken before me at the time and place
9   herein set forth; that the proceedings were reported
10  stenographically by me and later transcribed by
11  computer transcription; that the transcript
12  constitutes a full, true and correct record of said
13  proceedings taken on the date and time indicated
14  therein; and that signature is waived.
15      Further, that I am a disinterested
16  person to said action.
17      IN WITNESS WHEREOF, I have hereunto
18  subscribed my hand and affixed my official seal this
19  15th day of October 2007.

_____
Katherine L. Novak, RPR,
and Notary Public for the
State of Alaska.

My Commission Expires 6-10-09

9 (Pages 24 to 27)