Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,          )
                          )
        Plaintiff,        )
                          )
vs.                       )
                          )
STATE OF ALASKA, DEPARTMENT )
OF TRANSPORTATION AND PUBLIC )
FACILITIES,               )
                          )
        Defendant.        )
_____)

Case No. 3:05-cv-0240 (TMB)

COPY


DEPOSITION OF DALE JOHNSON

Pages 1 - 35, inclusive

Wednesday, September 26, 2007, 9:04 a.m.

Anchorage, Alaska




Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

**Exh. D**
**Johnson Deposition**

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2    For Defendant:

 3    ATTORNEY GENERAL'S OFFICE
      BY:  Brenda B. Page, Esq.
 4    1031 West 4th Avenue, Suite 200
      Anchorage, Alaska, 99501
 5    907/269-5100

 6


 7    For Public Employees Local 71:

 8    ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
      BY:  Kevin B. Dougherty, Esq.
 9    2501 Commercial Drive, Suite 140
      Anchorage, Alaska, 99501
10    907/276-1640

11


12    Reported By:

13    Katherine L. Novak, RPR
      Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

Dale Johnson
September 26, 2007

Billingham v. State of Alaska
Case No. 3:05-cv-0240 (TMB)

### Page 12

1  Q. And then at some point did it come to your
2  attention that she was being terminated?
3  A. Yes.
4  Q. And how did that come to your attention
5  initially?
6  A. She was -- well, I think she had a
7  violation, in terms of the letter of resolution.
8  And then she had some concerns about, you know, what
9  she was being accused of. And then that's when I
10 was brought in to investigate that part.
11 Q. Did she actually file a grievance?
12 A. I think she did. I think she did.
13 Q. So you said you were basically then
14 brought in to investigate the allegations that she
15 made?
16 A. Yes. Uh-huh.
17 Q. And was it your understanding that she was
18 alleging that her termination was in violation of
19 the collective bargaining agreement, or what was she
20 complaining about?
21 A. Her complaint was that she was being set
22 up, as far as -- let's see, how did she put that?
23 Well, she said she was being set up by her
24 supervisors. And that they were, you know,
25 nitpicking her into every little -- every little

### Page 13

1  thing she does, you know, she was being picked on.
2  Prior to that, it was some discrimination
3  there. She also mentioned to me at one point that
4  she was -- she was -- how did she put that? She was
5  under duress for when she did sign the letter of
6  resolution.
7  Q. So then did you look into all these
8  allegations --
9  A. Yes.
10 Q. -- that she made?
11 A. Uh-huh.
12 Q. Can you wait until I finish the whole --
13 A. Yes, ma'am.
14 Q. -- question.
15 A. Yes, ma'am.
16 Q. And you gave me some sense as to what you
17 did, but tell me just exactly then what you did in
18 terms of investigating her allegations?
19 A. Okay. First things first. I went out, I
20 had a meeting with Dan Hartman.
21 Q. And what is Dan's position?
22 A. Dan is the facility -- the airport
23 facilities supervisor.
24 So I met with Dan. We pulled Elsa's
25 record. Surprising to me, it was a lot thicker than

### Page 14

1  what was indicated to me by her. She had quite a
2  few violations at that time.
3  And anyway, we went on to talk about some
4  of Elsa's past history and what she had -- and what
5  she had -- excuse me one second, let me turn this
6  thing off.
7  Okay. And just some of her past history,
8  her violations. What she did currently, which
9  was -- he was pretty ticked about that. And her
10 inability to follow instructions.
11 In my opinion, at that time, I don't think
12 that Dan was out to get her in any way. It's just a
13 matter of her just not being able to follow
14 instructions and continuing to do things her own
15 way. And then, thus, causing, at some point, you
16 know, accidents or, you know, that sort of deal.
17 Q. Let me hand what you we'll mark as
18 Exhibit 1.
19 (Exhibit 1 marked.)
20 BY MS. PAGE:
21 Q. Have you seen this document before?
22 A. Yes.
23 Q. And what is it?
24 A. Letter of dispute resolution. Basically,
25 an agreement between both parties to -- that Elsa

### Page 15

1  clearly understands that, from the union standpoint
2  and the State standpoint, basically each one of
3  these items, what she needs to do or don't do in
4  order to continue her employment with the State.
5  Q. And was it your understanding that she had
6  violated some of the terms of this agreement?
7  A. Yes.
8  Q. Did Ms. Billingham dispute that with
9  you?
10 A. She did.
11 Q. She did?
12 A. Uh-huh.
13 This is the letter of dispute that she
14 said that she signed it, but she was under duress
15 when she did sign it.
16 Q. Did she explain to you what she meant by
17 under duress?
18 A. She believed that, from her point of view,
19 that Dan would -- that she was afraid of Dan and
20 losing her job, so she just went ahead and signed it
21 and she didn't look at it, she just signed it.
22 Q. Now, in the course of your duties in your
23 position now, have you been involved in other cases
24 in which the union has entered into a letter of
25 dispute resolution?

Page 16

1    A.  Yes. Yes. Uh-huh.
2    Q.  Can you approximate how many times you
3 have?
4    A.  Let's see. Well, my most recent one
5 was --
6    Q.  You don't need to tell me specific names.
7 I don't know if you've got confidentiality issues or
8 anything with that.
9    A.  Well, the most recent one I had, this was
10 July, where we had an accident where a foreman
11 was in -- violated some safety issues. We did a
12 letter of resolution to -- he would demote down a
13 notch, wouldn't be a foreman anymore. And that he
14 would -- let's see. He would no longer be a
15 foreman, but he would retain his employment.
16    Q.  Who was the employer? Was this airfield
17 maintenance?
18    A.  No. Department of Transportation.
19    Q.  And have you been involved in any
20 others?
21    A.  Yes. At the airport I had a guy who had
22 quite a few accidents out there. We did a last
23 chance to keep him employed. And as long as he
24 followed suit to continuing to make sure that he
25 checked and double-checked whatever he needed to do,

Page 17

1 as far as staying accident free, he was doing fine.
2 And then he had another oops, and then it was
3 done.
4    Q.  Was he terminated then?
5    A.  Yes. Uh-huh.
6    Q.  And when was it, can you recall, that you
7 entered -- the union entered into that particular
8 last chance agreement?
9    A.  Let's see. I want to say about January,
10 February.
11    Q.  Of this year?
12    A.  Uh-huh.
13    Q.  Any others that you've been involved in,
14 other than those two?
15    A.  Most of the time -- most of the time the
16 relationship between State management, myself, and
17 human resources, we can actually come to an
18 agreement of what we're trying to achieve to
19 maintain our member's employment. So we don't
20 always have a last chance until a guy or the member
21 has absolutely just got to that last, you know: We
22 can't have any more. But most of the time we do a
23 verbal, written -- we will do a written letter that
24 says, don't do it again.
25    Q.  Sure.

Page 18

1    A.  And we move on from there.
2    Q.  In your position and with your duties, do
3 you view one of these letters of dispute resolution,
4 which are commonly called a last chance letter, as
5 just that, a last chance to --
6    A.  Yes.
7    Q.  -- maintain your employment?
8    A.  Yes. Uh-huh.
9    Q.  And in terms of Ms. Billingham's
10 allegations, that she felt she was coerced into
11 entering into this agreement, you weren't there at
12 the time and you don't really know what the
13 circumstances were, in terms of how this last chance
14 agreement was negotiated --
15    A.  No.
16    Q.  -- for Ms. Billingham?
17    A.  No. No.
18    Q.  Now, when you were investigating
19 Ms. Billingham's grievance regarding her termination
20 in 2004, at some point did you request that your
21 attorney review your investigation or become
22 involved?
23    A.  Yes. Jim Ashton suggested that I get with
24 Kevin and we go over Ms. Billingham's record and
25 what her current allegations were, and then we

Page 19

1 would -- he would look at it and will make a
2 determination from there.
3    Q.  And did he do that?
4    A.  Yes.
5    Q.  I'm going to hand you what we'll mark as
6 Exhibit 2.
7    (Exhibit 2 marked.)
8 BY MS. PAGE:
9    Q.  Do you recognize this document?
10    A.  Yes.
11    Q.  And what is it?
12    A.  It is a -- let me look through it, make
13 sure.
14        Actually, I recognize what we're doing
15 here, but not exactly what the form is.
16    Q.  What do you mean by that?
17    A.  These are some of the questions and
18 concerns that Kevin and I went over in discussion to
19 Ms. Billingham. And a lot of the annotations are
20 from her records, which I recognize that. And the
21 dates on the last chance agreement. Accusation of
22 the disparate treatment, I remember that. So,
23 yes.
24    Q.  Is this a document that you've seen
25 before?

Dale Johnson
September 26, 2007

Billingham v. State of Alaska
Case No. 3:05-cv-0240 (TMB)

Page 20

1  A. Yes. Yes. Yes.
2  Q. And can you tell me what the document
3  itself is?
4  A. Well, now, that actually -- no.
5  Q. Is this a letter from Kevin Dougherty?
6  A. Yes.
7  Q. Who was the attorney that you had
8  consulted about --
9  A. Yes. Yes.
10  Q. And what's the date on the letter?
11  A. September 21st, 2004.
12  Q. And was the letter addressed to you?
13  A. Yes. Uh-huh.
14  Q. So would this have been a written response
15  that you would have gotten from Mr. Dougherty
16  regarding what you had discussed, in terms of the
17  merit of Ms. Billingham's grievance against the
18  State?
19  A. That is correct. That is correct.
20  Q. And did you review this at the time that
21  you were processing the grievance?
22  A. Yes.
23  Q. Okay.
24  A. I did.
25  Q. Did you agree with the conclusions set

Page 21

1  forth in this letter?
2  A. Yes, I did.
3  Q. And the conclusion in this letter is that
4  the employer had grounds to dismiss Ms. Billingham
5  based on progressive discipline principles, the last
6  chance agreement, and unacceptable work performance
7  documented in numerous ways in the June 2003 to June
8  2004 period.
9      Did you specifically agree with those
10  conclusions?
11  A. I did.
12  Q. So is it fair to say that after conducting
13  your investigation that you concluded that
14  Ms. Billingham's termination was done in accordance
15  with the collective bargaining agreement?
16  A. Correct.
17  Q. And in your estimation, did airfield
18  maintenance, the Department of Transportation,
19  Public Facilities, follow the terms of the contract
20  between the union and Ms. Billingham in terminating
21  her employment?
22  A. Yes, they did.
23  Q. Did you make a decision then as to whether
24  her grievance should be taken to arbitration?
25  A. No. That's not my final decision.

Page 22

1  Q. Who makes that decision?
2  A. Jim Ashton does.
3  Q. So did you have that discussion with
4  Mr. Ashton, or how does that work?
5  A. Yes. Because my job is to investigate it,
6  bring all of the evidence forward, and communicate
7  between the supervisor over there, Dan Hartman,
8  myself, what was being said, you know, what was the
9  accusations towards him.
10     And my conclusion to it at the end, and my
11  recommendation to Jim, is that Dan Hartman went
12  above and beyond the fact of trying to retain
13  Ms. Billingham out at the airport. And one of the
14  things at that time is that he was hurting for
15  bodies, so he really wasn't going after her in any
16  way. He was trying to retain her, because of her
17  experience at the time, and she being one of the
18  senior members out there. It's just that her -- but
19  her inability to follow instructions, he was between
20  a rock and a hard place. He couldn't afford it
21  anymore.
22  Q. In your dealings with, you know, employees
23  out at the airport, is safety an issue that
24  management expresses --
25  A. Number one.

Page 23

1  Q. Let me finish the question.
2  A. Oh, I'm sorry.
3  Q. Is safety an issue that management
4  expresses a concern about in their discipline and
5  how they handle their employees?
6  A. Yes.
7  Q. And why is that, in your opinion?
8  A. Well, number one, the airport is not a --
9  it is a specific -- I use the term "its own city."
10  And by the safety issues that has to be followed, as
11  far as guidelines of being on the flight line, to
12  just basic security has to be followed and held at
13  the utmost.
14     When you have violations there, it tends
15  to either cost the State a lot of money, it could
16  put a lot of people in harm's way. You just can't
17  have -- I mean, security measures, they have to be
18  followed.
19     And I would say that Dan expresses a lot
20  in his expectation of our members out there to
21  follow those guidelines that are held to the highest
22  esteem.
23  Q. So is failure to follow instructions
24  sometimes translated into safety concerns?
25  A. Yes.

Page 24

1  Q. So in this case, then, you discussed your
2  conclusions, and am I safe in assuming also
3  Mr. Dougherty's conclusions, regarding Elsa's
4  grievance -- or Ms. Billingham's grievance with
5  Mr. Ashton, correct?
6  A. Yes.
7  Q. And then he went on to make a decision as
8  to whether to pursue the grievance through
9  arbitration; is that right?
10 A. Yes.
11 Q. Did he discuss his decision with you?
12 A. Yes. We have our basic weekly meetings.
13 And all of our cases are actually sit down and
14 discussed. And Mr. Ashton, basically, here is
15 exactly each one of our cases. And he gives us his
16 insight of where we're taking it. Whether or not it
17 is something that we will pursue, as far as an
18 arbitration, if not, and whether or not we need to
19 get Kevin or a labor attorney involved at that part,
20 and -- but most of the time, yes, the decision is
21 made through him.
22 Q. And in this case, you consulted with
23 Mr. Dougherty, the attorney.
24    Is that something that you typically do
25 when you're processing these grievances?

Page 25

1  A. Well, it depends. And sometimes what
2  we're trying to do is make sure that we're not
3  missing anything out of there. And we need a
4  different insight as far as what we're looking at.
5    And, you know, Kevin, you know, being a
6  long-term attorney, he's pretty much seen every type
7  of case it is. And, yes, we have the go-ahead to
8  call Kevin up, ask him a question. You know, if he
9  wants us to bring the file over, we'll bring it over
10 and we'll sit down and discuss it.
11 Q. I asked you earlier about your conclusions
12 as to whether the employer in this case had followed
13 the terms of the collective bargaining agreement,
14 but I didn't ask you if you had made any conclusions
15 as to whether the employer had engaged in any kind
16 of discriminatory conduct towards Ms. Billingham.
17 Is that something you were looking at?
18 A. Yes. I looked at all avenues.
19 Q. And what were your conclusions regarding
20 the employer's conduct with regard to
21 discrimination?
22 A. That is -- well, that is one of my biggest
23 concerns, because of my background through the
24 military. And I look at that very strongly, look at
25 the members that she works around, I ask questions

Page 26

1  to them.
2    But my conclusion to that is that, you
3  know, Dan clearly had nothing to do with
4  discrimination. This was just about following
5  instructions. This is just about him asking Elsa to
6  do what he asked her to do. Go to work, be on time,
7  do what your supervisor and foremans ask you to do,
8  and then you don't have to come see me.
9    And he also has a clear open-door policy.
10 If anybody is harassing her in any way, she could
11 feel free to just walk in his office and let him
12 know, and he would follow up on it very quickly. He
13 jumps all over that stuff.
14 Q. When you said discrimination is one of
15 your biggest concerns because of your background in
16 the military, what do you mean by that?
17 A. Well, I -- 21 years in the Air Force, and
18 dealing with a lot of young men and women, this is
19 something that they kind of put into our DNA, to be
20 able to recognize when any of our airmen is being
21 harassed in any type of way, and to -- you know,
22 numerous numbers of classes to make sure that we
23 understand exactly what the signs are in
24 discrimination or sexual harassment, any of that
25 sort of thing.

Page 27

1  Q. And what was your position when you were
2  in the Air Force?
3  A. Tech sergeant in the Air Force.
4  Q. Were you dealing with human resource
5  issues?
6  A. Yes. Well, as a supervisor, you're -- you
7  know, my -- I deal with civilians, military, all of
8  that, because I ran the dining facility at
9  Elmendorf.
10 Q. The what facility?
11 A. Dining facility.
12 Q. Oh, dining; okay.
13 A. Yes.
14 Q. So let's talk about retaliation. I think
15 that's another part of Ms. Billingham's allegations.
16    Was that not -- and let me ask you that.
17 Was that not part of her allegations --
18 A. Yes.
19 Q. -- at the time of her termination --
20 A. Yes.
21 Q. -- was retaliatory?
22 A. Yes.
23 Q. And did you look into that?
24 A. Yes.
25 Q. And what were your conclusions regarding

Page 28

1 retaliation?
2     A. No retaliation.
3     Q. So is it fair to say you saw no evidence
4  that her termination was retaliatory?
5     A. No. No.
6     Q. Did you inform Ms. Billingham that the
7  union had concluded it wasn't going to take her
8  grievance to arbitration?
9     A. Yes.
10    Q. And I'll hand you what we'll mark as
11 Exhibit 3.
12    (Exhibit 3 marked.)
13 BY MS. PAGE:
14    Q. Take a look at that, Mr. Johnson.
15       Do you recognize this document?
16    A. Yes.
17    Q. What is it?
18    A. It is a -- this is a conclusion to our
19 grievance. And we issue this letter informing any
20 of our members what's our next step in the grievance
21 process. And whether or not we're moving forward
22 with it or whether or not we've reached a resolution
23 on it.
24    Q. And is this specifically a letter that you
25 sent to Ms. Billingham?

Page 29

1     A. Yes. Uh-huh.
2     Q. And what's the date on it?
3     A. The date is October 11, 2004.
4     Q. And the substance of the letter is
5  basically saying that you had concluded and that
6  your attorney had advised to dismiss her grievance
7  regarding her termination from airfield maintenance,
8  correct?
9     A. Correct.
10    Q. When you sent this -- after you sent this
11 letter to Ms. Billingham, did you have further
12 communications with her about her grievance?
13    A. No.
14    Q. Did she object to anyone about the fact
15 that the union was not going to pursue it to
16 arbitration?
17    A. She verbally lets us know that.
18    Q. Okay. And I'm going to hand you another
19 document that we'll mark as Exhibit 4.
20    (Exhibit 4 marked.)
21 BY MS. PAGE:
22    Q. Take a look at that, please.
23    A. Yes, I recognize this.
24    Q. And what is this letter?
25    A. This is basically a -- this is also a part

Page 30

1  of our grievance process, to just -- because Elsa
2  asked us at the time -- she wasn't satisfied with
3  the letter that I presented to her, so she wanted to
4  go forward, speak to the business manager and the E
5  board about her case. This is just, like I said,
6  one of our letters that we do and to ask her her
7  appeal at the time, it's basically an appeal.
8     Q. So this was a letter from you to
9  Ms. Billingham, correct?
10    A. Yes, uh-huh.
11    Q. And that's your signature on the letter?
12    A. Yes, ma'am.
13    Q. And what's the date on this?
14    A. The date on this is January 10, 2005.
15    Q. And you basically informed her in the
16 letter regarding what her current status was and
17 that you had found no basis for retaliatory
18 discrimination in her termination, correct?
19    A. Yes.
20    Q. And advised her that she could contact the
21 Alaska Commission for Human Rights if she desired
22 their review, correct?
23    A. Yes.
24    Q. In asking you about your conclusions
25 regarding whether Ms. Billingham's termination was

Page 31

1  retaliatory or discriminatory or in accordance with
2  the collective bargaining agreement, am I correct in
3  saying that you reached those conclusions prior to
4  sending Ms. Billingham her first letter informing
5  her that the union was not going to pursue her
6  agreements through arbitration?
7     A. Yes. Yes. I walk through the steps.
8     Q. So Ms. Billingham's -- any action she
9  later may have taken for testing that decision
10 didn't have any effect on your --
11    A. No.
12    Q. -- conclusion -- your original
13 conclusions, correct?
14    A. No. No, ma'am.
15    Q. Do you know if Ms. Billingham did actually
16 go to the Human Rights Commission regarding her
17 termination?
18    A. No.
19    Q. You don't know one way or the other?
20    A. No.
21    Q. Okay. And do you know if she pursued any
22 action against the union for failing to take her
23 grievance to arbitration?
24    A. Yes.
25    Q. She did?

Page 32

1  A. Yes.
2  Q. Was that an unfair labor practice or --
3  A. No. It's just her allegations of what she
4  perceived as the union's failure to represent her.
5  And basically, at that time, it's kind of way out of
6  my hands. And then that's when our attorneys, our
7  labor attorneys get involved and protect our
8  interest at that part.
9  Q. So you were not involved in handling any
10 subsequent actions she may have taken against the
11 union then?
12 A. No. No. Only thing I would do at that
13 time is just present all of my evidence and
14 conclusions to the investigation and hand that
15 over.
16 Q. Who was doing that, conducting that
17 investigation; do you remember?
18 A. Well, that's still me.
19 Q. Oh, okay.
20 A. Yeah. Yeah, that's still me. I do all --
21 you know, I'm just saying, I'm going back to the
22 part of, you know, the conclusion of what I came up
23 with.
24 Q. Okay.
25 A. Kevin and I's decision, and then whatever

Page 33

1  her attorney is asking for at that time, and then
2  we --
3  Q. Did she ever have an attorney?
4  A. I heard she had an attorney a couple of
5  times.
6  Q. So let me make sure I'm clear on this. So
7  at some point Ms. Billingham made certain
8  allegations that the union had failed to properly
9  represent her?
10 A. Right.
11 Q. And my understanding from what you're
12 saying is you turned over what you had done in --
13 A. Yes. It's a file, our grievance file.
14 Q. And who did you turn that over to?
15 A. Well, our grievance file is there for
16 Jim --
17 Q. Okay.
18 A. -- and our labor attorney, Kevin, to look
19 at, and just, you know, go over whatever steps they
20 take at that time.
21 Q. And regarding her complaints against the
22 union, do you know how they resolved?
23 A. That's funny you say that, because it --
24 from her opinion, it's never going to be fixed. So,
25 you know, we just -- what she wants is to go back to

Page 34

1  her job and, you know, Dan to be gone and everybody
2  else that she don't like to be gone and everything
3  will be better.
4  Q. So you don't know if any actual formal
5  proceedings have resolved one way or the other?
6  A. No. No.
7  Q. Have you had occasion to deal with any
8  other grievances that Ms. Billingham may have filed
9  against other employers, other than the State?
10 A. No.
11 Q. Do you know whether she has?
12 A. I do not know that.
13    MS. PAGE: I don't have any additional
14 questions. I'm done.
15    THE WITNESS: You're done?
16    MS. PAGE: Yeah.
17    MR. DOUGHERTY: No questions.
18 (Proceedings recessed at 9:44 a.m.)
19 (Signature waived.)
20          -oOo-
21
22
23
24
25

Page 35

1         REPORTER'S CERTIFICATE
2
3         I, KATHERINE L. NOVAK, RPR,
4  Registered Professional Reporter, and Notary Public
5  in and for the State of Alaska, do hereby certify:
6         That the witness in the foregoing
7  proceedings was duly sworn; that the proceedings
8  were then taken before me at the time and place
9  herein set forth; that the proceedings were reported
10 stenographically by me and later transcribed by
11 computer transcription; that the transcript
12 constitutes a full, true and correct record of said
13 proceedings taken on the date and time indicated
14 therein; and that signature is waived.
15        Further, that I am a disinterested
16 person to said action.
17        IN WITNESS WHEREOF, I have hereunto
18 subscribed my hand and affixed my official seal this
19 15th day of October 2007.
20
21
22
23  Katherine L. Novak, RPR,
    and Notary Public for the
24  State of Alaska.

My Commission Expires 6-10-09

**LETTER OF DISPUTE RESOLUTION**
between the
**STATE OF ALASKA**
and the
**PUBLIC EMPLOYEES LOCAL 71;**
representing the
**LABOR, TRADES AND CRAFTS UNIT**

Re: Elsa Billingham

State Case #03-L-304


EXHIBIT
D. Johnson 9-26-07

It is agreed between the parties that the following constitutes full and final resolution of the above referenced dispute for Elsa Billingham, Equipment Operator Sub-Journey II, with the Department of Transportation and Public Facilities.

1) Ms. Billingham will voluntarily demote to a WG58 Laborer, Sub-Journey I effective June 11, 2003.
2) Ms. Billingham will be placed on a thirty-day (30) suspension commencing Monday, May 12, 2003 and ending June 10, 2003.
3) During the first year as a WG58, Ms. Billingham will not be upgraded to higher level equipment, nor be entitled to training other than WG58 equipment and safety training.
4) If Elsa's performance does not reach a mid-acceptable level or higher after one year as a WG58, she will be dismissed.
5) This will be Ms. Billingham's last chance to change her behavior. One more act of unacceptable behavior will result in dismissal.

This agreement is entered into solely to address the particular circumstances of this situation and shall not establish any practice or precedent between the parties, nor shall it be referred to in any other matters which may arise between the parties except as may be necessary to implement the terms of this resolution.

FOR THE STATE OF ALASKA:

_____
Art Chance
Labor Relations Manager
Department of Administration

17 June 03
Date

FOR PUBLIC EMPLOYEES Local 71

_____
Jim Ashton
Assistant Business Manager
Public Employees, Local 71

June 10/03
Date

Post-it® Fax Note 7671

*Kevin Dougherty*
ATTORNEY AT LAW
2501 Commercial Drive, Suite 140
Anchorage, Alaska 99501
(907) 276-1640



September 21, 2004

Mr. Dale Johnson
Public Employees Local 71
2510 Arctic Blvd.
Anchorage, AK 99503

Dear Dale:

You have asked me to review the dismissal of Laborer Ms. Elsa Billingham on June 28, 2004 by DOT to determine whether the Labor Agreement was complied with.

### I.
### Progressive Discipline Followed

To begin, Ms. Billingham's disciplinary record indicates that she has been suspended on six occasions:

| | |
|---|---|
| August, 2000 | 3 day suspension |
| September, 2000 | 5 day suspension |
| January, 2001 | 10 day suspension |
| February, 2001 | 12 day suspension |
| August, 2002 | 30 day suspension |
| May 12, 2003 | 30 day suspension |

Exh. D, Att. 2
Page 1 of 4

PEU 0132

Such a lengthy record of disciplinary action indicates that this employee has a long history of unacceptable performance including the following:

    A.)    Safety infractions (stop sign incident, glass broken by equipment misuse, failure to follow safety instructions).

    B.)    Failure to follow directions

    C.)    Substandard work performance

    D.)    Intentionally destroying a foreman's document

This record of discipline demonstrates that the Employer has certainly followed the progressive discipline principle of labor relations, and thus would provide the foundations for the dismissal imposed in June, 2004.

## 2.
### Employee Was On Last Chance Agreement

Secondly, as the attached <u>Letter of Dispute Resolution</u> executed in June, 2003 indicates, Ms. Billingham was retained under a "Last Chance Agreement" arising from her May, 2003 disciplinary suspension. Under the terms of that resolution, Elsa was expressly notified that she would be dismissed if 1). her performance did not reach mid-acceptable or higher after one year as a WG 58 or, 2). one more act of unacceptable behavior occurred.

### 3.
### Numerous Instances of Substandard Performance

Unfortunately, there are numerous occasions recorded in the disciplinary file which 1). document unacceptable and low-acceptable evaluations (see the attached June 28, 2004 Performance Evaluation which records 5 months at "unacceptable" and 3 months at "low-acceptable" in her progress reports), and 2). acts of unacceptable behavior (damage to the irrigation lines, vehicle inspection failure concerning brake light, failure to complete work, chain of command conflicts, unauthorized leave complaints and co-worker conflicts).[1] Therefore, the Employer had a strong basis to terminate this employee. It should also be noted that Ms. Billingham's refusal to accept feedback, as noted in the November 18, 2003 memorandum further underscores the Employer's right to terminate.

### 4.
### No disparate Treatment Apparent

Finally, it should be noted that no evidence of disparate treatment against Ms. Billingham arises from this file to indicate discrimination in this dismissal. Other male DOT employees have also been subject to "Last Chance Agreements" following substandard job performance. [See the files on DOT employees John S_____ and

---

[1] Although there seems to be substantial evidence that a mower was improperly operated which differs from Ms. Billingham's information, this incident can be set aside as unsettled given the number of other problems which permit dismissal.

Gerald S_____.] Instead, it appears that the discipline arises from a number of reports of Ms. Billingham's unsatisfactory performance from several sources. Thus the dismissal is based on performance with no evidence of disparate treatment on the basis of sex.

### Conclusion

The Employer had grounds to dismiss this employee based on 1). progressive discipline principles, 2). the last chance agreement and 3). unacceptable work performance documented in numerous ways in the June, 2003 to June, 2004 period. Therefore, I must strongly advise that the grievance be withdrawn.

Sincerely,

Kevin Dougherty
General Counsel for
Public Employees Local 71

Enc.

KD/th
092004.ElsaB





EXHIBIT
3
D. Johnson 9-26-07

**JIM ASHTON**
Business Manager/
Secretary-Treasurer

**ROBERT JOHNSON**
President

**HEADQUARTERS**
2510 Arctic Blvd.
Anchorage, Alaska 99503
FAX (907) 279-7171
(907) 276-7211

2122 Airport Way
Fairbanks, Alaska 99701
FAX (907) 456-1771
(907) 452-5024

710 West 9th Street
Juneau, Alaska 99801
FAX (907) 586-5757
(907) 586-6993

October 11, 2004

Elsa Billingham
PO Box 231625
Anchorage, AK 99523

RE:   Your Grievance
      Union File No. 04-033

Dear Sister Billingham:

After a review of the above-referenced grievance, your personnel file, your Performance Evaluations, your disciplinary record of prior suspensions, meeting with you and a review of investigatory information from DOT staff; it has been determined that your grievance does not have the merit to proceed to Arbitration.

This decision is based on the "Last Chance Agreement" instructions and conditions as reviewed in your file in a number of instances.

Please note that we had our attorney review this matter, and he also advised us to dismiss this grievance.

We appreciate that this may not be answer you desired and truly wish you the best in your future employment.

If you have further questions or concerns, please do not hesitate to call.

Fraternally,

Dale Johnson
Special Representative

Exh. D, Att. 3
Page 1 of 1



PEU 0204

**PUBLIC EMPLOYEES LOCAL 71**


EXHIBIT
4
D. Johnson
9-26-07

**JIM ASHTON**
Business Manager/
Secretary-Treasurer

**ROBERT JOHNSON**
President

**HEADQUARTERS**
2510 Arctic Blvd.
Anchorage, Alaska 99503
FAX (907) 279-7171
(907) 278-7211

2122 Airport Way
Fairbanks, Alaska 99701
FAX (907) 456-1771
(907) 452-5024

710 West 9th Street
Juneau, Alaska 99801
FAX (907) 586-5757
(907) 586-6993

January 10, 2005

Ms. Elsa Billingham
Box 231625
Anchorage, AK  99523

Dear Ms. Billingham:

We would like to respond to your letter by noting that we have answered many of your questions in prior letters (September 21 and December 6, 2004) and in your meetings with our staff. We also add the following:

1. If you would like to discuss your grievance again please contact and schedule a meeting with Jim Aston, Local 71 Business Manager and our attorney. [The Executive Board does not have any jurisdiction to appeal the employer's termination decisions.] Please note, of course, that as we stated earlier, the grievance was closed several months ago based on the strong merits in the employer's favor and it cannot be reopened.

2. Regarding the Hiring Hall, you have already been re-registered on the Hiring Hall list since August, 2004 as the rules apply for terminated employees.

3. Although myself and our attorney Kevin Dougherty found no basis for retaliatory discrimination in your termination, you may contact the Alaska Commission on Human Rights if you desire their review.

Please contact my office if you would like to discuss your grievance again.

Sincerely,

Dale Johnson
Business Representative