Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM, )
  )
  Plaintiff, )
  )
vs. )
  )
STATE OF ALASKA, DEPARTMENT )
OF TRANSPORTATION AND PUBLIC )
FACILITIES, )
  )
  Defendant. )
_____)

Case No. 3:05-cv-0240 (TMB)

**COPY**

DEPOSITION OF WILLIAM (BILLY) MEERS

Pages 1 - 35, inclusive

Wednesday, September 26, 2007, 10:25 a.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

**Exh. E**
**Meers Depostion**

Page 2

```
 1                A-P-P-E-A-R-A-N-C-E-S

 2    For Defendant:

 3    ATTORNEY GENERAL'S OFFICE
      BY:  Brenda B. Page, Esq.
 4    1031 West 4th Avenue, Suite 200
      Anchorage, Alaska, 99501
 5    907/269-5100

 6


 7    For Public Employees Local 71:

 8    ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
      BY:  Kevin B. Dougherty, Esq.
 9    2501 Commercial Drive, Suite 140
      Anchorage, Alaska, 99501
10    907/276-1640

11


12    Reported By:

13    Katherine L. Novak, RPR
      Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 16**

1  the time, who is now no longer with AIA.
2  Q.  And can you, I guess, describe to me what
3  happened at this meeting?
4  A.  I can give you, to the best of my
5  recollection, what happened at the meeting. The
6  synopsis of it is that, with Elsa, they were going
7  to terminate Elsa because of her not following
8  instructions again. And they gave Elsa the
9  termination paper. They passed it to her and said:
10 Because of your actions we no longer need your
11 services.
12     At that time, Jim Ashton asked them to
13 hold on before Elsa accepted the paper. He says --
14 he asked them if he could talk to them. And they
15 said yes. So he asked me to take Elsa outside and
16 talk to Elsa and explain to her what could be
17 happening at this time.
18     So I left the facility that it was in, the
19 office it was in with Elsa, while Jim Ashton
20 discussed a different outcome. He was trying to
21 negotiate a different outcome rather than
22 termination for Elsa Billingham, which he did and
23 I'll get to.
24     At the same time I was out with Elsa
25 Billingham explaining to her that, yes, she's been

**Page 17**

1  terminated, but Jim Ashton is in there trying to
2  negotiate a lesser discipline. At that time I
3  wasn't sure what the discipline would be, which I
4  explained to her.
5      She informed me, I can't -- again, don't
6  remember her exact words, that if she could keep her
7  job, she was happy. To which time, I was asked to
8  come back in with Elsa Billingham. Jim Ashton was
9  done talking to them. We went in and Jim Ashton had
10 negotiated to where Elsa Billingham would not be
11 terminated, but management stated that they wanted
12 in writing a last chance letter of agreement;
13 because of her past incidences out at the airport,
14 she was becoming a liability, not an asset, and they
15 wanted to cover themselves and make sure that Elsa
16 knew the seriousness of this last chance.
17     And in the last chance letter of
18 agreement, Elsa was asked to take a demotion. She
19 would keep her job as a wage grade -- or wage grade
20 58 is what she was demoted to. She would keep her
21 job out at the Anchorage International Airport. She
22 would be on probation for one year. And in that one
23 year's time, she would have periodic evaluations
24 done on her, and they would be conversed with her on
25 how she is performing.

**Page 18**

1  Elsa was asked if that was acceptable.
2  And she was delighted that, yes, she still had her
3  job and she said, yes, thank you. She thanked
4  everybody. She signed the paper. We were done at
5  that time.
6  Q.  I'm going to hand you what we'll mark as
7  Exhibit 2.
8      You can mark that as Exhibit 1.
9      (Exhibits 1 and 2 marked.)
10 BY MS. PAGE:
11 Q.  Take a look at that, Mr. Meers.
12 A.  Okay.
13 Q.  Do you recognize this document?
14 A.  Yes, I do.
15 Q.  Is this the letter of dispute resolution
16 you were just referring to?
17 A.  This is the exact letter of resolution.
18 Q.  Is it your testimony then that at this
19 meeting, that Elsa was present at, she -- the terms
20 of this letter were discussed and she agreed to the
21 terms?
22 A.  Yes.
23 Q.  And you seem to have said she was
24 delighted to --
25 A.  Yes.

**Page 19**

1  Q.  -- have the opportunity to come back to
2  work --
3  A.  Yes, ma'am.
4  Q.  -- under the terms of this agreement?
5  A.  Yes, ma'am. She thanked Jim Ashton for
6  keeping her job; she thanked me, because I was
7  involved with it; and she also thanked management
8  for giving her the chance to keep her employment
9  there.
10 Q.  Now, have you dealt with other situations
11 in which the union has negotiated a letter of
12 dispute resolution?
13 A.  Yes.
14 Q.  And without breaching any kind of
15 confidentiality, I don't know if you have concerns
16 with that, but can you tell me how many other
17 situations and whether they're male or female; just
18 give me some details.
19 A.  Right off the top of my head -- actually,
20 not right off the top of my head. I know for a fact
21 three.
22 Q.  Of three; okay. And that's during your
23 time --
24 A.  That is during my time that I negotiated
25 myself. And one was male, two female.

**Page 20**

1  Q. And who was the employer with those?
2  A. State of Alaska.
3  Q. Were they out at the airport or different
4  places?
5  A. And actually, coincidence, they all three
6  were at the same facility. They worked at the
7  Palmer Pioneer Home, and the Department of Health
8  and Social Services.
9  Q. And in your mind, what is a letter of
10 dispute resolution, in terms of the contract?
11 A. In my mind, letter of dispute resolution
12 is something that management has a tool to use to
13 make sure that, you know, somebody realizes the
14 seriousness of their actions and that they will not
15 be tolerated anymore if it's a last chance letter of
16 agreement.
17     Another way of looking at a letter of
18 resolution is also if a dispute has arisen and we
19 negotiate an outcome of it -- whether it be for the
20 betterment of the member and the union, or for the
21 betterment of management, or for both -- that it is
22 agreed upon that that is the best outcome for it and
23 to where it doesn't go into a letter of agreement,
24 to where some article in the contract would be --
25 what's the word I'm looking for? -- would be

**Page 21**

1  addressed but not changed in the contract.
2      Letter of resolution also is a tool for
3  the union to at times refer back to, in situations
4  to where it's a last chance letter of agreement, to
5  where we can say we worked one before, can we do it
6  again.
7  Q. I guess, is it fair to say in your mind,
8  this is -- basically, what it says is, a resolution
9  of a dispute that's negotiated between the union and
10 the employer?
11 A. Yes, ma'am.
12 Q. Now, in entering into this last chance
13 agreement, did the employer comply with all the
14 terms of the collective bargaining agreement?
15 A. I believe so. In my mind, I believe that
16 they did not violate any article of the contract.
17 As a matter of fact, we have for years had a very
18 good rapport and working relationship with the
19 Anchorage International Airport management.
20 Q. So would you conclude that there was no
21 bad faith on the part of airfield management in
22 entering into this letter of dispute resolution?
23 A. Oh, no. As a matter of fact, I believe --
24 I feel that it was just the opposite. They were
25 giving somebody a chance that probably didn't

**Page 22**

1  deserve another chance.
2  Q. And that's Elsa Billingham that you're
3  referring to?
4  A. Yes, ma'am.
5  Q. So you would view this as an additional
6  opportunity given by airfield maintenance, that they
7  didn't need to give, for Ms. Billingham to have
8  another chance at employment?
9  A. Yes. As earlier stated, I mean, they had
10 the opportunity to terminate her, to whereas her
11 only other option would have been to file a
12 grievance, to where it basically would have come
13 back as non-meritorious.
14 Q. That was your conclusion at the time?
15 A. Yes, ma'am.
16 Q. So was it your conclusion at the time that
17 had Ms. Billingham been terminated in -- was this
18 meeting in May of 2003?
19 A. I believe it was. The best of my
20 recollection at this time.
21 Q. Okay. So had Ms. Billingham been
22 terminated when she was handed that termination
23 letter at this meeting, in which ended up with a
24 letter of dispute resolution, it's your opinion that
25 there would have been good cause to terminate her at

**Page 23**

1  that point in time?
2  A. I believe so.
3  Q. And is it your opinion that a termination
4  at that time would not only have been for good
5  cause, but would not have been discriminatory?
6  A. In my opinion, my opinion only, yes.
7  Q. Were you aware of any evidence of
8  discrimination?
9  A. No, none whatsoever.
10 Q. And is it your opinion that a termination
11 at that time, and we're talking mid-2003, would not
12 have been retaliatory towards Ms. Billingham?
13 A. No. I do not believe so.
14 Q. So you do not believe it would have been
15 retaliatory?
16 A. It would not have been retaliatory.
17 Q. Were you aware of any evidence that it
18 would have been retaliatory?
19 A. I'm not aware of any evidence that she was
20 retaliated against in any way.
21 Q. So is it also fair to say that, at that
22 time that the State entered into this letter of
23 dispute resolution, that you believe that entering
24 into the letter itself was neither discriminatory
25 nor retaliatory?

Page 24

1  A. No, ma'am, it was not.
2  Q. My understanding is that Ms. Billingham
3  has alleged that she was coerced into agreeing to
4  this letter of dispute resolution. Now, you were
5  there during the meeting. What's your response to
6  that?
7  A. My response is that that is untrue.
8  Ms. Billingham was not coerced in any way to sign
9  that letter of agreement. It was upon her decision
10 to either sign it or not. Nobody forced her. She
11 was not coerced. She was not under duress to sign
12 it. Her options were to accept the letter, which
13 she did, or be terminated. And she took the letter
14 of resolution.
15 Q. Well, do you consider just having a choice
16 of accepting a letter or being terminated, in your
17 opinion, is that in and of itself coercion?
18 A. No, I do not.
19 Q. Why don't you consider that to be
20 coercion?
21 A. Well, because if you were going to be
22 terminated in the first place -- or if the
23 initial -- initial meeting was for the intent of
24 terminating an employee, but a resolution came out
25 that was for the betterment of the employee, I don't

Page 25

1  feel that that is coercion. I feel that that is the
2  betterment for the member themselves, because then
3  they do have an option.
4  Q. So you felt that this was a good solution
5  for Ms. Billingham?
6  A. Yes, I do.
7  Q. And to go back to what you said earlier,
8  my understanding is that had she been terminated
9  then and filed a grievance regarding her
10 termination, it's your belief that the union would
11 have found that her grievance was not meritorious;
12 is that correct?
13 A. Yes, ma'am, based on all the past
14 incidences.
15 Q. Now, after Ms. Billingham agreed to the
16 terms of the letter of dispute resolution, did you
17 have further involvement with her while she was
18 still working at airfield maintenance?
19 A. I don't believe that I had contact with
20 her or I had any more involvement with any actions
21 that she was involved with.
22 Q. Was there any particular reason for
23 that?
24 A. No reason, other than like I stated
25 earlier also, that when somebody comes in, if a

Page 26

1  business representative is available and another one
2  is not, because they do not have the choice of
3  representation, that they will talk to whoever is
4  there and that individual -- or that representative
5  will handle the individual's concerns at that
6  time.
7  Q. Were you aware at any point if
8  Ms. Billingham was starting to object to the terms
9  of the letter of dispute resolution?
10 A. Are you referring to in the meeting?
11 Q. Well, did she object to the terms during
12 the meeting?
13 A. No. No. And I was not -- she did not
14 object to this letter at all of the resolution. And
15 I am not aware of any time after that her not
16 agreeing to any part of this resolution.
17 Q. So you then -- ultimately Ms. Billingham
18 was terminated from airfield maintenance; is that
19 right?
20 A. Yes.
21 Q. But you were not involved in any
22 grievances or anything to do with that?
23 A. No.
24 Q. Have you been involved in any grievances
25 that she may have filed with the Municipality?

Page 27

1  A. I was not involved with, but one was
2  brought to my attention.
3  Q. And which one was that?
4  A. Elsa Billingham, again, unfortunately,
5  Ms. Billingham was terminated from employment with
6  the Municipality of Anchorage. And that one, I also
7  did not handle that termination. That was handled
8  by another business representative. But that is one
9  of my duty station areas, and I deal with the
10 supervisors that did terminate her.
11    And in one of the meetings for another
12 individual there, another Local 71 member, it was
13 brought up that Elsa Billingham had filed a
14 discriminatory case with the EEOC against the
15 Municipality of Anchorage, parks and recreation,
16 horticulture.
17    And they asked if we, because they knew
18 that she had a -- I don't know how, that she had a
19 case against the State of Alaska pending, and they
20 asked if we were involved with the one with the MOA.
21 And I informed them, no, we're not, we didn't hear
22 nothing of it.
23    And they informed me at that time that one
24 of them, Dave Zaloudek is his name, he was called
25 down to the City Hall at the time, and he was told