Case 3:05-cv-00240-TMB   Document 87-13   Filed 11/06/2007   Page 1 of 13

Tracy Newbill
September 26, 2007

Billingham v. State of Alaska
Case No. 3:05-cv-0240 (TMB)

Page 1

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,               )
                               )
        Plaintiff,             )
                               )
    vs.                        )
                               )
STATE OF ALASKA, DEPARTMENT    )
OF TRANSPORTATION AND PUBLIC   )
FACILITIES,                    )
                               )
        Defendant.             )
_____)
Case No. 3:05-cv-0240 (TMB)

**COPY**

DEPOSITION OF TRACY NEWBILL

Pages 1 - 36, inclusive

Wednesday, September 26, 2007, 1:07 p.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

Exh. F
Newbill Deposition

Page 2

```
 1                A-P-P-E-A-R-A-N-C-E-S

 2    For Defendant:

 3    ATTORNEY GENERAL'S OFFICE
      BY:  Brenda B. Page, Esq.
 4    1031 West 4th Avenue, Suite 200
      Anchorage, Alaska, 99501
 5    907/269-5100

 6


 7    For Public Employees Local 71:

 8    ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
      BY:  Kevin B. Dougherty, Esq.
 9    2501 Commercial Drive, Suite 140
      Anchorage, Alaska, 99501
10    907/276-1640

11


12    Reported By:

13    Katherine L. Novak, RPR
      Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

IN THE DISTRICT COURT FOR THE UNITED STATES

FOR THE DISTRICT OF ALASKA

ELSA BILLINGHAM,                )
                                )
        Plaintiff,              )
                                )
    vs.                         )
                                )
STATE OF ALASKA, DEPARTMENT     )
OF TRANSPORTATION AND PUBLIC    )
FACILITIES,                     )
                                )
        Defendant.              )
_____)
Case No. 3:05-cv-0240 (TMB)

**COPY**

DEPOSITION OF TRACY NEWBILL

Pages 1 - 36, inclusive

Wednesday, September 26, 2007, 1:07 p.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at the
Attorney General's Office
1031 West 4th Avenue, Suite 200
Anchorage, Alaska

Page 2

```
 1                A-P-P-E-A-R-A-N-C-E-S

 2     For Defendant:

 3     ATTORNEY GENERAL'S OFFICE
       BY:  Brenda B. Page, Esq.
 4     1031 West 4th Avenue, Suite 200
       Anchorage, Alaska, 99501
 5     907/269-5100

 6

 7     For Public Employees Local 71:

 8     ALASKA STATE DISTRICT COUNCIL OF LABORERS AFL-CIO
       BY:  Kevin B. Dougherty, Esq.
 9     2501 Commercial Drive, Suite 140
       Anchorage, Alaska, 99501
10     907/276-1640

11

12     Reported By:

13     Katherine L. Novak, RPR
       Registered Professional Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1  ANCHORAGE, ALASKA; WEDNESDAY, SEPTEMBER 26, 2007
2                    1:07 P.M.
3                       -oOo-
4                   TRACY NEWBILL,
5       called as a witness herein, having
6       been first duly sworn upon oath, was
7       examined and testified as follows:
8                   EXAMINATION
9  BY MS. PAGE:
10     Q.  This is the deposition of Tracy Newbill,
11  in the case styled Elsa Billingham versus State of
12  Alaska, Department of Transportation and Public
13  Facilities, 3:05-cv-0240, which currently is pending
14  in the United States District Court for the District
15  of Alaska.
16          This deposition is taken by notice and
17  agreement of the parties pursuant to the Federal
18  Rules of Civil Procedure. It will be used for
19  discovery, cross-examination, and all other purposes
20  permitted by law.
21          Ms. Newbill, could you state your full
22  name for the record, please?
23     A.  Tracy Lynn Vanderbilt Newbill.
24     Q.  Have you ever been known by any other
25  name?

Page 5

1      A.  Just Tracy Vanderbilt. That's it.
2      Q.  Is that your maiden name?
3      A.  Yes.
4      Q.  When did you become Newbill?
5      A.  '91.
6      Q.  And as you know, my name is Brenda Page.
7   I represent the State of Alaska, Department of
8   Transportation and Public Facilities in this
9   lawsuit.
10          We also have Kevin Dougherty in the room
11  with us.
12          MR. DOUGHERTY: Representing Public
13  Employees Local 71.
14  BY MS. PAGE:
15     Q.  I'm going to go through a few introductory
16  matters just about depositions.
17          Have you ever had your deposition taken
18  before?
19     A.  Yes, ma'am.
20     Q.  When was that?
21     A.  It was with Don, back when Dennis Beegan
22  was suing us or DOT, one or the other.
23     Q.  So you have it taken once?
24     A.  Yeah.
25     Q.  Some time ago?

Page 6

1      A.  Yeah. It has to be at least two or three
2   years ago.
3      Q.  But you're familiar with how depositions
4   run then?
5      A.  Yes, ma'am.
6      Q.  I don't anticipate this will be a very
7   long deposition, but if you need to take a break,
8   though, at any time, just let me know.
9      A.  Okay.
10     Q.  If you don't understand one of my
11  questions, please ask me to repeat it and I will
12  rephrase the question; otherwise, I'll assume that
13  you understood the question and that your answer is
14  responsive.
15     A.  Okay.
16     Q.  We would like to get an accurate written
17  transcript, so please answer it with verbal answers
18  as opposed to shaking your head yes or no, or saying
19  uh-huh or huh-uh.
20          And also, try not to let me interrupt you
21  and try not to interrupt me. Let me get to the end
22  of my question before you answer, and that way we'll
23  have a nice, good transcript.
24     A.  Okay.
25     Q.  Your testimony is given under oath. Even

Page 7

1   though we're in an informal setting, your testimony
2   has the same force and effect as if given in a court
3   of law.
4           Can you think of any reason why you cannot
5   answer the questions I'm going to ask you
6   completely, accurately, and truthfully?
7      A.  No.
8      Q.  And are you taking any kind of medication
9   today that might affect your testimony?
10     A.  No.
11     Q.  I'm going to start just with some general
12  questions about your employment with the union.
13          What's your current position?
14     A.  Executive assistant, newspaper editor,
15  website manager, girl Friday. Oh, and dispatcher.
16  Sorry.
17     Q.  And dispatcher; okay.
18          And I said with the union. What union is
19  it that you're employed with?
20     A.  Public Employees Local 71.
21     Q.  And how long have you been employed there,
22  Tracy?
23     A.  Seven years.
24     Q.  Have you been in various positions during
25  your employment there?

### Page 8

1     A.  I started as an assistant to the trust
2 office for medical insurance, and in 2001 I became
3 an executive assistant.
4     Q.  So you've been in that same position ever
5 since 2001?
6     A.  Yes, ma'am.
7     Q.  Have your duties changed over that time?
8     A.  Frequently, usually just additions to my
9 position. Not anything where I've given anything
10 up. It's always been more things added to.
11     Q.  Prior to working for the union, did you
12 have other employment?
13     A.  Yeah.
14     Q.  What was that?
15     A.  I worked at Alaska USA Federal Credit
16 Union, Wal-Mart, Pizza Hut.
17     Q.  None of them were related to union
18 employment, though, in any way?
19     A.  No.
20     Q.  And what employees is it that Local 71
21 represents?
22     A.  State of Alaska, labor, trades and crafts,
23 Municipality of Anchorage, parks and rec positions,
24 the Anchorage School District custodians, and Haines
25 Borough employees.

### Page 9

1     Q.  And your duties as a dispatcher, do you
2 deal with all of those employers?
3     A.  I deal with all but Haines Borough.
4     Q.  Do you know the plaintiff in this case,
5 Elsa Billingham?
6     A.  I do through my job, yes.
7     Q.  And when did you first come into contact
8 with Ms. Billingham?
9     A.  Probably in 2001 when I started doing
10 dispatching. And because, you know, I do a lot of
11 the records keeping and filing, so...
12     Q.  I want to talk to you a little bit about
13 dispatch.
14     A.  Okay.
15     Q.  And I'm going to hand you what we'll mark
16 as Exhibit 1.
17     (Exhibit 1 marked.)
18 BY MS. PAGE:
19     Q.  Ms. Newbill, I'll represent to you that
20 this is some documents that were provided to us in
21 the course of our litigation with Ms. Billingham, by
22 Ms. Billingham. And it says at the top, Member's
23 Dispatch History.
24     Does this document look familiar to you?
25     A.  No, it does not.

### Page 10

1     Q.  And is this actually a dispatch from
2 Local 71, or is this from another union?
3     A.  I would have to guess that it's from
4 another union, because none of these are positions
5 we represent.
6     Q.  Do you have any kind of similar dispatch
7 printouts from Local 71?
8     A.  I wouldn't say so much a dispatch
9 printout. We do have EEOC records from the State
10 that we fill out, basically letting them know who
11 all we've dispatched, as far as their
12 classifications. But we have records of each and
13 every job call that we do.
14     Q.  And how are those records kept?
15     A.  They're kept by year and by department.
16     Q.  So on those records -- let me ask you
17 this. When someone is dispatched for a position,
18 how does it work? How does the process work? What
19 do you do, and then what happens -- what options
20 does the employer on the other end have?
21     A.  Okay. Well, basically, when someone comes
22 in for positions that they're interested in, they
23 sign up on our out-of-work list. We go strictly by
24 seniority; because we're public employees we can't
25 do the A, B, C, and D list that a lot of the other

### Page 11

1 laborer's halls can do. We have to go based
2 strictly by sign-up date.
3     They pay a monthly fee. Basically, what
4 that does is it keeps them on the list in the order
5 of their sign-up. And once we get positions
6 available in the areas that they've listed as being
7 interested in, we call them based on that sign-up
8 date, and then we talk to them, find out their
9 qualifications, if they're actually qualified or
10 interested in the position, and then we refer them
11 out. Up until recently, it's been two per position.
12 Now it's at three per position.
13     Q.  So it used to be two, so you would decide
14 the two that were going to get referred out, or the
15 three?
16     A.  Right.
17     Q.  And then does the employer or the employer
18 entity have an option at that point to say "I don't
19 want you to send that particular person"?
20     A.  Once they have had either previous
21 interview experience or previous employment
22 experience with an applicant, they are able to let
23 us know whether or not that person is either
24 qualified for a specific position or just not able
25 to be hired at their facility based on prior work

Page 12

1  history.
2  Q. And do you have a name for that? Is it
3  like a do-not-rehire list, or anything like that?
4  A. Basically, that's what it is. Do not
5  refer, do not -- well, theirs is, do not hire; ours
6  is do not refer.
7  Q. And is there any kind of certain criteria
8  that they have to meet, or can they just tell you on
9  any basis whatsoever that we don't want you to refer
10 this person to us?
11 A. Basically, it's up to the employer to tell
12 us that they don't want them referred. They do not
13 have to come up with specific reasons. They do have
14 to send it in writing. And it can be fax, e-mail,
15 or written letter letting us know that.
16 Q. So let me ask you this. As far as you
17 know, under the collective bargaining agreement that
18 you have with the State, is there anything on the
19 collective bargaining agreement that sets out any
20 kind of specific requirements for the employer to
21 say "don't refer somebody"?
22 A. I don't -- well, I know for sure it's not
23 in our collective bargaining agreement. However,
24 they do have their own standards, as far as placing
25 jobs with their HR people in Juneau, as to what

Page 13

1  requirements they have to meet in-house firstly.
2  And then they send to their HR people in Juneau the
3  people that are not eligible for rehire, and then
4  the people in Juneau basically decide whether it's
5  for a specific position or if it's for the state
6  altogether.
7  Q. Okay. So --
8  A. And I have examples of those with me.
9  Q. Okay. Great.
10     Do you know if there are actual personnel
11 rules that allow the State to request that someone
12 be not referred based on previous performance
13 issues?
14 A. Definitely based on previous performance
15 issues, I would have to say yes. I haven't seen
16 them, but I would have to say yes, just based on the
17 fact that a lot of the ones that come through to me
18 as not eligible for rehire statewide are generally
19 the same type of incidents. Usually safety, or just
20 blatant performance issues.
21 Q. And can you give me any kind of estimate
22 as to how often you get these kind of do-not-refer
23 requests?
24 A. I don't get them very often. Generally,
25 it's someone who -- statewide, generally they're

Page 14

1  going to be people who have theft issues, blatant
2  disregard for authority. People who, I mean, have
3  repeatedly showed over and over again that they, you
4  know, just don't work well with others, or don't,
5  you know, accept authority very well.
6  Q. Do you ever question the validity of a
7  do-not-refer?
8  A. I have. I have previously, only because
9  I've known that a person had not been referred
10 previously. I've known that a person based on, you
11 know, just talking with, you know, other people that
12 they've worked for have had pleasant working
13 experiences with them. And generally, in those
14 cases, the information has been received by an
15 outside employer and not through the State, so...
16 Q. Let me ask you -- go back to
17 Ms. Billingham again.
18     You indicated that you first came into
19 contact with her fairly early on in your employment.
20 In about 2001; is that what you said?
21 A. Yes.
22 Q. And what kind of communications did you
23 have with her at that point?
24 A. At that point she was currently working,
25 so everything that I dealt with was grievances that

Page 15

1  she brought to the union through different business
2  representatives. I was the one that types up their
3  letters, sends them out to both the member and the
4  employer, so that would have been my experience at
5  that time.
6  Q. And did you ever have any other, I mean,
7  real dealings with her during her employment, other
8  than just basically typing up grievances, that kind
9  of thing?
10 A. Just, I mean, because she would bring in
11 documents that she would want copied and stamped and
12 make sure that certain reps would get it.
13 Q. That was pretty much the extent of your
14 contact with her?
15 A. Yes.
16 Q. Did you have any involvement in the
17 termination proceedings when Ms. Billingham was
18 terminated?
19 A. Other than just the letters and filing and
20 recordkeeping, no.
21 Q. Now, after Ms. Billingham was terminated
22 from airfield maintenance, were you aware that she
23 was then hired into another temporary position at
24 the Department of Transportation and Public
25 Facilities?

Page 16

1  A. Yes. I referred her to that position.
2  Q. Just tell me what you know about that.
3  A. That position was an engineering tech
4  position with the Department of Transportation. It
5  was, I believe, with facilities maintenance. And it
6  so happens that the foreman of airfield maintenance
7  saw her riding around on a State vehicle and called
8  in to personnel to find out what was going on with
9  that. And it was at that time that I was informed
10 that she was not eligible for rehire with Department
11 of Transportation.
12 Q. And who was that foreman that called in?
13 A. Dan Hartman.
14 Q. Did he talk to you directly?
15 A. He talked with Charlotte Withers-Mushat
16 and she called me.
17 Q. And who is Charlotte Withers-Mushat?
18 A. She is the head of personnel with the
19 Department of Transportation. And apparently they
20 had not gotten the final approval on her hire before
21 she started working.
22 Q. So normally, once -- once
23 Ms. Billingham -- you said, you know, she had been
24 terminated and you said Charlotte had called you and
25 said that she shouldn't be rehired, was there

Page 17

1  something Charlotte should have done in the meantime
2  to inform you of that?
3  A. Generally, we like for them to send us
4  something that says that "this person is not
5  eligible for rehire." That hadn't been done, so
6  that's why she was referred.
7  Q. She was referred?
8  A. Yeah.
9  Q. And after that, did Charlotte send you
10 something in writing?
11 A. Yes. She sent me an e-mail on that.
12 Q. And I'm going to have this marked as
13 Exhibit 2.
14 A. E-mail on 8/30 of '04?
15 Q. Look at this one.
16 A. Yep, that's the one.
17 (Exhibit 2 marked.)
18 BY MS. PAGE:
19 Q. So you recognize this document?
20 A. Yes, I do.
21 Q. And is this the e-mail that you were
22 referring to before, that Charlotte Withers-Mushat
23 sent to you?
24 A. Yes.
25 Q. Okay. And this appears to be directed to

Page 18

1  you, and then it's also cc'd to Dan Hartman, Doug
2  Hunter, and Alice Parker, correct?
3  A. Yes. And I believe it was because Doug
4  was the one -- no, Doug actually was working with
5  Dan at that moment, because Doug eventually moved
6  over to facilities maintenance.
7  Q. So once you learned that Ms. Billingham
8  was supposed to be on the sort of do-not-rehire
9  list, what happened with her temporary position?
10 A. Well, basically her hire was never
11 actually approved before they started her, so they
12 just did not approve her hire, and she was basically
13 removed from the position prior to supposedly
14 working for it.
15 Q. Did you have involvement in that process
16 at all?
17 A. I referred her for the dispatch, yes.
18 Q. But in sort of unreferring her?
19 A. Well, at that point I could not unrefer
20 her. But with them rejecting the applicant and
21 based on the fact they had not completed the hiring
22 process, I just referred an applicant in her place.
23 Basically, the supervisor who hired her
24 kind of jumped in with both feet before, you know,
25 getting the approval on it, so...

Page 19

1  Q. And who was that?
2  A. I'm not a hundred percent sure.
3  Q. Could it have been Joe Owens?
4  A. It could have been, yeah. Because he
5  would have been part of the engineering techs at the
6  time.
7  Q. Now, have you received other similar
8  written requests, such as the one in Exhibit 2, from
9  Charlotte Withers-Mushat requesting that you remove
10 other employees from consideration?
11 A. Yes.
12 MS. PAGE: Why don't we mark this one as
13 Exhibit 3.
14 (Exhibit 3 marked.)
15 MS. PAGE: And we'll mark this one as
16 Exhibit 4.
17 (Exhibit 4 marked.)
18 BY MS. PAGE:
19 Q. I've just handed you Exhibit 3 and
20 Exhibit 4. Do you recognize these documents?
21 A. I definitely recognize Exhibit 3.
22 Exhibit 4, more than likely, but I'm not a hundred
23 percent sure on who that would be. Exhibit 3 I know
24 who it is.
25 Q. And these have had the actual names

### Page 20

1  redacted with just the initials left.
2   A.  Yeah.
3   Q.  But these are addressed to you, correct?
4   A.  Correct.
5   Q.  And they come from Charlotte Mushat,
6  correct?
7   A.  Uh-huh. Correct.
8   Q.  And these are both requesting removal of
9  individuals from consideration for DOT/PF vacant
10 positions. It also says DOT/PF LTC. What does that
11 stand for?
12  A.  Labor, trades and crafts. Those are any
13 of our positions.
14  Q.  Okay. You talked before a little bit
15 about the sort of the scope of positions that
16 someone can ask that someone be removed from
17 consideration of.
18      Can Ms. Mushat request that someone be
19 removed from consideration for all DOT/PF labor,
20 trades and crafts positions?
21  A.  She can, yes. Because she would be in
22 charge of the hiring approval for all labor, trades
23 and crafts positions with Department of
24 Transportation, at least here in Anchorage.
25  Q.  And you said on Exhibit 3 that you knew

### Page 21

1  who this individual was.
2   A.  Yes.
3   Q.  And you maybe weren't sure on Exhibit 4.
4  This does refer to both of these individuals as
5  males, though, in here. Rehiring him and rehiring
6  his, or his past employment performance.
7      I guess, to the best of your recollection,
8  did these letters refer to male employees?
9   A.  Giving the likelihood that they're
10 probably male, considering where they would be
11 working, I would probably say yes. The third one is
12 definitely yes.
13  Q.  Definitely yes. And you're not really
14 sure on the fourth.
15     Certainly, I guess, would it be fair to
16 say that you have received letters from Charlotte
17 Mushat --
18  A.  Definitely.
19  Q.  -- requesting that males -- let me finish
20 the question.
21  A.  Sorry.
22  Q.  -- requesting that males be removed from
23 consideration for DOT/PF --
24  A.  Yes, ma'am.
25  Q.  -- jobs.

### Page 22

1      And I'm going to hand you what we'll mark
2  as Exhibit 5.
3      (Exhibit 5 marked.)
4  BY MS. PAGE:
5   Q.  Do you recognize that document?
6   A.  Yes, I do.
7   Q.  Now, this one actually appears to be sent
8  to Jim Ashton as opposed to you, but is this
9  something you would have reviewed?
10  A.  Yes, it is. He would have received it and
11 then he would have passed it on to me, to add with
12 our files.
13  Q.  And again, the name has been redacted
14 here. But do you know if this was a male
15 employee?
16  A.  I believe that was definitely a male
17 employee.
18  Q.  And the dates of these letters range from
19 2003 to 2005, in Exhibit 3, 4, and 5, correct?
20  A.  2003, 2005, 2003. Yes.
21  Q.  And the request that Ms. Mushat sent you
22 regarding Elsa Billingham was on August 30th, 2004,
23 correct?
24  A.  Yes.
25  Q.  So you would have gotten similar requests

### Page 23

1  both before the request that you got regarding
2  Ms. Billingham and after the request regarding
3  Ms. Billingham; is that right?
4   A.  Yes.
5   Q.  When you got the request from Charlotte --
6  and her name was Withers-Mushat at that period; is
7  that right?
8   A.  Yes.
9   Q.  Is her name now Charlotte Mushat?
10  A.  Yes. She's dropped the hyphen.
11  Q.  When you got the request from Charlotte
12 Mushat to remove Ms. Billingham's name from the
13 referral list, did you have occasion after that to
14 ever refer her for any other State employment?
15  A.  Yes, I have.
16  Q.  And when was that?
17  A.  Several different times I've referred her
18 for Department of Natural Resources. She is
19 currently referred out to Department of Military and
20 Veteran Affairs out at Kulis Air National Guard
21 Base, and --
22  Q.  When you say she's currently referred out
23 there, what do you mean?
24  A.  Meaning I have a job call for a laborer's
25 position with them. She is one of three applicants

Page 24

1  currently referred.
2    Q.  Has she been interviewed yet; do you
3  know?
4    A.  I don't know at this point.
5    Q.  Now, going back to the just general
6  do-not-rehire list.  Is there any kind of end time
7  on that, or can that last indefinitely?
8    A.  Usually that lasts indefinitely or until
9  such time as they personally send me something that
10 says, you know, we are lifting it.  I've had that
11 happen previously.
12   Q.  And is it your understanding that the
13 request that Ms. Billingham not be rehired for the
14 DOT positions is still in force?
15   A.  It is in effect, yes.
16   Q.  But that request does not extend to other
17 state of Alaska positions; is that correct?
18   A.  That is correct.  And I have that actually
19 in writing from the HR in Juneau.
20   Q.  From HR in Juneau?
21   A.  Yes.
22   Q.  Do you have a copy of that with you
23 today?
24   A.  I do.
25   Q.  Okay.  And this is fairly recent then.

Page 25

1    A.  That was actually prior to me sending her
2  out for the Department of Military and Veterans
3  Affairs position.
4    Q.  So basically you checked to see what the
5  status was with other State of Alaska positions?
6    A.  I did.
7    Q.  Okay.
8    A.  It's basically kind of against -- at least
9  my policy, to continue to have people on my list
10 that I'm not able to refer.  At least not without
11 letting them know that it's more than likely I won't
12 be able to find them a position.
13   Q.  You do refer people out to other employers
14 other than the State of Alaska, correct?
15   A.  Correct.
16   Q.  What's Ms. Billingham's status with those
17 employers; do you know?
18   A.  With the Municipality of Anchorage, she is
19 not re-hirable.  And with the Anchorage School
20 District, she's not on the list to be called for
21 those, because she's not expressed interest in
22 custodial positions.
23   Q.  But as far as you know, she's not on any
24 kind of do-not-rehire list for the school
25 district?

Page 26

1    A.  Correct.
2    Q.  And do you have any personal knowledge as
3  to why she is on the do-not-rehire list for the
4  Municipality of Anchorage?
5    A.  Basically, not able to follow
6  instruction.
7    Q.  Was she terminated from a position
8  there?
9    A.  Two.
10   Q.  Two?  Okay.
11   A.  At the same time.
12   Q.  She was fired from two at the same time?
13   A.  (Nods head.)
14   Q.  How does that work?
15   A.  She was going into one season and coming
16 out of another one.  They have seasonal employment
17 out there, which is what she started out as.  And
18 she was coming off one and had an accident, and I
19 believe had another accident right behind it.  I've
20 got those grievances too.
21   Q.  Well, and when was her employment at the
22 Municipality?  Was it after her employment with the
23 State?
24   A.  Yes.
25   Q.  So who was it at the Municipality that

Page 27

1  informed you that they did not want to have
2  Ms. Billingham be referred for other positions
3  there?
4    A.  It was David -- I believe David -- hold
5  on.
6        Oh, Will Askren in employee relations.
7    Q.  What's his name?
8    A.  Will Askren.  I don't believe he works
9  there anymore, but he was in employee relations at
10 that point.
11   Q.  And you have some documents in front of
12 you today.  What are these documents that you're
13 referring to?
14   A.  I have all of her grievance files.  I have
15 the last time she actually brought charges against
16 us regarding her status on the employment referral
17 program, and there was a mediator involved and the
18 decision on that.
19       And then I have various letters from the
20 State regarding different persons who have been
21 asked not to be referred, basically, so that I have
22 a generalization of -- it's not uncommon for me to
23 get those requests.
24   Q.  Now, during the course of this litigation,
25 we requested -- we sent a document request to you

**Page 28**

1  basically requesting any documents that you had
2  related to Ms. Billingham and her grievance
3  procedures, and we had an authorization from her for
4  release of those records.
5      A.  Correct.
6      Q.  And you did provide me with --
7      A.  All of it.
8      Q.  -- all of it.  So everything that you have
9  in front of you today and that you're referring to
10 you have already provided to me; is that right?
11     A.  I believe everything except for the e-mail
12 from Shannon Conger regarding her not being on the
13 do-not-rehire list statewide.  Other than that, you
14 should have everything else.
15     Q.  Is that an original that you have there
16 today?
17     A.  I just printed it today.
18     Q.  Could we use that and make that as an
19 exhibit?
20     A.  Absolutely.
21     Q.  Why don't we do that.  So this document,
22 which we'll have marked as Exhibit 6, then, is the
23 only document that you have not provided to us, and
24 we in turn provided those documents to
25 Ms. Billingham.

**Page 29**

1      (Exhibit 6 marked.)
2  BY MS. PAGE:
3      Q.  And you referred earlier, you said you had
4  some letters that you had gotten from the State with
5  other individuals requesting that they not be
6  referred.
7          Are those any different from the letters
8  that I have showed you, are they the same kind of
9  thing?
10     A.  They're basically the same type of thing.
11 They just come from Juneau rather than from
12 personnel here in Anchorage.
13         So more than -- they are statewide
14 rejections rather than department.
15     Q.  Okay.  And you get both of those; is that
16 right?
17     A.  I do.
18     Q.  Now, you had just mentioned too that
19 Ms. Billingham brought some sort of grievance
20 against the union regarding her dispatch status --
21     A.  Correct.
22     Q.  -- is that correct?
23         What exactly was her allegation?  What was
24 she complaining about?
25     A.  Basically, she believed that we were in, I

**Page 30**

1  think I want to use the word collusion, with the
2  State in preventing her from obtaining employment.
3      Q.  So was she alleging that you and the State
4  were blacklisting her, so to speak?
5      A.  Exactly.
6      Q.  And did she file any kind of formal unfair
7  labor practice complaint about that, or what did she
8  do?
9      A.  I have the documents.  I don't want to say
10 without looking.
11         Basically, it was discrimination.
12     Q.  Was it an EEOC complaint?
13     A.  Yes.
14     Q.  And were you involved in the processing or
15 resolution of that complaint?
16     A.  Yes.
17     Q.  What was your involvement?
18     A.  The resolution that they were wanting to
19 come up with was that we give her an additional two
20 years on our employment referral program.
21 Basically, we have a five-year cap for our
22 membership.  Nobody has a date later than five
23 years, but they progress based on the order that
24 they signed up.  Obviously, the earlier your date,
25 the more often you'll get called for positions.

**Page 31**

1          With this, they were moving her date,
2  which would normally have been the first day of her
3  unemployment after termination.  They moved it up
4  two years in order to give her an advantage on the
5  list.
6      Q.  So this was a resolution through mediation
7  involving the EEOC; is that what it was?
8      A.  Correct.
9      Q.  And then since that resolution, you know,
10 you mentioned a couple of State of Alaska jobs that
11 she was referred to.
12     A.  Uh-huh.
13     Q.  Well, actually, let me ask you this.  Was
14 that resolution prior to her going to work at the
15 Municipality?
16     A.  Yes.
17     Q.  So that was taken care of, she then went
18 to work at the Municipality.  She was terminated
19 from positions there.
20     A.  Correct.
21     Q.  And they requested that she not be
22 referred to them anymore.
23     A.  Correct.
24     Q.  And you had had a request from DOT that
25 she not be referred to them anymore.

Page 32

1   A. Correct.
2   Q. She didn't want the Anchorage School
3   District custodian positions, correct?
4   A. Well, she didn't list that as one of her
5   options. Each applicant gets three options of
6   categories that they would like to be called out on,
7   and that was not one of her categories.
8   Q. So is the only thing, the only possible
9   area that she could be dispatched to non-DOT State
10  of Alaska positions?
11  A. At this point, yes.
12  Q. In terms of these allegations that she
13  made of discrimination, both on the part of the
14  union and the State, regarding her dispatch status,
15  in your opinion, is there any evidence that the
16  State discriminated against her in any way in
17  requesting that she not be referred --
18  A. No.
19  Q. -- to DOT/PF positions?
20  A. No.
21  Q. And in fact, that's a fairly common
22  practice if somebody is terminated for cause; is
23  that right?
24  A. Correct.
25  Q. Is there any evidence, in your mind, that

Page 33

1   the State retaliated against Ms. Billingham by
2   requesting that she not be rehired for DOT/PF
3   positions?
4   A. No. It is well within the employer's
5   right to request certain individuals not be
6   referred, based on prior work record or even, you
7   know, how well they get along with the other people
8   in a crew.
9   Q. So even for something like that, just
10  failure to get along with people, it's well within
11  an employer's right to request --
12  A. Right. I mean, because a harmonious work
13  environment is part of our contract.
14      We've had members bring grievances to the
15  State based on the fact they felt harassed at work
16  or had felt that other people are basically being
17  intimidating to them, that type of thing. So the
18  State has the same right.
19  Q. So -- and you went into this before, but
20  this request that an individual not be referred is
21  not in violation of the collective bargaining
22  agreement, correct?
23  A. No. We actually prefer that they let us
24  know, that way we're not wasting their time, our
25  time, or the applicant's time.

Page 34

1   Q. And the State didn't act any differently
2   than -- or DOT/PF, Department of Transportation and
3   Public Facilities, didn't act any differently than
4   other employer entities that you deal with in
5   requesting that Ms. Billingham not be referred for
6   other positions, correct?
7   A. No, they did not.
8   Q. Let me see if I have anything else.
9       Let me ask you this. Do you have any
10  knowledge of the State requesting that
11  Ms. Billingham not be sent to any other employer
12  positions, whether through your union or any other
13  union? And I'm not sure my question was clear,
14  but...
15  A. Well, through any other union, based on
16  what I generally know as her qualifications, there
17  are no other unions that represent our positions
18  with the State.
19      As far as her affiliation with Local 341,
20  which is basically our sister union, only they deal
21  with contractors rather than with public facilities,
22  they have, you know, requested basically that, you
23  know, we send her card so that she can transfer
24  information, as far as her experience based on
25  hours, but as far as qualifications I haven't heard

Page 35

1   anything.
2   Q. And is it your understanding this sort of
3   general blacklisting complaint that Ms. Billingham
4   brought against the union and the State, that there
5   is anything more involved in it than just this
6   making her ineligible for rehire?
7   A. Well, other than that, I mean, any other
8   State facility that would be interviewing her does
9   have access to any prior work records. So of course
10  that will follow her.
11  Q. So it's not as if the State is purposely
12  going out and showing this to particular employers
13  on their own volition; is that right?
14  A. That would be correct.
15  Q. I think Jim's here.
16  A. Yeah, that's my boss.
17      MS. PAGE: And I don't have any additional
18  questions, so I think we're done.
19      THE WITNESS: Okay.
20      MS. PAGE: Unless you have any?
21      MR. DOUGHERTY: No, I don't. Thank you,
22  Tracy.
23      MS. PAGE: Off the record
24  (Proceedings concluded at 1:44 p.m.)
25  (Signature waived.)



**Ted Stevens Anchorage International Airport**

State of Alaska, Department of Transportation & Public Facilities
Airfield Maintenance
4100 Aircraft Drive
Anchorage, AK 99502

September 12, 2003

Public Employees Local 71
Attn.: Mr. Jim S. Ashton
Assistant Business Manager
2510 Arctic Blvd.
Anchorage, AK 99503

RE: J_____ F_____

This is an official request that you no longer dispatch Mr. J_____ P_____ for any future positions with the Ted Stevens Anchorage International Airport (TSAIA), Airfield Maintenance. Mr. P_____ was terminated from State employment January 16, 2003.

Mr. P_____ will not be considered for future employment within the airfield maintenance section; however, he would be considered for other positions, i.e., custodial at TSAIA.

Thank you.

*[signature]*

Daniel A. Hartman
Manager, Airfield Maintenance

cc: DOT/Personnel-HR: Charlotte Withers-Mushat

EXHIBIT 5
T. Newbill 9-26-07

0839
Exh. F, Att. 1
Page 1 of 1